2025-1689, 2025-1690, 2025-1692, 2025-1693

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

ASIA WHEEL CO., LTD., TRAILSTAR LLC, LIONSHEAD SPECIALTY TIRE & WHEEL, LLC, DEXTER DISTRIBUTION GROUP LLC, FKA TEXTRAIL, INC.

Plaintiffs-Appellants,

v.

UNITED STATES,

and

DEXSTAR WHEEL DIVISION OF AMERICANA DEVELOPMENT, INC.,

Defendants-Appellees.

Appeal from the United States Court of International Trade
in Consol. Case No. 1:23-CV-00096
Judge Gary S. Katzmann

**JOINT BRIEF OF PLAINTIFFS-APPELLANTS**

Jay C. Campbell
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600
Counsel to Plaintiff-Appellant Asia
Wheel Co., Ltd.

Nancy A. Noonan
ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000
Counsel to Plaintiff-Appellant Dexter
Distribution Group LLC, fka TexTrail Inc.

Jordan C. Kahn
GRUNFELD DESIDERIO LEBOWITZ
SILVERMAN & KLESTADT, LLP
1201 New York Ave., NW Ste. 650
Washington, DC 20005
(202) 783-6881
Counsel to Plaintiff-Appellant
TRAILSTAR LLC

R. Kevin Williams
Mark Ludwikowski
CLARK HILL PLC
130 E. Randolph Street, Suite 3900
Chicago, IL 60601
(312) 985-5900
Counsel to Plaintiff-Appellant Lionshead
Specialty Tire & Wheel, LLC

June 23, 2025

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1689 |
| **Short Case Caption** | Asia Wheel Co., Ltd. v. US |
| **Filing Party/Entity** | Asia Wheel Co., Ltd. v. US |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: <u>06/23/2025</u>

Signature: <u>/s/ Jay C. Campbell</u>

Name: <u>Jay C. Campbell</u>

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Asia Wheel Co., Ltd. | | Zhejiang Jingu Co., Ltd., a publicly traded company in China, indirectly owns 99.99% of Asia Wheel Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Walter J. Spak, White & Case LLP | Chunfu Yan, White & Case LLP | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**  2025-1690

**Short Case Caption**  Asia Wheel Co., Ltd. v. US

**Filing Party/Entity**  TRAILSTAR LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/23/2025

Signature:  /s/ Jordan C. Kahn

Name:  Jordan C. Kahn

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. <br><br> ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. <br><br> ☑ None/Not Applicable |
| TRAILSTAR LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Kavita Mohan | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1692 |
| **Short Case Caption** | Asia Wheel Co., Ltd. v. US |
| **Filing Party/Entity** | Lionshead Specialty Tire and Wheel LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/23/2025

Signature: /s/ Robert Kevin Williams

Name: Robert Kevin Williams

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Lionshead Specialty Tire and Wheel LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| Kelsey Christensen | Associate | Clark Hill PLC |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2025-1693

**Short Case Caption** Asia Wheel Co., Ltd. v US

**Filing Party/Entity** Dexter Distribution Group LLC F/K/A Textrail, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 06/23/2025

Signature:  /s/ Nancy A. Noonan

Name:  Nancy A. Noonan

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Dexter Distribution Group LLC F/K/A Textrail, Inc. | | Dexter Distribution Group LLC (formerly TexTrail, Inc.) is indirectly majority owned by Brookfield Corporation, a publicly-held company |
| | | and by Brookfield Business Partners, a publicly-held company. Brookfield Corporation and Brookfield Business Partners are |
| | | affiliated with Brookfield Infrastructure Partners, Brookfield Renewable partners, and Brookfield Reinsurance, all of which are publicly-held companies. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................... VI

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE ............................................................. 3

SUMMARY OF THE ARGUMENT .................................................... 17

ARGUMENT ..................................................................................... 19

    I.     STANDARD OF REVIEW .................................................... 19

    II.    ARGUMENT ......................................................................... 20

        A.    Commerce's Unreasonable Interpretation of the Scope of the *AD/CVD Orders*, Erroneously Upheld by the CIT, Is Unsupported by Substantial Evidence ........................................... 20

            1.    Commerce's interpretation of the scope based on the § 351.225(k)(1) primary interpretive sources is unsupported by substantial evidence ................................... 21

                a.    Commerce determined in the AD/CVD investigations that wheels made in third countries with rims _or_ discs from China (but not both) are outside the scope .......................................... 22

                b.    Commerce recharacterized its *Final Scope Decision Memo* from the AD/CVD investigations ........................ 25

                c.    Conclusion ....................................................... 29

            2.    The CIT incorrectly upheld Commerce's finding that Method A Wheels were within the scope of the *AD/CVD Orders* ................................................................. 30

B.    Because the Importers Did Not Receive Fair Warning of Retroactive AD/CVD Duties, Commerce Impermissibly Directed CBP To Continue To Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry ...........................................................................35

1.    The Importers did not receive fair warning that trailer wheels produced in third countries from Chinese "rims or discs" were subject to the *AD/CVD Orders* and could be assessed duties................................................................36

2.    The CIT erroneously concluded that Commerce provided fair warning..........................................................42

3.    Commerce unlawfully "continued" CBP's prior suspension of liquidation ....................................................45

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................51

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Bradford. Corp. v. United States*,
  342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) ....................................................20

*Am. Silicon Techs. v. United States*,
  334 F.3d 1033 (Fed Cir. 2003) ...........................................................................19

*Aspects Furniture Int'l Inc. v. United States*,
  607 F. Supp. 3d 1246 (Ct. Int'l Trade 2022) ....................................................48

*Bell Supply Co., LLC v. United States*,
  888 F.3d 1222 (Fed. Cir. 2018) ...................................................................25, 26

*Canadian Solar, Inc. v. United States*,
  918 F.3d 909 (Fed. Cir. 2019) ...........................................................43, 44, 46

*Chr. Bjelland Seafoods A/S v. United States*,
  19 C.I.T. 35 (1995) ...........................................................................................20

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)...........................................................................................19

*Diamond Tools Technology LLC v. United States*,
  545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) ..............................................49, 50

*Duferco Steel, Inc. v. United States*,
  296 F.3d 1087 (Fed. Cir. 2002) ...........................................................20, 21, 22

*DuPont Teijin Films USA v. United States*,
  407 F.3d 1211 (Fed. Cir. 2005) .........................................................................19

*JTEKT Corp. v. United States*,
  642 F.3d 1378 (Fed. Cir. 2011) .........................................................................19

*Meridian Prods., LLC v. United States*,
  851 F.3d 1375 (Fed. Cir. 2017) ...........................................................20, 21, 22

*Micron Tech. Inc. v. United States*,
  117 F.3d 1386 (Fed. Cir. 1997) .........................................................................19

*Mid Continent Nail Corp. v. United States*,
  725 F.3d 1295 (Fed. Cir. 2013) ..........................................21, 36, 37, 41

*Smith Corona Corp. v. United States*,
  915 F.2d 683 (Fed. Cir. 1990) ..............................................................22

*Sunpreme Inc. v. United States*,
  946 F.3d 1300 (Fed. Cir. 2020) .....................................................46, 49

*Tai-Ao Aluminum (Taishan) Co. v. United States*,
  391 F. Supp. 3d 1301 (Ct. Int'l Trade 2019) ....................................37

*Tai-Ao Aluminum (Taishan) Co. v. United States*,
  983 F.3d 487 (Fed. Cir. 2020) .......................................................passim

*Target Corp. v. United States*,
  609 F.3d 1352 (Fed. Cir. 2010) ......................................19, 30, 32, 33

*Trans Texas Tire LLC v. United States*,
  519 F. Supp. 3d 1275 (Ct. Int'l Trade 2021) ....................................37

*Trans Texas Tire LLC v. United States*,
  519 F. Supp. 3d 1378 (Ct. Int'l Trade 2021) ....................................37

*USX Corp. v. United States*,
  655 F. Supp. 487 (Ct. Int'l Trade 1987) ...........................................20

## STATUTES AND REGULATIONS

19 U.S.C. § 1517(a)(3)...........................................................................47

19 U.S.C. § 1517(b)(4)...........................................................................10

19 U.S.C. § 1517(b)(4)(A)................................................................45, 47

19 U.S.C. § 1517(c)(1)(A)......................................................................47

19 U.S.C. § 1517(e) ...............................................................................46

19 U.S.C. § 1671e(a)(2).........................................................................36

19 U.S.C. § 1673e(a)(2).........................................................................36

28 U.S.C. § 1295(a)(5)............................................................................1

28 U.S.C. § 1581(c) .........................................................................1

19 C.F.R. § 351.225 ........................................................................21

19 C.F.R. § 351.225(b), (c) ........................................................24, 41

19 C.F.R. § 351.225(k) ...................................................................21

19 C.F.R. § 351.225(k)(1) ...........................................................21, 22

19 C.F.R. § 351.225(l) .....................................................................45

## LEGISLATIVE MATERIALS

Enforce and Protect Act of 2015,
    Pub. L. 114-125, 130 Stat. 122, 155, Feb. 24, 2016 ...................................passim

## ADMINISTRATIVE DETERMINATIONS

*Aluminum Extrusions from the People's Republic of China*,
    81 Fed. Reg. 15039 (Dep't Commerce Mar. 21, 2016) ..........................38, 39, 40

CBP, Notice of Determination as to Evasion – EAPA Consolidated Case Number
    7459 (Aug. 7, 2023) ........................................................................15

*Certain Steel Trailer Wheels 12 to 16.5 Inches From the People's Republic of
China: Antidumping Duty and Countervailing Duty Orders*,
    84 Fed. Reg. 45952 (Sept. 3, 2019) ..............................................8, 9

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of
China*,
    83 Fed. Reg. 45095 (Dept. Commerce Sept. 5, 2018) ("*AD Initiation*") .........3, 4

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of
China*,
    83 Fed. Reg. 45100 (Dep't Commerce Sept. 5, 2018) ("*CVD Initiation*").......3, 4

*Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of
China*,
    84 Fed. Reg. 16643 (Dep't Commerce Apr. 22, 2019) ..............................5, 6, 23

*Regulations to Improve Administration and Enforcement of Antidumping and
Countervailing Duty Laws*,
    86 Fed. Reg. 52300 (Dep't Commerce Sept. 20, 2021) ......................................21

v

**STATEMENT OF RELATED CASES**

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants Asia Wheel Co., Ltd. ("Asia Wheel"), Dexter Distribution Group LLC, fka TexTrail Inc. ("TexTrail"), TRAILSTAR LLC ("TRAILSTAR"), and Lionshead Specialty Tire & Wheel, LLC ("Lionshead") make the following statement:

1.     No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.     The following actions pending before the Court of International Trade ("CIT") and before this Court may be directly affected by this Court's disposition of this appeal:

- *Asia Wheel Co., Ltd. v. United States* (Fed. Cir. Case No. 25-1694) (companion case); and

- *Dexter Distribution Group LLC fka TexTrail, Inc. v. United States* (CIT Consol. Case No. 24-00019) (stayed pending outcome of this appeal).

# JURISDICTIONAL STATEMENT

The consolidated actions filed by Plaintiffs-Appellants Asia Wheel, TexTrail, TRAILSTAR, and Lionshead before the CIT, *Asia Wheel Co., Ltd. v. United States*, Consol. Ct. No. 23-00096, which resulted in this appeal, contested the Department of Commerce's ("Commerce" or the "Department") final scope ruling that certain trailer wheels produced by Asia Wheel in Thailand fall within the scope of the antidumping duty ("AD") and countervailing duty ("CVD") orders on certain steel trailer wheels 12 to 16.5 inches in diameter ("trailer wheels") from the People's Republic of China ("China" or "PRC") ("*Final Scope Ruling*"). Appx18-89. The CIT had exclusive jurisdiction over the Plaintiffs-Appellants' Complaints under 28 U.S.C. § 1581(c).

On February 21, 2025, the CIT affirmed Commerce's *Final Scope Ruling*, and Plaintiffs-Appellants timely filed their Notices of Appeal on April 21, 2025.

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

**Issue 1:**  Was Commerce's *Final Scope Ruling* that trailer wheels produced in Thailand from Thai-origin rims and Chinese-origin discs fall within the scope of the AD and CVD orders on trailer wheels from China unsupported by substantial evidence?

**Issue 2:**  Did Commerce fail to provide fair warning to the importers of trailer wheels produced in Thailand (using Thai-origin rims and Chinese-origin discs) of AD/CVD applicability, such that Commerce impermissibly directed U.S. Customs and Border Protection ("CBP" or "Customs") to continue to suspend liquidation of imports of the merchandise at issue entered before the date of initiation of the scope inquiry?

**STATEMENT OF THE CASE**

**1. *Commerce's AD/CVD Investigations and Scope Determination***

Commerce initiated AD and CVD investigations of trailer wheels from China on August 28, 2018, based on petitions filed by Dexstar Wheel Division of Americana Development, Inc. ("Dexstar" or "Petitioner"). *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China*, 83 Fed. Reg. 45095 (Dept. Commerce Sept. 5, 2018) ("*AD Initiation*"); *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China*, 83 Fed. Reg. 45100 (Dep't Commerce Sept. 5, 2018) ("*CVD Initiation*").

A trailer wheel consists of two main components: a rim and a disc. "The rim comprises the perimeter of the wheel and supports the tire when it is attached to the disc, while the disc serves as the center portion of the wheel within the rim." Appx1078. The rim and disc are both essential components of a finished trailer wheel. *See* Appx1074-1075; Appx46. The image below depicts the disc, rim, and complete trailer wheel (before the painting/coating process):



Appx165. The scope of the AD/CVD investigations included steel wheels, rims, and discs imported from China. *See* Appx130.

At the time that Commerce initiated the AD and CVD investigations, the proposed scope of the investigations did not include language covering trailer wheels, rims, or discs from China that undergo further processing in a third country. *AD Initiation*, 83 Fed. Reg. at 45100; *CVD Initiation*, 83 Fed. Reg. at 45104; Appx130-131. Subsequently, in March 2019, Dexstar proposed amending the scope to include the following language addressing "third-country-processing":

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the welding and painting of ***rims and discs*** to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the People's Republic of China.

Appx134 (emphasis added).

In response, mandatory respondent Zhejiang Jingu Company Limited ("Zhejiang Jingu"), an affiliate of Asia Wheel, argued that Chinese-origin rims and discs that are welded and painted in third countries should be considered outside the scope. *See id.* In the alternative, Zhejiang Jingu argued that Dexstar's proposed language should be amended "to require that the rim and disc ***both*** be of Chinese origin." *Id.* (emphasis added). Likewise, importer Tredit Tire & Wheel Co., Inc. ("Tredit") argued that:

{T}he limitation to rims and discs produced in China should be made explicit, rather than stated ambiguously as in the petitioner's current proposed language, to make clear the petitioner's intent that the scope covers . . . ***rims and discs produced in China*** that are welded and painted in a third country.

Appx135 (emphasis added).

In the preliminary scope determination, Commerce "agree{d} with Zhejiang Jingu and Tredit that the proposed scope amendment should include further clarifying language."  Appx137.  Based on its understanding that Dexstar was "requesting that rims and discs ***from China*** that have been further processed in a third country into finished steel wheels be included within scope{,}" Commerce "clarified the petitioner's proposed scope language to reflect the petitioner's intention."  Appx137-138 (emphasis added).  Specifically, Commerce added the "from China" requirement, as follows:

The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of ***rims and discs from China*** to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China.

Appx135, Appx140 (emphasis added).  This amended scope language was included in the preliminary AD determination issued by Commerce in April 2019.  *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China*, 84 Fed. Reg. 16643, 16646 (Dep't Commerce Apr. 22, 2019) (prelim. AD determ.) ("*Preliminary AD Determination*").

Commenting on Commerce's preliminary scope determination in case briefs, two U.S. importers, Trans Texas Tire, LLC ("Trans Texas") and HiSpec Wheel & Tire, Inc. ("HiSpec"), asserted that:

> The plain meaning and the intent of {the third-country-processing} language is to include only steel wheels assembled in a third country when both the rims <u>and</u> discs originate from China; in contrast, steel wheels assembled in a third country when either the rims <u>or</u> discs do not originate from China would <u>not</u> be within scope (*i.e.*, the Chinese rim or disc would no longer be considered scope merchandise).

Appx153, Appx157 (emphases in original). Further, Trans Texas and HiSpec cautioned that "the plain meaning of this scope and the scope's clear intent . . . potentially may be undermined by the phrase 'including but not limited to' in the *Preliminary AD Determination* scope." Appx154, Appx 158.

To address this concern, both importers asked Commerce to confirm in the final determination "that wheels comprised of <u>rims or discs</u> from China that are assembled in a third country with <u>rims or discs</u> from third countries are not within scope." *Id.* (emphases in original). They reasoned that "{c}larifying the scope language to make this clear – ideally written into the scope itself, beyond clarification in the Issues and Decision Memorandum – would inform the importing community as well as CBP, to avoid any confusion upon entry." *Id.* Zhejiang Jingu "agree{d} with {Trans Texas} and Hi-Spec that the amended scope language only covers third country processing if both the 'rims **and** discs' are from China." Appx147 (emphasis in original).

In response, Commerce concluded in its final scope determination issued in the AD/CVD investigations on July 1, 2019 ("*Final Scope Decision Memo*"), that such clarifying language was unnecessary because "the existing language sufficiently conveys the concept that third-country processing of a steel wheel ***must be of rims and discs produced in China***" for the imported merchandise to be within scope. Appx122-23 (emphasis added). In its conclusion, Commerce reiterated:

> Furthermore, as we find that the existing language sufficiently conveys the concept that third-country processing of a steel wheel ***must be of rims and discs produced in China*** and agree, generally, with the respondent/importer's understanding of this language, we do not find it necessary to adopt further clarification language proposed in the respondent/importer's affirmative scope comments.

Appx124 (emphasis added).

At the same time, Commerce rejected Dexstar's argument that the scope should be modified further to include trailer wheels assembled in a third country from rims "***or***" discs from China:

> The Petitioner now contends . . . that either a rim ***or*** a disc from China would be covered by these investigations, not only a rim and a disc together. However, no such intent is obvious on the record. Indeed, the entirety of the petitioner's initial request for the relevant clarification plainly discussed the processing involved in assembly and/or coating/painting/galvanizing of the finished wheel from all necessary constituent parts (*i.e.*, both the rim and disc). Thus, Commerce understood this clarification to address exactly the circumstance that was explicitly presented, the assembly (and surface finishing) of steel wheels in a third country from all constituent parts produced in China, and no such consideration of individual constituent parts was implicit in the clarification but, rather, was presented for the first time in the rebuttal stage of this proceeding where the petitioner

argues for a modification of the scope that uses the word "or" instead of "and." . . .

{W}e find that the use of the limit phrase ("or"), is intentionally and selectively expansionary and not consistent with the plain meaning of the word "and." This finding is consistent with the reasonable interpretation of the existing language as it was seemingly understood by all parties, including Commerce, to this point. As noted, Commerce does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern. We find, at this time, that the current scope language is clear that only if all constituent rim and disc parts to form a steel wheel are from China does the order apply notwithstanding any analysis of substantial transformation. Therefore, we will not adopt the petitioner's suggested language. Furthermore, as we find that ***the existing language sufficiently conveys the concept that third-country processing of a steel wheel <u>must</u> be of rims and discs produced in China*** and agree, generally, with the respondent/importer's understanding of this language, we do not find it necessary to adopt the further clarification language proposed in the respondent/importer's affirmative scope comments.

Appx123-124 (emphasis added).

Commerce issued the antidumping and countervailing duty orders ("*AD/CVD Orders*") on September 3, 2019. The orders adopted the *Final Scope Decision Memo* scope language and set a combined AD/CVD cash deposit rate for all entries of trailer wheels from China in excess of 400%. 84 Fed. Reg. at 45953-54.

## 2. *EAPA Investigation*

On March 19, 2020, Dexstar filed an allegation with CBP pursuant to the Enforce and Protect Act of 2015, Pub. L. 114-125, 130 Stat. 122, 155, Feb. 24, 2016 ("EAPA"), alleging that certain importers – namely, TexTrail, TRAILSTAR, and

Lionshead (collectively, "Importers") – evaded the *AD/CVD Orders* by importing trailer wheels that "were reportedly from the Chinese wheel producer, Jingu . . . and ***transshipped through Asia Wheel*** . . . , Jingu's affiliate in Thailand." Appx214-215 (emphasis added). In response, CBP initiated EAPA Case No. 7549 on April 9, 2020. *See* Appx220. Dexstar did not allege that the Importers evaded the *AD/CVD Orders* by importing wheels produced in Thailand with only one Chinese-origin wheel component (a rim or disc); nor did CBP initiate its EAPA investigation on that basis. *See* Appx213-221.

As "interim measures," CBP suspended liquidation of the Importers' imports of trailer wheels from Asia Wheel with entry dates from April 9, 2020, and extended the liquidation period for each unliquidated entry that entered before that date, ***retroactively subjecting their imports to AD and CVD liability in excess of 400%*** of the value of the imported merchandise. Appx220; *AD/CVD Orders*, 84 Fed. Reg. at 45953.

The Importers and Asia Wheel first received notice of the EAPA investigation in July 2020, and each fully cooperated with CBP. Appx213-218; Appx232-240. In doing so, the Importers also emphasized their reliance on Commerce's *Final Scope Decision Memo* from the AD/CVD investigations and their vetting of Asia Wheel's production to ensure compliance, including that:

- Before placing any purchase orders, TexTrail had one of its engineers conduct an onsite inspection of Asia Wheel in April 2019, and commissioned an

industry expert to do so in December 2019. *See* Appx571-579. These inspections were well-documented with photographs and findings from the expert confirming production in Thailand. *See* Appx578-579, Appx616-645.

- Lionshead, likewise, had its owner and an employee conduct and document a site inspection of Asia Wheel in May 2019. *See* Appx578-579, Appx646-650.

After reviewing information concerning Asia Wheel's production operations in Thailand, CBP issued a "covered merchandise referral" to Commerce under 19 U.S.C. § 1517(b)(4) on December 17, 2020. CBP did so because it was unable to determine whether the trailer wheels at issue in the EAPA investigation – "steel trailer wheels produced in Thailand from inputs sourced from China (*i.e.,* either the rim or disc component is sourced from China and the corresponding rim or disc component is produced in Thailand, which may or may not involve using inputs sourced from China)" – were "covered merchandise" (*i.e.*, subject to the *AD/CVD Orders*). Appx514-520; Appx511-512.

### 3. *Commerce's Scope Inquiry*

Before CBP issued its covered merchandise referral, Asia Wheel had requested on November 10, 2020, that Commerce issue a scope ruling to confirm that certain trailer wheels Asia Wheel produced in Thailand were not covered by the scope of the *AD/CVD Orders*. *See* Appx102. In particular, Asia Wheel asked Commerce to confirm that trailer wheels Asia Wheel produced in Thailand using either of the two following production methods are not covered by the scope of the *AD/CVD Orders*.

- **Production Method A:** Asia Wheel produces rims in Thailand from rectangular steel plates sourced from China or a third country; welds the Thailand-produced rims to discs sourced from China to assemble trailer wheels; and paints the wheels per the customer's specification ("Method A Wheels"). To convert the steel plate into a rim, Asia Wheel:

  o Coils the rectangular steel plate to form a circle;

  o Welds the open butts of the steel ring into a closed steel ring;

  o Polishes the welded steel ring to remove slag from the surface and expands the outer sides of the polished steel ring for precise positioning during the subsequent rolling phase;

  o Rolls the steel rings in three stages, gradually forming the surface of the steel ring into the precise shape of the rim;

  o Adjusts the unfinished rim to the precise shape required for insertion of the disc; and

  o Punches a valve hole in the surface of the rim.

  o Each step uses specific machinery. *See* Appx162-163.

The images below show the input rectangular steel plate compared to the output rim (*see* Appx164):



**Materials Imported into Thailand:**
**Rectangular Steel Plate**                    (Rim)

- **Production Method B:** Asia Wheel produces rims in Thailand from rectangular steel plates sourced from China or a third country. Asia Wheel also produces discs in Thailand from circular steel plates sourced from China. Asia Wheel then welds the Thailand-produced rims and Thailand-produced discs to assemble trailer wheels, and paints the wheels per the customer's specification ("Method B Wheels"). *See* Appx168-170.

Neither of the production methods uses ***both*** rims ***and*** discs from China.

Asia Wheel did not request a scope ruling from Commerce because it thought any of these trailer wheels were potentially covered by the scope of the *AD/CVD Orders*. Rather, Asia Wheel requested a scope ruling because it needed Commerce to confirm that the products were outside the scope for CBP, since CBP had initiated EAPA Case. No. 7459 concerning the same wheels imported from Thailand.

Commerce initiated a scope inquiry in response to Asia Wheel's request on March 22, 2021.  *See* Appx531-532.  During the inquiry, Commerce issued supplemental questionnaires, and Asia Wheel responded.  Commerce also announced in its notice of covered merchandise referral that it would "address the covered merchandise referral . . . in the ongoing scope segments of the AD and CVD proceedings{,}" and, "{b}ased on {its} determinations in the ongoing scope segments of the AD and CVD proceedings, {would} notify CBP as to whether the merchandise subject to the referral is covered merchandise within the meaning of section 517(a)(3) of the Act."  Appx512.

Commerce issued the preliminary scope ruling on August 25, 2022.  Appx1896.  Therein, Commerce preliminarily found that Method A Wheels are within the scope of the *AD/CVD Orders*, but that Method B Wheels are outside the scope of the *AD/CVD Orders*.  Appx1919.  Commerce denied that it had determined in the *Final Scope Decision Memo* from the original AD/CVD investigations that only trailer wheels produced in a third country with **_both_** rims **_and_** discs from China are covered by the scope of the *AD/CVD Orders*.  Appx1908.

On October 5, 2022, Asia Wheel filed a case brief in the scope proceeding.  Appx2022.  In relevant part, Asia Wheel **_first_** argued that the scope of the *AD/CVD Orders*, as interpreted by Commerce during the original AD/CVD investigations in the *Final Scope Decision Memo*, does not include trailer wheels made in a third

country using rims *or* discs from China (but not both). Appx2034-2038. ***Second***, Asia Wheel argued that, in the event of an affirmative final scope ruling, Commerce should direct CBP to commence suspension of liquidation no earlier than the date of the preliminary scope ruling (August 25, 2022), and discontinue any prior suspension imposed by CBP, because importers lacked adequate notice that Method A Wheels were covered by the scope of the *AD/CVD Orders* until that date. Appx2058-2063.

The Importers also submitted a case brief making the same or similar arguments. Appx1983. Asia Wheel and the Importers presented their arguments to Commerce at a February 2023 hearing. Appx2158-2183.

On April 11, 2023, more than two years after it had initiated the scope inquiry and after having given itself ***fourteen*** extensions of the deadline, Appx2219, Commerce issued the *Final Scope Ruling*. Commerce continued to find that Method A Wheels are subject to the scope of the *AD/CVD Orders*, and that Method B Wheels are outside the scope of the *AD/CVD Orders*.[1]  *See* Appx71.

Commerce found that "the plain language of the scope is ambiguous" as to whether Method A Wheels – where only one of the two components (the discs) was

---

[1] Commerce also found that Method C Wheels, a third production method used by Asia Wheel, are within the scope of the *AD/CVD Orders*. Appx1919. Plaintiffs-Appellants do not challenge this aspect of the *Final Scope Ruling* in the instant appeal before this Court.

from China – are subject to the scope of the *AD/CVD Orders*. Appx31. Commerce further stated that it "intend{ed} to instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the *Orders* if already suspended, and if liquidation of entries of such products is not already suspended, {it} intend{ed} to instruct CBP to suspend liquidation of entries of products found to be covered by the scope of the *Orders* effective to the date we initiated upon Asia Wheel's scope request" (*i.e.*, March 21, 2021). Appx57.

**4. *CBP's EAPA Determination***

In August 2023, after Commerce issued the *Final Scope Ruling*, CBP issued an affirmative duty evasion determination, for which the Importers requested administrative review per 19 C.F.R. § 165.41. *See* CBP, Notice of Determination as to Evasion – EAPA Consolidated Case Number 7459 (Aug. 7, 2023). Based upon its administrative review, CBP affirmed the agency's affirmative evasion determination on December 15, 2023. *See* CBP, H334521, EAPA Consolidated Case Number 7459 (Dec. 15, 2023). In January 2024, the Importers appealed CBP's affirmative evasion determination to the CIT, and, on May 15, 2024, the CIT granted a stay of that appeal (CIT Court No. 24-00019) pending final resolution of the present action addressing Commerce's *Final Scope Ruling*.

**5. *CIT Appeal and Decision***

Asia Wheel, TRAILSTAR, Lionshead, and TexTrail all appealed the *Final Scope Ruling* to the CIT in May 2023. The CIT consolidated all four appeals and, in February 2025, affirmed Commerce's *Final Scope Ruling*. Appx1-17. This appeal followed.

**SUMMARY OF THE ARGUMENT**

**Issue 1: Commerce's Determination that Method A Wheels Produced in Thailand Are Covered by the *AD/CVD Orders* on Trailer Wheels from China Is Unsupported by Substantial Evidence.**

Commerce's determination that trailer wheels produced in Thailand from Thai-origin rims and Chinese-origin discs fall within the scope of the *AD/CVD Orders* on trailer wheels from China is unsupported by substantial evidence. In its *Final Scope Decision Memo* in the original investigations, Commerce was clear: only wheels produced in third countries from Chinese-origin rims **and** discs are subject to the scope of the *AD/CVD Orders*. In later backtracking and concluding that Asia Wheel's Method A Wheels – which are produced in Thailand using Thai-origin rims and Chinese-origin discs – fall within the scope of the *AD/CVD Orders*, Commerce disregarded and recharacterized its reasoning and conclusion from the *Final Scope Decision Memo*. Consequently, Commerce's *Final Scope Ruling* is unsupported by substantial evidence. Similarly, in affirming the *Final Scope Ruling*, the CIT misread Commerce's *Final Scope Decision Memo* from the original investigations, relying on isolated statements out of context. Consequently, the CIT's decision should not be affirmed.

**Issue 2: Commerce Impermissibly Directed CBP To Impose AD/CVD to Method A Wheels Retroactively Without Fair Warning in Violation of Due Process.**

Commerce failed to provide fair warning to importers that Method A Wheels produced in Thailand using only one Chinese-origin component (discs) were covered by the *AD/CVD Orders* on trailer wheels from China. Commerce may not lawfully suspend liquidation retroactively and collect AD/CVD cash deposits for entries that entered prior to the initiation of a scope inquiry without having previously provided "adequate notice" of AD/CVD liability. In the original investigations, Commerce agreed with Zhejiang Jingu and Importers that trailer wheels produced in third countries fall within scope *only if* both the rims *and* discs originate from China. Consequently, Commerce failed to provide fair warning to importers that trailer wheels produced in third countries from rims *or* discs from China (but not both) are covered the *AD/CVD Orders*. Commerce's authority to determine whether *and when* a product is within the scope of an order is necessarily subject to the due-process requirement of providing fair warning before AD/CVD applicability. Because Commerce failed to provide adequate notice to importers that Method A Wheels are covered, Commerce impermissibly directed CBP to continue to suspend liquidation of imports entered before the date of initiation of the scope inquiry.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). It does so "without affording any deference to the Court of International Trade . . . ." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation marks omitted). The Court "shall hold unlawful" a Commerce final scope determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether Commerce's conclusions are based on substantial evidence, the Court must consider "the record as a whole, including {evidence} which fairly detracts from {the} weight" of Commerce's conclusions. *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted). A determination based on inadequate reasoning cannot survive the "substantial evidence" standard of review.

*See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)).

As concerns judicial review of Commerce's scope rulings, "the question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that {the court} review{s} de novo." *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing *Allegheny Bradford. Corp. v. United States*, 342 F. Supp. 2d 1172, 1183 (Ct. Int'l Trade 2004)). The separate "question of whether a product meets the . . . scope terms presents a question of fact reviewed for substantial evidence." *Meridian Prods.*, 851 F.3d at 1382.

## II. ARGUMENT

### A. Commerce's Unreasonable Interpretation of the Scope of the *AD/CVD Orders*, Erroneously Upheld by the CIT, Is Unsupported by Substantial Evidence

"Scope orders may be interpreted as including {specific} merchandise only if they contain language that specifically includes {that} merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002). Commerce confirmed in the original investigations that the scope of the *AD/CVD Orders* requires that ***both*** the rims ***and*** the discs must originate from China for a wheel assembled in a third country to fall within the scope. Despite this, Commerce unreasonably backtracked in the *Final Scope Ruling*,

claiming that wheels manufactured in third countries with either rims or discs that originated in China are within the scope of the *AD/CVD Orders*. Commerce's interpretation of the scope language in the *Final Scope Ruling* is unsupported by substantial evidence. Likewise, the CIT's affirmance of that interpretation is based on a misreading of Commerce's *Final Scope Decision Memo* from the original investigations and should be vacated or reversed.

**1.** **Commerce's interpretation of the scope based on the § 351.225(k)(1) primary interpretive sources is unsupported by substantial evidence**

Commerce determines whether a product is covered by the scope of an order in accordance with 19 C.F.R. § 351.225(k).[2] The starting point for Commerce's analysis is the scope language itself. *See Meridian*, 851 F.3d at 1381; *see also Duferco*, 296 F.3d at 1097. If "the language is ambiguous, Commerce must . . . consider . . . the so-called '(k)(1) materials': '{t}he descriptions of the merchandise contained in the petition, Commerce's initial investigation, and the prior determinations of Commerce (including prior scope determinations) and the International Trade Commission.'" *Mid Continent Nail Corp. v. United States*, 725

---

[2] Commerce amended 19 C.F.R. § 351.225, effective November 4, 2021. Appx19 n.4 (citing *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300 (Dep't Commerce Sept. 20, 2021)). As Commerce explained, however, "because Asia Wheel filed its scope ruling request on November 11, 2020," the pre-amendment version of 19 C.F.R. § 351.225 applies to Commerce's *Final Scope Ruling* and is discussed throughout this brief. *Id.*

F.3d 1295, 1302 (Fed. Cir. 2013) (citations, internal quotation marks and brackets omitted); 19 C.F.R. § 351.225(k)(1); *see also Meridian*, 851 F.3d at 1382; *Duferco*, 296 F.3d at 1097; *Smith Corona Corp. v. United States*, 915 F.2d 683, 685 (Fed. Cir. 1990). "Commerce's analysis of these sources against the product in question produces factual findings reviewed for substantial evidence." *Meridian*, 851 F.3d at 1382. Here, contrary to an unequivocal record, Commerce unreasonably denied having confirmed in its *Final Scope Decision Memo* from the original investigations that wheels manufactured in third countries with only one wheel component (rims or discs) originating in China are outside the scope.

a. **Commerce determined in the AD/CVD investigations that wheels made in third countries with rims _or_ discs from China (but not both) are outside the scope**

Commerce's scope determination in the original investigations – consideration of which is required under 19 C.F.R. § 351.225(k)(1) – demonstrates that both the rims and discs must originate in China for steel wheels assembled in third countries to fall within the scope of the *AD/CVD Orders*.

In its preliminary scope determination from the AD/CVD investigations, Commerce amended Petitioner's proposed third-country-processing provision to clarify "that rims and discs ***from China*** that have been further processed in a third country into finished steel wheels be included within scope" – adding the "from China" requirement. Appx137-138 (emphasis added). Commerce specifically did

so in response to comments from Zhejiang Jingu and importer Tredit, both of which had argued that Dexstar's proposed third-country-processing provision should be amended "to require that the rim and disc both be of Chinese origin." Appx134-135.

Two other importers, Trans Texas and HiSpec, subsequently argued in their case briefs that Commerce's amendment to the third-country-processing provision did not go far enough. In their view, although "{t}he plain meaning and the intent of {the third-country-processing} language is to include only steel wheels assembled in a third country when both the rims <u>and</u> discs originate from China{,}" the "plain meaning of this scope . . . potentially may be undermined by the phrase 'including but not limited to' in the *Preliminary AD Determination* scope." Appx153-154, Appx157-158 (emphasis in original). Accordingly, both importers asked Commerce to confirm in the final determination – "ideally written into the scope itself" – "that wheels comprised of <u>rims or discs</u> from China that are assembled in a third country with <u>rims or discs</u> from third countries are not within scope." Appx154, Appx158 (emphases in original). Zhejiang Jingu "agree{d} with {Trans Texas} and Hi-Spec that the amended scope language only covers third country processing if both the 'rims <u>**and**</u> discs' are from China." Appx147 (emphasis in original).

Commerce's response in the *Final Scope Decision Memo* was unequivocal. Commerce declined to amend the scope language further because "the existing language sufficiently conveys the concept that third-country processing of a steel

wheel ***must be of rims and discs produced in China***" for the imported wheel to be within scope.  Appx122-123 (emphasis added).  Commerce reiterated this position at the conclusion of its analysis:

> Furthermore, as we find that the existing language sufficiently conveys the concept that third-country processing of a steel wheel ***must be of rims and discs produced in China*** and agree, generally, with the respondent/importer's understanding of this language, we do not find it necessary to adopt further clarification language proposed in the respondent/importer's affirmative scope comments.

Appx124 (emphasis added).  If it were unnecessary for both the rims ***and*** discs of third-country origin trailer wheels to originate from China, Commerce would not have used the word "must" – but it did.  The final scope language adopted by Commerce thus requires that both the rims and the discs "must" originate from China for third-country-assembled wheels to be within scope.

Although Commerce afforded itself some leeway to revisit the issue of third-country processing using a substantial transformation analysis (*i.e.*, "Commerce does not foreclose a further analysis of substantial transformation . . . "), this unremarkable comment did not detract from its conclusion that third-country wheels produced from rims ***or*** discs from China (but not both) components are outside the scope of the *AD/CVD Orders*.  *See* Appx9.  Commerce ***always*** has authority to conduct a scope ruling and perform a substantial transformation analysis to address a particular fact pattern.  19 C.F.R. § 351.225(b), (c) (providing that Commerce may self-initiate a scope inquiry or initiate a scope inquiry based on an application by an

interested party); *cf. Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1230 (Fed. Cir. 2018) ("Commerce is entitled to use the substantial transformation analysis to determine whether an imported article is covered by AD or CVD orders in the first instance."). Commerce added nothing to its interpretation of the scope by recognizing its inherent authority. Commerce's superfluous reference to its ability to conduct a substantial transformation analysis as part of a scope inquiry do not affect its unequivocal finding in the *Final Scope Decision Memo* from the original AD/CVD investigations "that the current scope language is clear that ***only if*** all constituent rim and disc parts to form a steel wheel ***are from China*** does the order apply notwithstanding any analysis of substantial transformation." Appx124 (emphases added).

For these reasons, Commerce's scope determination in the AD/CVD investigations leads to the unavoidable conclusion that the agency interpreted the third-country-processing provision to mean that trailer wheels manufactured in a third country with rims *or* discs from China – but not both – are outside the scope of the *AD/CVD Orders*. Any conclusion otherwise is unsupported by substantial evidence.

### b. Commerce recharacterized its *Final Scope Decision Memo* from the AD/CVD investigations

Despite its interpretation of the third-country-processing provision in the original AD/CVD investigations and continued use of the phrase "rims **and** discs

from China" (which unambiguously does not mean "rims *or* discs from China") in the scope description, Commerce concluded in the *Final Scope Ruling* that the scope of the *AD/CVD Orders* is "ambiguous" as to coverage of finished wheels manufactured in a third country using rims or discs (but not both) from China. *See* Appx31. In doing so, Commerce offered three flawed justifications for its newfound position – none of which is supported by substantial evidence.

First, Commerce claimed to have rejected the interpretation advanced by importers Trans Texas and HiSpec that the third-country-processing provision includes only wheels made in third countries from rims **and** discs from China. *See id.* ("we declined to clarify the scope language as requested by the respondent and certain importers"); Appx32 ("we were rejecting *all* parties' attempts to clarify this question {(*i.e.*, rims **or** discs from China)} *generally*") (emphasis added). Commerce's claim, however, is impossible to reconcile with its handling of the third-country-processing provision during the original AD/CVD investigations, as recounted above in **Section II.A.1.a**.

In particular, importers Trans Texas and HiSpec specifically asked Commerce to confirm "that wheels comprised of <u>rims or discs</u> from China that are assembled in a third country with <u>rims or discs</u> from third countries are not within scope{,}" and recommended that Commerce amend the scope language to make this even clearer, if necessary. Appx154, Appx158 (emphases in original). Commerce agreed with

Trans Texas's and HiSpec's understanding of the third-country-processing provision, and concluded it was unnecessary to "adopt further clarification language" because "the existing language sufficiently conveys the concept that third-country processing of a steel wheel ***must** be of rims **and** discs produced in China* . . . ." Appx124 (emphasis added). In other words, Commerce declined to amend the scope further because it agreed that steel wheels assembled in third countries fall within scope *only if* both the rims *and* discs originate from China. Commerce's contrary claim in the *Final Scope Ruling* is unreasonable and, thus, unsupported by substantial evidence.

Second, Commerce asserted that the "including, but not limited to" language of the third-country-processing provision means that wheels made in third countries from rims or discs from China were not necessarily excluded from the scope. Appx32 (citing Appx140) ("The 'including, but not limited to' clause indicates that the 'painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing . . . ."). While the "including, but not limited to" phrase indicates the scope *may* include scenarios of third-country processing of Chinese-origin rims, discs, and wheels beyond those provided as examples in the scope language, Commerce specifically addressed the question of wheels made in third countries from rims *or* discs from China in the *Final Scope Decision Memo*.

In fact, Trans Texas and HiSpec warned in their case briefs submitted in the AD/CVD investigations that, absent clarification from Commerce, the "including, but not limited to" phrase could potentially undermine the plain meaning of the third-country-processing provision – that "steel wheels assembled in a third country when either the rims or discs do not originate from China" are outside the scope. Appx154, Appx158. Commerce responded that another amendment to the third-country-processing provision was unnecessary because "the existing language sufficiently conveys the concept that third-country processing of a steel wheel ***must be of rims and discs produced in China***" for the imported wheels to be within scope. Appx124 (emphasis added). In light of its *Final Scope Decision Memo* from the original AD/CVD investigations, Commerce's contrary conclusion in the *Final Scope Ruling* that the "including, but not limited to" phrase could be interpreted to cover steel wheels assembled in third countries with rims *or* discs from China is unreasonable and unsupported by substantial evidence.

Third, Commerce contended that it deferred the question of whether the scope covers wheels made in third countries from rims *or* discs (but not both) from China in the underlying AD/CVD investigations for resolution in a future scope or circumvention inquiry. *See* Appx31-32. According to the *Final Scope Ruling*, in the original AD/CVD investigations:

> {Commerce} anticipated additional analysis where one component was sourced in a third country, stating "Commerce does not foreclose a

further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern."

Appx31 (citing Appx124). Commerce, however, relied on this sentence in isolation. Whatever Commerce meant by "a mix of rim and disc ***parts*** from China and a third country," it did ***not*** mean that wheels made in third countries from rims ***or*** discs from China (but not both) could potentially be covered by the scope, because Commerce expressly addressed this scenario during the investigations. Commerce confirmed this in the last sentence of the same paragraph in the *Final Scope Decision Memo*, stating:

> {A}s we find that the existing language sufficiently conveys the concept that third-country processing of a steel wheel ***<u>must</u>*** be of ***rims <u>and</u> discs produced in China*** and agree, generally, with the respondent/importer's understanding of this language, we do not find it necessary to adopt the further clarification language proposed in the respondent/importer's affirmative scope comments.

Appx124 (emphasis added). Once again, Commerce's recharacterization of its scope analysis from the original AD/CVD investigations is unreasonable and unsupported by substantial evidence.

### c. Conclusion

To produce Method A Wheels, Asia Wheel manufactures rims in Thailand from rectangular steel plates, welds the Thai-origin rims to Chinese-origin discs, and coats the assembled wheel. *See* Appx107-108, Appx162-165. Asia Wheel manufactures Method A Wheels in Thailand using Thai-origin rims and Chinese-

29

origin discs – not "rims and discs from China."  Consequently, consistent with Commerce's interpretation of the third-country-processing provision in the *Final Scope Decision Memo* from the original AD/CVD investigations, Asia Wheel's Method A Wheels are outside the scope of the *AD/CVD Orders*.  Commerce's conclusion in the *Final Scope Ruling* that the scope is ambiguous on this point is unsupported by substantial evidence.

> **2.  The CIT incorrectly upheld Commerce's finding that Method A Wheels were within the scope of the *AD/CVD Orders***

In affirming Commerce's *Final Scope Ruling*, the CIT made various incorrect conclusions, based on isolated instances in which it misread Commerce's *Final Scope Decision Memo* from the original investigations.  The CIT's conclusions should not be affirmed.  Commerce interpreted the third-country-processing provision to exclude "rims or discs from China" wheels in the original AD/CVD investigations, and continued to use the phrase "rims and discs from China"  (which unambiguously does not mean "rims or discs from China") in the scope description. In addition, the substantial evidence standard of review requires the court to consider "the record as a whole, including {evidence} which fairly detracts from {the} weight" of Commerce's conclusions.  *Target*, 609 F.3d at 1358 (internal quotation marks and citation omitted).  Here, the CIT selectively relied on isolated statements

in the *Final Scope Decision Memo* out of context, thereby rendering its judgment – like Commerce's below – unsustainable.

First, the CIT ignored relevant context to conclude that, in the original investigations, Commerce indicated that third-country wheels produced from mixed origin components could fall within the scope of the *AD/CVD Orders*. For example, the CIT concluded that, by refusing to accept both the Importers' and Petitioner's proposed revisions to the third-country processing provision during the original investigations, "Commerce communicated that . . . it would not address the inclusion of wheels produced from mixed origin components." Appx9. This is not, however, what Commerce said in response to the Importers' proposed revision. Rather, Commerce responded that "the existing language sufficiently conveys the concept that third-country processing of a steel wheel ***must*** *be of rims* ***and*** *discs produced in China* . . . ." Appx124 (emphasis added). In other words, Commerce declined to accept the Importers' proposed revision because it ***agreed*** at the time that steel wheels assembled in third countries "must" consist of both rims and discs from China to fall within scope.

Further, the CIT noted that "Commerce's statement during the original investigation that it 'does not foreclose a further analysis . . . should a product be completed in a third country from a mix of rim and disc parts from China and a third country' confirmed that the original investigation would not address wheels from

mixed-origin components." Appx9 (quoting Appx124). As discussed above in **Section II.A.1**, however, the CIT's conclusion is contradicted by Commerce's explicit statement immediately afterwards that the existing scope language was clear that both the rim and disc "must" originate from China for a third country-assembled wheel to fall within the scope of the *AD/CVD Orders*. Appx124. Furthermore, the isolated line on which the CIT relies refers to a "mix of rim and disc ***parts***" – not a "mix of rims and discs." Read in context, Commerce's reference to a "mix of rim and disc ***parts***" cannot reasonably be interpreted to contradict its explicit confirmation in the *Final Scope Decision Memo* that "third-country processing of a steel wheel ***<u>must be of rims <u>and</u> discs produced <u>in China</u></u>***" for the imported wheel to be within scope. *Id.* (emphasis added).

Second, the CIT misread Commerce's statement that "third-country processing of a steel wheel must be of rims and discs produced in China" as a "single, nonexclusive example of third-country processing that would certainly not remove {such} wheels from the scope." Appx9. The CIT's interpretation is flawed, because no party disputed that wheels welded in third countries from "rims and discs from China" were within scope. Rather, as Commerce acknowledged, Petitioner sought an explicit statement by Commerce that "either a rim or a disc from China would be covered by these investigations, not only a rim and a disc together." Appx123. Conversely, Zhejiang Jingu, TransTexas, and HiSpec requested "even more explicit

clarification" that third-country wheels produced from rims or discs from China (but not both) are outside the scope of the *AD/CVD Orders*. *Id.*; *see* Appx147, Appx153, Appx157. In response, Commerce rejected Petitioner's argument and agreed with Zhejiang Jingu, TransTexas, and HiSpec, explaining that it was "not necessary to adopt the further clarification language proposed in {their} affirmative scope comments" because "the existing language sufficiently conveys the concept that third-country processing of a steel wheel **must** be of **rims and discs produced in China**" for the wheels to fall within the scope. Appx124 (emphasis added). Viewed in this context, Commerce's statement that "third-country processing of a steel wheel must be of rims and discs produced in China" to fall within the scope of the *AD/CVD Orders* means exactly – and only – that. The CIT's misinterpretation of Commerce's statement – reiterated in the very conclusion to its *Final Scope Decision Memo* – is nonsensical considering the actual questions that Commerce was answering.

Third, the CIT ignored Commerce's explicit statements in the *Final Scope Decision Memo* indicating that third-country wheels produced from rims or discs from China (but not both) are not within the scope of the *AD/CVD Orders*. While acknowledging Commerce's statement that it "agreed, generally, with the respondent/importer's understanding" that such wheels did not fall within the scope of the *AD/CVD Orders*, the CIT erroneously concluded that Commerce was "deferring" this very question to avoid issuing "a late-stage scope determination in

the original investigation . . . ." Appx10 (internal brackets and quotation marks omitted). Yet, contrary to the CIT's misreading of the record, Commerce's agreement with Zhejiang Jingu, Trans Texas, and HiSpec was crucial. As noted above, Commerce did "not find it necessary to adopt further clarification language proposed" by Trans Texas and HiSpec *because* – in Commerce's words – the existing language "sufficiently conveys the concept that third-country processing of a steel wheel ***must be of rims <u>and</u> discs produced in China*** . . . ." Appx124 (emphasis added).

Fourth and finally, the CIT otherwise misread Commerce's *Final Scope Decision Memo* from the original investigations. For example, the CIT concluded that "Commerce also noted that substantial transformation analysis is a fact-specific inquiry, and that a sweeping decision for all wheels produced from mixed-origin components would accordingly be inappropriate." Appx10. To support this statement, the CIT cited page 9 of Commerce's preliminary scope memorandum from the original investigations. While Commerce's discussion therein does state that "the decision to conduct {a substantial transformation} analysis is contingent upon the facts and circumstances of a particular case{,}" Appx136, nowhere does Commerce connect that statement to the conclusion that a scope determination on third-country wheels produced from rims or discs from China (but not both) would be inappropriate. *See id.* To the contrary, Commerce stated that it could "properly

address issues concerning circumvention by incorporating the petitioner's proposed clarification of the scope, subject to the minor change discussed further below" (*i.e.*, specifying that only rims **and** discs **from China** are subject to the scope of the *AD/CVD Orders*). *See id.*, Appx137-138. Then, in the *Final Scope Decision Memo*, Commerce addressed the very question of trailer wheels made in a third country with rims or discs (but not both) from China.

Because the CIT misread Commerce's analysis in the original AD/CVD investigations, its affirmance of the *Final Scope Ruling* – which is unsupported by substantial evidence – should not be affirmed.

**B.    Because the Importers Did Not Receive Fair Warning of Retroactive AD/CVD Duties, Commerce Impermissibly Directed CBP To Continue To Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry**

The issue here is whether importers did not receive fair warning that the scope of the *AD/CVD Orders* could be interpreted to include wheels produced in a third country using rims or discs from China (but not both), in light of Commerce's confirmation in the *Final Scope Decision Memo* from the original investigations that the scope of the *AD/CVD Orders* did not include such products. The answer is "yes" – the importers lacked fair warning. Consequently, Commerce impermissibly directed CBP to continue to suspend liquidation of imports entered before the date of initiation of the scope inquiry – retroactively subjecting the Importers to crippling AD/CVD in excess of 400% of the entered value. In the event that the Court sustains

Commerce's ruling that third-country wheels made with rims or discs from China are within the scope of the *AD/CVD Orders*, we respectfully ask this Court to remand the *Final Scope Ruling* and order Commerce to instruct CBP that suspension of liquidation and AD/CVD duties can only be collected on entries of Method A Wheels that entered on or after March 22, 2021, the date of initiation of the underlying scope inquiry.

1. **The Importers did not receive fair warning that trailer wheels produced in third countries from Chinese "rims or discs" were subject to the *AD/CVD Orders* and could be assessed duties**

Commerce wrongly concluded in the *Final Scope Ruling* that its *Final Scope Decision Memo* from the original AD/CVD investigations could reasonably be interpreted as providing adequate notice that Method A Wheels were covered by the scope of the *AD/CVD Orders*. *See* Appx18-89.

As acknowledged by the CIT below, an "antidumping and countervailing duty order must contain 'a description of the subject merchandise, in such detail as the administering authority deems necessary,' to provide adequate notice to the relevant importers. 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2)." Appx14. Commerce may not retroactively suspend liquidation and collect cash deposits for entries that entered prior to the initiation of a scope inquiry without having provided "adequate notice" of AD/CVD liability. *See Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020) ("*Tai-Ao II*"); *Mid Continent Nail Corp. v. United*

*States*, 725 F.3d 1295, 1300–01 (Fed. Cir. 2013).  To determine whether an interested party has "adequate notice" prior to initiation of a scope inquiry, the court inquires whether the scope of the orders "may be reasonably interpreted to include" the products at issue.  *Mid Continent*, 725 F.3d at 1301; Appx14.

In *Tai-Ao II*, this Court reaffirmed the "broader due-process principle" that Commerce must provide fair warning of potential AD or CVD liability before liquidation of entries can be suspended.  *Tai-Ao II*, 983 F.3d at 495.  In doing so, this Court made clear that the "notice requirement is designed to avoid unfairness to importers and foreign exporters."  Although *Tai-Ao* involved a circumvention proceeding, there is no indication in the decision that critical due process protection regarding scope is only required in a circumvention proceeding.  Indeed, the CIT expressly found that *Tai-Ao* is not limited to the circumvention context and applies when Commerce revisits the scope of AD/CVD orders.  *Trans Texas Tire LLC v. United States*, 519 F. Supp. 3d 1275, 1287-88 (Ct. Int'l Trade 2021); *Trans Texas Tire LLC v. United States*, 519 F. Supp. 3d 1378, 1304-05 (Ct. Int'l Trade 2021).

Rather, the *Tai-Ao* case stands for the "broader due-process principle" that Commerce must not impose AD/CVD liability retroactively without having provided "fair warning" to importers.  *Tai-Ao II*, 983 F.3d at 495; *Tai-Ao Aluminum (Taishan) Co. v. United States*, 391 F. Supp. 3d 1301, 1314-15 (Ct. Int'l Trade 2019) ("*Tai-Ao I*").  Moreover, *Tai-Ao* confirms that Commerce's statements of intent to

consider the potential application of AD/CVD in the future do not, by themselves, constitute fair notice. *See Tai-Ao*, 391 F. Supp. 3d at 1314–15; *Tai-Ao II*, 983 F.3d at 495.

The *Tai-Ao* facts confirm the lack of warning here, because Commerce – at most – suggested in the *Final Scope Decision Memo* that it might in the future revisit its finding that rims and discs must be from China for AD/CVD to apply based on a substantial transformation analysis.

In *Tai-Ao*, Commerce was found to have unlawfully assessed AD/CVD retroactively on entries of "5050-grade" aluminum extrusions from China imported by Tao-Ao Aluminium (Taishan) Co. ("Tai-Ao"). Tai-Ao was not identified as a company covered by the circumvention inquiry as initiated, which covered only Zhongwang Holdings Ltd. ("Zhongwang"). *Aluminum Extrusions from the People's Republic of China*, 81 Fed. Reg. 15,039, 15,039 (Dep't Commerce Mar. 21, 2016) ("*Tai-Ao Initiation Notice*").

As to companies other than Zhongwang, the *Tai-Ao Initiation Notice* said only that: "The Department **intends to consider** whether the inquiry should apply to all imports of extruded aluminum products that meet the chemical specifications for 5050-grade aluminum alloy and are heat-treated, regardless of producer, exporter, or importer, from the PRC." *Id*. at 15,042 (emphasis added). This Court found that such a statement of intent did not confer "fair warning" unless and until Commerce

actually applied AD/CVD to companies other than Zhongwang. *Tai-Ao II*, 983 F.3d at 494-95 ("A statement of intention to 'consider whether the inquiry should apply to all imports' is not the same as a notice that such imports are within the scope of the inquiry.").

Here, the lone sentence in Commerce's *Final Scope Decision Memo* (*i.e.*, "Commerce does not foreclose a further analysis of substantial transformation . . . {,}" Appx124) – which, at most, suggested that Commerce might revisit the question of substantial transformation and third-country wheels made from a "mix of rim and disc parts from China and a third country" in the future – was nothing more than the "inten{t} to consider" found insufficient in *Tai-Ao*. *Initiation Notice*, 81 Fed. Reg. at 15039. Commerce plainly found that only wheels comprised of rims and discs from China were in-scope; for wheels comprised of rims or discs from China, Commerce provided the antithesis of fair warning. The investigation record does not support the CIT's basis to distinguish *Tai-Ao*, because it cannot reasonably be concluded that "Commerce's statement here that it would not foreclose future analysis of wheels produced from mixed-origin components served as adequate notice that wheels produced from mixed-origin components could be included within the scope." Appx15.

To the contrary, Commerce made the following definitive statements – among others – in the *Final Scope Decision Memo* conveying that wheels produced in a third country from rims or discs from China (but not both) are outside the scope:

- "*{W}e disagree with the petitioner* that the intent of the clarifying language . . . added at the time of the Preliminary AD Determination, covered steel wheels assembled in a third country *when either the rims or discs do not originate from China*." Appx122 (emphases added).

- "{W}e find that the existing language sufficiently conveys the concept that third-country processing of a steel wheel *must be of rims and discs produced in China* and, thus, decline to add the further clarification requested by respondent/importer interested parties." Appx122-123 (emphasis added).

- "{W}e find that the use of the limit phrase ('or'), is intentionally and selectively expansionary and not consistent with the plain meaning of the word 'and.' This finding is consistent with the reasonable interpretation of the existing language as it was seemingly understood by all parties, including Commerce . . . ." Appx124.

- "{A}s we find that the existing language sufficiently conveys the concept that third-country processing of a steel wheel *must* be of rims and discs produced in China and agree, generally, with the respondent/importer's understanding of this language, we do not find it necessary to adopt the further clarification language proposed in the respondent/importer's affirmative scope comments." *Id.* (emphasis added).

Against the overwhelming weight of the robust and clear statements quoted above, the *Final Scope Ruling* points to the **one sentence** that Commerce claims provided adequate notice that Method A Wheels are covered by the *AD/CVD Orders*: "Commerce does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope

ruling and/or to address a future circumvention concern." Appx124. Yet, as noted above, *see* **Section II.A.1.a** *supra*, Commerce *always* has the authority to conduct a scope inquiry and perform a substantial transformation analysis. *See* 19 C.F.R. § 351.225(b), (c). Consequently, a reference to such inherent authority is not fair warning.

To summarize, Commerce's *Final Scope Decision Memo* in the original AD/CVD investigations confirmed that wheels produced in a third country using rims or discs from China (but not both) are out-of-scope. Accordingly, because the scope could not reasonably be interpreted as covering the wheels at issue prior to March 22, 2021 (the date of initiation of the underlying scope inquiry), interested parties lacked adequate notice up until that date. *See Mid Continent*, 725 F.3d at 1301. Moreover, even if the *Final Scope Decision Memo*'s line that "Commerce does not foreclose a further analysis of substantial transformation" could somehow be construed to mean that Commerce was deferring the question of wheels made in third countries from rims or discs from China (but not both), a stated intention to consider whether merchandise is subject to an AD/CVD order in the future fails to provide adequate notice. *See Tai-Ao II*, 983 F.3d at 495 ("A statement of intention to 'consider whether the inquiry should apply to all imports' is not the same as a notice that such imports are within the scope of the inquiry."). Simply, put the Importers did not receive adequate notice.

## 2. The CIT erroneously concluded that Commerce provided fair warning

The CIT wrongly held that Commerce provided fair warning to importers that trailer wheels produced in third countries with rims or discs from China (but not both) are covered by the scope of the *AD/CVD Orders* on trailer wheels from China. The CIT offered three main reasons for concluding that Commerce had provided adequate notice, each of which is either inconsistent with the *Final Scope Decision Memo* or binding case law.

First, the CIT misinterpreted the "does not foreclose a further analysis" line in isolation as "Commerce merely confirm{ing} that the single, nonexclusive example of wheels that would certainly fall within the scope is limited to wheels produced from Chinese rims and Chinese discs." Appx15. In doing so, the CIT failed to engage fully with the many other statements in the *Final Scope Decision Memo* from the original investigations – in particular, that "the existing language sufficiently conveys the concept that third-country processing of a steel wheel *must* be of rims and discs produced in China . . . ." Appx124. The complete discussion of the scope issue in the *Final Scope Decision Memo* shows that Commerce fully considered whether third-country wheels comprised of rims or discs from China (but not both) are within the scope and concluded that they are not. *See* **Section II.A.1.a** *supra*.

Second, the CIT stated that the "existence of some ambiguity in scope language does not mean that notice is inadequate as to products requiring substantial transformation to determine country of origin, as it is impractical to require Commerce to anticipate every type of third-country processing." Appx14. The CIT's statement overlooks that Commerce was asked to address the specific issue of third-country wheels comprised of rims or discs from China (but not both) in the original AD/CVD investigations and did so. *See* **Section II.A.1.a** *supra*. Consequently, contrary to the CIT's reasoning, this is not a situation of asking "Commerce to anticipate every type of third-country processing." Appx14.

Third, the CIT cited *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 921-22 (Fed. Cir. 2019) for the proposition that it "is unnecessary for Commerce to engage in a game of whack-a-mole when it may reasonably define the class or kind of merchandise in a single set of orders, and within the context of a single set of investigations, to include all imports causing injury." Appx14. *Canadian Solar*, however, is inapposite. *Canadian Solar* involved original investigations in which Commerce used a country-of-assembly test to determine country of origin instead of its usual substantial transformation test. *See Canadian Solar, Inc.*, 918 F.3d at 919. This Court held that Commerce provided a reasoned explanation for using a different country-of-origin test and that the test was permissible. *See id.* at 920-21. Here, in contrast, Commerce specifically addressed in the *Final Scope Decision Memo*

whether the scope included third-country wheels made with rims or discs from China (but not both) and determined that such wheels are outside the scope. Consequently, this case does not give rise to a "whack-a-mole" situation at all. Nor does the instant action involve Commerce's determination of the scope in an original investigation, in which Commerce has the authority to define a scope so as to prevent circumvention. *See Canadian Solar*, 918 F.3d at 921-22. Rather, the current appeal challenges a *Final Scope Ruling* issued ***after*** imposition of the *AD/CVD Orders* and Commerce's unlawful decision to impose retroactive AD/CVD liability without having given fair warning that Method A Wheels were within scope.

To be clear, Plaintiffs-Appellants do not contest Commerce's authority to clarify the scope – provided it does not change the scope and the scope language may reasonably be interpreted to include the products in question. Rather, the issue here concerns ***when*** AD/CVD liability may begin to attach. Liability cannot attach retroactively without fair warning. The importers had the ***opposite*** of fair warning because of Commerce's statements in the *Final Scope Decision Memo* that third-country wheels made with rims or discs from China (but not both) are outside the scope. Sustaining the CIT's decision on this issue would be inconsistent with this Court's binding precedent in *Tai-Ao II*.

### 3. Commerce unlawfully "continued" CBP's prior suspension of liquidation

Because of the lack of fair warning, it was unlawful for Commerce to direct CBP to continue to suspend liquidation of, and collect AD/CVD cash deposits for, entries that entered prior to March 22, 2021 (*i.e.*, the date Commerce initiated the scope inquiry resulting in the *Final Scope Ruling*). Commerce did so despite CBP's admission that it could not determine whether the wheels were within the scope of the *AD/CVD Orders*. In declining to instruct CBP to terminate its prior (and retroactive) suspension of liquidation under the EAPA, Commerce impermissibly – and in contravention of the broader due-process principle of adequate notice – relied on the suspension of liquidation provision of its regulations, 19 C.F.R. § 351.225(l).

Commerce received a covered merchandise (scope) referral request from CBP on December 17, 2020. Appx518. CBP made the request pursuant to 19 U.S.C. § 1517(b)(4)(A) because it was "unable to determine whether the merchandise at issue is covered merchandise {defined as merchandise covered by an AD or CVD order}" and stated that Commerce's "determination will assist CBP's EAPA investigation in determining which merchandise is subject to the payment of antidumping duties." Appx519. In response, Commerce stated that it "intend{ed} to determine whether the merchandise subject to the referral is covered by the scope of the orders" and that the covered merchandise referral would be addressed in the scope inquiry requested by Asia Wheel. Appx512.

In its *Final Scope Ruling*, Commerce found the scope language ambiguous with respect to trailer wheels manufactured by Asia Wheel in Thailand with one wheel component (the disc) sourced from China, yet refused to acknowledge its failure to provide fair warning that such wheels were subject. *See* Appx31, Appx58-61. Instead, Commerce stated it would "instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the *Orders* if already suspended," Appx57 (citing 19 C.F.R. § 351.225(l)(3)), and claimed it lacked "authority to direct suspension of liquidation implemented by CBP {under interim measures pursuant to 19 U.S.C. 1517(e)}." Appx60.

To the contrary, Commerce's has the authority to determine whether ***and when*** a product is within the scope of an order, subject to the due-process requirement of providing fair warning before AD/CVD applicability. *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1321 (Fed. Cir. 2020) (recognizing that, while CBP has initial authority to determine whether a given entry of imported merchandise is subject to the scope of an AD/CVD order, CBP cannot "'modify Commerce's determinations' or otherwise impinge on Commerce's authority to issue and set the scope of duty orders"); *Canadian Solar*, 918 F.3d at 917 ("{Because t}he Tariff Act does not require Commerce to define the 'class or kind of {foreign} merchandise' in any particular manner{,} . . . Commerce has the authority to fill that

gap and define the scope of an order consistent with the countervailing duty and antidumping duty laws.") (citation omitted).

Under the EAPA specifically, Commerce has the authority to determine whether "the merchandise at issue is covered merchandise" in response to a CBP referral. 19 U.S.C. § 1517(b)(4)(A). "Covered merchandise" means "merchandise that is subject to" an AD/CVD order. 19 U.S.C. § 1517(a)(3). Inherently, a determination of whether imported merchandise is "subject to" an order may also entail **when** the merchandise **became** subject to the order.

Here, Commerce did not provide the Importers with either adequate notice or fair warning that Method A Wheels were "subject to" the *AD/CVD Orders* until March 22, 2021, the date Commerce initiated the scope inquiry. Accordingly, Commerce was bound by due-process principles and this Court's decision in *Tai-Ao II* to direct CBP to terminate its prior suspension of liquidation applying to entries made before that date.

The CIT has recognized that Commerce's determination of the scope overrides a contrary scope position taken by CBP:

> Customs' inclusion of merchandise in the EAPA investigation that had been determined by Commerce to be outside the scope of the Order is contrary to law because **the EAPA statute does not permit Customs to include merchandise that is not covered by the scope of the Order**. 19 U.S.C. § 1517(c)(1)(A). The Court notes that the EAPA statute states clearly that Commerce, not Customs, is the appropriate administering authority to issue a referral determination of whether merchandise is covered or not. Id. § 1517(b)(4)(A)(i), (B). **Allowing Customs to**

> **override and disregard a statutorily authorized Final Scope Ruling by the administering authority would be contrary to law** because this would effectively substitute Customs as the administering authority rather than Commerce. *Id.* § 1517(b)(4)(A)(i).

*Aspects Furniture Int'l Inc. v. United States*, 607 F. Supp. 3d 1246, 1267-1268 (Ct. Int'l Trade 2022) (emphases added).

Given the lack of fair warning, Commerce should have instructed CBP that imports of Method A Wheels were not covered merchandise prior to the date of initiation of the scope inquiry. In *Tai-Ao*, for example, this court instructed: "Because Commerce did not provide adequate notice . . . until November 14, 2016, Commerce's instructions to suspend liquidation effective March 21, 2016, were not in accordance with law." *Tai-Ao II*, 983 F.3d at 497. Tai-Ao did not receive fair warning or adequate notice until Commerce acted on its intent and added companies other than Zhongwang in its November 2016 preliminary circumvention determination, despite having communicated that intent earlier in the *Tai-Ao Initiation Notice*.

Likewise, the Importers first received fair warning and adequate notice when Commerce actually considered adding wheels with "rims or discs" from China when initiating the scope inquiry in March 2021, despite – at most – having suggested the possibility of reconsidering that question through a substantial transformation analysis in the *Final Scope Decision Memo* from the AD/CVD investigations.

This Court's decision in *Sunpreme* does not change this outcome. In *Sunpreme*, CBP determined the merchandise at issue was subject to an AD order and, consequently, suspended liquidation of those entries. *See Sunpreme*, 946 F.3d at 1305. This Court upheld Commerce's instructions for CBP to continue suspension of liquidation even though the scope at issue was ambiguous, holding that "Customs has the authority to suspend liquidation of goods ***when it determines*** that the goods fall within the scope of an ambiguous {AD/CVD} order." *Sunpreme*, 946 F.3d at 1321 (emphasis added).

Here, in stark contrast, CBP was ***unable to determine*** that the wheels in question were within the scope of the *AD/CVD Orders* and referred that question to Commerce. Consequently, *Sunpreme* does not require Commerce to continue the prior (and retroactive) suspension of liquidation imposed by CBP. To the contrary, "the broader due-process principle" of fair warning required Commerce to instruct CBP to terminate its prior suspension of liquidation and to commence suspension as of March 22, 2021, at the earliest. *Tai-Ao II*, 983 F.3d at 495. Unlike here, this Court affirmed Commerce's decision to continue CBP's prior suspension of liquidation in *Sunpreme* because "retroactivity concerns" were not raised. *See Sunpreme*, 946 F.3d at 1319.

In the *Final Scope Ruling*, Commerce also cited *Diamond Tools Technology LLC v. United States*, 545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) as supporting

CBP's separate authority to suspend liquidation under the EAPA.  Appx62.  That case, however, is distinguishable.  In *Diamond Tools*, the CIT upheld CBP's decision to continue a prior suspension of liquidation imposed as interim measures under the EAPA, where Commerce had not imposed any temporal limitation on CBP's authority to suspend liquidation in its response to a covered merchandise referral.  *See* 545 F. Supp. 3d at 1348.  Whereas *Diamond Tools* involved a challenge to CBP's EAPA authority directly, here Asia Wheel and the Importers contest **Commerce's** unlawful decision to continue a prior (and retroactive) suspension of liquidation in violation of "the broader due-process principle" that importers must have fair warning before their imported merchandise is subject to AD/CVD liability.  *Tai-Ao II*, 983 F.3d at 495.

Because the Importers did not have fair warning that the subject wheels were in-scope, as discussed above, Commerce's instructions to continue to suspend liquidation of and collect AD/CVD cash deposits for entries that entered prior to March 22, 2021, are unlawful.

# CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Commerce's *Final Scope Ruling* is unsupported by substantial evidence on the record and otherwise not in accordance with law. Plaintiffs-Appellants respectfully request that this Court vacate or reverse the CIT's decision on these issues, and remand to Commerce with instructions to issue a revised determination, consistent with the opinion of this Court.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler
Allison Kepkay
Matthew W. Solomon
Cristina Cornejo

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant
Asia Wheel Co., Ltd.

/s/ Nancy A. Noonan
Nancy A. Noonan

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000

Counsel to Plaintiff-Appellant Dexter Distribution Group LLC, fka TexTrail Inc.

/s/ Jordan C. Kahn
Jordan C. Kahn

GRUNFELD DESIDERIO LEBOWITZ SILVERMAN & KLESTADT, LLP
1201 New York Ave., NW Ste. 650
Washington, DC 20005
(202) 783-6881

Counsel to Plaintiff-Appellant
TRAILSTAR LLC

/s/ R. Kevin Williams
R. Kevin Williams
Mark Ludwikowski

CLARK HILL PLC
130 E. Randolph Street, Suite 3900
Chicago, IL 60601
(312) 985-5900

Counsel to Plaintiff-Appellant
Lionshead Specialty Tire & Wheel, LLC

June 23, 2025

51

*Asia Wheel Co. Ltd. V. United States,*
762 F.Supp.3d 1289 (2025)
Appx001-017

762 F.Supp.3d 1289
United States Court of International Trade.

ASIA WHEEL CO., LTD., Plaintiff,
and

Trailstar LLC and Lionshead Specialty Tire
and Wheel LLC, Consolidated Plaintiffs,
and

Dexster Distribution Group LLC f/k/
a TexTrail, Inc., Plaintiff-Intervenor,

v.

UNITED STATES, Defendant,
and

Dexstar Wheel Division of Americana
Development, Inc., Defendant-Intervenor.

Slip Op. 25-17
|
Consol. Court No. 23-00096
|
February 21, 2025

**Synopsis**
**Background:** Importers filed suit challenging Department
of Commerce's scope ruling, determining that importer's
steel truck wheels, manufactured in Thailand using discs
from China and rims produced in Thailand from rectangular
steel plates sourced from China or a third country, were
within scope of antidumping (AD) and countervailing duty
(CVD) orders on certain steel trailer wheels from China.
Following intervention by domestic distributor of trailer parts,
as plaintiff-intervenor, and by domestic wheel producer, as
defendant-intervenor, importers and distributor moved for
judgment on agency record.

**Holdings:** The Court of International Trade, Gary S.
Katzmann, J., held that:

Commerce correctly determined that plain scope language of
orders did not categorically exclude wheels produced from
mixed-origin components;

Commerce's scope determination did not change orders'
scope;

Commerce's substantial transformation methodology was in
accordance with law;

Commerce's determination that importer's truck wheels were
not substantially transformed was supported by substantial
evidence;

Commerce's imposition of duties on entire wheel was
supported by substantial evidence; and

importers and distributor had sufficient notice that mixed-
origin wheels were covered by orders.

Motion denied; sustained.

**Procedural Posture(s):** Review of Administrative Decision;
Motion for Judgment on Administrative Record.

**Attorneys and Law Firms**

**\*1295** Jay C. Campbell, White & Case LLP, of Washington,
D.C., argued for Plaintiff Asia Wheel Co., Ltd. With him on
the briefs were Walter J. Spak and Chunfu Yan.

Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman &
Klestadt, LLP, of Washington, D.C., argued for Consolidated
Plaintiff Trailstar LLC.

R. Kevin Williams, Clark Hill, of Chicago, IL, argued for
Consolidated Plaintiff Lionshead Specialty Tire and Wheel
LLC.

Nancy A. Noonan, Yun Gao, and Leah N. Scarpelli, ArentFox
Schiff LLP, of Washington, D.C., for Plaintiff-Intervenor
Dexter Distribution Group LLC.

Stephen C. Tosini, Senior Trial Counsel, U.S. Department of
Justice, Washington, D.C., argued for Defendant the United
States. With him on the briefs were Brian M. Boynton,
Principal Deputy Assistant Attorney General, Patricia M.
McCarthy, Director, L. Misha Preheim, Assistant Director. Of
counsel in the briefs were Ian A. McInerney, Senior Attorney,
Danielle Cossey, Attorney, and Brishailah Brown, Attorney,
Office of the Chief Counsel for Trade Enforcement and
Compliance, U.S. Department of Commerce, of Washington,
D.C.

Nicholas J. Birch, Schagrin Associates, of Washington, D.C.,
argued for Defendant-Intervenor Dexstar Wheel Division of

Appx001

Americana Development, Inc. With him on the briefs was Roger B. Schagrin.

## OPINION

Katzmann, Judge:

This case arises from the U.S. Department of Commerce's ("Commerce") ruling that certain trailer wheels produced by Asia Wheel Co., Ltd. ("Asia Wheel") fall within the scope of the antidumping and countervailing duty orders on certain steel trailer wheels from the People's Republic of China ("China"). In September 2019, Commerce issued antidumping and countervailing duty orders on certain steel wheels from China covering: "certain on-the-road steel wheels, discs and rims," including "rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China." Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders, 84 Fed. Reg. 45952, 45954 (Dep't Com. Sept. 3, 2019) ("Orders").

In response to Asia Wheel's request for scope proceedings, Commerce determined in a scope ruling that Asia Wheel's steel trailer wheels, manufactured in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country, are subject to the Orders. See Mem. from E. **\*1296** Begnal to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Apr. 11, 2023), P.R. 126 ("Final Scope Ruling"). Plaintiff Asia Wheel, a Thai subsidiary of a Chinese steel wheel manufacturer; Consolidated Plaintiffs Trailstar LLC ("Trailstar"), an American trailer wheel wholesaler, and Lionshead Specialty Tire and Wheel LLC ("Lionshead"), an American trail component contract manufacturer; and Plaintiff-Intervenor Dexter Distribution Group ("Dexter"), an American distributer of trailer parts, (collectively, "Plaintiffs") challenge Commerce's Final Scope Ruling. See Pls.' Am. Mot. for J. on Agency R., Feb. 22, 2024, ECF No. 47 ("Pls.' Br."); Pls.' Reply Br., May 31, 2024, ECF No. 58 ("Pls.' Reply"); Orders, 84 Fed. Reg.; Final Scope Ruling. Defendant the United States ("the Government") and Defendant-Intervenor Dexstar Wheel Division of Americana Development, Inc. ("Defendant-Intervenor") ask the court to sustain Commerce's determination. See Def.'s Resp. in Opp'n

to Pls.' Mot. for J. on the Agency R., Mar. 8, 2024, ECF No. 48 ("Gov't Br."); Def.-Inter.'s Resp. in Opp'n to Pls.' Mot. for J. on the Agency R., Apr. 5, 2024, ECF No. 52 ("Def.-Inter.'s Br.").

This case presents four issues: (1) whether Commerce impermissibly expanded the scope of the Orders; (2) whether Commerce's determination that Asia Wheel's trailer wheels produced from mixed-origin components were not substantially transformed in Thailand is supported by substantial evidence and in accordance with law; (3) whether Commerce's decision to impose duties on the entire imported trailer wheel is supported by substantial evidence and in accordance with law; and (4) whether importers lacked adequate notice that the trailer wheels produced from mixed-origin components were covered by the Orders, such that Commerce impermissibly directed U.S. Customs and Border Protection ("Customs") to continue to suspend liquidation of imports entered before the date of initiation of the scope inquiry. The court concludes that (1) Commerce did not impermissibly expand the scope of the Orders; that (2) Commerce's determination that Asia Wheel's trailer wheels were not substantially transformed is supported by substantial evidence and in accordance with law; that (3) Commerce's imposition of duties on the entire wheel based on a substantial transformation analysis is supported by substantial evidence and in accordance with law; and that (4) Plaintiffs had sufficient notice that the wheels were covered by the Orders. Therefore, the court denies Plaintiffs' motion and sustains the Final Scope Ruling.

## BACKGROUND

### I. Legal Background

#### A. Antidumping and Countervailing Duties and Scope Determinations

To facilitate fair trade, the Tariff Act of 1930 "permits Commerce to impose two types of duties on imports that injure domestic industries[.]" Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014) (citing 19 U.S.C. §§ 1671(a), 1673). Commerce assesses antidumping duties on foreign goods if it determines that the "merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the U.S. International Trade Commission separately concludes that dumping materially injures, threatens, or impedes the

Appx002

establishment of an industry in the United States. 19 U.S.C. § 1673; see also Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017). Similarly, Commerce imposes countervailing duties if it determines that a good is receiving a "countervailable subsidy" **1297** from a foreign government. 19 U.S.C. § 1671(a).

The duty orders that Commerce issues must "include[ ] a description of the subject merchandise, in such detail as [Commerce] deems necessary ...." 19 U.S.C. § 1673e(a) (2). Under Commerce's regulations, an interested party may request that Commerce issue a scope ruling to clarify whether a certain article of merchandise is subject to an order. See 19 C.F.R. § 351.225(a).

### B. Substantial Transformation Analysis

Antidumping and countervailing orders "must specify both the class or kind of merchandise and the particular country from which the merchandise originates." Ugine & Alz Belg., N.V. v. United States, 31 C.I.T. 1536, 1550, 517 F. Supp. 2d 1333, 1345 (2007) (citing Certain Cold Rolled Carbon Steel Flat Prods. from Arg., 58 Fed. Reg. 37062, 37065 (July 9, 1993)). In determining country of origin and whether an imported article falls within the scope of an order, Commerce may conduct a substantial transformation analysis. See Bell Supply Co. v. United States, 888 F.3d 1222, 1229 (Fed. Cir. 2018) ("Bell Supply IV"). [1] The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has affirmed substantial transformation analysis as "a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (quoting E.I. Du Pont de Nemours & Co. v. United States, 22 C.I.T. 370, 373–74, 8 F. Supp. 2d 854, 858 (1998)). The Federal Circuit has explained that if a product:

> originates from a country identified in the order, then Commerce need not go any further. On the other hand, if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in [the] order, then Commerce can include such

merchandise within the scope ... only if it finds circumvention under [19 U.S.C.] § 1677j.

Id. at 1230 (citations omitted). Ultimately, in conducting a substantial transformation analysis, Commerce asks whether "as a result of manufacturing or processing, the **1298** product loses its identity and is transformed into a new product having a new name, character[,] and use." Id. at 1228 (internal quotation marks omitted) (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)). To determine whether substantial transformation has occurred, "Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." Id. at 1228–29.

### C. Customs's EAPA Investigations

The Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517 (2018), directs Customs to investigate agency referrals or interested-party allegations that "reasonably suggest[ ] that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1); see also Diamond Tools Tech. LLC v. United States, 45 CIT ——, ——, 545 F. Supp. 3d 1324, 1331– 32 (2021). If Customs determines that covered merchandise entered the United States through evasion, it will suspend liquidation of unliquidated entries "that enter on or after the date of the initiation of the investigation ...." 19 U.S.C. § 1517(d)(1)(A)(i). If liquidation of entries has already been suspended, then that suspension will continue. See id. § 1517(d)(1)(A)(ii).

EAPA's purpose is to "empower the U.S. Government and its agencies with the tools to identify proactively and thwart evasion at earlier stages to improve enforcement of U.S. trade laws, including by ensuring full collection of [antidumping and countervailing] duties and, thereby, preventing a loss in revenue." Diamond Tools, 45 CIT at ——, 545 F. Supp. 3d at 1351. EAPA establishes the procedure for an "interested party" to submit allegations of importer evasion of antidumping and countervailing liability. 19 U.S.C. § 1517(b). Within fifteen days of a filed allegation, Customs will open an investigation. See id. § 1517(b)(1). Within ninety

days, Customs must determine whether there is "reasonable suspicion" of evasion, at which point Customs imposes interim measures, including suspension of liquidation. Id. § 1517(e). Next, parties can submit factual information, written arguments, and responses before Customs reaches a final determination.[2] See 19 C.F.R. § 165.23(b), (c)(2); id. § 165.26(a)(1), (b)(1). If Customs cannot make a final determination of evasion, it refers the matter to Commerce through a "covered merchandise referral." 19 U.S.C. § 1517(b)(4)(A); 19 C.F.R. § 351.227(a). Upon receiving the referral, Commerce "shall determine whether the merchandise is covered merchandise and promptly transmit that determination to the Commissioner." 19 U.S.C. § 1517(b)(4)(B); 19 C.F.R. § 351.227(a).

### II. Factual Background

On September 3, 2019, Commerce issued antidumping and countervailing orders on imports of certain steel trailer wheels from China in response to a petition from Defendant-Intervenor Dexstar. See Orders, 84 Fed. Reg. The trailer wheels subject to the Orders are used on road and highway trailers and on other towable equipment. See id. at 45954. These wheels consist of two components—a rim and a disc—that are welded together.

**\*1299**



Description and Flowchart of Production Method A at 4 (Nov. 11, 2020), P.R. 1, 2, C.R. 1, 2, 3, 4, Attach. 4.

The Orders account for certain types of processing in third countries:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not

otherwise remove the merchandise from the scope of the Orders if performed in China.

Orders, 84 Fed. Reg. at 45954.

During the original investigation, both Plaintiffs, as importers of the steel wheels at issue, and Defendant-Intervenor, as a producer of the domestic like product, sought Commerce's clarification on whether the scope includes steel wheels where only one component—that is, a rim or a disc—originates in China. See Letter from G. De Prest to W. Ross, re: Pet'r's Req. for Clarification of Country of Origin Criteria at 4, Case No. A-570-090, Bar Code: 3798826-01 (Mar. 1, 2019); Letter from W. Spak to W. Ross, re: Jingu's Rebuttal Scope Case Brief at 14–15, Case No. A-570-090, Bar Code: 3841819-01 (May 30, 2019) ("Jingu's Rebuttal Br."); Letter from N. Marshak to W. Ross, re: TTT's Scope Case Br. at 11–12, Case No. A-570-090, Bar Code: 3837566-01 (May 22, 2019) ("TTT's Br."). Plaintiffs requested explanation and potential language changes to clarify that wheels with only one component from China would not fall within the Orders' scope. See Jingu's Rebuttal Br. at 14–15; TTT's Br. at 11–12. Commerce declined these requests, stating "the current scope language is clear that only if all constituent rim and disc parts to form a steel wheel are from China does the order apply notwithstanding any analysis of substantial transformation." Final Scope Decision Mem. for the Final AD/CVD Determinations at 24 (Dep't Com. July 1, 2019), P.R. 57, C.R. 36, Ex. 1 ("Final Scope Mem."). Commerce also declined to change the language in the Orders from "rims and discs" to "rims or discs," explaining that the word "or" was "selectively expansionary and not consistent with the plain meaning of the word 'and.' " Id. Commerce added during the initial investigation that it would:

> not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern.

Id.

On November 10, 2020, Asia Wheel requested a scope ruling from Commerce asking whether certain models of their wheels produced in Thailand fall under the scope of the Orders. See Letter from **\*1300** White & Case LLP to W. L. Ross, Sec'y of Com., re: Request for Scope Ruling for Asia Wheel's Steel Trailer Wheels (Nov. 10, 2020), P.R. 1, 2, C.R. 1, 2, 3, 4 ("Scope Ruling Request"). Asia Wheel specifically requested rulings on wheels produced through the following three production methods:

- **Production Method A:** Trailer wheels manufactured from Chinese-origin discs and rims produced in Thailand from rectangular steel plates sourced from China.

- **Production Method B:** Trailer wheels manufactured from Thai-origin discs made from circular steel plates from China or a third country and Thai-origin rims made from rectangular steel plates from China or a third country.

- **Production Method C:** "Dual wheels" manufactured using Thai-origin discs made from disc blanks from China and rims from China.

See id. at 6–7.

In response to an evasion allegation by Dexstar, Customs initiated an EAPA investigation under 19 U.S.C. § 1517 to determine if mixed-component wheels, such as those manufactured by Asia Wheel, evaded the Orders. See Letter from Customs, re: Notice of Initiation of Investigation and Interim Measures Taken as to Lionshead Specialty Tire and Wheel LLC; TexTrail LLC; and TRAILSTAR LLC Concerning Evasion of the Antidumping and Countervailing Duty Orders on Steel Trailer Wheels from China (CBP July 15, 2020), P.R. 14, C.R. 6, Attach. 1. Customs was unable to determine if these wheels were covered merchandise, and on December 17, 2020 (shortly after Asia Wheel requested a scope ruling), issued a "covered merchandise referral" to Commerce under 19 U.S.C. § 1517(b)(4). Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Notice of Covered Merchandise Referral, 86 Fed. Reg. 10245, 10246 (Dep't Com. Feb. 19, 2021).

In response to Asia Wheel's scope request and the covered merchandise referral, Commerce initiated a scope inquiry on March 22, 2021. See Mem. from B. Quinn to All Interested Parties, re: Initiation of Asia Wheel Scope Inquiry (Dep't

Com. Mar. 22, 2021), P.R. 34. Commerce found that the original underlying investigation did not explicitly exclude wheels produced using mixed-origin components from the scope, and that the Orders are ambiguous as to the inclusion of wheels produced from mixed-origin inputs. See Final Scope Ruling at 14. As a result, Commerce conducted a substantial transformation analysis based on the five factors outlined in Bell Supply IV. See 888 F.3d at 1228–29. Commerce concluded that the finished wheels processed in Thailand under Production Methods A and C are not substantially transformed, and that those wheels' country of origin is therefore China. See Final Scope Ruling at 26–36. On August 25, 2022, Commerce issued a Preliminary Scope Ruling, finding that Method A and C wheels are within the scope of the Orders, while Method B wheels are not. See Mem. from E. Begnal, to J. Maeder, re: Preliminary Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Aug. 25, 2022), P.R. 100 ("Prelim. Scope Ruling").

Commerce issued its Final Scope Ruling on April 11, 2023, continuing to find that Method A and C wheels are within the scope of the Orders and that Method B wheels are not. See Final Scope Ruling at 54. Commerce then instructed Customs to continue to suspend liquidation of entries of Methods A and C wheels if liquidation was already suspended; for entries not subject to suspension, Commerce instructed **\*1301** Customs to suspend liquidation effective as of the March 22, 2021 initiation of the scope inquiry. See id. at 40.

### III. Procedural History

Asia Wheel brought this action against the Government on June 8, 2023 to challenge Commerce's Final Scope Ruling. See Compl., June 8, 2023, ECF No. 11. Defendant-Intervenor and Plaintiff-Intervenor each moved to intervene in the instant action under USCIT Rule 24, and the court granted both motions. See Mot. to Intervene as Def.-Inter., July 7, 2023, ECF No. 14; Order, July 11, 2023, ECF No. 22; Mot. to Intervene as Pl.-Inter., July 10, 2023, ECF No. 18; Order, July 11, 2023, ECF No. 23.

On August 18, 2023, the parties filed a joint status report agreeing to consolidate separate actions initiated by Asia Wheel, Trailstar, Lionshead, and Dexter. See Joint Status Report, Aug. 18, 2023, ECF No. 26. The court subsequently consolidated the four cases under Consolidated Court Number 23-00096. See Order, Aug. 18, 2023, ECF No. 27.

On November 20, 2023, Plaintiffs together filed a Motion for Judgment on the Agency Record under USCIT Rule 56.2. See Pls.' Br. The Government and Defendant-Intervenor filed their respective response briefs on June 13 and June 27, 2023. See Gov't Br.; Def.-Inter.'s Br. Plaintiffs filed a reply on July 31, 2023. See Pls.' Reply.

With all papers filed, the court held oral argument on Tuesday, July 23, 2024. See Order, June 14, 2024, ECF No. 59. Prior to oral argument, the court issued, and the parties responded to, questions regarding the case. See Letter re: Qs. for Oral Arg., July 8, 2024, ECF No. 63; Def.'s Resp. to Ct.'s Qs. for Oral Arg., July 18, 2024, ECF No. 66; Def.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., July 18, 2024, ECF No. 67; Pls.' Resp. to Ct.'s Qs. for Oral Arg., July 18, 2024, ECF No. 68. As directed by the court, the parties also filed briefs following oral argument. See Def.'s Post-Arg. Br., July 30, 2024, ECF No. 73; Def.-Inter.'s Post-Arg. Br., July 30, 2024, ECF No. 74; Pls.' Post-Arg. Br., July 30, 2024, ECF No. 75.

The case was held in abeyance pending oral argument in a parallel case, Asia Wheel Co. v. United States, Consol. Ct. No. 23-00143 (USCIT filed July 14, 2023) ("Asia Wheel II"). See Order, Oct. 18, 2024, ECF No. 76. That case involves a scope determination where Commerce considered wheels much like those here: those with components originating from China but where processing culminates in Thailand. See Mem. from J. Pollack to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand at 9, Case No. A-570-082, Bar Code: 4386647 (Dep't Com. June 7, 2023). The opinion in Asia Wheel II is being released concurrently with this opinion. See Opinion, Asia Wheel II, Feb. 21, 2025, ECF No. 65.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi). Section 1516a(b)(1)(B)(i) provides the standard of review: "[t]he Court shall hold unlawful any determination, finding, or conclusion" by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

A determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017)

(citing **\*1302** Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). This standard requires Commerce to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.) Ltd. v. United States, 33 C.I.T. 1407, 1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of Commerce with respect to the substantial-evidence standard). Substantial evidence may support Commerce's determination even if there is "evidence that detracts from the agency's conclusion or [if] there is a 'possibility of drawing two inconsistent conclusions from the evidence.' " Aluminum Extrusions Fair Trade Comm. v. United States, 36 C.I.T. 1370, 1373 (2012) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)).

In issuing scope rulings in particular, Commerce has "substantial freedom to interpret and clarify its antidumping orders," leading to "significant deference to Commerce's interpretation of a scope order." Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1300 (Fed. Cir. 2013). However, the question of whether the scope set out in an original investigation is ambiguous such as to warrant substantial transformation analysis is reviewed by the court de novo. See Meridian Prods. LLC v. United States, 851 F.3d 1375, 1381 (Fed Cir. 2017).

**DISCUSSION**

*I. Commerce's Interpretation of the Orders Is Supported by Substantial Evidence and in Accordance with Law.*

The text of the Orders here provides that "[t]he scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China." Orders, 84 Fed. Reg. at 45954. Plaintiffs argue that the word "and" in the phrase "rims and discs from China" is conjunctive such that only wheels consisting of both Chinese-origin discs and

Appx006

Chinese-origin rims fall within the scope. See Pls.' Br. at 19–20. Therefore, Plaintiffs maintain that the term "rims and discs from China" unambiguously excludes wheels produced from mixed-origin components. See id.

The Government and Defendant-Intervenor counter that the words "including, but not limited to" in the scope indicate "that the 'painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing," and point out that the "plain language does not address what varieties of processing may otherwise exclude a product from the scope." Gov't Br. at 12 (quoting Prelim. Scope Ruling at 13); see also Def-.Inter.'s Br. at 6–8. Therefore, the Government contends that the scope does not exclude Asia Wheel's wheels produced from mixed-origin components, and instead reflects that wheels produced from mixed-origin components are covered by the scope if the "processing would not otherwise exclude these items had the processing **\*1303** occurred in China." Gov't Br. at 12 (quoting Prelim. Scope Ruling at 13).

Commerce's interpretation of the scope is supported by substantial evidence and in accordance with law because (1) "rims, discs, and wheels that have been further processed in a third country" may be reasonably interpreted to include wheels produced from mixed-origin components and because (2) Commerce's later statements only addressed wheels produced from Chinese components such that they did not contradict the earlier interpretation that wheels produced from mixed-origin components fall within the scope of the Orders. Orders, 84 Fed. Reg. at 45954.

### A. Commerce Did Not Err in Determining the Plain Language of the Orders Does Not Exclude Asia Wheel's Steel Wheels from the Scope.

The terms of an order govern its scope. See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1087 (Fed. Cir. 2002) ("[A] predicate for the interpretive process is language in the order that is subject to interpretation."); see also Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1071–72 (Fed. Cir. 2001); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998). The first step in considering whether a product is within the scope of an order is to consider the language of the order itself. See ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012). In analyzing the language of the

scope, Commerce may also examine primary interpretive sources such as the descriptions of the merchandise in the petition and in the initial investigation, previous or concurrent determinations of the Secretary, and reports issued pursuant to the initial investigation. See 19 C.F.R. § 351.225(k)(1)(i). If the language of the order unambiguously covers or excludes a product, then that language governs Commerce's inquiry. See 19 C.F.R. § 351.225(k)(1); Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382–83 (Fed. Cir. 2005).

"Scope orders may be interpreted as including merchandise only if they contain language that specifically includes merchandise or may be reasonably interpreted to include it." Duferco Steel, 296 F.3d at 1089. "[A]n interpretation that renders [a term in the scope language] meaningless and mere surplusage," is not reasonable. SMA Surfaces, Inc. v. United States, 47 CIT ——, ——, 617 F. Supp. 3d 1263, 1275 (2023) (internal quotation marks and citations omitted). Commerce "may reasonably define the class or kind of merchandise in a single set of orders," rather than "engage in a game of whack-a-mole" to specifically include every item of merchandise that could fall within an order in the language of that order. Canadian Solar, Inc. v. United States, 918 F.3d 909, 921–22 (Fed. Cir. 2019). "Commerce need only meet a low threshold to show that it justifiably found an ambiguity in scope language, but it is not justifiable to identify an ambiguity where none exists." Allegheny Bradford Corp. v. United States, 28 CIT 830, 342 F. Supp. 2d 1172, 1184 (2004) (citing Novosteel SA v. United States, 284 F.3d 1261, 1272 (Fed. Cir. 2002)).

The original scope language as laid out at the outset of the antidumping and countervailing investigations included "steel wheels, discs, and rims" imported from China. Certain Steel Wheels 12 to 16.5 Inches in Diameter From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation, 83 Fed. Reg. 45095, 45100 (Dep't Com. Sept. 5, 2018) ("Initiation of Investigation"). Commerce later modified this scope language to more explicitly include wheels that undergo further processing outside of China. In response to a proposal from Defendant-Intervenor on the issue of wheels processed **\*1304** in third countries, Commerce included a provision in its preliminary scope determination, and later its final scope determination, explicitly stating that "[t]he scope includes rims, discs, and wheels that have been further processed in a third country." Mem. from E. Begnal to G. Taverman, re: Preliminary Scope Decision Mem. at 7–8 (Dep't Com. Apr. 15, 2019), P.R. 1, 2, C.R. 1, 2, 3, 4, Attach. 2 ("Prelim. Scope Mem."); Final Scope

Appx007

Ruling at 6. While this scope language does not specifically include wheels produced from mixed-origin components, it can be reasonably interpreted to include any wheels produced from mixed-origin components that still qualify as "steel wheels ... from China," and whose processing "would not otherwise remove the merchandise from the scope of the investigations if performed in [China]." Id.

Commerce also accepted Defendant-Intervenor's proposed example of further processing, noting that this provision "include[es], but [is] not limited to, the welding and painting of rims and discs to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the People's Republic of China." Prelim. Scope Mem. at 5. Commerce added further clarifying language at the request of Asia Wheel, and ultimately included the following example of further processing in the final Orders: "the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel." Orders, 84 Fed. Reg. at 45954 (emphasis added).

Plaintiffs argue that this example, and in particular the phrase "rims and discs from China" indicates that wheels produced from mixed-origin components are unambiguously excluded from the scope. See Pls.' Br. at 19–20. However, the phrase "rims and discs from China" comes only after the phrase "including, but not limited to," indicating that "the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel" constitute two non-exclusive examples. The words "including, but not limited to" would be rendered meaningless if Commerce were to interpret the scope to unambiguously exclude wheels produced from mixed-origin components because they are not "rims and discs from China":

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China.

Orders, 84 Fed. Reg. at 45954 (emphasis added); Def.-Inter.'s Br. at 5–6. "The court cannot accept an interpretation that renders [a term in the scope language] meaningless and mere surplusage." SMA Surfaces, 47 CIT at ——, 617 F. Supp. 3d at 1275 (internal quotation marks and citation omitted). A nonexclusive example of third-country processing that would not remove wheels from the scope still leaves open what other types of third-country processing would similarly not remove the merchandise from the scope of the investigation.

The phrase "including, but not limited to" indicates that there are methods of third-country processing that will fall within the scope of the Orders, even if not specifically outlined. Orders, 84 Fed. Reg. at 45954. The above excerpt from the Orders indicates that there are methods of processing that will be within the scope, though Commerce explicitly chose not to enumerate them all. To rule that any method of processing not explicitly outlined **\*1305** in the Orders is outside the scope would render certain key phrases superfluous. Therefore, this language does not, as Plaintiffs argue, indicate that wheels produced from mixed-origin components are unambiguously excluded from the scope.

The plain scope language includes rims, discs, and wheels that have undergone further processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China. While the scope language notes that "the painting of wheels from China and the welding and painting of rims and discs from China" are further processing that do not remove the merchandise from the scope, the scope language is ambiguous as to what other further processing would not remove the merchandise from the scope. Id. Therefore, Commerce did not err in determining that the scope language does not categorically exclude wheels produced from mixed-origin components.

### B. Commerce's Scope Determination Did Not Change the Scope of the Orders.

Plaintiffs state that Commerce "confirmed in the original investigation that wheels manufactured in third countries with only one wheel component (rims or discs) originating in China are outside the scope." Pls.' Br. at 21. Thus, Plaintiffs argue, Commerce "recharacterized" its scope analysis from the antidumping and countervailing investigations by concluding that the scope of the Orders is ambiguous. Id.

Appx008

at 23. The Government counters that Commerce declined to modify the scope to expressly include wheels produced from rims or discs from China, but also "did not dictate that wheels manufactured from some other variation of Chinese rims or discs must be held to be out-of-scope." Gov't Br. at 14. Defendant-Intervenor further argues that "Commerce was explicit that its determination on this point addressed only 'the clarifying language in question,' " and therefore did not change the scope of the order or alter its express terms. Def.-Inter.'s Br. at 8.

"[A] scope determination is not in accordance with law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms." Allegheny Bradford, 28 C.I.T. at 843, 342 F. Supp. 2d at 1183 (citing Duferco Steel, 296 F.3d at 1094–95); see also Wheatland Tube, 161 F.3d at 1370 ("Although Commerce enjoys substantial freedom to interpret and clarify its antidumping duty orders, it can neither change them, nor interpret them in a way contrary to their terms." (internal quotation marks and citations omitted)). A clarification of scope language does "not change the scope of the order or alter its express terms." King Supply Co. v. United States, 674 F.3d 1343, 1351 (Fed. Cir. 2012) (distinguishing Duferco Steel on the ground that Commerce in that case "had impermissibly relied upon language in the petitions rather than the orders to modify the scope of the orders by effectively importing a physical description of certain products that was not present in the text of the order." (citation omitted)).

Commerce's statements during the investigation did not "recharacterize" or change the scope of the Orders, but rather confirmed the scope was ambiguous as to which types of third-country processing would not remove a product from the scope. Pls.' Br. at 23; see also Prelim. Scope Mem. at 8–11; Final Scope Mem. at 22–24. In refusing to accept suggested revisions from both Plaintiffs and Defendant-Intervenor, Commerce communicated that during the original investigation it would not address the inclusion of wheels produced from mixed-origin components. See Final Scope Mem. at 22–24 ("Commerce understood this clarification to address exactly **1306** the circumstance that was explicitly presented, the assembly (and surface finishing) of steel wheels in a third country from all constituent parts in China."). For example, Commerce's statement during the original investigation that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country" confirmed that the

original investigation would not address wheels produced from mixed-origin components. See id. at 24.

As Plaintiffs point out, Commerce reiterated this position again at the conclusion of its analysis:

> [A]s we find that the existing language sufficiently conveys the concept that third-country processing of a steel wheel must be of rims and discs produced in China and agree, generally, with the respondent/ importer's understanding of this language, we do not find it necessary to adopt further clarification language proposed in the respondent/importer's affirmative scope comments.

Id.

The term "existing language" refers to "the welding and painting of rims and discs from China to form a steel wheel," as it contains the term "rims and discs." Orders, 84 Fed. Reg. at 45954. As indicated above, this language provides a single, nonexclusive example of third-country processing that would certainly not remove wheels from the scope. This statement confirms only that that single, nonexclusive example does not include wheels produced from mixed-origin components; it does not, as Plaintiffs suggest, confirm that wheels produced from mixed-origin components do not fall within scope. This is consistent with Commerce's intent to defer the question of wheels produced from mixed-origin components for later, case-by-case analysis. See Def.'s Br. at 15.

Commerce commentary in the Final Scope Memorandum responded to both Plaintiffs' and Defendant-Intervenor's attempts to gain a favorable scope ruling far along in the original investigation process. See Final Scope Mem. at 24 ("[T]he petitioner did not avail itself of previous opportunities to provide exclusionary language regarding the component parts of wheels."). Commerce had requested that all interested parties submit scope comments by September 17, 2018. See Initiation of Investigation at 45096. Neither Defendant-Intervenor nor Plaintiffs put forward proposed language changes to the third-country processing provision until early 2019. See Prelim. Scope Mem. at 3–4.

Instead of issuing a late-stage scope determination in the original investigation, Commerce's "agree[ed], generally, with the respondent/importer's understanding" pertaining only to wheels made with both Chinese discs and rims, while deferring the question of wheels produced from mixed-origin components to a later scope inquiry. See Final Scope Mem. at 24. This interpretation is also consistent with Commerce's other statements. For example, Commerce found "at this time, that the current scope language is clear that only if all constituent rims and disc parts to form a steel wheel are from China does the order apply notwithstanding any analysis of substantial transformation." Id. (emphasis added). Commerce also noted that substantial transformation analysis is a fact-specific inquiry, and that a sweeping decision for all wheels produced from mixed-origin components would accordingly be inappropriate. See Prelim. Scope Mem. at 9. These additional statements emphasize that Commerce spoke only to wheels produced from Chinese-origin components rather than making a wholesale determination **\*1307** on the additional question of wheels produced from mixed-origin components.

The court concludes that Commerce's scope determination that the Orders did not exclude wheels produced from mixed-origin components was consistent with both the plain text of the Orders and with Commerce's statements during the investigations. Therefore, Commerce's scope determination did not "change[ ] the scope of [the] order or interpret[ ] [the] order in a manner contrary to the order's terms." Allegheny Bradford, 28 C.I.T. at 843, 342 F. Supp. 2d at 1183 (citing Duferco Steel, 296 F.3d at 1094–95). In lawfully determining that the scope of the Orders was ambiguous as to wheels produced from mixed-origin components, Commerce permissibly proceeded to conduct a substantial transformation analysis. See Bell Supply Co. v. United States, 39 CIT 948, 970, 83 F. Supp. 3d 1311, 1328 (2015) ("Bell Supply I") (finding that Commerce must first "interpret the actual words of an order when it conducts a scope inquiry" before conducting a substantial transformation analysis).

## II. Commerce's Determination that the Mixed-Origin Components Were Not Substantially Transformed into Thai-Origin Wheels Is Supported by Substantial Evidence and in Accordance with Law.

Plaintiffs argue that Commerce failed to apply the proper legal standard in conducting its substantial transformation analysis, and that Commerce's analysis is unsupported by substantial evidence. The court addresses each argument in turn and concludes that (1) Commerce's method of analysis is

in accordance with law, and that (2) Commerce's analysis and subsequent conclusion that Asia Wheel's steel wheels were of Chinese origin is supported by substantial evidence.

### A. Commerce's Five-Factor Method of Analysis Is in Accordance with Law.

Recall that antidumping and countervailing orders apply based on the type of merchandise and the country of origin, and that in determining country of origin, Commerce may conduct a substantial transformation analysis. See Bell Supply IV, 888 F.3d at 1228, 1230. Substantial transformation analysis is a metric to determine "whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (internal quotation marks and citation omitted).

Plaintiffs first contend that Commerce employed the incorrect test in performing its substantial transformation analysis. According to Plaintiffs, the "fundamental question" is whether the Chinese-origin components became "a new product having a new name, character and use," through Thai processing. Pls.' Br. at 27–28 (citing Bell Supply IV, 888 F.3d at 1228 (internal quotation marks and citations omitted)). Instead, Plaintiffs argue, Commerce "had it backwards," employing five factors noted in Bell Supply IV for determining whether substantial transformation had occurred as the primary test—disconnected from the fundamental question such that its analysis was "meaningless"—rather than using the factors to inform the "name, character, and use" question. See id. at 28–29 (citing Bell Supply IV, 888 F.3d at 1228–29). The Government contends that Commerce "may consider whether the third[-]country processing imparted 'a new name, character, and use' in consideration of the totality of the circumstances, [but] such [a] **\*1308** finding[ ] may not supplant analysis of the record with respect to the" five factor test. Gov't Br. at 21. The Government and Defendant-Intervenor also argue that implementation of this standard as the "sole basis of analysis would result in even minor finishing/assembly operations sufficient to determine country of origin and render the existing substantial transformation factors moot." Id. at 20–21 (quoting Final Scope Ruling at 28); see also Def.-Inter.'s Br. at 19–20.

Commerce's application of the five factors from Bell Supply IV, in analyzing whether the wheel components underwent

Appx010

substantial transformation in Thailand, is in accordance with law. See 888 F.3d at 1228–29. Recall that in Bell Supply IV, the Federal Circuit held that "[a] substantial transformation occurs where, as a result of manufacturing or processing steps ... [,] the [product] loses its identity and is transformed into a new product having a new name, character and use." Id. at 1228 (internal quotation marks and citation omitted). According to the Final Scope Ruling, Commerce's substantial transformation analysis here asked:

> (1) whether, as a result of the manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character, and use; and

> (2) whether through that transformation, the new article becomes a product of the country in which it was processed or manufactured.

Final Scope Ruling at 8 (footnotes omitted).

Thus, while Plaintiffs correctly note that whether a product "loses its identity and is transformed into a new product having a new name, character, and use" is relevant to the substantial transformation question here, this is not where the analysis ends. Pls.' Br. at 28 (quoting Bell Supply IV, 888 F.3d at 1228–29). Recall that the court in Bell Supply IV went on to posit five (nonexclusive) factors for the substantial transformation analysis:

> To determine whether there has been a substantial transformation, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment.

888 F.3d at 1228–29.

Consequently, while a product's "new name, character[,] and use" may be relevant, the five-factor test is the primary mechanism for determining whether substantial transformation has occurred. [3] Additionally, the five-factor test is a "totality of the circumstances" method of analysis

such that the factors are not "divorced" from the fundamental question, as Plaintiffs **\*1309** allege. See Venus Wire Indus. Pvt. Ltd. v. United States, 43 CIT ——, ——, 424 F. Supp. 3d 1369, 1378 n.11 (2019) ("While the formulation of the factors Commerce considers in a substantial transformation test varies slightly across proceedings, in general, Commerce considers [these five factors.]" (citing Bell Supply IV, 888 F.3d at 1228–29)). Accordingly, Commerce's thorough analysis of the five factors outlined in Bell Supply IV in determining whether Asia Wheel's steel wheels underwent substantial transformation in Thailand is in accordance with law.

### B. Commerce's Substantial Transformation Analysis Is Supported by Substantial Evidence.

Plaintiffs next suggest that Commerce, in conducting its substantial transformation analysis, considered just one component (the rims for Method A wheels) rather than the finished wheel, thus failing to apply the governing legal standard. See Pls.' Br. at 29–30. [4] The Government contends that the court rejected a similar argument ten years ago in a case where it considered whether unfinished and finished parts from China were substantially transformed into finished products in Thailand. See Gov't Br. at 23 (citing Peer Bearing Co.-Changshan v. United States, 39 CIT 1942, 1963–64, 128 F. Supp. 3d 1286, 1304 (2015) ("Commerce was not precluded from taking into consideration the uncontested fact that the [tapered roller bearing] production in Thailand was conducted upon parts, finished and unfinished, that ultimately were destined to become [tapered roller bearings].")).

While the parties agree that one component (the rims for Method A wheels) of the subject merchandise is of Chinese origin, Plaintiffs' characterization ignores Commerce's thorough analysis of the wheel as a whole and the other component of the finished wheel (the disc in Method A wheels). The relevant question in Commerce's substantial transformation analysis was not whether the rectangular sheet of steel is substantially transformed when turned into a round rim in the case of Method A wheels. Rather, the question was whether both wheel components undergo substantial transformation to become a finished wheel. See Final Scope Ruling at 26–36. Thus, Commerce here asked whether an in-process component (a steel plate for Method A wheels) and a finished component (a disc for Method A wheels) are substantially transformed when processed and assembled into a finished wheel. Focusing only on the transformation from

steel sheet to finished rim ignores the rest of the processing, much of which takes place in China: for example, the creation of the steel plate and the production of the finished disc for Method A wheels. But again, the relevant question was not whether the in-process component is substantially transformed when processed into a finished component (the steel sheet into a rim for Method A wheels), but rather whether the in-process component and the finished component are substantially transformed when processed and assembled into a finished wheel. See id.

Commerce's Final Scope Ruling demonstrates that the agency considered exactly this question at every stage of analysis. Contrary to Plaintiffs' contention that Commerce only considered a single component rather than the finished wheel, see Pls.' Br. at 30, Commerce found that: (1) the wheel components and finished wheel are of the same class or kind of merchandise included within the scope, (2) both major components continue to function as **\*1310** the only such component after incorporation into the finished wheel, and (3) the production in China culminates in a complete component and an in-process component, functionally creating an already-designed wheel. See Final Scope Ruling at 26–36. Commerce ultimately concluded that "the finished wheels processed in Thailand under Production Methods A and C are not substantially transformed such that the third-country processing confers country of origin based on the totality of circumstances." Id. at 26 (emphasis added). This conclusion is supported by substantial evidence, as Commerce thoroughly considered all five factors in analyzing whether the in-process component and the finished component are substantially transformed into a finished wheel in Thailand.

The Method A at issue, where the production in China culminates in one finished component and one in-process component, differ from the Method B wheels, where the production in China culminates in two in-process components. Compare Final Scope Ruling at 32, with Prelim. Scope Mem. at 15. Commerce reasonably found that because the Chinese manufacturing of Method A wheels results in one finished component and one in-process component, unlike Method B wheels, the processing in China "functionally results in an already designed wheel." Final Scope Ruling at 32. Additionally, though Commerce did not conduct substantial transformation analysis on Method B wheels, the value added in Thailand and the Thai investment in Method B wheels is presumptively higher than for Method A wheels, as more manufacturing is likely required to produce finished wheels from two in-process components rather than one

finished component and one in-process component. Thus, Commerce reasonably determined that Method A wheels fall within the scope of the Orders while Method B wheels do not.

Plaintiffs suggest that Commerce's analysis of the "essential component" factor "further illustrates its flawed approach." Pls.' Br. at 30. To the extent that this argument serves as an example that Commerce only considered one component, it fails, as Commerce considered both components and the finished wheel throughout its analysis. See Final Scope Ruling at 26–36. To the extent that this argument raises an independent ground for finding Commerce's substantial transformation analysis to be unsupported by substantial evidence, it also fails, as Commerce extensively considered the properties and end uses of both the rim and the disc and the finished wheel. See Final Scope Ruling at 27–28. In doing so, Commerce noted that, while the essential characteristics of the finished wheel are not established until the rim and disc are assembled, the elements remain the same both before and after assembly. Id. at 29. Commerce found that "a given disc or rim continues to function as the only such component after incorporation into a finished wheel." Id. at 28 (quoting Prelim. Scope Ruling at 18). Commerce considered, for example, that the qualities of a disc do not change or transform through processing: the number, placement, and type of bolt holes; the mounting arrangement; and the materials used to produce the disc all remain the same. See Prelim. Scope Ruling at 18. Additionally, Commerce noted that the introduction of certain physical characteristics in Thailand, like the rim's diameter, is merely the finishing of a process that began in China. See Final Scope Ruling at 32. Commerce thus "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action ...." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Commerce's finding is therefore supported by substantial evidence.

**\*1311  III. Commerce's Decision to Impose Duties on the Entire Wheel Is Supported by Substantial Evidence.**

Plaintiffs also argue Commerce impermissibly expanded the scope contrary to its terms when it determined that the entire wheel is covered by the scope of the Orders when "only one wheel component ... was exported from China ...." Pls.' Br. at 3, see also id. at 32. The Government counters that Plaintiffs begin the inquiry at the wrong point in the analysis, asking the court to determine whether some components of the wheel are not dutiable on their own when it has been determined that the entire wheel is subject merchandise. See Gov't Br. at 24. Defendant-Intervenor further argues that "precedent confirms

that Commerce's determination is to the origin of the imported article <u>as a whole</u>, not separately where its amalgamated components may have originated." Def.-Inter.'s Br. at 22.

While Plaintiffs are correct that Commerce cannot interpret the scope of the <u>Orders</u> to change the scope or otherwise interpret it contrary to its terms, that is not the case here. <u>See</u> Pls.' Br. at 32 (citing <u>Eckstrom Indus.</u>, 254 F.3d at 1072). Commerce did not change or expand the scope, but merely conducted a substantial transformation analysis to confirm that the wheels here are Chinese and therefore fall within the scope.

Plaintiffs' argument on this point is based on its mischaracterization of Commerce's substantial transformation analysis as concluding that only one component of the wheel was of Chinese origin. <u>See</u> Pls.' Br. at 29–30. As indicated above, this characterization overlooks Commerce's thorough analysis of both components and the finished wheel. Indeed, substantial transformation analysis assesses duty liability for a product assembled from multiple components upon its entry into the United States. <u>See</u> <u>Bell Supply IV</u>, 888 F.3d at 1229 ("Because a single article can be assembled from various components and undergo multiple finishing steps, Commerce must have some way to determine the country of origin during scope inquiries."). Subsequently, the substantial transformation analysis provides a metric "for determining whether the processes performed on merchandise in a country are of such significance as to require that the <u>resulting merchandise</u> be considered the product of the country in which the transformation occurred." <u>Id.</u> (internal quotation marks and citation omitted) (emphasis added). In conducting substantial transformation analysis, Commerce sought to determine the country of origin for the resulting product as entered into the United States—that is, as an assembled wheel.

Plaintiffs do not provide any legal support for a different method of duty assessment that would first exclude specific components before determining what duties to assess. To the extent the Plaintiffs suggest Commerce should follow this method separately from conducting a substantial transformation analysis, the suggestion is moot. As Commerce already determined the entire wheel is within scope, it need not assess duties on individual wheel components. Therefore, Commerce's imposition of antidumping and countervailing duties on the entire wheel is supported by substantial evidence.

*IV. Commerce Permissibly Directed Customs to Continue to Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry.*

Plaintiffs argue that importers did not receive fair warning that trailer wheels produced in third countries from mixed-origin components are subject to the <u>Orders</u> **\*1312** until Commerce initiated the scope inquiry at Asia Wheel's request. <u>See</u> Pls.' Br. at 34. Thus, Plaintiffs contend, Commerce impermissibly directed Customs to continue its prior suspension of liquidation of imports entered before the date of initiation of the scope inquiry. <u>See</u> <u>id.</u> This direction, according to Plaintiffs, will subject them to millions of dollars in retroactive antidumping and countervailing duties that they could not have anticipated. <u>See</u> Pls.' Br. at 3–4. The Government and Defendant-Intervenor counter that Commerce expressly noted during the underlying investigation that mixed-origin wheels may be the subject of a future scope inquiry and therefore provided adequate notice to importers of mixed-origin wheels. <u>See</u> Def.'s Br. at 30–31; Def.-Inter.'s Br. at 24–25. Even if Commerce did not provide adequate notice, the Government and Defendant-Intervenor argue, Commerce has no authority to direct the outcome of decisions that Commerce entrusted to Customs. <u>See</u> Def.'s Br at 34; Def.-Inter.'s Br. at 26–28; 19 U.S.C. § 1517(b)(1) ("[Customs] shall initiate an investigation if [Customs] determines that the information provided in ... the referral ... reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion.").

Upon an affirmative scope determination, Commerce will "direct U.S. Customs and Border Protection to continue the suspension of liquidation of previously suspended entries and apply the applicable cash deposit rate until appropriate liquidation instructions are issued ...." 19 C.F.R. § 351.225(*l*) (3). Additionally, Commerce "will direct U.S. Customs and Border Protection to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product not yet suspended ... on or after the date of initiation of the scope inquiry ...." <u>Id.</u> Fair notice is particularly important in contexts like this one where importers may be subjected to substantial retroactive liability. The fair notice requirement reflects the "broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires.' " <u>Tai-Ao Aluminium Co. v. United States</u>, 983 F.3d

Appx013

487, 495 (Fed. Cir. 2020) (quoting Mid Continent Nail, 725 F.3d at 1300–01).

Commerce's statements expressly "not foreclos[ing] a further analysis of substantial transformation" of mixed-origin components served as adequate notice. Final Scope Mem. at 24. Because Plaintiffs had adequate notice, Commerce permissibly directed Customs to continue its prior suspension of liquidation.

### A. Commerce Provided Lawful Notice That Mixed-Origin Wheels Could Be Subject Merchandise.

An antidumping and countervailing duty order must contain "a description of the subject merchandise, in such detail as the administering authority deems necessary," to provide adequate notice to the relevant importers. 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2). Adequate notice requires "that antidumping orders only be applied to merchandise that they may be reasonably interpreted to include." Mid Continent Nail, 725 F.3d at 1301 (internal quotation marks and citation omitted). Without adequate notice, "Commerce cannot suspend liquidation of entries entered 'on ... the date of initiation of the scope inquiry.' " Tai-Ao, 983 F.3d at 490 (quoting 19 C.F.R. § 351.225(*l*)(2)). This notice requirement reflects the "broader due-process principle" that Commerce must provide fair warning to regulated **\*1313** parties before enforcing a penalty or sanction. Id. at 495 (quoting Mid Continent Nail, 725 F.3d at 1300–01).

However, adequate notice is not the same as certainty that a product will or will not fall within the scope of an order. Instead, adequate notice need only allow an importer to reasonably interpret what merchandise is included in the order. Cf. Mid Continent Nail, 725 F.3d at 1301–02 ("The mere fact that the order in this case makes no explicit reference to mixed media items does not conclusively establish that Commerce lacked authority to consider the order's applicability to nails contained within such items."). Notice need not be certain because questions often later "arise as to whether a particular product is covered by the scope of an antidumping or countervailing duty order. Such questions, such as those regarding the country of origin of merchandise, may arise for a variety of reasons given that the description of the merchandise subject to the scope is written in general terms." 19 C.F.R. § 351.225(a); see also Bell Supply Co. v. United States, 43 CIT ——, ——, 393 F. Supp. 3d 1229, 1236 (2019) ("Bell Supply VI") ("Issues arise regarding

whether a product falls within the scope of an [antidumping or countervailing duty] order, in part because federal regulations require Commerce to write the descriptions in 'general terms.' "). Commerce may use a substantial transformation analysis to resolve questions regarding the country of origin of an imported article. See Bell Supply IV, 888 F.3d at 1229. The existence of some ambiguity in scope language does not mean that notice is inadequate as to products requiring substantial transformation to determine country of origin, as it is impractical to require Commerce to anticipate every type of third-country processing. Cf. Canadian Solar, 918 F.3d at 921–22 ("It is unnecessary for Commerce to engage in a game of whack-a-mole when it may reasonably define the class or kind of merchandise in a single set of orders, and within the context of a single set of investigations, to include all imports causing injury.").

Here, Commerce explicitly included within the scope "rims, discs, and wheels that have been further processed in a third country," and provided two types of processing that would certainly be included (painting of Chinese wheels and welding and painting of Chinese rims and discs). Orders, 84 Fed. Reg. at 45954. However, by including "any other processing that would not otherwise remove the merchandise from the scope of the orders if performed in China," Commerce left open the question of what other types of third-country processing would not remove merchandise from the scope. Id. While this language did not explicitly indicate that the exact processing here would be included, supra section I.A., it contained the general statement that rims, discs, and wheels processed in a third country may be included.

Even if the scope language itself was not enough to provide adequate notice on its own, Commerce went further. Commerce stated during the investigation that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Final Scope Mem. at 24. This statement further delineated the type of merchandise that was subject to the scope: "wheels completed in a third country from a mix of rim and disc parts from China and a third country" that did not undergo substantial transformation that would otherwise remove them from the scope. Id. Commerce cannot be expected to anticipate every type of third-country processing, and thus cannot feasibly indicate **\*1314** with certainty every hypothetical product that would fall within the scope. Despite this ambiguity as to specific types of processing, Plaintiffs could anticipate that the wheels at issue

fall within Commerce's description and thus are covered by the scope based on the language of the Orders and Commerce's commentary during the investigation. Therefore, Commerce's commentary during the investigation provided further adequate notice that wheels produced from mixed-origin components could be subject merchandise.

Plaintiffs argue that "Commerce gave importers the exact opposite of fair warning," by stating that "the existing language sufficiently conveys the concept that third-country processing of a steel wheel must be of rims and diss produced in China." Pls.' Br. at 36; see also Final Scope Mem. at 24. However, in confirming that "the use of the limit phrase ('or'), is intentionally and selectively expansionary and not consistent with the plain meaning of the word 'and,' " Commerce merely confirmed that the single, nonexclusive example of wheels that would certainly fall within the scope is limited to wheels produced from Chinese rims and Chinese discs. Final Scope Mem. at 24. This confirmation does not, as Plaintiffs suggest, exclude any other wheels from the scope, such as wheels produced from mixed-origin components.

Along with this confirmation that the non-exhaustive example includes only wheels produced from Chinese rims and Chinese discs, Commerce importantly noted that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Final Scope Mem. at 24. In refusing to foreclose this further analysis, Commerce clearly contemplated the exact wheels at issue here such that Plaintiffs could reasonably anticipate that the wheels at issue would fall within the scope subject to a substantial transformation analysis. This express statement, along with the original scope language and third-country processing provision, provided importers with adequate notice.

### B. *Tai-Ao* and *Trans Texas* Do Not Support Plaintiffs' Argument that Commerce Failed to Provide Fair Notice Here.

Plaintiffs provide two cases to support their assertion that Commerce's statements clarifying the original scope did not provide adequate notice. See Tai-Ao Aluminium Co. v. United States, 983 F.3d 487 (Fed. Cir. 2020); Trans Tex. Tire, LLC v. United States, 45 CIT ——, 519 F. Supp. 3d 1275 (2021). However, those cases differ in important ways from the present case. In Tai-Ao, Commerce expanded

the scope of its inquiry. See 983 F.3d at 495–96. In Trans Texas, Commerce did not suggest the relevant products were included in the scope until the final scope ruling. See 45 CIT at ——, 519 F. Supp. 3d at 1281. Those cases are unlike the present case, where a reasonable importer could interpret Commerce's original scope language to include the wheels at issue and where Commerce provided additional commentary noting that substantial transformation analysis would be used on a case-by-case basis. See Orders, 84 Fed. Reg. at 45954; Final Scope Mem. at 24.

Plaintiffs argue that Tai-Ao "confirms that statements of intent to consider the potential application of antidumping and countervailing duties in the future do not constitute fair warning." Pls.' Br. at 40. However, the court in Tai-Ao did not hold that a statement of intent can never provide adequate notice, but only that a statement of intent contemplating whether the inquiry should be expanded does not provide adequate notice. **1315** Tai-Ao, 983 F.3d at 495. This holding was supported by Commerce's statements and conduct suggesting the scope was limited to a single importer. For example, in Tai-Ao, the Initiation Notice only named one importer, Commerce's explanation for why it initiated the inquiry focused primarily on one importer, and Commerce issued a questionnaire to only one importer. See id. at 495–96. Unlike in Tai-Ao, where the statement of intent contemplated expansion of the scope and contradicted Commerce's other statements and conduct, Commerce's statement here that it would not "foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country," merely clarified the original scope and was consistent with Commerce's other statements and conduct. Final Scope Mem. at 24. Therefore, unlike in Tai-Ao, Commerce's statement here that it would not foreclose future analysis of wheels produced from mixed-origin components served as adequate notice that wheels produced from mixed-origin components could be included within the scope.

Trans Texas similarly does not support the Plaintiffs' argument that Commerce did not provide adequate notice here. See 45 CIT ——, 519 F. Supp. 3d 1275. In Trans Texas, Commerce expressly excluded certain on-the-road steel wheels that are coated entirely in chrome from its preliminary determination and reiterated this position throughout the investigation. Id. at ——, 519 F. Supp. 3d at 1281. However, Commerce ultimately included PVD chrome wheels in its final scope ruling despite their being coated in chrome. See id. While the court confirmed that Commerce can "alter the

scope of the investigation until the final order," Commerce did not alter the scope to include PVD chrome wheels until publication of the final scope ruling, and thus did not provide adequate notice until then. Id. at ——, ——, 519 F. Supp. 3d at 1284, 1288. This is unlike the present case where wheels produced from mixed-origin components can reasonably be considered within the original scope and where Commerce expressly indicated they might be included subject to a substantial transformation analysis during the initial investigation. See Final Scope Mem. at 24.

Ultimately, Commerce's initial scope language, Commerce's addition of the third-country processing provision, and Commerce's express statements during the investigation that it would not foreclose future substantial transformation analysis of wheels produced from mixed-origin components provided Plaintiffs with adequate notice that their wheels could reasonably be subject to the Orders. Because

Commerce provided Plaintiffs with adequate notice, Commerce's instructions to Customs to continue its prior suspension of liquidation were proper.

## CONCLUSION

For the reasons stated above, Commerce's determination is supported by substantial evidence and in accordance with law. The court thus denies Asia Wheel's motion and sustains Commerce's Final Scope Ruling. Judgment will enter accordingly.

**SO ORDERED.**

**All Citations**

762 F.Supp.3d 1289

---

### Footnotes

1    Commerce published revisions to its scope regulations in September 2021, adding a new relevant provision titled "[c]ountry of origin determinations." 19 C.F.R. § 351.225(j)(1). Under the new provision, Commerce "may use any reasonable method" to "determine the country of origin of the product," to ultimately "consider[ ] whether a product is covered by the scope of the order at issue ...." Id. § 351.225(j). The provision goes on to state that "the Secretary may conduct a substantial transformation analysis that considers relevant factors that arise on a case-by-case basis," and includes the factors outlined in Bell Supply IV. Id. § 351.225(j)(1); see also Bell Supply IV, 888 F.3d at 1228–29. While this revision codified the substantial transformation test, the parties agree that because Asia Wheel filed its scope ruling request on November 11, 2020, before the effective date of the new regulations, the pre-revision version of the regulations applies. See Pls.' Br. at 19 n.3; Def.'s Br. at 11 (citing to (k)(1) rather than (j)(1)); see also Scope Ruling Request; Regulations to Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52300 (Dep't Com. Sept. 20, 2021) ("Amendments to § 351.225 ... apply to scope inquiries for which a scope ruling application is filed ... on or after November 4, 2021."). The parties also agree that substantial transformation was relevant in determining whether a product falls within scope even before Commerce's revision of its scope regulations. See Pls.' Br. at 27 (arguing that Commerce applied the wrong standard, but not challenging the use of substantial transformation analysis itself); Def.'s Br. at 16 ("Commerce reasonably decided to apply a substantial transformation analysis to determine country of origin ....").

2    Customs typically must reach this final determination within 300 days of the initiation of the original investigation, though that timeline can be extended in extraordinarily complicated situations. See 19 U.S.C. § 1517(c)(1).

3    This court previously addressed the Federal Circuit's mention of a "new name, character[,] and use" in Bell Supply IV, noting that "[a]lthough the Court of Appeals quotes Bestfoods to invoke the name, character[,] or use test, Bestfoods involved a North American Free Trade Agreement country of origin determination applying statutory tariff-shift rules as opposed to Gibson-Thomsen's 'name, character[,] and use' test, which

evolved in Customs law." Bell Supply Co. v. United States, 42 CIT ——, ——, 348 F. Supp. 3d 1281, 1287 n.6 (2018) ("Bell Supply V"). The Federal Circuit "[spoke] of the name, character or use test, [but did] not invoke any of the factors used in Customs cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation." Id. Because Commerce itself noted the new name, character, and use question within the Final Scope Ruling, the court considers it here just as courts did in Bell Supply IV and V: as secondary to the more essential five factors.

4    Plaintiffs do not challenge Commerce's substantial transformation determination with respect to Method C wheels due to low U.S. shipment volumes. See Pls.' Br. at 27 n.4.

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Antidumping and Countervailing Duty Orders on Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China, Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Asia Wheel)*
Appx018 – Appx089

Barcode:4364599-01 A-570-090 SCO - Scope Inquiry/Ruling (New)

A-570-090, C-570-091<br>
Scope Inquiry: Asia Wheel<br>
**Public Document**<br>
E&C/OIII: CD/BQ

April 11, 2023

| | |
|---|---|
| **MEMORANDUM TO:** | James Maeder<br>Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **FROM:** | Erin Begnal<br>Director, Office III<br>Antidumping and Countervailing Duty Operations |
| **RE:** | Antidumping and Countervailing Duty Orders on Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China |
| **SUBJECT:** | Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Asia Wheel) |

---

## I.  SUMMARY

In accordance with 19 CFR 351.225(f)(4) and 351.225(k)(1), we recommend that the U.S. Department of Commerce (Commerce) determine that certain types of trailer wheels that Asia Wheel Co., Ltd. (Asia Wheel) manufactures in its facilities in Thailand and exports to the United States and described in its scope request are outside the antidumping duty (AD) and countervailing duty (CVD) orders on certain steel wheels 12 to 16.5 inches in diameter (certain steel wheels) from the People's Republic of China (China).[1]  Further, we recommend that Commerce find certain other types of trailer wheels that Asia Wheel manufactures in its facilities in Thailand and exports to the United States and described in its scope requests are subject to the *Orders*.

Commerce intends to use the final determination in this case as a basis to respond to the covered merchandise referral (CMR) from U.S. Customs and Border Protection (CBP)[2] concerning certain trailer wheels imported from Thailand into the United States by Asia Wheel.

---

[1] *See Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China:  Antidumping Duty and Countervailing Duty Orders*, 84 FR 45952 (September 3, 2019) (*Orders*).

[2] *See* Memorandum, "Transmitting Covered Merchandise Referral from U.S. Customs and Border Protection to the Record" dated March 3, 2021, containing CBP's Letter, "Scope Referral Request for Merchandise under EAPA Cons. Investigation 7459, Imported by Lionshead Specialty Tire and Wheel LLC; Tex Trail LLC; and Trailstar LLC., and concerning the Investigation of Evasion of the Antidumping and Countervailing duty orders (A-570-090 and C-570-091) on Steel Trailer Wheels from the People's Republic of China," dated December 17, 2020 (CBP's EAPA Letter).

## II.     BACKGROUND

On November 11, 2020, Commerce received a scope ruling request from Asia Wheel to determine whether certain types of trailer wheels that it manufactures in its facilities in Thailand and exports to the United States are covered by the scope of the *Orders* (herein referred to Asia Wheel I Request and resulting proceeding).[3]  The Asia Wheel I Request identified wheels manufactured by three distinct production methods (Production Methods A, B, and C) as subject to the request and further detailed below.  On March 22, 2021, Commerce initiated a formal scope inquiry pursuant to 19 CFR 351.225(e).[4]

Between December 2020 and October 2021, interested parties submitted relevant information and argument to the record for Commerce's consideration in making a preliminary determination.[5]  In this period, Asia Wheel separately submitted a further ruling request regarding trailer wheels identified to be largely the same as Production Method B identified in the Asia Wheel I Request, except that Asia Wheel manufactures the disc in Thailand using a rectangular steel plate instead of a circular steel plate (herein referred to as the Asia Wheel II proceeding).  On August 25, 2022, Commerce issued its Preliminary Scope Ruling, preliminarily finding that trailer wheels that Asia Wheel manufactures in its facilities in Thailand and exports to the United States and described in its scope requests as manufactured pursuant to Production Method B are outside the *Orders*, whereas the trailer wheels that Asia Wheel manufactures in its

---

[3] *See* Asia Wheel's Letter, "Request for Scope Ruling for Asia Wheel's Steel Trailer Wheels," dated November 11, 2020 (Asia Wheel I Request).

[4] *See* Commerce's Letter, "Initiation of Asia Wheel Scope Inquiry," dated March 22, 2021 (Asia Wheel Initiation). Although Commerce published revisions to its scope regulations in September 2021, the new scope regulations only became effective on November 4, 2021.  *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021).  Thus, because Asia Wheel filed its scope ruling request on November 11, 2020, before the effective date of the new regulations, the instant determination has been made under the scope regulations, 19 CFR 351.225, in effect prior to November 4, 2021.  *Id.* ("Amendments to § 351.225… apply to scope inquiries for which a scope ruling application is filed... on or after November 4, 2021.").

[5] *See* Petitioner's Letter, "Petitioner's Opposition," dated December 8, 2020; *see also* Asia Wheel's Letter, "Rebuttal to Petitioner's Opposition," dated December 18, 2020; Asia Wheel's Letter, "Supplemental Questionnaire Response," dated December 22, 2020 (Asia Wheel 1st SQR); Importers' Letter, "Importers' Response to Request for Information, Scope Inquiry (Asia Wheel)," dated August 30, 2021 (Importers' RFI Response); Petitioner's Letter, "Substantial Transformation Submission," dated August 30, 2021 (Petitioner's RFI Response); Asia Wheel's Letter, "Responses to the Request for Information for All Interested Parties and the Second Supplemental Questionnaire for Asia Wheel," dated August 31, 2021 (Asia Wheel RFI Response and Asia Wheel 2nd SQR, respectively); Petitioner's Letter, "Deficiency Comments on Asia Wheel's Second Supplemental Questionnaire Response," dated September 9, 2021 (Petitioner's 2SQR Rebuttal); Asia Wheel's Letter, "Comments to Petitioner's Substantial Transformation Submission and Importers' Response to Request for Information," dated September 9, 2021 (Asia Wheel's RFI Rebuttal); Petitioner's Letter, "Response to Asia Wheel Comments on Valuation," dated September 27, 2021 (Petitioner's 2SQR Surrebuttal); Asia Wheel's Letter, "Response to Petitioner's Factor-of-Production Comments," dated October 5, 2021 (Asia Wheel's FOP Rebuttal); Petitioner's Letter, "Comments on Scope Determination," dated October 7, 2021 (Petitioner's Additional Comments); and Asia Wheel's Letter, "Resubmission of Rebuttal Comments," dated October 14, 2021 (Asia Wheel's 2SQR Surrebuttal).

facilities in Thailand and exports to the United States and described in its scope requests as manufactured pursuant to Production Methods A and C are subject to the *Orders*.[6]

In the Preliminary Scope Ruling, Commerce explained that although the trailer wheel products subject to the Asia Wheel II proceeding are manufactured by a distinct production method which is not identified in the Asia Wheel I Request, because the production method identified in the Asia Wheel II proceeding is very similar to that of Production Method B identified in the Asia Wheel I Request, Commerce addressed the products and production methods identified in both the Asia Wheel I and Asia Wheel II scope requests in the single Preliminary Scope Memorandum applicable to both proceedings.[7] Accordingly, the Preliminary Scope Ruling preliminarily found the trailer wheels subject to the Asia Wheel II request are outside the scope of the *Orders* based on the same standard of analysis applied to Production Method B wheels in the instant request.[8]

Due to various administrative considerations,[9] Commerce determined not to issue a single decision memorandum covering the final determination in both scope inquiries and is, instead, issuing distinct final scope ruling memoranda for the separate scope proceedings. Accordingly, the instant memorandum addresses the comments received in case and rebuttal briefs submitted to the record of the Asia Wheel I Request and constitutes the final scope determination of the Asia Wheel I inquiry. On February 24, 2023, Commerce issued its separate final scope ruling in the Asia Wheel II proceeding, finding that the wheels subject to the Asia Wheel II Request are outside the scope of the *Orders*.[10]

In the Preliminary Scope Ruling, Commerce set aside a period of time for parties to comment on

---

[6] *See* Memorandum, "Preliminary Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand," dated August 25, 2022 (Preliminary Scope Ruling).

[7] *See* Preliminary Scope Ruling at 3.

[8] *Id*. at 24.

[9] Specifically, the case briefing submissions received for the instant Asia Wheel I inquiry discuss business proprietary information not relevant to and not contained on the record of the corollary Asia Wheel II scope inquiry. Additionally, the products/production methods identified in this Asia Wheel I inquiry are subject to a covered merchandise referral received from U.S. Customs and Border Protection (CBP) pursuant to section 517(b)(4)(A) of the Act and the Trade Facilitation and Trade Enforcement Act of 2015 was signed into law, which contains Title IV – Prevention of Evasion of Antidumping and Countervailing Duty Orders (short title, Enforce and Protect Act of 2015 or EAPA) (Pub. L. 114-125, 130 Stat. 122, 155, February 24, 2016), which is not applicable to the products identified in the Asia Wheel II inquiry. Finally, though the production method identified in Asia Wheel II closely resembles production Method B in the instant Asia Wheel I Request, as distinct inquiries were requested and initiated upon, the two inquiries have distinct deadlines and require distinct CBP instructions and certifications.

[10] *See* Memorandum, "Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Asia Wheel II)," dated February 24, 2023 (*Asia Wheel II Ruling*) (provided to the instant record in Memorandum, "Transmitting Additional Documents Relied Upon in the Asia Wheel I Scope Ruling," dated concurrently with this memorandum at Attachment 1).

the determination.[11]  We received timely-filed case briefs[12] and rebuttal briefs[13] from Asia Wheel, Dexstar Wheel Division of Americana Development Inc. (the petitioner), and Trailstar Tire & Wheel, LLC, TexTrail Inc., and Lionshead Specialty Tire and Wheel, LLC (collectively, the Importers).  As the case briefs received contained business proprietary information (BPI), an analysis of comments which discuss BPI, is contained in a separate supplemental BPI memorandum.[14]

### Covered Merchandise Referral

On February 24, 2016, the Trade Facilitation and Trade Enforcement Act of 2015 was signed into law, which contains Title IV – Prevention of Evasion of Antidumping and Countervailing Duty Orders (short title, Enforce and Protect Act of 2015 or EAPA) (Pub. L. 114-125, 130 Stat. 122, 155, February 24, 2016).  Effective August 22, 2016, section 421 of the EAPA added section 517 to the Tariff Act of 1930, as amended (the Act), which establishes a formal process for CBP to investigate allegations of the evasion of AD and/or CVD orders.  Section 517(b)(4)(A) of the Act provides that if, during the course of an EAPA investigation, CBP is unable to determine whether the merchandise at issue is covered merchandise within the meaning of section 517(a)(3) of the Act, it shall refer the matter to Commerce to make such a determination.  Section 517(a)(3) of the Act defines covered merchandise as merchandise that is subject to an AD or CVD order issued under section 736 or 706 of the Act, respectively.  Section 517(b)(4)(B) of the Act states that Commerce, after receiving a covered merchandise referral from CBP, shall determine whether the merchandise is covered merchandise and promptly transmit its determination to CBP.  The Act does not establish a deadline by which Commerce must issue its determination.

On December 17, 2020, Commerce received a covered merchandise referral from CBP regarding CBP EAPA Investigation No. 7459,[15] which concerns the *Orders*.  Specifically, CBP requested that Commerce issue a determination as to whether certain types of trailer wheels produced in Thailand from inputs sourced from China (either the rim or disc component is sourced from China and the corresponding rim or disc component is produced in Thailand, which may or may not involve using inputs sourced from China; *i.e.*, the covered merchandise referral specified that

---

[11] *Id.*

[12] *See* Importers' Letter, "Importers' Case Brief and Hearing Request:  Scope Inquiry (Asia Wheel)," dated September 21, 2022 (Importers' Case Brief); *see also* Petitioner's Letter, "Petitioner's Case Brief," dated September 21, 2022 (Petitioner's Case Brief); and Asia Wheel's Letter, "Case Brief," dated October 5, 2022 (Asia Wheel's AWI Case Brief).

[13] *See* Petitioners' Letter, "Petitioner's Rebuttal Brief," dated October 12, 2022 (Petitioner's AWI Rebuttal Brief); *see also* Asia Wheel's Letter, "Rebuttal Brief," dated October 12, 2022 (Asia Wheel's AWI Rebuttal Brief).  The Importers submitted a non-substantive letter in lieu of rebuttal comment which expressed full support for Asia Wheel's Case Brief.  *See* Importers' Letter, "Importers' Letter in Lieu of a Rebuttal Case Brief:  Scope Inquiry (Asia Wheel)," dated October 12, 2022.

[14] *See* Memorandum, "Final Asia Wheel BPI Analysis Memo," dated concurrently with this memorandum (Final BPI Memo).

[15] *See* CBP's EAPA Letter.

4

the products at issue were those specified in the Asia Wheel I request).[16] Notice of this referral was published in the *Federal Register* on February 19, 2021.[17] In this notice, we explained that because the covered merchandise referral requests a determination on merchandise identified in a request for a scope ruling previously submitted to Commerce and currently under consideration, we will address the covered merchandise referral and Asia Wheel Co., Ltd.'s scope ruling request (Asia Wheel I Request) in the ongoing scope segments of the AD and CVD proceedings.[18]

## III.     SCOPE OF THE *ORDERS*

The products covered by the *Orders* are certain on-the-road steel wheels, discs, and rims for tubeless tires with a nominal wheel diameter of 12 inches to 16.5 inches, regardless of width. Certain on-the-road steel wheels with a nominal wheel diameter of 12 inches to 16.5 inches within the scope are generally for road and highway trailers and other towable equipment, including, inter alia, utility trailers, cargo trailers, horse trailers, boat trailers, recreational trailers, and towable mobile homes. The standard widths of certain on-the-road steel wheels are 4 inches, 4.5 inches, 5 inches, 5.5 inches, 6 inches, and 6.5 inches, but all certain on-the-road steel wheels, regardless of width, are covered by the scope.

The scope includes rims and discs for certain on-the-road steel wheels, whether imported as an assembly, unassembled, or separately. The scope includes certain on-the-road steel wheels regardless of steel composition, whether cladded or not cladded, whether finished or not finished, and whether coated or uncoated. The scope also includes certain on-the-road steel wheels with discs in either a "hub-piloted" or "stud-piloted" mounting configuration, though the stud-piloted configuration is most common in the size range covered.

All on-the-road wheels sold in the United States must meet Standard 110 or 120 of the National Highway Traffic Safety Administration's (NHTSA) Federal Motor Vehicle Safety Standards, which requires a rim marking, such as the "DOT" symbol, indicating compliance with applicable motor vehicle standards. See 49 CFR 571.110 and 571.120. The scope includes certain on-the-road steel wheels imported with or without NHTSA's required markings.

Certain on-the-road steel wheels imported as an assembly with a tire mounted on the wheel and/or with a valve stem or rims imported as an assembly with a tire mounted on the rim and/or with a valve stem are included in the scope of these *Orders*. However, if the steel wheels or rims are imported as an assembly with a tire mounted on the wheel or rim and/or with a valve stem attached, the tire and/or valve stem is not covered by the scope.

---

[16] Though the products/production method subject to the Asia Wheel II Request are very similar to those specified in Production Method B identified in the Asia Wheel I Request, because the Asia Wheel II Request was filed subsequently to CBP submitting its referral, the covered merchandise referral did not specifically cover the products/production method specified in the Asia Wheel II Request.

[17] *See Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Notice of Covered Merchandise Referral*, 86 FR 10245 (February 19, 2021).

[18] *Id.* at 10246.

5

The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the *Orders* if performed in China.

Excluded from this scope are the following:
(1) Steel wheels for use with tube-type tires; such tires use multi piece rims, which are two-piece and three-piece assemblies and require the use of an inner tube;
(2) aluminum wheels;
(3) certain on-the-road steel wheels that are coated entirely in chrome.  This exclusion is limited to chrome wheels coated entirely in chrome and produced through a chromium electroplating process, and does not extend to wheels that have been finished with other processes, including, but not limited to, Physical Vapor Deposition (PVD);
(4) steel wheels that do not meet Standard 110 or 120 of the NHTSA's requirements other than the rim marking requirements found in 49 CFR 571.110S4.4.2 and 571.120S5.2;
(5) steel wheels that meet the following specifications:  steel wheels with a nominal wheel diameter ranging from 15 inches to 16.5 inches, with a rim width of 8 inches or greater, and a wheel backspacing ranging from 3.75 inches to 5.5 inches; and
(6) steel wheels with wire spokes.

Certain on-the-road steel wheels subject to these *Orders* are properly classifiable under the following category of the Harmonized Tariff Schedule of the United States (HTSUS): 8716.90.5035 which covers the exact product covered by the scope whether entered as an assembled wheel or in components.  Certain on-the-road steel wheels entered with a tire mounted on them may be entered under HTSUS 8716.90.5059 (Trailers and semi-trailers; other vehicles, not mechanically propelled, parts, wheels, other, wheels with other tires) (a category that will be broader than what is covered by the scope).  While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the subject merchandise is dispositive.

## IV.    LEGAL FRAMEWORK

When a request for a scope ruling is filed, Commerce examines the scope language of the order(s) at issue and the description of the product contained in the scope-ruling request.[19] Pursuant to Commerce's regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the records from the investigation, and prior scope determinations made for the same product.[20]  If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by an order.

Conversely, where the plain scope language in the order and the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider

---

[19] *See Walgreen Co. of Deerfield, IL v. United States*, 620 F. 3d 1350, 1356-57 (Fed. Cir. 2010).
[20] *See* 19 CFR 351.225(k)(1).

the factors set forth in 19 CFR 351.225(k)(2). These factors are: (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed. The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration and enforcement of the AD and CVD statute. The scope of an AD or CVD order is limited to merchandise that originates in the country covered by the orders.[21] Commerce has explicitly stated that the scope of an AD order is "defined by the type of merchandise and the country-of origin."[22]

In determining the country-of-origin of a product, Commerce's practice has been to conduct a substantial transformation analysis.[23] The U.S. Court of International Trade (CIT) has upheld Commerce's "substantial transformation" analysis as a means to carry out its country-of-origin analysis.[24] The CIT has stated and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has upheld, that "{the} 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[25]

Commerce's substantial transformation analysis asks:

---

[21] *See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) (*SSPC from Belgium*), and accompanying Issues and Decision Memorandum (IDM) at Comment 4.

[22] *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina*, 58 FR 37062, 37065 (July 9, 1993) (*Carbon Steel Flat Products*), where Commerce stated that "{the} scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (*e.g.*, widgets from Ruritania). For merchandise to be subject to an order it must meet both parameters, *i.e.*, product type and country of origin. In determining country of origin for scope purposes, Commerce applies a 'substantial transformation' rule." This language was quoted by the CIT in *Advanced Tech & Materials Co., Ltd. v. United States*, 35 CIT 1380, 1384 (2011), and *Ugine and ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333,1345 (CIT 2007) (*Ugine CIT 2007*).

[23] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008) (*Glycine from India*), and accompanying IDM at Comment 5; *see also SSPC from Belgium* IDM at Comment 4.

[24] *See Bell Supply Co. v. United States*, 888 F.3d 1222, 1229 (Fed. Cir. 2018) (*Bell Supply CAFC 2018*) (citing *E.I. DuPont De Nemours & Company v. United States*, 8 F. Supp. 692, 695 (CIT 1993) ("noting that in determining if merchandise exported from an intermediate country is covered by an antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation.")).

[25] *Id*.

(1) whether, as a result of the manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character, and use;[26] and

(2) whether through that transformation, the new article becomes a product of the country in which it was processed or manufactured.[27]

Commerce may examine a number of factors in conducting its substantial transformation analysis, and the weight of any one factor can vary from case to case and depends on the particular circumstances unique to the products at issue.[28]  For this scope inquiry, Commerce considered the following factors when performing our substantial transformation analysis:

1. Class or Kind of Merchandise
2. Product Properties, the Essential Component of the Merchandise, and Intended End-Use
3. Nature/Sophistication of Processing in the Country of Exportation
4. Cost of Production/Value Added
5. Level of Investment.[29]

Because the scope request addresses certain steel wheels assembled in a third country that contain wheel components manufactured in China, we have used a substantial transformation analysis, as appropriate, to determine whether certain of Asia Wheel's products exported to the United States are covered by the scope of the *Orders*.

## V.    DESCRIPTION OF THE MERCHANDISE SUBJECT TO THESE SCOPE REQUESTS

The products subject to the Asia Wheel I scope request are certain models of trailer wheels which Asia Wheel processes in Thailand from certain components of Chinese origin, using various distinct production methods, and exported to the United States from Thailand by Asia Wheel (collectively, requested products).[30]  Asia Wheel distinguishes the requested products by the production method used to manufacture them, specifically:[31]

- Production Method A:  Trailer wheels manufactured using discs from China and rims produced in Thailand from rectangular steel plates from China or a third country.

---

[26] *See, e.g.*, *Bell Supply CAFC 2018*, 888 F.3d at 1228–29.

[27] *See Ugine CIT 2007*, 517 F. Supp. 2d at 1337 n.5.

[28] *See Laminated Woven Sacks from the People's Republic of China:  Final Results of First Antidumping Duty Administrative Review*, 76 FR 14906 (March 18, 2011) (*Laminated Woven Sacks*), and accompanying IDM at Comment lb.

[29] *See, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results of the 2008-2009 Antidumping Duty Administrative Review*, 76 FR 3086 (January 19, 2011), and accompanying IDM at Comment 6; *see also Laminated Woven Sacks* IDM at Comment 1b; *Final Determination of Sales at Less Than Fair Value:  Certain Artist Canvas from the People's Republic of China*, 71 FR 16116 (March 30, 2006), and accompanying IDM at Comment 1; and *Bell Supply CAFC 2018*, 888 F.3d at 1228–29.

[30] *See* Asia Wheel I Request at 6-7.

[31] *Id.*; *see also* Asia Wheel 1st SQR at Attachment 1; and Asia Wheel 2nd SQR at Exhibit SQR2-1.

8

- Production Method B:  Trailer wheels manufactured using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country.[32]
- Production Method C:  Dual wheels manufactured using discs produced in Thailand from disc blanks from China and rims from China.

The Asia Wheel I Request did not identify specific model numbers of wheels otherwise covered by the scope of the *Orders* if produced in China and finished in Thailand using the various production methods identified in the requests, nor identified which specific trailer wheel products were produced using the various production methods.  However, we note the product list provided by Asia Wheel indicates that its trailer wheels all possess diameters in the range of 12 to 16.5 inches covered by the scope of the *Orders*, and would, thus, be covered by the scope of the *Orders* if manufactured in China.[33]

In supplemental questionnaires, Commerce inquired as to:  (1) the specific products covered by the request and subject to each production method; (2) whether the same product could be produced using two or more different production methods; and (3) how Asia Wheel was able to determine the production method by which a given steel trailer wheel product was manufactured and how this information could be identified on the commercial invoice or other relevant documentation at the time of entry into the United States.  In response, Asia Wheel noted that it can use Production Methods A and B identified in the Asia Wheel I Request to manufacture any non-dual steel trailer wheel models in Thailand which would otherwise be covered by the scope of the *Orders* if produced in China; however only Production Method C is used to produce the dual-wheel trailer wheel products in Thailand which would otherwise be covered by the scope of the *Orders* if produced in China.[34]  Further, Asia Wheel noted that it only uses internal merchandise codes to identify its products; these are not further applied to its invoices and shipment documents.[35]

## VI.    RELEVANT SCOPE DETERMINATIONS

US Wheel Components Ruling[36]

In the *US Wheel Components Ruling*, the products in question were certain models of passenger vehicle and light truck rims and discs produced in China and imported by the requestor. Commerce found that the requested products were identified as belonging to a series of products previously found to be not subject to the scope in a prior determination.  Noting that the stated uses of the products were not contradicted by the record, Commerce analyzed the physical

---

[32] The production method identified in the Asia Wheel II is otherwise identical to that of Production Method B identified in the Asia Wheel I request, with the distinction being the cross-section shape of the steel plate input used in the disc production.

[33] *See* Asia Wheel 2nd SQR at Exhibit SQR2-2.

[34] *Id*. at 2.

[35] *Id*. at 4.

[36] *See* Memorandum, "Final Scope Ruling:  U.S. Wheel's Passenger Vehicle and Light Truck Discs and Rims," dated May 3, 2021 (*US Wheel Components Ruling*) (provided to the instant records in Memorandum, "Transmitting Documents Relied Upon in the Asia Wheel Scope Rulings," dated August 25, 2022 (Transmittal Memorandum) at Attachment 1).

9

characteristics and specifications of the requested wheel components *and* the corresponding finished wheels of the same series manufactured from the requested wheel components. We determined on this basis that the requested products could be identified as passenger vehicle and light truck rims and discs and, thus, the products in question were not covered by the *Orders*, pursuant to 19 CFR 351.225(k)(1).

HPS Conductor for Transformer Coil Ruling[37]

This ruling addressed certain aluminum foil conductors processed in Canada from common alloy aluminum sheet sourced from China. The relevant scope language at issue was "common alloy sheet that has been further processed in a third country, including, but not limited to, annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in the country of manufacture of the common alloy sheet." Commerce performed a substantial transformation analysis, finding that the class or kind of the merchandise; the nature and sophistication of processing; and product properties, essential component, and intended end-use all did not support substantial transformation. As Commerce found the then requested products subject to the scope based on the totality of the substantial transformation factors, it did not issue specific findings with respect to level of investment and cost of production (COP)/value added.

Asia Wheel II Ruling[38]

In the final ruling for the Asia Wheel II proceeding, Commerce continued to find that the finished trailer wheels Asia Wheel produces from rims produced in Thailand from rectangular steel plates from China or a third country and discs produced in Thailand from rectangular steel plates sourced from China or a third country are not subject to the scope of the *Orders*. Additionally, Commerce made certain amendments to draft certifications for importers and exporters.

## VII. DISCUSSION OF INTERESTED PARTIES' COMMENTS

**Comment 1:  Whether Asia Wheel's Steel Wheels Manufactured Under Production Methods A or C Are Excluded Under the Plain Language of the Scope**

Asia Wheel's AWI Case Brief[39]

- The Preliminary Scope Ruling impermissibly interprets the third-country processing provision of the scope of the *Orders* to mean that wheels made in a third country from rims or discs from China, but not both, are covered by the scope of the *Orders*.

---

[37] *See* Memorandum, "Antidumping and Countervailing Duty Orders on Aluminum Sheet from the People's Republic of China; Final Scope Ruling Determination: HPS Aluminum Conductor for Transformer Coil," dated January 20, 2022 (*HPS Conductor for Transformer Coil*) (provided to the instant records in Transmittal Memorandum at Attachment 2).
[38] *See*, *generally*, *Asia Wheel II Ruling*.
[39] *See* Asia Wheel's AWI Case Brief at 3-7.

10

- During the underlying investigations, importers and the respondent[40] argued that the third-country processing provision of the scope specifies that wheels made in a third country from either rims or discs from China – but not both – are outside the scope of the *Orders* and recommended that Commerce modify the scope language to make this even clearer, if necessary. In response, Commerce declined to add clarifying language, stating at the beginning and end of its analysis that "the existing language sufficiently conveys the concept that third-country processing of a steel wheel must be of rims and discs produced in China" for the imported merchandise to be within the scope.[41] This statement leads to the unavoidable conclusion that the agency interpreted the third-country-processing provision to mean that trailer wheels manufactured in a third country with rims or discs from China – but not both – are outside the scope of the *Orders*.

- The petitioner would not have argued that the scope be amended to replace "and" with "or" if it thought the third-country processing provision could reasonably be interpreted to include trailer wheels manufactured in a third country with rims or discs from China.[42] Further, if it were unnecessary, Commerce would not have used the word "must," but did.[43]

- Commerce's interpretation of the statement from the Final Scope INV Memorandum that it "did not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern" is not consistent with its other statements in the investigation and must be read in the context of its overall analysis that indicated that both the rims and discs "must" originate in China for a third-country-assembled wheel to be within scope.[44] These statements confirm Commerce considered it unnecessary to add language clarifying that wheels manufactured in third countries using rims or discs from China were outside the scope.

- Moreover, Commerce indicated that it would not foreclose additional analysis in the context of addressing circumvention – when a party "requests a scope ruling and/or to address a future circumvention concern." The present scope proceeding is not a circumvention inquiry.[45]

- Asia Wheel manufactures finished trailer wheels in Thailand under Production Methods A and C using rims or discs (but not both) from China. Therefore, consistent with Commerce's interpretation of the third-country processing provision in the original AD/CVD investigations, Asia Wheel's Method A Wheels and Method C Wheels are outside the scope of the *Orders*.

---

[40] The respondent referred to here is Zhejiang Jingu Co., Ltd. (Zhejiang Jingu), a Chinese producer of steel trailer wheels and Asia Wheel's parent company. *See* Asia Wheel I Request at 2.

[41] *See* Asia Wheel's AWI Case Brief at 4 (citing Memorandum, "Certain Steel Wheels from the People's Republic of China: Final Scope Decision Memorandum for the Final Antidumping Duty and Countervailing Duty Determinations," dated July 1, 2019 (Final INV Scope Memo) at Comment 3 (provided to the instant record by Importers' RFI Response) at Exhibit 1)).

[42] *Id*. at 5 (citing Final INV Scope Memo at Comment 3).

[43] *Id*. at 5-6 (citing Final INV Scope Memo at Comment 3).

[44] *Id*. at 6-7 (citing Final INV Scope Memo at Comment 3).

[45] *Id*. at 7 (citing Final INV Scope Memo at Comment 3).

11

Importers' Case Brief[46]

- The Preliminary Scope Ruling directly contradicts Commerce's consideration of wheels produced in third countries consisting of "rims or discs" from China in the investigations and is contrary to the plain language of the scope. Commerce refused to adopt the language to expand the scope to include rims or discs produced in China suggested by the petitioner, yet that is exactly what Commerce is now proposing to do, in contravention of its decision in the investigations.

- When rejecting the petitioner's attempt in the investigations to revise the scope language to convey instead that "either a rim or a disc from China {that is further processed in a third country} would be covered by these investigations, not only a rim and a disc together," Commerce stated that "no such intent {to include this type of third country processing} is obvious on the record." Commerce also stated that it "previously understood the scope language to mean what it expressly states - that both constituent parts {the disc and rim} are covered under the scope." Commerce acknowledged that it typically defers to the petitioner "to make scope changes to best reflect the product from which the domestic industry is seeking relief" and still rejected the petitioner's change to the scope language as being "intentionally and selectively expansionary and not consistent with the plain meaning of the word "and" {that was in the scope}.[47]

- The inclusion of the word "and" to "rims and discs" cannot be interpreted to mean "or." Federal courts have long recognized this critical distinction between "and" and "or."[48]

- Commerce's general statement that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention," must be taken in the context of the "rims or discs from China" determination in the investigations. This previous determination does not support Commerce's scope determination in this proceeding.

- For Commerce to reverse its position now and find that third country processing of a disc in Thailand into a wheel is sufficient to bring the wheel into the *Orders* is contrary to the plain language of the scope which covers third country processing of "rims and discs," and unlawfully expands the scope.[49]

- Commerce's Preliminary Scope Ruling ignores the clear regulatory requirement that a scope inquiry begins with the plain language of the scope, which clearly states that the rim and the disc must be from China for the finished wheel to be within the scope of the *Orders*. The plain language of the scope says, "rims and discs," and no further analysis is required.[50]

---

[46] *See* Importers' Case Brief at 3-7.
[47] *Id*. at 3-4 (citing Final INV Scope Memo at Comment 3).
[48] *Id*. at 4 (citing *Adams v. U.S. Forest Serv.*, 617 F.3d 1138, 1145 (Fed. Cir. 2012); *Idaho v. Wright*, 497 U.S. 805, 831 n.2, (1990) (Kennedy, J., dissenting); and *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742 (9th Cir. 1988) (Kozinski, J., dissenting)).
[49] *Id*. at 5 (citing *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998); and *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990) (*Smith Corona*)).
[50] *Id*. at 6-7 (citing Final INV Scope Memo at Comment 3).

12

<u>Petitioner's Case Brief</u>[51]

- Commerce properly dismissed claims that Commerce had ruled otherwise during the investigations and determined that all parts of the wheel (both the rim and the disc) had to be finished in China for the scope to apply, when Commerce explicitly stated that it was not addressing that question in the investigation. It was also correct to reject the stance that the language of "including, but not limited to" a set of certain examples should, instead, be read to mean the opposite and that "not limited to" can somehow mean "limited only to."[52]

<u>Petitioner's AWI Rebuttal Brief</u>[53]

- Asia Wheel and Importers selectively take some of Commerce's phrases from the investigation out of context to argue that they must be imbued with a meaning Commerce expressly disavowed.
- During the investigations underlying these *Orders*, Commerce was clear in its preliminary scope determinations that the additional language regarding third-country finishing was to "*Clarify* the Scope of the Investigations."[54] To "clarify" means "to make understandable" or "to free of confusion;" it does not mean to change or modify.[55] When Commerce clarifies scope language, it does not change it.
- The scope of the underlying investigations and these *Orders* has always included "wheels, discs, and rims," not just finished wheels, and thus, Commerce only clarified that certain already-covered merchandise would not be removed from the scope of the investigations and *Orders* if third-country processing, which "would not otherwise remove the merchandise from the scope of the investigations if performed in China," occurred.[56] Commerce was also specific that it was not applying its substantial transformation analysis to clarify the scope, based on clear statements from the Federal Circuit that the substantial transformation test was only one of the permissible ways for Commerce to approach such questions.[57]
- In its final scope determination in the investigations, Commerce explicitly declined to modify the scope language to limit coverage to third-country processing of both rims and discs from China, as argued by the respondent and certain importers at the briefing stage.[58]
- Commerce was bluntly clear that it was not answering the question regarding "rim and disc" wheels at that time. Any reasonable reader cannot interpret its statement that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested

---

[51] *See* Petitioner's Case Brief at 1-3.

[52] *Id*. at 1-2 (citing Preliminary Scope Ruling at 13-14).

[53] *See* Petitioner's AWI Rebuttal Brief at 2-10.

[54] *Id*. at 3 (adding emphasis and citing Memorandum, "Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Preliminary Scope Decision Memorandum," dated April 15, 2019, at Comment 3 (Preliminary INV Scope Memo) (provided to the instant record by Petitioner's Letter, "Substantial Transformation Submission," dated August 30, 2021 (Petitioner's RFI Response) at Attachment 2)).

[55] *Id*. at 3 (citing *Merriam-Webster*, "Clarify," retrieved October 10, 2022, https://www.merriam-webster.com/dictionary/clarify).

[56] *Id*. at 3-4 (citing Preliminary INV Scope Memo at 8 (We note that the reference likely meant to cite to the Final INV Scope Memo)).

[57] *Id*. at 4 (citing Preliminary INV Scope Memo at 9-10 (We note that the reference likely meant to cite to the Final INV Scope Memo)).

[58] *Id*. at 4-5 (citing Final INV Scope Memo at Comment 3).

13

party requests a scope ruling and/or to address a future circumvention concern" as having answered the question of "a mix of rim and disc parts from China and a third country."[59]

- Commerce must write the description of the scope in general terms, so Commerce must be able to *later* address questions of those general terms, and it has the authority to do so.[60]  In the Final INV Scope Memo, Commerce's statement that it would address that question in the future cannot be imbued with any meaning other than the fact that Commerce was not addressing nor answering that question at that time.

- A key principle of reading and interpreting rulemaking is that the entirety of the piece must be read as a unified whole.[61]  Commerce should reject the selective reading of its own determinations as argued by Asia Wheel and Importers.[62]

- The Federal Circuit[63] and the CIT[64] support the application of a substantial transformation analysis to determine the country of origin and counter circumvention.  Contrary to Importers' claims, Commerce correctly applied its authority to use this analysis in the instant proceeding.[65]

- Asia Wheel's interpretation of Commerce's statement that it could apply further analysis in "a scope ruling and/or to address a future circumvention concern" is incorrect.[66]  First, it reverses the plain meaning of "and/or" to mean "only and."  Second, Commerce did not specify a circumvention inquiry, and given the circumvention concerns indicated by CBP's EAPA investigations, Commerce is applying a substantial transformation analysis in the exact circumstance it posited during the underlying investigations.[67]

**Commerce's Position**:  For this final ruling, we continue to find it appropriate to apply a substantial transformation analysis to determine country of origin for Asia Wheel's steel wheels manufactured under Production Methods A and C.  Specifically, the plain language of the scope is ambiguous as to the status of finished wheels processed in a third country from a mix of one wheel component sourced from China and one component originating from a third country, and the need to perform such an analysis to address this ambiguity was specifically contemplated in the underlying investigations.

As discussed at length and addressing nearly identical arguments in the Preliminary Scope Ruling, we declined to clarify the scope language as requested by the respondent and certain importers or as requested by the petitioner in rebuttal at the briefing stage of the underlying investigations.[68]  Asia Wheel and Importers' arguments that the plain language is clear that wheels made in a third country from rims or discs from China, but not both, are outside the scope

---

[59] *Id.* at 6 (citing Final INV Scope Memo at Comment 3).

[60] *Id.* at 7 (citing *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1236 (CIT 2019)).

[61] *Id.* at 8 (citing *Williams v. Taylor*, 529 U.S. 362, 364, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009); *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1073 (Fed. Cir. 2001); and *Duncan v. Walker*, 533 U.S. 167, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)).

[62] *Id.* at 8-9, comparing Importers' Case Brief at 7 and 17 and Final INV Scope Memo at Comment 3.

[63] *See* Petitioner's AWI Rebuttal Brief at 9 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1229).

[64] *Id.* at 9 (citing *E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 374 (CIT 1998) (*E.I. Du Pont*)).

[65] *Id.* at 9 (citing Importers' Case Brief at 6-7).

[66] *Id.* at 10 (citing Asia Wheel AWI Case Brief at 6).

[67] *Id.* at 10 (citing Preliminary Scope Ruling at 4-5).

[68] *See* Preliminary Scope Ruling at Issue 1.

14

of the *Orders* are specious and reliant on a mischaracterization of the investigation record.  First, Asia Wheel and Importers vastly overstate the impact of Commerce's rejection of the petitioner's counter-request in the investigations to modify the scope to clarify that the third-country processing of Chinese "rim or disc" products are covered by the scope.  They characterize this as both a wholesale rejection foreclosing any subsequent consideration of the topic and as a primary finding that such products are not covered based on the plain language.[69] As the language of the rejection in the Final INV Scope Memo indicates, we were rejecting *all* parties' attempts to clarify this question *generally*, raised for the first time in the briefing stage, and were instead tabling the discussion for evaluation in the context of actual examples of third-country processing later submitted.[70]  Thus, the "context" which Asia Wheel and Importers request be considered belies all of their arguments on this issue, given we made no such overall determination and instead considered the most appropriate resolution to the question to be evaluation of specific examples on a case-by-case basis in the context of future scope or circumvention inquiries, in consideration of information regarding substantial transformation, if appropriate.

The petitioner is correct to note that Asia Wheel and Importers' arguments that such products are covered by the plain meaning and no further analysis is needed rely on overlooking all context the source materials cited, selective omission of critical phrases which directly contradict the arguments, conspicuously overlooking the corollary rejection of Asia Wheel and Importers' request and, indeed, reading out the very meaning of Commerce's explicit statements.[71] However, Importers are correct that the scope of an order may be clarified but not changed contrary to its terms.[72]  As we emphasized in the Preliminary Scope Ruling, the "including, but not limited to" wording of the scope's third-country processing language is non-exclusive, and we stated "{t}he plain language does not address what varieties of processing may otherwise exclude a product from the scope."[73]  The instant proceeding seeks to provide specific clarification, as requested by Asia Wheel, as to whether the requested products are subject to this clause.  Our preliminary finding that wheels made in a third country from rims or discs from China, but not both, are not addressed by the explicit language of the scope and that the source materials otherwise direct Commerce to further evaluate coverage of such products based on case-specific factors, which may include substantial transformation information, is fully supported by the record and consistent with relevant precedent upholding the application of this methodology to resolve questions of country of origin.[74]

---

[69] *See* Asia Wheel's AWI Case Brief at 4; *see also* Importers' Case Brief at 3-4.
[70] *See* Final INV Scope Memo at Comment 3.
[71] *See* Petitioner's AWI Rebuttal Brief at 8-9.
[72] *See* Importers' Case Brief at 5 (citing *Smith Corona*, 915 F.2d at 686).
[73] *See* Preliminary Scope Ruling at 13.
[74] *See, e.g.*, *Bell Supply CAFC 2018*, 888 F.3d at 1229.

15

Appx032

**Comment 2:   Whether Commerce's Preliminary Substantial Transformation Analysis Was Correct and Supported by the Record**

Asia Wheel's AWI Case Brief[75]
- Commerce incorrectly applied portions of its substantial transformation analysis to the Chinese-origin component rather than the finished wheel.  Such analysis is used to determine the country of origin "for an imported article," which, in this instance, is a finished trailer wheel.[76]

*Class or Kind*
- Commerce has argued that "the same class or kind of merchandise is not a controlling factor of a substantial transformation analysis," and that substantial transformation can occur when the class or kind of merchandise remains the same.[77]  While discs, rims, and finished trailer wheels are subject to the *Orders* when manufactured in China, they are not interchangeable. The wheel components have different functions and physical characteristics than finished wheels, becoming new products after conversion into finished trailer wheels in Thailand.

*Essential Characteristics*
- Commerce's analysis of essential characteristics is inconsistent with the substantial transformation test upheld by the Federal Circuit as "when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process."[78]
  o Finished trailer wheels acquire their name, character, and use after a rim and disc are welded together, neither of which possess the same name, character, or use as finished trailer wheels.
  o The petitioner stated that "the rim or disc are ***not useable*** without being assembled into a wheel."[79]  Additionally, it explained that "{t}he rim comprises the perimeter of the wheel and supports the tire when it is attached to the disc while the disc serves as the center portion of the wheel within the rim."[80]  Since a trailer wheel cannot function without both a rim and a disc, neither component individually possesses the same name, character, or use as a finished wheel.

---

[75] *See* Asia Wheel's AWI Case Brief at 8-27.

[76] *Id*. at 8 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1228).

[77] *Id.* at 9 (citing *Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances:  Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303 (May 22, 2006) (*Diamond Sawblades from China*), and accompanying IDM at Comment 4).

[78] *Id*. at 11-12 (citing *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1350 (CIT 2022) (*Cyber Power Sys. (USA)*)).

[79] *Id.* at 12 (citing and adding emphasis to Petitioner's Letter, "Petitioner's Request for Clarification of Country of Origin Criteria," dated March 1, 2019 (Petitioner's INV Origin Request) (provided, in part, to the instant record in Asia Wheel's RFI Response at Exhibit RFI-ALL-3) at 8).

[80] *Id*. at 12 (citing Petitioner's Letter, "Petitions for the Imposition of Antidumping Duties and Countervailing Duties on Imports of Certain Steel Wheels 12 – 16.5 Inches in Diameter from the People's Republic of China – Resubmission of Injury Narrative (Volume I)," dated August 8, 2018 (provided, in part, to the instant record in Asia Wheel's RFI Response at Exhibit RFI-ALL-4) at I-10).

16

- o In *Diamond Sawblades from China*, Commerce examined the same factor with respect to finished diamond sawblades consisting of two equally important components (*i.e.*, core and segments), which are analogous to the rim and disc components at issue in this proceeding, and found that the essential quality of the product is not imparted until the cores and segments are attached to create a finished diamond sawblade.[81] The same reasoning applies here.

- Commerce misapplied the *WorldPac Ruling* in the Preliminary Scope Ruling, noting that "a finished wheel does not make use of multiple of the same component, sourced from different countries."[82] Specifically, Asia Wheel uses significant non-subject equivalents in its production process, as in the *WorldPac Ruling*, but Asia Wheel also manufactures significant non-subject equivalents in Thailand. Therefore, the *WorldPac Ruling* supports substantial transformation for Production Methods A and C, where the facts more strongly indicate such transformation.[83]

- Similarly, the *Solar Cells Solaria Ruling* cited by Commerce is not analogous to the facts at issue in this proceeding.[84] The scope language in the *Solar Cells Solaria Ruling* covered "solar modules produced in a third country from cells produced in China or Taiwan," and the further third processing at issue in that case involved the modules further processed in those countries.[85] As such, the *Solar Cells Solaria Ruling* case involved further processing explicitly considered by the plain language, analogous to the "rim and disc" products explicitly considered by the instant scope but not the "rim or disc" products at issue in this proceeding. The finding in the *Solar Cells Solaria Ruling* was based on a plain reading of the language and did not consider further substantial transformation analysis. Further, the essential characteristics of a finished trailer wheel are not established until both rim and disc are assembled, unlike in *Solar Cells Solaria Ruling*, where Commerce found that the distinct solar cell product, as imported from the order country and notwithstanding further processing, imparts the essential character of the finished product exported from the third country; in contrast to the instant facts where Thai processing adds one half of the essential components and assembles the wheel into its final form.

*Nature and Sophistication of Processing*

- Commerce inappropriately focuses on whether the China-origin components are dedicated to the production of finished trailer wheels, but whether they adopt a new name, character, and use.[86]

---

[81] *Id*. at 13 (citing *Diamond Sawblades from China* IDM at Comment 4).

[82] *Id*. at 14 (citing Preliminary Scope Ruling at 17-18).

[83] *Id*. at 14 (citing Memorandum, "Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Scope Ruling on WorldPac Inc.'s Wheel Hub Assemblies," dated September 11, 2019 (*WorldPac Ruling*) (provided to the instant record in Asia Wheel's RFI Response at Exhibit RFI-ALL-1).

[84] *Id*. at 14-15 (citing Preliminary Scope Ruling at 17-18; and Memorandum, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Products from Taiwan:  The Solaria Corporation Scope Ruling," dated Aril 8, 2021 (provided to the instant record in Petitioner's RFI Response at Exhibit 2) (*Solar Cells Solaria Ruling*)).

[85] *Id*. at 15 (citing *Solar Cells Solaria Ruling* at 12).

[86] *Id*. at 16-17 (citing Preliminary Scope Ruling at 19).

17

- Commerce substantially understates the level of processing Asia Wheel performs by noting assembly, welding, and painting steps (*i.e.*, finishing operations). Production Method A includes the manufacture of steel plates into rims, establishing the rim's diameter. Production Method C includes the manufacture of disc blanks into discs, establishing the number, placement, and type of holes and the finished wheel's mounting arrangement. Asia Wheel provided descriptions, photos, and videos substantiating that the level of sophistication is well beyond finishing operations.[87]

- Commerce overstates the level of processing that occurs in China by finding "the wheels produced by Production Methods A and C were ***designed*** (involving complex engineering) in and began production in China."[88] Substantial transformation analysis concerns the location where merchandise is physically produced "as a result of manufacturing or processing."[89] The CIT has recognized that "{i}f ITA's decision as to where merchandise is produced were to be based on design and engineering, a first step in production, rather than on the final stage of production prior to exportation, the statute would be unworkable."[90]

- The plain language of the third-country processing provision of the scope applies to rims, discs, and wheels. This language does not list steel plates or other steel inputs, and thus, Commerce wrongly asserts that Asia Wheel "merely finishes the process that began in China" because steel plate production occurs in China.[91]

- Commerce should not accept the petitioner's claims that Asia Wheel's processing steps "are similar to (and, indeed, fewer than) those found to not constitute substantial transformation" in another scope ruling.[92]

*Cost of Production/Value Added*

- Commerce's conclusion that "the processing steps of finishing the components into a finished wheel in Thailand are relatively minor in comparison to the production operations in China which produce the components themselves," overlooks Asia Wheel's production of Production Method A's rims and Production Method C's discs.[93]

- Commerce should accept the cost ratios submitted by Asia Wheel and find that its costs incurred in Thailand and the value added for Production Methods A and C are significant.

- The steel plates and disc blanks used in Production Methods A and C, respectively, are substantially transformed into Thailand-origin rims and discs, respectively. Since these Thai-origin wheel components are non-subject merchandise, their costs, including steel input costs, should be attributed to Asia Wheel's COP in Thailand.[94]

- The only processing costs attributable to China should be limited to the input steel and initial fabrication steps for discs and rims manufactured in and exported from China, for Production Methods A and C, respectively.

---

[87] *Id*. at 17 (citing Asia Wheel's RFI Response at 14).
[88] *Id*. at 18 (citing and adding emphasis to Preliminary Scope Ruling at 19).
[89] *Id*. at 18 (citing *Bestfoods v. United States*, 165 F.3d 1371, 1372 (Fed. Cir. 1999) (*Bestfoods*)).
[90] *Id*. at 18 (citing *Smith Corona*, 811 F. Supp. at 696).
[91] *Id*. at 18 (citing Preliminary Scope Ruling at 19).
[92] *Id*. at 19 (citing Preliminary Scope Ruling at 19; and Petitioner's RFI Response at 14-15).
[93] *Id*. at 20 (citing Preliminary Scope Ruling at 20-21).
[94] *Id*. at 21-22.

18

- Asia Wheel's steel input purchases from an affiliate are at prices comparable to market prices, as demonstrated by the steel plate purchase records submitted in the Asia Wheel II proceeding. However, as such input costs should be attributed to Asia Wheel's COP in Thailand, should transfer prices be found to be not at arm's length, then Asia Wheel's COP incurred in Thailand would be understated.[95]
- Commerce's Second Supplemental Questionnaire states "{t}he exporter may complete this {surrogate value} spreadsheet when filing the questionnaire response, or later in accordance with the deadlines set forth in section 351.301(c)(3) of Commerce's regulations."[96] If Commerce decides to value factors of production (FOP) for a value-added calculation, it should provide Asia Wheel an opportunity to submit surrogate value information, since 19 CFR 351.301(c)(3) allows for the submission of this information no later than 30 days before a preliminary determination in an administrative review, and Commerce did not announce a deadline for its preliminary ruling.

*Level of Investment*

- Asia Wheel's investment in its Thailand production is significant, including land, factory space, and equipment for all steps involved in trailer wheel production.[97]
- When Commerce found that "Zhejiang Jingu's investment in its Thai operations is roughly one-fifth that of its Chinese production plant," it did not consider that the Chengdu Jingu factory in question is much larger than Asia Wheel.[98] Chengdu Jingu is the "***largest automotive*** steel wheel manufacturing base in Midwest China."[99] Furthermore, Zhejiang Jingu's response form the underlying investigations indicates that trailer wheel production accounts for a small portion of Chengdu Jingu's overall production.[100] The fact that Chengdu Jingu is a larger enterprise than Asia Wheel does not negate Asia Wheel's substantial level of investment in Thailand.[101]
- Commerce incorrectly considered investment factors that are irrelevant to a substantial transformation analysis, which examines whether manufacturing or processing causes the transformation of one product into another possessing a new name, character, and use. Commerce did not explain why Asia Wheel's use of data compiled by an affiliate, finding that Asia Wheel "lacks basic knowledge of its own production process," affects substantial transformation.[102]
- Additionally, Commerce did not explain how Zhejiang Jingu involvement at Asia Wheel is relevant to whether the manufacturing or processing in question results in substantial transformation.[103]

---

[95] *Id*. at 22.
[96] *Id*. at 23 (citing Commerce's Letter, "Second Supplemental Questionnaire for the Asia Wheel Co., Ltd. Ruling Request," dated July 21, 2021) Appendix I at 5).
[97] *Id*. at 23-24 (citing Asia Wheel's 2nd SQR at 17 and Exhibits SQR2-9, SQR2-10, SQR2-14, and SQR2-15).
[98] *Id*. at 24 (citing Preliminary Scope Ruling at 20).
[99] *Id*. at 24 (citing and adding emphasis to Petitioner's RFI Response at Exhibit 8).
[100] *Id*. at 24 (citing Zhejiang Jingu's Letter, "Response of Jingu to Section D of the Department's Questionnaire," dated December 3, 2018 at D-4 (Zhejiang Jingu's DQR) (provided, in part, to the instant record in Petitioner's RFI Response at Exhibit 6)).
[101] *See* Final BPI Memo.
[102] *Id*. at 25 (citing Preliminary Scope Ruling at 20).
[103] *Id*. at 26 (citing Preliminary Scope ruling at 20); *see also* Final BPI Memo.

19

- Commerce found that Production Method B resulted in substantial transformation, yet the same Asia Wheel employees, equipment, and money borrowed are used to manufacture finished trailer wheels in Production Methods A, B, and C, in addition to Asia Wheel's non-subject truck wheels.

Petitioner's Case Brief[104]

- Commerce correctly rejected Asia Wheel's calculations of the relative costs of its processing in Thailand. Transfer prices between fully intertwined parties are inherently unreliable and Asia Wheel's transfer prices reflect costs shifted to manipulate Commerce's methodologies.
- The Act directs Commerce to disregard transfer prices between such affiliated parties, unless independent evidence demonstrates that they reflect open market prices or cover the COP of the transferred input; in the instant case, the reported transfer prices do not indicate what Zhejiang Jingu's actual costs are.[105]
- Commerce considers costs and prices from non-market economies (NME), including China, to be unreliable.[106] The costs reported by Asia Wheel/Zhejiang Jingu are unreliable and reflective of the NME in which it operates and from which it benefits.
- In addition to rejecting costs and prices to calculate normal value under section 773(c) of the Act, Commerce applies market economy surrogate values to FOPs in NME substantial transformation analyses for scope purposes.[107] The CIT supported Commerce's application of its NME methodology to a circumvention inquiry since the "analysis of {the} Chinese-origin input costs appropriately falls under the purview of Commerce's NME methodology, which by statute presumes that NME costs and prices are inherently unreliable."[108]
- Comparing the petitioner's submitted surrogate values with Asia Wheel's reported transfer prices for inputs demonstrates that these prices are unreliable.[109]
- Assuming that Asia Wheel's costs were reliable, they support a finding that its Thailand operations are not significant.[110]
- Commerce is correct that these transfer prices are unreliable and provide no support that costs attributed to production in China are minor, reflecting a reasonable use of its authority to determine value as part of a substantial transformation test. This decision could be

---

[104] *See* Petitioner's Case Brief at 3-9.
[105] *Id*. at 4 (citing sections 773(f)(2) and (3) of the Act; and *Use of Market Economy Input Prices in Nonmarket Economy Proceedings*, 78 FR 46799 (August 2, 2013)).
[106] *Id*. at 4 (citing section 773(c) of the Act; 19 CFR 351.408(a); *Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order and Rescission of Later-Developed Merchandise Anticircumvention Inquiry*, 78 FR 56864 (September 16, 2013); *Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339, 1341 (CIT 2004); and *Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 36168 (June 17, 2013)).
[107] *Id*. at 5 (citing *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 FR 844 (January 6, 2010) (*TRBs from China*), and accompanying IDM at Comment 1(D)).
[108] *Id*. at 5-6 (quoting *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1377 (CIT 2021) (*Al Ghurair*); also citing *U.K. Carbon & Graphite Co. v. United States*, 37 CIT 1295, 1311 (CIT 2013)).
[109] *Id*. at 6-7; *see also* Final BPI Memo.
[110] *See* Petitioner's Case Brief at 8; *see also* Final BPI Memo.

20

reinforced by finding Zhejiang Jingu's costs also reflect unreliable NME costs and prices and are not reflective of fair market prices or costs.

Asia Wheel's AWI Rebuttal Brief[111]

- The petitioner relies on inapposite cases and distorted comparisons to argue that steel inputs and wheel components sourced from China constitute unreliable NME inputs and fails to demonstrate that the NME cost calculation methodology governs in a "substantial transformation" analysis.

- The petitioner fails to cite a single case in which Commerce applied the NME methodology in the context of a substantial transformation analysis in a scope inquiry, instead relying on case precedent relevant to analysis applied in circumvention inquiries and to calculation of dumping margins in investigations and administrative reviews. The CIT has stated that "{s}ubstantial transformation and circumvention represent two distinct legal standards and two distinct inquiries."[112]

  o *TRBs from China* involved an administrative review where FOPs were reported for the purpose of constructing normal value and not for the purpose of, or even initially considered by, the substantial transformation analysis eventually conducted.[113]

  o In the context of "substantial transformation" analyses involving AD and CVD orders on China, Commerce does not have an established practice of requiring FOP data for inputs manufactured in China; nor did Commerce instruct Asia Wheel to report FOPs (and corresponding surrogate values) for inputs manufactured in China in this case. Absent any such instruction from Commerce, there is no basis to reject the prices and costs of Asia Wheel's inputs sourced from China as "inherently unreliable" based on the NME methodology.

- The petitioner's value-added comparisons are distorted. First, the petitioner compares Asia Wheel's reported prices for steel inputs sourced from China (*e.g.*, disc, steel plate for disc, steel plate for rim) to surrogate values it submitted for steel coil and steel plate. However, the petitioner's surrogate value for steel coil is higher than for steel plate, which is the upstream product for the plate input. Based on Commerce's practice cited in support otherwise by the petitioner, Commerce finds price data unreliable when a price of the upstream input is demonstrated to be higher than that of the downstream product.[114]

- The petitioner also compares Asia Wheel's reported cost for a steel plate (for rim production) to its reported cost for a rim, claiming Asia Wheel's cost records "demonstrably do not reflect actual costs or fair market prices."[115] However, this is rendered meaningless because it compares steel plates used to produce rims for Production Methods A and B trailer wheels to rims used for Production Method C dual wheels.

- Dules Wheels differ in that they: (1) are manufactured to fit side-by-side on an axle; (2) can be used on light commercial vehicles; and (3) have higher load-carrying capacity.[116] Also, the record shows that dual wheels are in much lower demand than regular trailer wheels, as

---

[111] *See* Asia Wheel's AWI Rebuttal Brief at 1-12.
[112] *Id*. at 4 (citing *Al Ghurair*, 536 F. Supp. 3d at 1375).
[113] *Id*. at 4-5 (citing Petitioner's AWI Case Brief at 5; *TRBs from China*; and Asia Wheel's 2SQR Surrebuttal at 8-9).
[114] *Id*. at 5-6 (citing Petitioner's AWI Case Brief at 7-8).
[115] *Id*. at 6-8 (citing Petitioner's AWI Case Brief at 8); *see also* Final BPI Memo.
[116] *See* Asia Wheel's AWI Rebuttal Brief at 7 (citing Asia Wheel's 1st SQR at 3).

demonstrated by Asia Wheel's purchase, withdrawal, and production information on the record.[117]

- The petitioner's argument that the cost calculation should treat the costs of all inputs provided from the Chinese operations (including the processed steel plates it produces in China) as costs in China lacks merit. The raw material steel inputs cannot be assembled to form trailer wheels and are not covered by the *Orders*. Because these steel inputs are non-subject merchandise, the cost to produce the rim for Production Method A wheels and the cost to produce the disc for Production Method C wheels should be attributed to Asia Wheel's production costs in Thailand. Thus, Commerce should not treat the value of non-subject raw materials as costs incurred in China (when imported from China), consistent with its methodology under a similar circumstance in *Diamond Sawblades from China*.[118]

- Regardless of whether Commerce accepts the transfer prices between Asia Wheel and its affiliate for third-country cost calculation, the finished trailer wheels are a new product with different characteristics and uses than either discs or rims individually, supporting a finding that they are substantially transformed and conferring a Thai origin.

Petitioner's AWI Rebuttal Brief[119]

*Class or Kind*

- Finished wheels exported from Thailand remain the same class or kind of product as Chinese-origin rims or discs. Commerce has stated that it "almost invariably determines substantial transformation has not taken place when both products are within the same 'class or kind' of merchandise."[120] Thus, as this factor is unquestionably met here, only if the other substantial transformation factors cast uncommonly high weight against that conclusion that Commerce would find otherwise.

- Asia Wheel relies on *Diamond Sawblades from China* to indicate that, where the in-scope inputs and the finished products are both covered by the scope, Commerce has recently de-emphasized the importance of the class or kind factor.[121] Moreover, *Diamond Sawblades from China* did not disregard the class or kind factor but recognized that other factors in the substantial transformation test had a greater weight directing a determination to the contrary.[122]

---

[117] *Id*. at 7-8 (citing Asia Wheel's 2nd SQR at Exhibit Exhibits FOP-9 and FOP-10; and Asia Wheel's RFI Response at Exhibit RFI-ALL-6 Attachment 1); *see also* Final BPI Memo.

[118] *See* Asia Wheel's AWI Rebuttal Brief at 10-11 (citing *Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Affirmative Determination of Circumvention*, 83 FR 57425 (November 15, 2018) and accompanying PDM at 3 and 9, unchanged in *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Determination of Anti-Circumvention Inquiry*, 84 FR 33920 (July 19, 2019)).

[119] *See* Petitioner's AWI Rebuttal Brief at 10-30.

[120] *Id*. at 11 (citing *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Final Determination of Sales at Less Than Fair Value*, 79 FR 76966 (December 23, 2014), and accompanying IDM at Comment 1; and *Notice of Final Determination of Sales at Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbons from France*, 69 FR 10675, 10676 (March 8, 2004)).

[121] *Id*. at 12 (citing Asia Wheel's AWI Case Brief at 10-11).

[122] *Id*. at 13 (citing *Diamond Sawblades from China* IDM at Comment 1).

22

*Essential Characteristics*

- Asia Wheel claims that the Federal Circuit has held that the actual substantial transformation test is to examine if the merchandise gets "a new name, character, and use," but this interpretation is in error.[123] In *Bell Supply CAFC 1998*, the Federal Circuit quoted from its 1999 decision in *Bestfoods* to explain the idea underlying the substantial transformation test: to determine if the product "loses its identity and is transformed into a new product having a new name, character and use."[124] However, *Bestfoods* dealt with CBP's substantial transformation test, which is not controlling for Commerce's purposes. In *Bell Supply CAFC 1998*, the Federal Circuit did not hold that Commerce should apply the same test that CBP applies, but rather, agreed specifically that Commerce looks to the factors enumerated in the substantial transformation test and stated that "even if a product assumes a new identity, the process of 'assembly or completion' may still be minor or insignificant."[125] Thus, the Federal Circuit was explicit that even if the product is substantially transformed under CBP's test, it may not be under Commerce's five-factor test.

- In examining those five factors in its substantial transformation test, Commerce looks to whether there are any changes to the "essential" characteristics of the merchandise, the characteristics that allow their basic function. Commerce has explained that the use of a product does not change through third-country processing when "{t}he use of the imported articles was predetermined at the time of importation."[126] The CIT has also recognized that it is the "intended end-use" that is relevant to Commerce's substantial transformation analysis, which, if unchanged, weighs against substantial transformation.[127]

- Asia Wheel's argument is that the "essential" properties of its Chinese wheel parts are changed in Thailand as they are finished into a completed wheel.[128] No product is functional as a finished product until it is finished, and adopting Asia Wheel's position would render the substantial transformation test unnecessary, as the only question to resolve would simply be where the product is finished. Rather, Commerce has regularly found that third-country finishing, including assembly, does not necessarily substantially transform a product.[129] The central essential property and sole use of the wheel component shipped out of China is to be used to make a finished wheel. Commerce also pointed to other key qualities that do not change in Asia Wheel's further finishing operations, whereas Asia Wheel suggested Commerce instead consider other undefined characteristics which provide no reason for Commerce to change its preliminary determination.

*Nature and Sophistication of Processing*

- The fact that Asia Wheel was able to perform the processing steps Zhejiang Jingu shifted to it while lacking such fundamental knowledge about those processes and the product directly indicates the level of sophistication of the Thai processing.

---

[123] *Id*. at 14 (citing Asia Wheel's AWI Case Brief at 11-12).
[124] *Id*. at 14 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1228; and *Bestfoods*, 165 F.3d 1371).
[125] *Id*. at 15 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1230).
[126] *Id*. at 16 (citing *Nat'l Hand Tool Corp. v. United States*, 16 CIT 308, 310 (CIT 1992)).
[127] *Id*. at 16 (citing *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1292 (CIT 2018) (*Bell Supply CIT 2018*)).
[128] *Id.* at 16 (citing Asia Wheel's AWI Case Brief at 14).
[129] *Id*. at 16-17 (citing *Solar Cells Solaria Ruling* at 5).

23

- Asia Wheel quotes from court decisions in *Bestfoods*, which is not controlling of Commerce's practice, and *Smith Corona* in support of its argument that Commerce cannot consider steps such as the engineering and designing of the product in its substantial transformation analysis.[130]  However, *Smith Corona* is taken out of context, was not a decision which considered substantial transformation (rather, it involved an argument regarding country of origin where parties agreed that transformation had occurred), and does not prohibit such analysis.  It simply notes that Commerce's country of origin decision in that case was not made based on design and engineering factors at the initial stage of production, but rather on the final stage of production prior to exportation.[131]  Here, where Commerce is examining *whether* substantial transformation has occurred, the question of whether it is the earlier or the final processing that confers the country of origin is not only relevant, it is the entire question, and the language of *Smith Corona* indeed supports that design and engineering are relevant considerations in the context of a substantial transformation analysis.

*Cost of Production/Value Added*

- Asia Wheel cites to no authority to support its argument Commerce must recognize that the steel plate is itself substantially transformed in Thailand and those costs to be attributable to the third-country processing.  Asia Wheel's affiliated Chinese supplier's own statements during the original investigations described how one of Zhejiang Jingu's operations in China performed the first processing steps on these steel plates and showed how Zhejiang Jingu had recognized this as a significant processing step that had to be accounted for in its COP reporting.[132]
- Asia Wheel provides no support for its argument that Commerce should adopt a piecemeal approach and determine separately if each input it sources from China is substantially transformed in Thailand.  This is consistent with Commerce's practice in valuing subject-country merchandise used as inputs to third-country processing as part of the subject-country costs.  Commerce properly recognized Zhejiang Jingu's steel plate and steel plate processing as sourced from and performed in China.[133]
- Commerce has no duty to supplement the record with information which Asia Wheel suggests supports that its reported transfer prices reflect arm's-length prices and shows its purchases of steel plate were comparable to prices from unaffiliated suppliers.[134]
- Asia Wheel fails to provide any support for its stance that where transfer prices do not reflect arm's-length prices, the transfer prices can only understate costs.  Asia Wheel ignores that a party may just as easily overstate transfer prices.[135]  Commerce properly

---

[130] *Id*. at 18 (citing Asia Wheel's AWI Case Brief at 18; and *Smith Corona*, 811 F. Supp. 692).

[131] *Id*. at 19 (citing *Smith Corona*, 811 F. Supp. at 696).

[132] *Id*. at 21-22 (citing Asia Wheel AWI Case Brief at 21-22; and Petitioner's RFI Response at 10-11).

[133] *Id*. at 22-23 (citing *Oil Country Tubular Goods from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention*, 86 FR 43627 (August 10, 2021), and accompanying PDM at 11-14, unchanged in *Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Determinations of Circumvention*, 86 FR 67443 (November 26, 2021)).

[134] *Id*. at 23 (citing Asia Wheel's AWI Case Brief at 22; *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011); and *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1015 (CIT 1992)).

[135] *Id*. at 24 (citing *Shieldalloy Metallurgical Corp. v. United States*, 975 F. Supp. 361, 364 (CIT 1997)).

24

rejected Asia Wheel's reported set prices and relied on other evidence on the record showing repeatedly that whatever value Asia Wheel does add in Thailand, it is not significant.[136]

- Asia Wheel's argument that Commerce must allow it yet another chance to submit proposed surrogate values is meritless. Even Asia Wheel acknowledges that the regulation it depends on sets a deadline of 30 days before the preliminary determination for administrative reviews; but Commerce, here, is conducting a scope inquiry, not an administrative review.[137] Asia Wheel did not miss an opportunity it otherwise would have received with a formal announcement of a preliminary determination date. After the petitioner raised surrogate value issues, instead of submitting what surrogate values it thought were relevant even in rebuttal, Asia Wheel argued that even if Commerce decided to apply surrogate values, Commerce need only perform certain calculations, calculations Asia Wheel argued that "all of the information for which are included in" its prior submissions.[138]

*Level of Investment*

- Commerce does "not {…} evaluate the level of investment in a vacuum," but undertakes a comparative examination of whether the level of investment in the third country indicates that substantial transformation has occurred.[139] The question is whether Asia Wheel's level of investment into processing performed in Thailand is substantial enough in comparison to the level of investment to perform the entire trailer wheel production process to transform the finished wheels into a product of Thailand.

- Recently, the CIT held, with respect to the level of investment factor in circumvention inquiries, that "{t}he statute does not provide for a specific minimum or maximum level of investment to qualify as minor or insignificant, so Commerce has the discretion to adapt to different factual circumstances{…}."[140] It further agreed that Commerce's practice of using a comparative analysis to determine if the level of investment is significant based on the product and processes in question was not only permissible but reasonable.[141] The CIT has further explained that "{t}he greater the investment, the analysis goes, the greater the transformation of the product. This approach is reasonable, so as not to evaluate the level of investment in a vacuum."[142] Asia Wheel's comparatively limited investment in Thailand supports Commerce's finding of a limited transformation of the product.

- Asia Wheel cites to no authority to support its statements that the proper comparison of the Chinese and Thai factories should be consider a per-area analysis and does not provide an explanation for why this analysis would address the central question of comparative investment levels.[143] Taking into account levels of output for the levels of investment, Asia

---

[136] *Id.* at 23-24; *see also* Final BPI Memo.
[137] *See* Petitioner's AWI Rebuttal Brief at 25 (citing Asia Wheel AWI Case Brief at 23; and 19 CFR 351.301(c)(3)(ii)).
[138] *Id.* at 25-26 (citing Asia Wheel's 2SQR Surrebuttal at 7).
[139] *Id.* at 27 (citing *Bell Supply CIT 2018*, 348 F. Supp. 3d at 1296).
[140] *Id.* at 27 (citing *Al Ghurair*, 536 F. Supp. 3d at 1368).
[141] *Id.* at 27-28 (citing *Al Ghurair*, 536 F. Supp. 3d at 1368; and *Bell Supply CIT 2018*, 348 F. Supp. 3d at 1295).
[142] *Id.* at 28 (citing *Bell Supply CIT 2018*, 348 F. Supp. 3d at 1296).
[143] *Id.* at 28 (citing Asia Wheel AWI Case Brief at 24-25).

25

Wheel's investment in Thailand is minimal.[144]

- There is also record information regarding the level of investment Zhejiang Jingu made to start a $23 million steel trailer wheel facility in the United States, a project since abandoned, comparable to the $27 million investment in Zhejiang Jingu's Chengdu plant, both of which are much more than the $4.3 million in Asia Wheel's Thailand operations.[145] The CIT has affirmed Commerce's comparison of the third-country level of investment to the investment required to set up a factory for the product in the United States as a reasonable measure of third-country investment.[146]

**Commerce's Position:** For this final ruling, we continue to find the finished wheels processed in Thailand under Production Methods A and C are not substantially transformed such that the third-country processing confers country of origin based on the totality of circumstances. As discussed in the Preliminary Scope Ruling, to determine whether there has been a substantial transformation, Commerce considers factors such as: (1) the class or kind of merchandise; (2) the product properties, essential component of the merchandise, and intended end-use; (3) the nature and sophistication of processing in the country of exportation; (4) the COP/value added; and (5) level of investment.[147] We are not altering our assessment of any individual factor, but address parties' comments regarding each below.

*Class or Kind*

As we noted in the Preliminary Scope Ruling, parties agree that the requested products remain the same class or kind of product as the Chinese-origin wheel components processed in Thailand.[148] Asia Wheel points to *Diamond Sawblades from China* as an example where substantial transformation occurred despite relevant products remaining of the same class or kind, noting that this factor is "not dispositive."[149] Asia Wheel notes that wheel components are not interchangeable with finished wheels, as they possess different physical characteristics and different functions. The petitioner counters that Commerce continues to rely on this factor when ascertaining whether substantial transformation occurs.[150] The arguments from both parties support our practice of considering class or kind as one of several factors contributing to our totality of circumstances conclusion. In *Diamond Sawblades from China*, Commerce emphasized the case-by-case nature of its analysis, and we note that any differences or similarities in physical characteristics and functions between products, as mentioned by Asia Wheel, is addressed by subsequent factors in our substantial transformation analysis.[151]

Commerce continues to consider the class or kind of merchandise factor in its substantial transformation analysis because it serves, generally, as an indicator of the degree of

---

[144] *Id*. at 29; *see also* Final BPI Memo.
[145] *See* Petitioner's AWI Rebuttal Brief at 29 (citing Petitioner's RFI Response at 16 and Exhibit 9).
[146] *Id* at 29-30 (citing *Bell Supply CIT 2018*, 348 F. Supp. 3d at 1295).
[147] *See* Preliminary Scope Ruling at 7-8 and Issue 3 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1228).
[148] *Id*. at Issue 3 (citing Asia Wheel's RFI Response at 9-10; and Petitioner's RFI Response at 11-12).
[149] *See* Asia Wheel's AWI Case Brief at 9-10 (citing *Diamond Sawblades from China* IDM at Comment 4).
[150] *See* Petitioner's AWI Rebuttal Brief at 12-13.
[151] *See Diamond Sawblades from China* IDM at Comment 4.

26

transformation. That is, if a product is of a certain class or kind of merchandise and through processing is transformed into a different class or kind of merchandise, the change is indicative (but not dispositive) of a more significant transformation than if the merchandise were of the same class or kind of merchandise both before and after processing. If the downstream product becomes a different class or kind of merchandise, this weighs in favor of a finding that the product is a new and different article of commerce (*i.e.*, substantially transformed) in the third country. Conversely, where the upstream and downstream products are within the same class or kind, Commerce has found that it weighs against a finding of substantial transformation.[152] It is, thus, reasonable to continue to consider this factor when analyzing the nature and degree of the transformation that has occurred. The Chinese-origin wheel components used in and the finished wheels resulting from Production Methods A and C are, when ignoring country of origin, otherwise included within the scope of the *Orders*, meaning they are of the same class or kind of merchandise, *i.e.*, that they are "certain on-the-road steel wheels, discs, and rims {…}." In the Preliminary Scope Ruling, we noted that "Asia Wheel does not argue that any given component could be used to produce wheels that would not be covered by the scope," and parties have not provided evidence that we should reconsider our finding.[153] Accordingly, we continue to find that this factor weighs against finding that substantial transformation has occurred.

*Essential Characteristics*

Asia Wheel's application of rulings concerning CBP country-of-origin findings to the examination of essential characteristics in a substantial transformation analysis for a scope determination is misplaced, asking Commerce to focus on whether the requested products obtained "a new name, character, and use" as a result of third-country processing, without consideration of the totality of processing in the context of the enumerated prongs of the substantial transformation analysis.[154] In referencing CBP's country-of-origin findings in *Bestfoods* in *Bell Supply CAFC 2018,* the CIT notes the difference between CBP's analysis and the factors used by Commerce to address substantial transformation, "although the {Federal Circuit} speaks of the name, character or use test, it does not invoke any of the factors used in {CBP} cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation."[155] Whereas Commerce may consider whether the third-country processing imparted "a new name, character, and use" in consideration of the totality of

---

[152] *See, e.g.*, *Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea*, 69 FR 17645, 17647 (April 5, 2004) (citing *Notice of Initiation of Countervailing Duty Investigation: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 67 FR 70927, 70928 (November 27, 2002)); *Dynamic Random Access Memory Semiconductors of 256 Kilobits and Above from Japan; Suspension of Investigation and Amendment of Preliminary Determination*, 51 FR 28396, 28397 (August 7, 1986); *Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products from the People's Republic of China*, 66 FR 22183, 22186 (May 3, 2001); and *Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings from India*, 60 FR 10545, 10546 (February 27, 1995).
[153] *See* Preliminary Scope Ruling at 19.
[154] *See* Asia Wheel's AWI Case Brief at 8 and 12 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1228; *Bestfoods*, 165 F.3d at 1373; and *Cyber Power Sys. (USA)*, 560 F. Supp. 3d at 1350).
[155] *See Bell Supply CIT 2018*, 348 F. Supp. 3d 1287 at fn. 6.

27

circumstances, any such finding may not supplant an analysis of the record otherwise with respect to the substantial transformation factors and evidence which suggests the further processing did not substantially transform the merchandise, regardless of whether a new name, character, and use was obtained as a result of such processing. Adopting any such standard as the sole basis of analysis would result in even minor finishing/assembly operations sufficient to determine country of origin and render the existing substantial transformation factors moot, which is plainly not the intent of the reference to CBP's "name, character, and use" analysis in *Bell Supply CAFC 2018*.

Prior to our preliminary ruling, Asia Wheel contended that the *WorldPac Ruling* supported its essential characteristics argument because, in that inquiry, Commerce found that the in-scope Chinese-origin tapered roller bearing (TRB) set lost its function, acting in unison with a Polish TRB set as part of an assembly.[156] In the Preliminary Scope Ruling, we noted that this comparison was inapt, since the *WorldPac Ruling* addressed a more complex assembly of "{TRBs from China} combined with a non-subject equivalent (a TRB set from Poland); a shaft seal with an anti-lock brake sensor; and one bare wheel hub from Germany."[157] In its case brief, Asia Wheel notes that it produces one wheel component in Thailand (or a "non-subject equivalent"), whereas the second TRB set was "simply" purchased from a third country in the *WorldPac Ruling*, arguing that the instant record is even more supportive of a finding of substantial transformation as a result.[158] Our use of the phrase "non-subject equivalent" in the Preliminary Scope Ruling emphasized the differences between the *WorldPac Ruling* and the instant inquiry. Specifically, we are not examining finished wheels processed from two discs, one Chinese-origin disc and another disc processed in Thailand, for example. Rather, we emphasized in the Preliminary Scope Ruling that, "The assembly in the instant proceeding is much simpler, utilizing only two major components, both otherwise subject to the *Orders* as components. Additionally, a given disc or rim continues to function as the only such component after incorporation into a finished wheel. In other words, unlike the TRBs in *WorldPac*, a finished wheel does not make use of multiple of the same component, sourced from different countries."[159] Asia Wheel does not address Commerce's statement that the *WorldPac Ruling* is not an appropriate parallel due to the many non-subject components involved and the complexity of the assembly involved in the *WorldPac Ruling*.[160]

Asia Wheel's first argument against the applicability of the *Solar Cells Solaria Ruling*, is that the plain language of the scope of the *Orders* does not contemplate processing of finished wheels from discs *or* rims from China. As we explain above in Comment 1, we are addressing the ambiguity in the scope specifically contemplated during the underlying investigations, where one component is sourced from a third country. Next, Asia Wheel notes that the

---

[156] *See* Asia Wheel's RFI Response at 13 (citing *WorldPac Ruling* at 5).
[157] *See* Preliminary Scope Ruling at 18 (citing *WorldPac Ruling* at 2).
[158] *See* Asia Wheel's AWI Case Brief at 14.
[159] *See* Preliminary Scope Ruling at 18.
[160] Furthermore, in the *WorldPac Ruling* we found "the value that the single Chinese set adds to the complete wheel hub assembly is a minor and insignificant portion of the total cost of manufacturing," and note that Asia Wheel is not contending that a single rim or disc contributes only a minor amount to the cost of manufacturing. *See WorldPac Ruling* at 5.

28

circumstances in this inquiry differ from the *Solar Cells Solaria Ruling* since the solar cells in question imparted the sole purpose of the finished product (*i.e.*, the input itself, as imported, contains the essential characteristics of the further manufactured product) whereas the essential characteristics of a finished trailer wheel "are not established until the rim and disc are assembled together and painted."[161]

Additionally, Asia Wheel cites to language in the underlying investigations that wheel components are "not useable without being assembled in into a wheel."[162]  However, the broader context of this quote supports our substantial transformation finding (emphasis added):[163]

> The observation that the rim or disc are not useable without being assembled into a wheel does not detract from the fact that the rim and the disc are the essential components of the wheel.  The properties of rim and disc define the properties of the wheel and its end-use.  The {U.S. International Trade Commission (ITC)} report, advertising materials supplied with the petition, the {National Highway Traffic Safety Administration's} marking requirements (discussed in the petition and the {ITC's} report) and {ITC} reports issued in other investigations on wheels (included in the petition) all **confirm that the properties and end uses of a wheel are determined by the physical properties of the rim and the disc, not by the assembly process.**

Asia Wheel's primary contention with respect to this factor is that a finished wheel's use is determined after assembly of both a rim and disc, and, consequently, neither wheel component alone possesses the same name, character, or use as a finished wheel.[164]  Asia Wheel argues that this inquiry is similar to *Diamond Sawblades from China* where Commerce noted that the finished product is not functional until two components are assembled, imparting an essential quality to the finished product.[165]  However, Asia Wheel does not indicate what specific qualities are imparted by assembly that we should consider as essential besides end use and does not revisit the physical characteristics it identified before our preliminary ruling as imparted by assembly, such as wheel offset and load rating.[166]  Moreover, Asia Wheel does not address the specific finished wheel characteristics identified in the preliminary ruling as belonging to individual components, such as the number, placement, and type of bolt holes in a disc.[167]

---

[161] *See* Asia Wheel's AWI Case Brief at 15 (citing *Solar Cells Solaria Ruling* at 13-14).

[162] *Id*. at 12 (citing Petitioner's INV Origin Request at 8-9).

[163] *See* Petitioner's INV Origin Request at 8-9.

[164] *See* Asia Wheel's AWI Case Brief at 12.

[165] *Id* at 13 (citing *Diamond Sawblades from China* IDM at Comment 4).

[166] *See* Asia Wheel's AWI Case Brief at 15; *see also* Asia Wheel's RFI Response at 13, "{t}wo of these key characteristics for a finished trailer wheel – the offset and load rating – are not established until the rim and disc are assembled."

[167] *See* Preliminary Scope Ruling at Issue 3, "Asia Wheel notes that certain characteristics are set during wheel assembly, offset and load rating.  However, these are additional characteristics set by further processing.  The "key qualities" of a disc as identified in Asia Wheel's own argument are not changed or otherwise transformed through

29

*Nature and Sophistication of Processing*

Asia Wheel contends that Commerce was incorrect to consider the end-use of wheel components when discussing the nature and sophistication of its Thai processing, "{t}he principal question under the substantial transformation analysis is not whether any of the Chinese-origin components is dedicated for production of finished trailer wheels, but whether the imported trailer wheels are new products – 'having a new name, character, and use' – or otherwise remain the Chinese-origin components."[168]   Consideration of whether further processing imparts a new name, character, and use to a product must be considered in the context of the enumerated factors and the totality of evidence regarding substantial transformation.  Application of any such standard on its own and without consideration of the totality of processing required to produce the merchandise would necessarily limit the focus of analysis to only the third-country processing itself, and myopically disregard the entirety of the production process otherwise.  In order to determine whether substantial transformation has occurred, Commerce must consider the nature and sophistication of all production steps required to produce the merchandise, regardless of where those steps occurred.  Accordingly, the totality of circumstances finding regarding whether substantial transformation has occurred may consider *both* conclusions regarding the *absolute* nature and sophistication of third country processing, on its own, but also conclusions regarding the *relative* nature and sophistication of third-country processing in the context of all production steps required to produce the merchandise, including those in the order country.

Citing *Bestfoods* and *Smith Corona*, Asia Wheel argues that Commerce should not take into consideration the design or engineering of the requested products.[169]   Asia Wheel simply cites to the use of "as a result of manufacturing or processing" language as support that design and engineering are not relevant to a substantial transformation analysis, but rather the analysis should focus on where the merchandise was "physically produced."[170]   *Bestfoods* is not relevant to the instant inquiry as it concerned CBP's assessment of substantial transformation in the context of North American Free Trade Agreement country of origin marking requirements.[171]   However, the Federal Circuit's description that "a product undergoes such a 'substantial transformation' if, as a result of manufacturing or processing steps in this country, the imported product loses its identity and is transformed into a new product having 'a new name, character and use,'"[172] was in the context of a CBP determination, not a substantial transformation analysis conducted by Commerce using the five factor test.  With respect to Asia Wheel's reliance on *Smith Corona*, we also find that case to be inapposite.  There, the question was not whether substantial transformation occurred, but rather dealt with whether Commerce properly

processing: '(1) the number, placement, and type of bolt holes; (2) the mounting arrangement; and (3) the materials used to produce the disc.'{citations omitted}," referencing Asia Wheel's RFI Response at 11-12.
[168] *See* Asia Wheel's AWI Case Brief at 16-17.
[169] *Id.* at 17-18 (citing *Bestfoods*, 165 F.3d at 1372; and *Smith Corona*, 811 F. Supp. at 696).
[170] *See* Asia Wheel's AWI Case Brief at 18 (citing *Bestfoods*, 165 F.3d at 1372).
[171] *See Bestfoods*, 165 F.3d at 1372-1373.
[172] *See Bestfoods*, 165 F.3d at 1373 (citing *United States v. Gibson-Thomsen Co.*, 27 C.C.P.A. 267 (CCPA 1939)).

30

excluded certain third-country parts from its circumvention analysis that Smith Corona claimed should be considered as products of Japan because they were designed and engineered there.[173] Further, the CIT's cites to section 781(a)(1)(B) of the Act in its statement that "production, not the design and engineering aspects of production," is "the critical factor,"[174] which is not relevant to the instant substantial transformation analysis. For the purposes of determining whether substantial transformation has occurred, as stated above, Commerce must consider the nature and sophistication of all production steps required to produce the merchandise, regardless of where those steps occurred. Importantly, as the petitioner correctly noted, the CIT in *Smith Corona* referred to design and engineering as "a first step in production."[175] Thus, we view that this initial design and engineering step in China is important in assessing the processing which takes place in Thailand and the relative sophistication of those steps performed in Thailand.[176]

Asia Wheel contends that Commerce's consideration of steel plate processing in China is inapt since the third-country processing provision of the scope language applies to "rims, discs, and wheels" but not steel plates or inputs.[177] We disagree, as this language clearly and plainly discusses the end result of the processing in question, the processing whose nature and sophistication is at issue for the third factor. In our examination of whether this factor (the nature and sophistication of processing) supports substantial transformation, we compare the processing which Asia Wheel performs in Thailand to produce the finished wheel exported to the United States to the processing performed elsewhere to produce the said wheel. The petitioner provided information to this record from the underlying antidumping investigation from Zhejiang Jingu, the most recent cost and production information from a Chinese producer of trailer wheels subject to the *Orders*.[178] Specifically, that record information indicates that the first stage of the Chinese producer's production process involves the slitting and cutting of steel coils into steel plates of specific sizes for rim or disc processing.[179]

Contrary to Asia Wheel's characterization, we did not overlook that, in addition to its finishing operations, Asia Wheel produces wheel components in Thailand.[180] In the Preliminary Scope Ruling, our analysis focused on differences raised by parties rather than the portions of Production Methods A and C the record indicates are otherwise identical had they not been performed by Asia Wheel in Thailand, *i.e.*, the production of rims in Thailand from a steel plate for Production Method A or the production of a disc from a disc blank for Production Method C and subsequent finishing steps. Specifically, we considered differences such as the design and engineering, the cutting of a steel plate of appropriate size, and, in the case of Production Method C, the use of a disc blank as a starting point for processing into a disc.[181]

---

[173] *See Smith Corona*, 811 F. Supp. at 693-696.
[174] *Id.* at 696.
[175] *See* Petitioner's AWI Rebuttal Brief at 18-20 (citing *Smith Corona*, 811 F. Supp. at 696).
[176] *See Smith Corona*, 811 F. Supp. at 695-696, where the CIT rejected an argument that the location of a product's design is dispositive and emphasized the importance of the subsequent processing at issue.
[177] *See* Asia Wheel's AWI Case Brief at 18.
[178] *See* Petitioner's RFI Response at 10-11 and 15 and Exhibits 4-6.
[179] *See* Petitioner's RFI Response at 10 and Exhibit 6.
[180] *See* Asia Wheel's AWI Case Brief at 20.
[181] *See* Preliminary Scope Ruling at 19-20.

31

Our consideration of the nature and sophistication of processing is not to compare whether individual steps are sophisticated in their own right or in comparison to another case, but whether the nature and sophistication of processing is such that the processing contributes to substantial transformation conferring a new country of origin.[182] In case and rebuttal briefs, parties reference scope rulings that have not been supplied to the record of this proceeding, particularly to compare the relative sophistication of processing across inquiries.[183] However, for this ruling, we do not address specific details from those proceedings and instead address parties' arguments, sources supplied to the record, and public precedent of our practice or that of the CIT and Federal Circuit. Regarding how its processing is transformative, Asia Wheel notes that Production Method A establishes the rim's diameter and Production Method C establishes the number, placement, and type of holes and the wheel's mounting arrangement.[184] As we outlined in the Preliminary Scope Ruling, Asia Wheel's processing in Thailand finishes the process production process begun in China. The introduction of certain physical characteristics in Thailand (the rim's diameter in Production Method A and the number, placement, and type of holes and the wheel's mounting arrangement in Production Method C), and the assembly and finishing steps performed in Thailand are not sophisticated to the extent that it supports transformation. Rather, the design and engineering steps; the cutting of steel plates; the processing of a plate into a disc blank in Production Method C; and the production of a disc or a rim in Production Methods A or C, respectively, which take place in China, functionally result in an already designed wheel, either a complete rim or disc, and an in-process other wheel component awaiting additional processing and eventual assembly into a finished wheel.

*Cost of Production/Value Added*

With respect to COP and value added, Asia Wheel argues that Commerce should attribute the costs, including steel inputs, of the rims and discs it produces in Production Methods A and C, respectively, entirely to processing in Thailand as it argues the resulting rims and discs are substantially transformed into Thai-origin components.[185] This approach detracts from an accurate evaluation of this factor. Our analysis seeks to determine if the COP and value added by Asia Wheel's processing in Thailand supports substantial transformation. To the extent that prior processing or costs associated with steel plates or disc blanks used by Asia Wheel are attributable to production steps in China or a third country, that information helps to clarify the level attributable to processing in Thailand. Moreover, Asia Wheel's arguments that any consideration of this factor should attribute Chinese sheet input costs to Thai further

---

[182] Continuing our practice of considering substantial transformation on case-by-case basis, we do not view certain types of processing as sophisticated to the extent that they are always indicative of transformation or not, or that certain levels of sophistication of prior processing are sophisticated to the extent that they cannot subsequently be substantially transformed. The CIT has stated, "this type of strict comparative analysis could preclude a finding of substantial transformation for any downstream processing. Such an approach strays from the focus of the inquiry, *i.e.*, whether substantial transformation occurs as a result of the downstream processing." *See Bell Supply CIT 2018*, 348 F. Supp. 3d at 1290.
[183] *See* Asia Wheel's AWI Case Brief at 19-20; *see also* Petitioner's AWI Rebuttal Brief at 12, 16, and 20.
[184] *See* Asia Wheel's AWI Case Brief at 17 (citing Asia Wheel's RFI Response at 14).
[185] *Id*. at 21-22.

manufacturing fail to consider the fact that these inputs were sourced from Asia Wheel's affiliate and corporate parent in China, who performed processing on these inputs prior to importation.

In our preliminary ruling, we noted that record information did not support the application of a detailed cost or value-added quantitative analysis.[186]  Specifically, Asia Wheel based its costs on transfer prices with its parent company, Zhejiang Jingu, and the petitioner submitted surrogate value information for raw material inputs but not finished wheel components (the rims and discs Asia Wheel imports from China which we would seek to value).[187]  For this final ruling, Asia Wheel fails to provide a sufficient basis to compel Commerce to rely on its affiliated transfer prices as a basis for cost because there is no evidence that these are market-based prices.  Asia Wheel also does not provide any support for its stance that, where transfer prices do not reflect arm's-length prices, the transfer prices can only understate costs, or cite to any authority to support using its reported costs.[188]  Furthermore, the record continues to lack sufficient information regarding FOPs or complete surrogate values to calculate the value added otherwise. Asia Wheel asks that Commerce allow it to submit surrogate value information should it rely on such an analysis, citing language that it may do so in reference to 19 CFR 351.301(c)(3).[189] However, this regulation concerns administrative reviews, and is not applicable to a scope inquiry.  Moreover, Asia Wheel was afforded ample time to provide such information in the nearly two-year record building stage of this inquiry, which included explicit requests for such relevant information from Commerce.[190]  As such, Asia Wheel has referenced an inapposite regulation to purport that it was denied the opportunity to provide such information.  Regardless, we are not relying on such an analysis based on the extant information supplied to the record.[191]

Our preliminary scope ruling effectively made no determination on this factor, stating that "even presuming that the value added in Thailand is not insignificant, as Asia Wheel contends, we preliminarily find that that portion does not appear to be so high as to outweigh our analyses under the other four factors to such a degree that we believe substantial transformation occurred in Thailand, particularly in consideration of the evidence regarding the extent to which the input steel and initial fabrication steps add to the value of subject merchandise."[192]  We find no reason to amend that finding, and – though Asia Wheel is correct that certain of the petitioner's calculations used an improper basis of comparison or were otherwise inconsistent with

---

[186] See Preliminary Scope Ruling at 20.

[187] Id.

[188] See Asia Wheel's AWI Case Brief at 22, requesting that Commerce place material onto the record from the Asia Wheel II proceeding which Asia Wheel had opportunity to do so, given that Commerce specifically solicited information regarding substantial transformation factors; see also Commerce's Letter, "Second Supplemental Questionnaire for the Asia Wheel Co., Ltd. Ruling Request," dated July 12, 2021 (Second Supplemental Questionnaire and RFI) at enclosure page 1, "Interested parties have the opportunity to provide information and supporting documentation to demonstrate whether Asia Wheel's requested products were substantially transformed in Thailand according to the five factors."

[189] See Asia Wheel's AWI Case Brief at 23 (citing Second Supplemental Questionnaire and RFI Appendix I at 5).

[190] See Second Supplemental Questionnaire and RFI, generally.  We also note that Commerce extended the deadline for issuing the instant scope determination several times, such that Asia Wheel had sufficient time to request leave to submit such surrogate value information.

[191] Asia Wheel has previously argued that additional surrogate value information is unnecessary.  See Asia Wheel's FOP Surrebuttal at 2-3; see also Asia Wheel's 2SQR Surrebuttal at 6-7.

[192] See Preliminary Scope Ruling at 20.

33

Commerce's practice – the petitioner's arguments otherwise provide a strong basis of support to find that, at the very least, this factor does not support a finding of substantial transformation.[193]

*Level of Investment*

Concerning level of investment, Asia Wheel argues that "Commerce found" a particular ratio of investment in our preliminary ruling.[194] Rather, we noted that "{o}utside of the finishing capabilities described, Asia Wheel's response indicates it has not invested substantially in the production of finished trailer wheels, and the *record information* provided by the petitioner *suggests* that Zhejiang Jingu's investment in its Thai operations is roughly one-fifth that of its Chinese production plant {emphasis added}." Our finding with respect to this factor draws from record information, as quoted above, to support a reasonable conclusion that the level of investment in Thailand is not significant based on the submitted record information.

Asia Wheel argues that Chengdu Jingu Wheel Co., Ltd.'s (Chengdu Jingu) factory, the Zhejiang Jingu affiliate operating the aforementioned facility, is much larger than that of Asia Wheel.[195] However, the relative size of the production facility, potentially, by area or output can indicate the level of investment. This analysis seeks to examine the level of investment in Asia Wheel, as a downstream processer, compared to a producer of finished steel wheels, where the relative level of investment serves as a reference as to whether the processing in question supports substantial transformation.[196] The size of a facility or its output, may be indicative of more robust investment in a greater number of production steps occurring in one facility, as an example. Next, Asia Wheel emphasizes that Chengdu Jingu's facility deals in "automotive" steel wheels, rather than the subject trailer wheels.[197] However, this descriptor of Chengdu Jingu does not elucidate to what extent investment in the facility, if any, we should attribute to production of non-subject wheels.[198] Finally, Asia Wheel suggests that the record indicates trailer wheels accounted for only a small portion of Chengdu Jingu's overall production.[199] However, we find the specific reference ambiguous at best, "And Chengdu Jingu, with minority production quantities in the reported database, have also introduced Zhejiang Jingu's tolling factors in its FOP database."[200] Prior to this statement, Zhejiang Jingu reported the individual percentages of its reported subject trailer wheels that it, another affiliate, and Chengdu Jingu produced during the period of investigation.[201] As the specific percentages are not on this record of this scope inquiry, in this context, the language Asia Wheel cites could indicate a variety of things, *e.g.*, that Chengdu Jingu's facility is comparatively modest, "with minority production quantities," in comparison to Zhejiang Jingu's output.

Concerning our proprietary discussion of certain aspects of Asia Wheel's processing, Asia

---

[193] *See* Final BPI Memo.
[194] *See* Asia Wheel AWI Brief at 24 (citing Preliminary Scope Ruling at 20).
[195] *Id.*
[196] *See Bell Supply CIT 2018*, 348 F. Supp. 3d at 1296.
[197] *See* Asia Wheel AWI Case Brief at 24 (citing Petitioner's RFI Response at Exhibit 8).
[198] Asia Wheel also does not propose how this compares to its own investment into non-subject wheels.
[199] *See* Asia Wheel's AWI Case Brief at 24 (citing Zhejiang Jingu's DQR at D-4).
[200] *See* Zhejiang Jingu's DQR at D-4.
[201] *Id.* at D-3.

34

Wheel contends that the same is true of Production Method B, which it states we found substantially transformed.[202] We did not conduct a substantial transformation analysis with respect to Production Method B; instead, we preliminarily found that the scope language of the *Orders* is dispositive without further analysis.[203] More generally, Asia Wheel primarily contends that its investments should be viewed as substantial and indicative of transformation in isolation, taking issue with Commerce's use of record evidence as a source of comparison but does not offer an alternative for this final ruling. We continue to find that a comparison of the level of investment in the third-country to the investment needed to perform the entire production process in the order country is the correct framework and that the record does not support that the processing performed in Thailand is substantial enough to transform the products Jingu first processes in China into a product of Thailand, and Asia Wheel's arguments that we modify this analysis are misplaced.

For this final ruling, our analysis for each factor has not functionally changed from our preliminary ruling, and thus, we continue to find that a totality of the evidence does not support that wheels produced using Production Methods A and C are substantially transformed in Thailand such that the third processing confers country of origin. Specifically: 1) the components are of the same class or kind; 2) they maintain their essential characteristics (the rims and discs, and disc blanks each have a sole purpose/end use as exported from China: *i.e.*, to be incorporated into a specific finished wheel); 3) the processing steps of finishing the components (either as imported from China or from a disc blank or steel plate) into a finished wheel in Thailand are not substantially sophisticated considering the production operations in China which produce the components themselves; 4) Asia Wheel's investment into trailer wheel production is not comparable to the investment into production facilities involved in producing the components in China, and the record reflects that the Thai investment is highly dependent on expertise of the Chinese affiliate; and 5) though the record does not contain information to calculate the precise amount of value added in Thailand, statements regarding the amount of value added by the input steel and initial production steps suggests that production in China constitutes a significant portion of value added and, even given the presumption that Thai production adds a not insignificant amount of value, this does not outweigh the totality finding under the other four factors. Furthermore, with our preliminary ruling, we placed on the record Commerce's scope ruling regarding *HPS Conductor for Transformer Coil Ruling*.[204] We explained that this ruling was supportive of our totality of the circumstances ruling in this inquiry, noting that in that case, we found that the facts did not support substantial transformation without definitive conclusions concerning COP, value added, or level of investment.[205] No party commented on our drawing a parallel to this case, and so we continue to view it as supportive of our conclusions here. We find that the totality of the factors considered in our substantial transformation analysis weigh against finding the rims in

---

[202] *See* Asia Wheel Case Brief at 26-27.
[203] *See* Preliminary Scope Ruling at Issue 2. Additionally, given such a hypothetical analysis resulting in a conclusion of substantial transformation concerning a different production method, it is unclear why we should consider a potential similar finding with respect to one factor out of five, considered in totality, relevant to our analysis here.
[204] *See* Preliminary Scope Ruling at 21.
[205] *Id*. at 21 (citing *HPS Conductor for Transformer Coil Ruling* at 10-11).

35

Production Method A and discs in Production Method C are substantially transformed when used to produce steel wheels in Thailand. As a result, we find that the country of origin of such inputs is China, and, thus, remain subject to the *Orders* after processing in Thailand. Thus, because the *Orders*' scope language is dispositive, we find it unnecessary to further analyze the criteria set forth in 19 CFR 351.225(k)(1) or to consider the additional factors provided in 19 CFR 351.225(k)(2).

**Comment 3:**   **Whether Suspension of Liquidation Should Commence No Earlier than the Date of the Preliminary Scope Ruling**

Asia Wheel's AWI Case Brief[206]
- In the event Commerce continues to find that China is the country of origin for Production Methods A and C, Commerce should instruct CBP that the suspension of liquidation with respect to import entries of such wheels begins on August 25, 2022, the date of the Preliminary Scope Ruling. Due to Commerce's earlier determination that trailer wheels manufactured in third countries are subject to the *Orders* only if both the rims and discs originate from China, importers did not have adequate notice that these wheels are covered by the scope of the *Orders* until that date, consistent with CIT and Federal Circuit decisions which hold that suspension of liquidation must not commence until importers are provided adequate notice concerning whether certain products are covered by the scope of AD/CVD orders.[207]
- In the *Trans Texas Tire* litigation of the instant *Orders*, the CIT held that Commerce did not provide adequate notice of certain product coverage until issuance of the Final INV Scope Memo, because a reasonably informed importer was not certainly provided notice by the language of the notice of initiation and preliminary AD/CVD determinations and, as a consequence, antidumping and countervailing duties could only be assessed from the date of adequate notice (*i.e.*, issuance of the final scope memo).[208]
- At best, the investigation was ambiguous on the question of whether trailer wheels manufactured in a third country with rims or discs from China – but not both – are outside the scope of the *Orders*. In light of CIT's decision in *Trans Texas Tire*, suspension of liquidation and the collection of AD/CVD cash deposits for Method A Wheels and Method C Wheels should commence no earlier than August 25, 2022, the date of the Preliminary Scope Ruling, because importers did not have adequate or fair notice that Production Method A and C wheels are covered by the *Orders* until this date.[209]
- Also instructive is *Tai-Ao Aluminum*, wherein the Federal Circuit held that liquidation could only have been suspended as of the date of the relevant preliminary determination, when the importers were first given adequate notice that their products would be covered by the

---

[206] *See* Asia Wheel's AWI Case Brief at 27-31.
[207] *Id*. at 27.
[208] *Id*. at 27-28 (citing *Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1275 (CIT 2021), *aff'd* after remand, *Trans Texas Tire, LLC v. United States*, 545 F. Supp. 3d 1374 (CIT 2021); *Trans Texas Tire, LLC v. United States*, 519 F. Supp. 3d 1289 (CIT 2021), *aff'd* after remand, *Trans Texas Tire, LLC v. United States*, 545 F. Supp. 3d 1378 (CIT 2021) (*Trans Texas Tire*)).
[209] *Id*.

circumvention inquiry.[210]  Importantly, the Federal Circuit held that this adequate notice (fair warning) requirement applies regardless of Commerce's suspension of liquidation regulation.[211]  Given this context, neither Asia Wheel nor the importers had adequate or fair notice that Production Method A and C wheels might by covered by the scope of the *Orders* until Commerce issued the Preliminary Scope Ruling.

- In addition, Commerce must not continue the suspension of liquidation with respect to Production Method A and C wheels implemented by CBP as part of the EAPA investigation's interim measures.  Although 19 CFR 351.225(l)(1) and (l)(2) instruct that a previous "suspension of liquidation will be continued," the Federal Circuit indicated in *Sunpreme* that this provision applies when CBP has made a "determination" under 19 USC 1500(c) that the products in question are subject to a given order.[212]  However, CBP did not determine that Production Method A and C wheels are subject to the *Orders*; CBP referred that question to Commerce in its covered merchandise referral.  Furthermore, CBP's suspension of liquidation under 19 USC 1517(e) (interim measures) is invalid, because that provision only applies to "covered merchandise."  For these reasons, Commerce must state in the final scope ruling that any suspension of liquidation of Production Method A or C wheels begins no earlier than August 25, 2022, the date on which importers first had adequate notice that trailer wheels manufactured in Thailand using Chinese-origin rims or Chinese-origin discs (but not both) were subject to the *Orders*.

- Commerce should be aware that CBP has not suspended liquidation of all imports of Production Method A and C wheels; CBP has suspended liquidation only of such entries made by the importers targeted in its EAPA investigations.  Consequently, at minimum, Commerce is obligated to instruct CBP when suspension of liquidation applies to entries of Production Method A and C wheels made by other importers.  Such suspension of liquidation can apply no earlier than the date of Commerce's Preliminary Scope Ruling.

Importers' Case Brief[213]

- Importers and foreign producers relied on Commerce's clear statements in the investigations that third-country processing of a steel wheel required both the rims and the discs to be produced in China.  If Commerce continues to erroneously find that the wheels are within the scope, then any such liability must be prospective from when the importers received notice.  It is a fundamental precept of trade law that importers must receive fair warning of AD/CVD applicability before such liability can be assessed.  The massive retroactive AD/CVD liability to be imposed on the Importers if the Preliminary Scope Ruling is finalized cannot lawfully apply to shipments entered before the Importers first received fair warning of AD/CVD applicability.[214]
  - o  Controlling judicial precedent confirms that Commerce must provide fair warning such that importers would reasonably understand that products are subject to antidumping and/or countervailing duties before such liability can be lawfully assessed retroactively.

---

[210] *Id*. at 29 (citing *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2021) (*Tai-Ao Aluminum*)).
[211] *Id.* at 29-30 (citing *Tai-Ao Aluminum*, 983 F.3d at 495-496).
[212] *Id*. at 30 (citing *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1317-1318 (Fed. Cir. 2020) (*Sunpreme*)).
[213] *See* Importers' Case Brief at 7-25.
[214] *Id.* at 7-8.

Here, that means that AD/CVD cannot be imposed retroactively as of the date of the notice of initiation of this scope proceeding.

- In *Tai-Ao*, the Federal Circuit found that "the broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties fair warning of the conduct {the order or regulation} prohibits or requires'" applies to Commerce's AD/CVD determinations in finding that Commerce failed to provide the requisite "fair warning" of AD/CVD applicability and emphasizing equitable concerns: "This notice requirement is designed to avoid unfairness to importers."[215]

- In *Trans Texas Tire*, the CIT invalidated Commerce's retroactive assessment of AD/CVD on trailer wheels pursuant to the *Orders* at issue in this scope inquiry, relying on the *Tai-Ao Aluminum* rationale, in holding that Commerce unlawfully assessed such liability retroactively from the date of the preliminary determinations.[216] The CIT expressly rejected arguments from Commerce and the petitioner that the legality of retroactive AD/CVD assessment was different in the context of a scope inquiry than in an investigation (or circumvention inquiry), holding that there is one standard: *i.e.*, whether a reasonably informed importer has been provided with sufficient notice.[217]

o Commerce found in the investigation that trailer wheels manufactured in third countries from Chinese "rims and discs" are subject to the *Orders*, and expressly declined to make trailer wheels made from Chinese "rims or discs" subject. Commerce, thus, did not provide fair warning that trailer wheels produced in third countries from Chinese "rims or discs" imported into the United States were or could eventually be subject to duties.[218]

- Commerce's discussion of preserving its ability to revisit the scope after publication of the *Orders* to potentially include trailer wheels produced in third country from "a mix of rim and disc parts from China and a third country" and reference to future substantial transformation analysis in the Final INV Scope Memo must be read in the context of a contingent future possibility which indicates that Commerce recognized that any change could only have prospective effect. The temporal nature of Commerce's investigation scope determinations precludes importers from having the requisite fair notice that trailer wheels produced in a third country from Chinese "rims or discs" were subject to antidumping and/or countervailing dutiesunless and until the issue was revisited.[219]

- The *Trans Texas Tire* precedent confirms the inadequate notice, as the CIT found that Commerce's position that the investigation record sufficiently indicated what was meant by the chrome exclusion was further unjustified. The CIT repeatedly found that the scope language trumps any stray references in the record.[220] Here, the scope language clearly and deliberately covered Chinese "rims and discs;" the fact that a

---

[215] *Id*. at 8-9 (citing *Tai-Ao Aluminum*, 983 F.3d at 494-495).
[216] *Id*. at 9-11 (citing *Trans Texas Tire*, 519 Supp. 3d at 1287-1288 and 1304-1305).
[217] *Id*. at 11-12 (citing *Trans Texas Tire*, 519 Supp. 3d at 1287-1288 and 1304-1305).
[218] *Id*. at 16-21.
[219] *Id*. at 17-19 (citing Final INV Scope Memo at 24; and Preliminary Scope Ruling at 13-14).
[220] *Id*. at 20 (citing *Trans Texas Tire*, 519 Supp. 3d at 1287-1288 and 1304-1305)).

38

    potential future substantial transformation analysis was noted in the record does not alter the "plain language" of the scope that is the "paramount" consideration.[221]

o  The Final INV Scope Memo did not provide reasonably informed importers with sufficient notice the trailer wheels produced by Asia Wheel in Thailand using Production Methods A and C were subject to antidumping and/or countervailing duties, as Commerce's rejection of the request to change the term "rims and discs" to "rims or discs" led the Importers to reasonably understand that such trailer wheels were not subject to duties at that "time" and would continue not being subject until such time in the "future" if adequate notice was first provided.[222] The Importers acted responsibly and diligently to observe the production of rims in Thailand to ensure that Asia Wheel's exports of trailer wheels were not produced from Chinese "rims and discs."[223] As the Preliminary Scope Ruling did not articulate a date when the AD/CVD applicability would become effective for any other third country production methods where one of the components was produced in China contemplated but not specifically addressed, Commerce failed to provide adequate notice that such exports would potentially make the Importers subject to AD/CVD liabilities in excess of 400 percent on all unliquidated entries of trailer wheels sourced from Asia Wheel.[224] Assessing such massive liabilities in these circumstances contradicts the broader due-process principle.[225] Accordingly, AD/CVD liabilities may only be assessed on the trailer wheels that the Importers sourced from Asia Wheel using Production Methods A and C when they "first received notice" that such trailer wheels were subject to the *Orders*, which was provided for the first time when it formally initiated the Asia Wheel scope inquiry in March 2021.[226]

**Petitioner's AWI Rebuttal Brief[227]**

- The respondent parties are entirely incorrect that they had no notice that "rim or disc" wheels could be subject to the *Orders*. Commerce was entirely specific during the investigation that it was not making a determination on the "rim or disc" question at that time but would return to it in the future. By specifically stating that certain merchandise may be the subject of a future scope inquiry, Commerce provided fair notice that such merchandise may be the subject of a future scope inquiry. Respondent parties' insistence on reading only one part of what Commerce said in no way makes their decision to ignore Commerce's full statement reasonable.

- Though the factual basis respondent parties use as a basis for their challenge to Commerce's date of application of the scope determination is unsupported, the petitioner does not further take a position on the matter and leaves the selection of the date of application in Commerce's hands, as its primary concern is the strong and proper enforcement of the *Orders* and rejection of loopholes that allow for continued evasion of liabilities.

---

[221] *Id*. at 20 (citing *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)).
[222] *Id*. at 21 (citing Final INV Scope Memo at 24).
[223] *Id*. at 21-22 (citing Importers' RFI Response at 8-9 and Exhibits 2-4).
[224] *Id*. at 22 (citing *Orders*, 84 FR at 45954).
[225] *Id*. at 22-23 (citing *Tai-Ao Aluminum*, 983 F.3d at 49).
[226] *Id*. at 24-25.
[227] *See* Petitioner's AWI Rebuttal Brief at 34.

**Commerce's Position:** As provided in Commerce's regulations at 19 CFR 351.225(l)(3), for the purposes of this final scope ruling, we intend to instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the *Orders* if already suspended, and if liquidation of entries of such products is not already suspended, we intend to instruct CBP to suspend liquidation of entries of products found to be covered by the scope of the *Orders* effective to the date we initiated upon Asia Wheel's scope request. Section 351.225(l) of Commerce's regulations addresses the suspension of liquidation in the context of a scope inquiry. Specifically, this section provides for Commerce to continue any existing suspension of liquidation pending subsequent rulings; to continue such liquidation in the event of a preliminary ruling or suspend liquidation from the date of the scope inquiry's initiation; and to further continue suspension of liquidation if a final ruling finds the relevant products included within the scope, in 19 CFR 225(l)(1), (l)(2), and (1)(3), respectively.

Asia Wheel and Importers assert, the regulations notwithstanding, that suspension is impermissible prior to the date on which parties were given reasonable notice that the merchandise in question could be subject to AD/CVD liabilities.[228] Asia Wheel asserts that the facts of the case establish that fair warning that AD/CVD liabilities may be applicable to the merchandise in question was not given until the date of the preliminary ruling in this case, and parties cannot be said to have had reasonable notice prior to this date given the language of the investigation rejecting the petitioner's request to explicitly include relevant merchandise in the plain language of the scope.[229] We disagree.

As an initial matter, fair warning that merchandise produced pursuant to production methods such as those specified in Production Methods A and C, generally, may be the subject of a future scope inquiry was explicitly provided by the statements in the underlying investigation which considered this type of inquiry: "{Commerce} does not foreclose a further analysis of

---

[228] *See, generally*, Asia Wheel's AWI Case Brief at 27-31 and Importers' Case Brief at 7-25.

[229] *Id.* Despite laying out extensive arguments in support of its assertions that adequate notice was not established by Commerce's Final INV Scope Memo concerning the merchandise subject to the instant inquiry, Importer's Case Brief at 24-25 concludes by acknowledging "The March 2021 date of initiation constitutes the earliest possible date for ADD/CVD liability to attach to the Importers' trailer wheels produced by Asia Wheel under Production Methods A and C." Though, as laid out below, we disagree with the assertion that adequate notice was not reasonably provided at a prior point in time, the relevant regulations governing scope inquiries guide Commerce to instruct CBP to suspend liquidation for entries not already suspended from the date of the scope inquiry's initiation under 19 CFR 351.225(l). This is the precise March 22, 2021, date identified in Importers' Case Brief, and consistent with the effective date identified in the preliminary in-scope cash deposit instructions. Thus, Commerce agrees with Importers' conclusion regarding the appropriate effective date, consistent with 19 CFR 351.225(l). Though Importers may disagree with the continuation of any suspension of liquidation prior to the date of initiation of the scope inquiry, we note that we instructed CBP in the Preliminary Scope Instructions to continue to suspend liquidation of entries of trailer wheels produced under Production Methods A and C as of the date of the initiation of the scope inquiry (March 22, 2021) consistent with 19 CFR 351.225(l)(3), and we did not order any retroactive suspension of liquidation. However, liquidation of entries of trailer wheels produced under Production Methods A and C may have been suspended by CBP prior to the date of the initiation of the inquiry, which is within CBP's authority, as discussed further below. Nevertheless, Commerce and Importers generally agree that the date of the scope inquiry's initiation is the applicable date for suspension of liquidation of entries for which liquidation had not previously been suspended.

substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern."[230]  We agree with the petitioner that, by specifically stating that certain merchandise may be the subject of a future scope inquiry, Commerce conveyed to any reasonably informed importer sufficient notice that such merchandise may be the subject of a future scope inquiry.  As discussed in Comment 1, above, Asia Wheel and Importers' contentions regarding the ambiguity of this statement and conclusions that this statement reflected the opposite meaning are not informed by reason.  Notably, notwithstanding Asia Wheel and Importers' strained attempts to interpret the meaning of the language of the Final Investigation Scope Memo otherwise, no party contests that the Production Method A and C merchandise subject to this request is precisely the merchandise contemplated by the phrase "{products} completed in a third country from a mix of rim and disc parts from China and a third country."[231]  Thus, establishing the effective date of suspension of liquidation of entries for which liquidation was not already suspended to be the March 22, 2021, date of initiation pursuant to 19 CFR 351.225(l) is wholly consistent with the principles espoused in *Tai-Ao* and *Trans Texas Tire*, as adequate notice that a product be completed in a third country from a mix of rim and disc parts from China and a third country may be subject to further analysis of substantial transformation, *in general*, was established at the time of the underlying investigation, and any ambiguity that the *specific* steel wheels manufactured by Production Methods A and C may be subject to liabilities was established by the March 22, 2021, Asia Wheel Initiation memorandum, and the explicit mention of the merchandise in question therein constituted fair warning to any reasonably informed importer.[232]

Further, we disagree with Importers and Asia Wheel regarding the applicability of the *Tai-Ao* and *Trans Texas Tire* decisions to scope inquiries, generally, including the instant inquiry.  *Tai-Ao* concerned a circumvention proceeding, and addressed issues regarding fair warning and adequate notice regarding collection of duties which arose due to the specific nature of anticircumvention proceedings.  Specifically, the "adequate notice" issue in *Tai-Ao* concerned the retroactive collection of duties with respect to a series of products considered by the request, which evaluated the production/export activities of certain firms as initiated, but where the resulting determination made an affirmative finding of circumvention applicable on a country-wide basis (*i.e.*, applicable to all imports of that series of product, including products not explicitly manufactured, exported, or imported by entities identified in the request, as initiated).[233]  Critical to the *Tai-Ao* decision was the fact Tai-Ao was not identified as a company covered by the Commerce's circumvention inquiry when it published its initiation notice, which covered only Zhongwang Holdings Ltd.[234]  The lack of reasonable notice with respect to Tai-Ao

---

[230] *See* Final INV Scope Memo at Comment 3.
[231] *Id.*
[232] *See* Asia Wheel Initiation at 1, "Commerce finds that it cannot determine whether the requested products are inside the scope of the Orders based solely upon Asia Wheel's application for a scope ruling, Supplemental Questionnaire response, other comments provided to the record, and the descriptions of the merchandise contained in 19 CFR 351.225(k)(1)."
[233] *See Tai-Ao Aluminum*, 983 F.3d 487.
[234] *Id.*

at issue in that proceeding is thus inapposite to the instant proceeding where Asia Wheel was plainly identified as the applicable party at all points in this inquiry.

Further, *Trans Texas Tire* concerned a scope determination made in the final determination stage of the investigation and involved reconciling the date on which adequate notice was established with Commerce's standard practice in an investigation of commencing the collection of duties on the date of the preliminary determination (which necessarily results in the retroactive collection of duties for any products determined to be in-scope at the final stage of the investigation which were not considered at the time of the preliminary determination).[235] The critical issue regarding fair warning in *Trans Texas Tire* concerned the ambiguity of the scope coverage with respect to PVD coated wheels and applicability of the scope exclusion for chrome-coated wheels.[236] As this type of coating and the ambiguity of scope coverage with respect to this merchandise was introduced shortly before the preliminary determination, Commerce indicated the necessity of further building the record on this issue and deferred our decision of whether the scope of the *Orders* covered merchandise with a PVD coating until the final determination, where we found the products covered by the scope.[237] As a result, such products were at that point covered by the cash deposit instructions, which identified beginning the date of suspension of liquidation as of the date of the preliminary determination, which the CIT found to be an impermissible retroactive application of liabilities which lacked adequate reasonable notice.[238] Thus, *Trans Texas Tire* involved "fair warning" and "adequate notice" in the context of collection of duties at a point prior to the time at which the central issue regarding scope coverage was adequately identified and addressed in the underlying proceeding. In other words, the relevance of the scope coverage of PVD wheels was not fully laid bare at the initial stages of the investigation, but only became apparent through the progression of the investigation, and issues regarding "adequate notice" were compounded by specific aspects of the nature of the proceeding itself (*i.e.*, standard practice in an investigation sets the date of beginning of suspension as of the preliminary determination).

This too is plainly not analogous to the instant inquiry where the products under consideration were explicitly identified in the initial scope request, not later identified, and 19 CFR 351.225(l) dictates that suspension commence as of the date of initiation. Thus, neither circumstance is analogous to the circumstances of a scope inquiry, generally, nor is analogous to the instant scope inquiry, where the product subject to the inquiry (steel wheels manufactured pursuant to Production Methods A and C) and the entity to which collection of duties would be applicable (importers of merchandise produced and exported by Asia Wheel) was clearly identified at the time of the initial request and subsequent initiation of the inquiry. Neither Asia Wheel nor Importers cite to a case where the notice of initiation of a scope proceeding was found to constitute inadequate notice of the potential that AD/CVD liabilities may apply to the products identified in the underlying request.

---

[235] *See Trans Texas Tire*, 519 F. Supp. 3d 1275.
[236] *Id.*
[237] *Id.*
[238] *Id.*

42

Regarding Asia Wheel's assertion that Commerce must not continue the suspension of liquidation with respect to Method A and C Wheels implemented by CBP as part of the EAPA investigations, we note that CBP suspends liquidation under interim measures pursuant to 19 USC 1517(e) based on its own authority, not that of Commerce. We have no authority to direct suspension of liquidation implemented by CBP, and Asia Wheel cites to no statutory or regulatory authority under which such an instruction would be permissible, nor precedent in support of this request. While Commerce will direct CBP to continue suspension of liquidation for Production Method A and C wheels as of the March 22, 2021, date of initiation of this inquiry, we have no authority to dictate any existing suspension implemented pursuant to CBP's separate EAPA authority, and thus, reject Asia Wheel's request, consistent with the CIT's findings in *Diamond Tools Tech*.[239] Asia Wheel asserts that CBP's continuation of suspension of liquidation is inconsistent with the Federal Circuit's findings in *Sunpreme* that suspension applies only when CBP has made a determination under 19 USC 1500(c), but that no such decision was made in the instant case, but rather referred to Commerce.[240] We decline to read any such meaning into the *Sunpreme* decision, and disagree with Asia Wheel's interpretation that this ruling provides Commerce any authority with respect to suspension of liquidation implemented by CBP.[241]

Finally, Asia Wheel states that "Commerce should be aware that CBP has not suspended liquidation of all imports of Method A and C Wheels; CBP has suspended liquidation only of such entries made by the importers targeted in its EAPA investigations. Consequently, at a minimum, Commerce is obligated to instruct CBP when suspension of liquidation applies to entries of Method A and C Wheels made by other importers… no earlier than the date of Commerce's Preliminary Scope Ruling."[242] As identified in the initial scope request and noted in the "Description of the Merchandise Subject to These Scope Requests," above, Commerce's scope inquiry concerns: "certain models of trailer wheels which Asia Wheel processes in Thailand from certain components of Chinese origin, using various distinct production methods, and exported to the United States from Thailand by Asia Wheel." This language does not limit the scope of Commerce's inquiry to merchandise imported by any party, nor has any party to this proceeding suggested that the inquiry be limited only to merchandise imported by certain importers. Thus, this scope inquiry covers all relevant wheel products otherwise described by the production methods identified, produced and exported by Asia Wheel, regardless of importer of record.

In its covered merchandise referral, CBP merely referenced back to the products identified in the Asia Wheel Scope Request as the merchandise for which it requested a ruling: *i.e.*, the merchandise of the CMR was identical to that of the scope inquiry, "certain types of trailer

---

[239] *See Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1344 (CIT 2021) (*Diamond Tools Tech*).
[240] *See* Asia Wheel's AWI Case Brief at 30 (citing *Sunpreme*, 946 F.3d at 1317-1318).
[241] We note that the *Sunpreme* decision otherwise supports Commerce's decision to set the effective date of suspension of liquidation as the initiation date of the scope inquiry, as the issue in that case concerned a circumstance where suspension began prior to formal initiation of the relevant scope inquiry, and the Federal Circuit sustained the CIT's determination that Commerce's instructions to Customs would be limited to products entered on or after the date of initiation of the scope inquiry. *See Sunpreme*, 946 F.3d 1300.
[242] *See* Asia Wheel's AWI Case Brief at 31.

43

wheels produced in Thailand from inputs sourced from China (either the rim or disc component is sourced from China and the corresponding rim or disc component is produced in Thailand, which may or may not involve using inputs sourced from China."[243] The CMR likewise made no reference to specific importers.

Commerce is not aware of information, on the record or otherwise, to substantiate the veracity of Asia Wheel's claims regarding the importer-specific nature of CBP's suspension of liquidation. However, presuming these statements to be accurate, it would be inappropriate for Commerce to speculate as to the reason that CBP suspended liquidation only for entries made by the importers targeted in its EAPA investigations. We are only able to note that, to the extent that our scope inquiry informs the EAPA investigation, it should not be read in a manner that limits its applicability to certain importers.

For the reasons stated above, Commerce has no authority to direct CBP as to when CBP's own suspension of liquidation applies to entries of Production Method A and C wheels made by other importers. For Commerce's purposes, suspension of liquidation, applicable to all importers, for entries for which liquidation was not already suspended, is effective as of the March 22, 2021, date of initiation of this inquiry. This effective date was transmitted to CBP in its preliminary instructions, which otherwise contain no information restricting applicability to certain importers, and will be elsewhere indicated in the final determination instructions and notice to CBP regarding the final results of the scope inquiry in the context of the covered merchandise referral. CBP may use this information to inform its own investigation but, as noted above, we have no authority to otherwise direct suspension of liquidation implemented separately by CBP.

**Comment 4: Whether to End Suspension of Liquidation for Wheels Determined to Be Out-of-Scope**

Asia Wheel's AWI Case Brief[244]
- For out-of-scope wheels (wheels not produced from either Chinese origin rims or discs, *i.e.*, wheels produced pursuant to Production Method B), any existing suspension of liquidation must end. For these wheels, Commerce must instruct CBP to end any existing suspension of liquidation, including the ones CBP imposed on entries of the importers who are the subject of EAPA investigation. Section 351.225(l)(2) of Commerce's regulations requires that, if Commerce issues a preliminary scope ruling to the effect that the product in question is not included within the scope of the order, Commerce "will order any suspension of liquidation on the product ended." The use of the term "any" indicates that Commerce must terminate all suspensions of liquidation with respect to non-subject imports, regardless of whether the suspension of liquidation is initially ordered by Commerce or CBP.

---

[243] *See* CBP's EAPA Letter.
[244] *See* Asia Wheel's AWI Case Brief at 31.

Petitioner's AWI Rebuttal Brief[245]

- CBP's EAPA authority is not subject to Commerce's regulations, and instead, CBP suspends liquidation during an EAPA investigation based on its own authority from Congress and under its own implementing regulations.[246]  Under CBP's regulation, its suspension of liquidation lasts until it either makes a negative determination of evasion or continues if evasion is found.[247]  CBP's suspension due to its EAPA investigation of steel trailer wheels is not derivative of, or directed by, Commerce's authority.  Asia Wheel fails to provide any authority in support of its argument.

- The CIT recently rejected a similar argument that CBP's authority to determine how and when to suspend liquidation in an EAPA investigation is circumscribed by Commerce's determinations on suspension dates.  In *Diamond Tools Tech.*, during an EAPA investigation on diamond sawblades from China, Customs referred a question of scope to Commerce, and Commerce then conducted a circumvention injury and brought the merchandise in question under the scope of the orders.[248]  As the circumvention determination only applied as of a certain date, the respondent in that investigation argued to the CIT that CBP was also bound by the dates Commerce set for its circumvention determination.  The CIT disagreed, explaining that Commerce's determinations do not diminish CBP's authority under the EAPA to apply Commerce's affirmative covered merchandise determination and upheld the decision that applied Commerce's determination on a different date.[249]

**Commerce's Position:**  Commerce intends to properly notify CBP to terminate the suspension of liquidation of relevant entries previously suspended pursuant to Commerce's authority resulting from a finding that such merchandise is determined to not be covered by the scope of the *Orders*.  However, as the petitioner correctly notes, CBP suspends liquidation during an EAPA investigation based on its own authority, not that of Commerce.[250]  Based on CBP's regulations under 19 CFR 165.27 and 165.28, suspension will end pursuant to the separate EAPA authority at which point CBP makes a negative determination of evasion or continues if evasion is found.  However, we have no authority to direct any such termination of suspension of liquidation implemented by CBP, and Asia Wheel cites to no statutory or regulatory authority under which such an instruction would be permissible, nor any precedent in support of this request.[251]  Indeed, as the petitioner notes, the CIT recently rejected similar arguments in *Diamond Tools Tech*, where the CIT upheld differing effective dates resulting from the final determinations of inquiries covering the same merchandise issued by CBP and Commerce, and explained that Commerce's determinations do not "diminish {CBP's} authority under the EAPA to apply Commerce's affirmative covered merchandise determination" and that allowing Commerce to direct how CBP applies its EAPA authority would "contravene Congress' expressed intent for the statute {…} Such an outcome would be contrary to the congressional

---

[245] *See* Petitioner's AWI Rebuttal Brief at 32-33.

[246] *Id*. at 32 (citing 19 USC 1517(e); and 19 CFR 165.24(b)(1)(i)).

[247] *Id*. at 32 (citing 19 CFR 165.27(c) and 28(l)).

[248] *Id*. at 32-33 (citing *Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1344 (CIT 2021) (*Diamond Tools Tech*)).

[249] *Id*. at 33 (citing *Diamond Tools Tech*, 545 F. Supp. 3d at 1351).

[250] *See* 19 USC 1517(e).

[251] *See* Asia Wheel's AWI Case Brief at 31.

45

intent underlying the EAPA statute and Customs' ability to exercise its statutory authority."[252] While Commerce will direct CBP to terminate any existing suspension in place with respect to merchandise found to be out-of-scope and implemented under Commerce's authority, we have no authority to dictate any existing suspension implemented pursuant to CBP's separate EAPA authority, and thus, reject Asia Wheel's request, consistent with the CIT's findings in *Diamond Tools Tech*.[253]

## Comment 5:  Whether Only the Chinese-Origin Components Should Be Subject to AD/CVD Liabilities

Asia Wheel's AWI Case Brief[254]
- The plain language third-country processing provision of the scope and Commerce's substantial transformation analysis both require Commerce, should it maintain its preliminary determination regarding Production Method A and C Wheels, to only apply its findings to the Chinese-origin component and not the entire imported wheel.[255]
- If substantial transformation did not occur, it follows that the Chinese-origin discs and Chinese-origin rims did not lose their identities as such after processing under Production Methods A and C, respectively.  A disc from China or a rim from China remains the same product even if it is assembled into a finished wheel with non-Chinese components and then exported to the United States as a finished trailer wheel.  Concomitantly, the non-Chinese components also do not lose their identities and remain products of Thailand (or other third countries where they are produced).  By the rationale of the substantial transformation analysis, Asia Wheel's Production Method A and C products exported to the United States were not trailer wheels, but rather respective combinations of discs from China and rims from Thailand or discs from Thailand and rims from China.  Under these circumstances, only the subject component of the imported wheel should be covered by the *Orders* and subject to antidumping and/or countervailing duties.
- The third-country processing provision states, "{t}he scope includes rims, discs, and wheels that have been further processed in a third country {…}."  Only the Chinese-origin components constitute subject merchandise covered by the *Orders* and subject to AD/CVD liabilities.  Commerce should thus instruct CBP to only suspend liquidation of such Chinese-origin discs and rims and require cash deposits based only on the values of such Chinese-origin discs and rims.

Importers' Case Brief[256]
- To the extent that Commerce continues to find that Production Method A and C wheels are subject to the *Orders*, liabilities may only apply to the value of the Chinese component.  The *Orders*' scope makes clear that the antidumping and/or countervailing duties only apply to

---

[252] *See Diamond Tools Tech*, 545 F. Supp. 3d at 1351.
[253] Parties submitted essentially identical arguments in the Asia Wheel II proceeding, and our position here mirrors our recent determination; *see* Asia Wheel II Ruling at Comment 1.
[254] *See* Asia Wheel's AWI Case Brief at 32-33.
[255] *Id*. at 32 (citing Preliminary Scope Ruling at 7).
[256] *See* Importers' Case Brief at 25-26

46

the component that is subject, as opposed to covering any non-subject components as well.[257] Applying duties only to the value of subject components further comports with Commerce's practice, as affirmed by the Federal Circuit in the context of mixed-media kits with non-subject items and commingled chemicals with product from non-subject countries.[258]

Petitioner's AWI Rebuttal Brief[259]

- The CIT has stated, "{t}he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[260] The resulting merchandise is the merchandise that is the result of the third-country processing, *i.e.*, the complete finished product, not only some subsection of it brought into the third country. The Federal Circuit stated that "Commerce is entitled to use the substantial transformation analysis to determine whether an imported article is covered by AD or CVD orders," that Commerce's determination applies to the finished, imported article, not only to some earlier input to it.[261]

- Commerce's mixed-media practice is only relevant to cases where separate subject and non-subject items are "packaged and imported together" in a "mere aggregation of separate items" but "{do} not interact in any way or otherwise represent a unique product."[262] A finished wheel cannot be described as a "mere aggregation of separate items" where the parts the wheel was made from do not interact in any way, but rather those parts are permanently welded together in order to form the wheel which is imported as a single, unitary item.[263] Commerce should continue to find that the entire imported product, a steel wheel not substantially transformed in Thailand, is subject to the *Orders*.

**Commerce's Position:** We continue to apply our analysis and findings to the finished trailer wheels processed in Thailand as the imported articles subject to this scope proceeding. As the petitioner correctly notes, the purpose of applying the substantial transformation framework is to determine whether the merchandise *as imported* into the United States has been substantially transformed by third-country processing and covered by the orders.[264] The precedent of applying AD/CVD liabilities to the merchandise that is the result of the third-country processing, regardless of whether components thereof are otherwise covered by the scope, has been established by virtually the entirety of cases which have involved a substantial transformation

---

[257] *Id*. at 25 (citing *Orders*, 84 FR at 45964, "if the steel wheels or rims are imported as an assembly with a tire mounted on the wheel or rim and/or with a valve stem attached, the tire and/or valve stem is not covered by the scope.").

[258] *Id*. at 25 (citing *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295 (Fed. Cir. 2013) (*Mid Continent*); and *Global Commodity Grp. v. United States*, 709 F.3d 1134 (Fed. Cir. 2013) (*Global*)).

[259] *See* Petitioner's AWI Rebuttal Brief at 30-32.

[260] *Id*. at 30-31 (citing *E.I. Du Pont*, 22 CIT at 374).

[261] *Id*. at 31 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1230).

[262] *Id*. at 31 (citing *Mid Continent*, 725 F.3d at 1298 (Fed. Cir. 2013); and *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1356-1357 (Fed. Cir. 2010) (*Walgreen*)).

[263] *Id*. at 31 (citing Asia Wheel I Request at Exhibits 4-6).

[264] *See, e.g.*, *Bell Supply CAFC 2018*, 888 F.3d at 1230.

47

analysis, and has been upheld by the courts.[265] Our determination with respect to Production Method A and C wheels finds that the finished wheels resulting from these production methods, as exported from Thailand to the United States, are not substantially transformed by Thai processing and remain Chinese-origin wheels. This decision plainly applies to the finished article, the steel wheel, as exported from Thailand. We fundamentally disagree with Asia Wheel's assertion that this finding begs the concurrent conclusion that Asia Wheel's Production Method A and C products exported to the United States were not trailer wheels, but rather respective combinations of discs from China and rims from Thailand or discs from Thailand and rims from China. The products exported from Thailand are Chinese steel wheels, not substantially transformed by component parts sourced or further processing performed in Thailand. Asia Wheel and Importers fail to cite any precedent to underly its presumption, nor instance where Commerce has split a substantial transformation determination and held that only some inputs are subject to an order.

As the petitioner correctly notes, references to the mixed-media and commingled chemicals practice are inapposite. The precedent referenced applies only to cases where separate subject and non-subject items are packaged and imported together in an aggregation of separate items and do not interact in any way or otherwise represent a unique product, or where subject chemical products are comingled with product from non-subject countries.[266] This precedent is plainly inapplicable to steel wheels exported from Thailand, which are solitary articles plainly covered by the scope of the *Orders*.

**Comment 6:   Whether to Amend the Draft Importer/Exporter Certifications**

Asia Wheel's AWI Case Brief[267]
- Commerce should revise the language of the proposed certifications to avoid inclusion of certain out-of-scope wheels. As written, the language of the proposed certifications will impermissibly expand the scope of the *Orders* to cover trailer wheels manufactured in Thailand using discs produced in Thailand from circular or rectangular steel plates from a third country and rims produced in Thailand. Commerce has found that such trailer wheels are not subject to the scope of the *Orders*.[268]
  - The language of the proposed importer certification reads, at paragraph F, "The certain steel wheels {…} covered by this certification are trailer wheels manufactured in

---

[265] *See, e.g., Al Ghurair* 536 F. Supp. 3d 1357 (CIT 2021); *E.I. Du Pont* 22 CIT 370 (CIT 1998); and *Bell Supply CAFC 2018*, 888 F.3d at 1230.
[266] *See Mid Continent*, 725 F.3d at 1298; *Walgreen*, 620 F.3d at 1356-1357; and *Global*, 709 F.3d 1134.
[267] *See* Asia Wheel's AWI Case Brief at 34-37.
[268] *Id*. at 34-35, citing a discrepancy in the Preliminary Scope Ruling between the descriptions of the products determined to be out-of-scope (Preliminary Scope Ruling at 23-24, finding out-of-scope the wheels previously identified as "trailer wheels which Asia Wheel processes in Thailand from rims produced in Thailand from rectangular steel plates from China or a third country and **discs produced in Thailand from rectangular steel plates sourced from China *or a third country*"** {emphasis added}) and the products identified in the certifications (Preliminary Scope Ruling at 27 and 31: "The certain steel wheels . . . covered by this certification are trailer wheels manufactured in Thailand using **discs produced in Thailand from circular or rectangular steel plates from China** and rims produced in Thailand from rectangular steel plates from China or a third country" {emphasis added by Asia Wheel's AWI Case Brief}).

48

Thailand using discs produced in Thailand from circular or rectangular steel plates from China and rims produced in Thailand from rectangular steel plates from China or a third country."

o The language of the proposed exporter certification contains the same sentence. This language does not cover trailer wheels that are manufactured in Thailand using discs produced in Thailand from steel plates from a third country and a rim produced in Thailand, which Commerce has found to be outside the scope of the Orders.

o In the Preliminary Scope Ruling, Commerce recognized that the merchandise subject to Asia Wheel's scope ruling requests includes "Product Method B: Trailer wheels manufactured using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country."

o Commerce found "the trailer wheels {...} manufactured by Asia Wheel in Thailand using Production Method B are not subject to the scope of the *Orders*."[269] Therefore, trailer wheels manufactured by Asia Wheel in Thailand using discs produced in Thailand from steel plates <u>from a third country</u> are also not subject to the scope of the *Orders*, and should qualify for the certification process, and the certification language should be amended to make this clear.[270]

• To ensure CBP's administration of the scope rulings renders correct results, Commerce should permit Asia Wheel and EAPA-subject importers to issue certifications to affirm the production method used for trailer wheels imported under entries made before the Preliminary Scope Ruling by those importers. Such certifications are necessary for Asia Wheel, the EAPA-subject importers, and CBP to distinguish out-of-scope wheels from potentially in-scope wheels in entries made before the Preliminary Scope Ruling.[271]

o The Preliminary Scope Ruling "concerns the method of production as documented by Asia Wheel and not specific models of trailer wheel."[272] As reported, Asia Wheel identifies the production method used by reference to the material codes specified in the production records, not by any markings in the constituent components or the finished wheels, or the shipping documents.[273] Consequently, neither Asia Wheel, the EAPA-subject importers, nor CBP can, by reviewing only the shipping documents, identify out-of-scope wheels in entries made before the Preliminary Scope Ruling.

o Commerce intends to instruct CBP to suspend all unliquidated entries for which the certification requirements were not met and require the importer to post AD/CVD cash deposits at the country-wide or all-others rate in effect for the *Orders*. "These certification requirements will go into effect on the date of the preliminary scope ruling."[274] Before this time, Asia Wheel and the EAPA-subject importers could not have known the certification requirements and prepared certifications accordingly. It would be unlawful and extremely unfair to Asia Wheel and the EAPA-subject importers if out-of-scope wheels covered by entries made before the Preliminary Scope Ruling are subject to

---

[269] *Id.*
[270] *Id.* at 35.
[271] *Id.* at 35-36.
[272] *Id.* at 36 (citing the Preliminary Scope Ruling at 23).
[273] *Id.* at 36 (citing Asia Wheel 2nd SQR at 2).
[274] *Id.* at 36 (citing Preliminary Scope Ruling at 23).

49

suspension of liquidation and AD/CVD cash deposits requirements simply because certification requirements were not in place at the time of entry.

o The current language of the proposed certifications does not permit certifications to be provided for prior entries of out-of-scope wheels. The language of the proposed importer certification reads, "This certification was completed *at or prior to* the date of entry summary."[275] The language of the proposed exporter certification reads, "I understand that Asia Wheel Co., Ltd. must provide a copy of this Exporter Certification to the U.S. importer *by* the date of shipment" and "{t}his certification was completed *at or prior to* the date of shipment."[276] Asia Wheel and importers therefore could not have prepared certifications that were "completed at or prior to the date of entry summary" or "completed at or prior to the date of shipment" for entries made before the Preliminary Scope Ruling.

o Commerce can address this issue by proposing certifications that are specifically designed for entries made before the Preliminary Scope Ruling, or explicitly instruct CBP to accept certifications that are prepared after the date of the Preliminary Scope Ruling for entries made before the date of the Preliminary Scope Ruling.

Neither the petitioner nor any other interested parties rebutted Asia Wheel's affirmative brief regarding certification language issues.

<u>Petitioner's AWI Case Brief</u>[277]

• As it is unlikely that any majority of shipments will be further examined and verified, the petitioner encourages Commerce to make certain modifications to the proposed certifications to further strengthen them against abuse.

• Commerce should clarify the certification language to make it clear that more than an unsupported exporter claim is required, and that the importer must have a reasonable basis for their own claimed personal knowledge based on documentation it has obtained for its own records to make these claims, specifically modifying the language in paragraph E to state:[278]

E. I have personal knowledge of the facts regarding the production of the certain steel wheels 12 to 16.5 inches in diameter identified below. "Personal knowledge" includes facts obtained from the sufficient documentation supporting this certification that was obtained from another party, (*e.g.*, through documentation provided through correspondence received by the importer (or exporter) from the producer regarding the country of manufacture of the imported products).

• Commerce should require the importer's certification include the exporter's certification and supporting documentation. These documents should be an integral part of the certification so that some determination of the veracity of the claims made in the certification can be made without having to resort to a verification process and the additional effort of seeking further

---

[275] *Id.* at 37 (citing and adding emphasis to Preliminary Scope Ruling at 29).
[276] *Id.* at 37 (citing and adding emphasis to Preliminary Scope Ruling at 31).
[277] *See* Petitioner's AWI Case Brief at 9-14.
[278] *Id.* at 11-12 (citing Preliminary Scope Ruling at 27 and Attachment 1, generally).

50

documents from the importer.  The importer should also provide a short explanation of how the documents support the claims made (the importer should be able to state how they have personal knowledge of the facts) so that a reviewing CBP official can examine those claims without having to guess why the importer asserts its claims are correct or how those claims tie to some enigmatic documents.  That explanation should include a reconciliation showing how the quantities of wheels in the entries covered by the certification tie to the production documentation.[279] Commerce should revise paragraph K of the certification to read:

> K. Copies of the documentation supporting this certification are attached and include {LIST OF ATTACHED DOCUMENTS}.  These documents show {EXPLANATION OF HOW THE ATTACHED DOCUMENTS SUPPORT THAT THE WHEELS IN THE ENTRIES COVERED BY THIS CERTIFICATION WERE MANUFACTURED IN THAILAND USING DISCS PRODUCED IN THAILAND FROM CIRCULAR OR RECTANGULAR STEEL PLATES FROM CHINA AND RIMS PRODUCED IN THAILAND FROM RECTANGULAR STEEL PLATES FROM CHINA OR A THIRD COUNTRY, WITH SPECIFIC REFERENCES TO INDIVIDUAL DOCUMENTS, ALSO SHOWING HOW THE QUANTITIES IN THE ENTRIES COVERED BY THIS CERTIFICATION RECONCILE WITH THE QUANTITIES SHOWN IN THE PRODUCTION DOCUMENTATION}.

- Commerce should keep the verification language (paragraph L) to fully alert the importer that these claims and the documents submitted may be subject to further verification to assure that they are consistent with the Importer's own records and with Zhejiang Jingu and Asia Wheel's records.

Asia Wheel's AWI Rebuttal Brief[280]
- Commerce should reject the petitioner's proposed changes to the certification language, as the current language of the importer certification is consistent with certifications used by Commerce under similar circumstances and are unnecessary and would unduly burden CBP.
- Commerce has used the same certification language as contained in the draft language in other cases in which production method is relevant.[281]  In asking Commerce to modify the text of the importer certification, the petitioner ignores that Commerce has used the same language in various cases, presumably without issue.  Commerce's use of the same language in prior importer certifications demonstrates that such certifications are effective and can be used in this case to prevent CBP from collecting AD/CVD cash deposits on entries of trailer wheels that originate in Thailand.

---

[279] *Id.* at 12-13 (citing Preliminary Scope Ruling at 28).
[280] *See* Asia Wheel's AWI Rebuttal Brief at 13-17.
[281] *Id.* at 13-15 (citing *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia: Affirmative Final Determination of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 FR 71025, 71028-31 (December 14, 2021); and *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30263, 30264-30266 (June 7, 2021)).

- The petitioner's request for the "personal knowledge" and all relevant documents in Paragraph E would unduly burden CBP with thousands of pages of documentation without justification.[282]
- The petitioner proposes that the importer certification require importers to submit, for every single entry of out-of-scope wheels, supporting documents, including a reconciliation linking the entry to Asia Wheel's production documents, together with the certification provided to CBP. Record evidence shows that a single production run could include 30 pages of production records, as well as material purchase records.[283] If Commerce were to accept the petitioner's proposed changes, importers throughout the United States would need to submit approximately 20,000 pages of production documentation to CBP based on Asia Wheel's 2020 production levels. CBP port officials would need to examine all the records to ensure that the imported wheels were imported from Thailand. This exercise would be extremely burdensome and unlikely for CBP to undertake, given the severe ongoing demands on both CBP and Commerce acknowledged by the petitioner.[284] The verification requirement included in Commerce's preliminary certification would achieve the same purpose without adding undue burden.
- The current language of the importer certification alerts importers that the certification and supporting documents are subject to verification, and therefore, importers are likely to require supporting documents from Asia Wheel regardless of whether they are required to submit such documentation to CBP for all entries.[285] This is particularly true given that paragraph M(iii) of the certification states that any failure to substantiate the certification would result in revocation of the importer's privilege to certify future imports as outside the scope of the *Orders*.

**Commerce's Position:** For this final ruling, we are modifying our certification requirements to address certain concerns raised by Asia Wheel. Asia Wheel accurately identifies an omission of language in the description of merchandise in the certifications which could result in the inclusion of certain wheels found to be out-of-scope and proposes "or a third country" to be added to the description "Trailer wheels manufactured using discs produced in Thailand from circular steel plates from China **or a third country** and rims produced in Thailand from rectangular steel plates from China or a third country" to correct for this discrepancy and ensure that all products identified as out-of-scope are properly identified to be subject to the certifications.[286]

Further, in consideration of the fact that, as reported, Asia Wheel identifies the production method used by reference to the material codes specified in the production records (and not by any markings in the constituent components or the finished wheels or the shipping documents), we agree with Asia Wheel that neither it nor the importer could have known the certification requirements and prepared certifications accordingly at the time of entry with respect to entries of out-of-scope wheels prior to the Preliminary Scope Ruling. Thus, we find that it is

---

[282] *Id*. at 15 (citing Petitioner's AWI Case Brief at 12-13; and Preliminary Scope Ruling at Attachment 1).
[283] *Id*. at 16 (citing Asia Wheel 2nd SQR at Exhibit SQR2-4).
[284] *Id*. at 17 (citing Petitioner's AWI Case Brief at 11).
[285] *Id*. at 17 (citing Preliminary Scope Ruling at 28, paragraph L).
[286] *See* Attachment.

52

appropriate and consistent with prior cases involving third country processing later determined to not be subject to an order to provide an opportunity to prepare certifications for prior entries of out-of-scope merchandise.[287]  As such, we are amending the draft out-of-scope CBP instructions and relevant certification language to include a 30-day grace period for importers and exporters to provide blanket certifications for post-initiation entries found to be out-of-scope.[288]

Finally, we agree with Asia Wheel that the petitioner's request to amend the importer's certification language to include all information otherwise provided by the exporter, certification as to personal knowledge of its accuracy, and reconciliation, would result in an undue burden to all parties and its necessity is not apparent given the documentary requirements otherwise specified and verification language included, which are consistent with certifications in other cases which have presented no enforceability or administrability concerns to date.  Should we receive further information which suggests additional substantiation is necessary to appropriately enforce this determination, we may re-evaluate whether further language is needed to strengthen administrability.

## VIII.  CERTIFICATION REQUIREMENTS

Commerce is requiring that Asia Wheel and importers of the trailer wheels Asia Wheel produced in Thailand from discs produced in Thailand from circular or rectangular steel plates from China and rims produced in Thailand from rectangular steel plates from China or a third country, and exported to the United States by Asia Wheel, maintain certifications to that effect.  Asia Wheel and the importer are further required to present the certifications to Commerce and/or CBP, as appropriate, upon demand by the respective agency.  Additionally, the claims made in the certifications and any supporting documentation are subject to verification by Commerce and/or CBP.  Attached to this scope ruling is the language for the Asia Wheel and importer certifications.

Asking Asia Wheel and the importer of the trailer wheels that Asia Wheel produces and exports to certify that the product satisfies the requirements of this scope ruling is a reasonable and appropriate approach to the enforcement of Commerce's AD and CVD orders.

In the event that the certification requirements established by this scope ruling are not met, Commerce intends to instruct CBP to suspend all unliquidated entries for which these requirements were not met and require that the importer post cash deposits at the country-wide or all-others rate in effect for the relevant order(s).  Because 19 CFR 351.225(l)(2) requires that Commerce terminate the suspension of liquidation if it determines that the product subject to the scope inquiry is not within the scope of the order, these certification requirements will go into effect on the date of the final scope ruling.

---

[287] *See Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Preliminary Determination of Anti-Circumvention Inquiry on the Antidumping Duty Order*, 84 FR 32864 (July 10, 2019).
[288] *See* Attachment.

## IX.    CERTIFICATIONS

Please *see* Attachment for the Asia Wheel and importer certifications (included in draft final CBP instructions).

## X.    RECOMMENDATION

With respect to the Asia Wheel I inquiry, based upon the above analysis, and in accordance with 19 CFR 351.225(f)(4), we recommend continuing to find that the trailer wheels identified in the Asia Wheel I Request as manufactured by Asia Wheel in Thailand using Production Method B and exported to the United States are not subject to the scope of the *Orders*.  Additionally, we recommend that Asia Wheel and importers of these products certify that they were manufactured in this manner.

Also with respect to the Asia Wheel I inquiry, based on the above analysis concerning country of origin, and in accordance with 19 CFR 351.225(f)(3), we recommend that Commerce continue to find that the trailer wheels identified in the Asia Wheel I Request as manufactured by Asia Wheel in Thailand using Production Methods A and C and exported to the United States are subject to the scope of the *Orders*.

If the recommendations in this memorandum are accepted, we will notify all interested parties on the scope service list, as directed by 19 CFR 351.225(f)(4).

☒                        ☐
_____          _____
Agree                   Disagree

4/11/2023

X *James Maeder*

Signed by: JAMES MAEDER

_____
James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

Filed By: Charles Doss, Filed Date: 4/11/23 4:09 PM, Submission Status: Approved

**Attachment**

Re: Antidumping duty scope determination on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China (A-570-090/A-549-090).

Notice of the lifting of suspension occurred on the message date of these instructions. See paragraph 5 below.

1. Commerce received a scope ruling request from Asia Wheel Co., Ltd. Commerce issued a final scope determination on 04/11/2023, that Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand, are not within the scope of the antidumping duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China (A-570-090).

2. Commerce determined that Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand are outside the scope of the order based on the plain language of the scope because the Chinese steel plate components are neither finished or unfinished rims, discs, or steel wheels. Therefore, Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand are not within the scope of the antidumping duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China.

3. For all entries of Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand not within scope that remain unliquidated on or after 04/22/2019 (the first date of suspension of liquidation in this proceeding), CBP shall terminate suspension and liquidate entries of product not within scope which were entered, or withdrawn from warehouse, for consumption.

4. Refund any cash deposits relating to the Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand described above.

5. These instructions constitute notice of the lifting of suspension of liquidation of entries of Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from

rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand entered, or withdrawn from warehouse, for consumption on or after 04/22/2019.

6. The assessment of antidumping duties by CBP on shipments or entries of this merchandise is subject to the provisions of section 778 of the Tariff Act of 1930, as amended. Section 778 requires that CBP pay interest on overpayments or assess interest on underpayments of the required amounts deposited as estimated antidumping duties. The interest provisions are not applicable to cash posted as estimated antidumping duties before the date of publication of the antidumping duty order. Interest shall be calculated from the date payment of estimated antidumping duties is required through the date of liquidation. The rate at which such interest is payable is the rate in effect under section 6621 of the Internal Revenue Code of 1954 for such period.

7. Unless instructed otherwise, for all other shipments of certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China not covered by paragraph 2 above, you shall continue to collect cash deposits of estimated antidumping duties for the merchandise at the current rates.

8. This instruction to liquidate entries covered by this message does not limit CBP's independent authority, including its authority to suspend, continue to suspend, or extend liquidation of entries addressed by this message. Accordingly, CBP should examine all entries for which this message directs liquidation to determine whether any such entries are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's independent authority (e.g., Enforce and Protect Act under section 517 of the Tariff Act of 1930, as amended). If entries of subject merchandise covered by this message are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's own authority, CBP port officials should follow CBP's internal procedures with respect to continuing any suspension, the lifting of suspension, and/or continuing any extension of liquidation for such entries.

9. Certifications

If an importer imports Asia Wheel Co., Ltd.'s trailer wheels from Thailand and claims that the trailer wheels were completed using the production method described in paragraph 1, the importer and exporter (Asia Wheel Co., Ltd.) are required to meet the certification and documentation requirements described below in order for no suspension of liquidation and no cash deposit to be required for such entries.

9a. Certification Requirements for Importers and Exporters

9a. (i) For entries of Asia Wheel Co., Ltd.'s trailer wheels from Thailand entered, or withdrawn from warehouse, for consumption on or after 03/22/2021 (the date of initiation of this scope inquiry) for which the importer claims that Asia Wheel Co., Ltd's trailer wheels were completed in Thailand using the production method described in paragraph 1 above, the importer and exporter are required to meet the certification and documentation requirements detailed in the

Filed By: Charles Doss, Filed Date: 4/11/23 4:09 PM, Submission Status: Approved

certification below in order for no suspension of liquidation and no cash deposit to be required for such entries.

9a.(ii) The exporter is further required to provide the importer a copy of the exporter certification, and the importer is required to maintain a copy of the exporter certification.

9a.(iii)  The importer and exporter are required to maintain sufficient documentation supporting the importer and  exporter certifications (e.g., production records, invoices, etc.).  The importer and exporter are required to maintain the certification and supporting documentation for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in United States courts regarding such entries.

9a.(iv) Although the importer will not be required to submit the certification or supporting documentation to CBP as part of the entry process, the importer and the exporter will be required to present the certification and supporting documentation to Commerce and/or CBP, as applicable, upon request by the respective agency.

9a.(v) Agents of the importer, such as brokers, are not permitted to make this certification. Where the importer uses a broker to facilitate the entry process, it should obtain the entry number and date of entry from the broker.

9a.(vi) The claims made in the importer and exporter certifications and any supporting documentation are subject to verification by Commerce and/or CBP.

9b. Certification Timing Requirements

9b. (i) For entries of Asia Wheel Co., Ltd.'s trailer wheels from Thailand shipped and/or entered, or withdrawn from warehouse, for consumption during the period 03/22/2021 through 04/10/2023, for which certifications are required, importers and exporters each have the option to complete: (a) a blanket certification covering multiple entries, (b) individual certifications for each entry, or (c) a combination thereof.  Importer and Exporter certifications for these entries should be completed, signed, and dated no later than 05/26/2023 (within 45 days of signature of the final scope ruling).

Accordingly, the relevant bullet in the certification should be edited to reflect that the certification was completed within this time frame.  For example, the bullet in the importer certification that reads: "This certification was completed at or prior to the time of entry," could be edited as follows: "The shipments/products referenced herein entered before 04/11/2023. This certification was completed on mm/dd/yyyy, within 45 days of the issuance of the final scope ruling."

Similarly, the bullet in the exporter certification that reads "This certification was completed at or prior to the time of shipment," could be edited as follows: "The shipments/products referenced herein shipped before 04/11/2023.  This certification was completed on mm/dd/yyyy, within 45 days of the issuance of the final scope ruling."

Additionally, the exporter must provide the importer a copy of the exporter certification within 45 days of the final scope ruling issuance.

9b. (ii) For entries of Asia Wheel Co., Ltd.'s trailer wheels from Thailand shipped and/or entered, or withdrawn from warehouse, for consumption on or after 04/11/2023, for which certifications are required:

-- the importer certification must be completed, signed, and dated by the time of filing of the entry summary for the relevant importation; and

-- the exporter certification must be completed, signed, dated and provided to the importer by the time of shipment.

Note: For merchandise shipped within 30 days of 04/11/2023, the certification requirements should be met as soon as practicable, but no later than 45 days after 04/11/2023.

9b. (iii) For unliquidated entries (and entries for which liquidation has not become final) of Asia Wheel Co., Ltd.'s trailer wheels from Thailand for which the importer and/or exporter is unable to meet the certification requirements, which entered as non-AD/CVD type entries (*e.g.*, type 01), and that were entered, or withdrawn from warehouse, for consumption on or after 03/22/2021, for which certifications are required, importers should file a Post Summary Correction with U.S. Customs and Border Protection (CBP) in accordance with CBP's regulations, regarding conversion of such entries to AD/CVD type (i.e., types 03, 06, 34 and 38) entries and report those AD/CVD type entries using the third country case number A-549-090. Similarly, the importer should pay cash deposits on those entries consistent with the regulations governing post summary corrections that require payment of additional duties.

10. Certifications

10a. IMPORTER CERTIFICATION

I hereby certify that:

A. My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADRESS OF IMPORTING COMPANY}.

B. I have direct personal knowledge of the facts regarding the importation into the Customs territory of the United States of the certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. that entered under entry summary number(s), identified below, and which are covered by this certification. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter's identity and location.

C.  If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

> The certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. covered by this certification were imported by {IMPORTING COMPANY} on behalf of {U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER};

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

> {NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

D.  The certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. covered by this certification were shipped to {NAME OF PARTY TO WHOM MERCHANDISE WAS FIRST SHIPPED IN THE UNITED STATES}, located at {ADDRESS OF SHIPMENT}.

E.  I have personal knowledge of the facts regarding the production of the certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. identified below.  "Personal knowledge" includes facts obtained from another party, (e.g., correspondence received by the importer (or exporter) from the producer regarding the production method and source of the inputs of the imported products).

F. The certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. covered by this certification are trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country.

G. This certification applies to the following entries (repeat this block as many times as necessary):

> Entry Summary #:
> Entry Summary Line Item #:
> Asia Wheel's Invoice #:
> Asia Wheel's Invoice Line Item #:

H.  I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill certificates, production records, invoices, etc.) until the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.

I.  I understand that {IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of (1) the date that is five years after the latest entry date of the entries covered by the certification or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries;

J.  I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon request of either agency;

K.  I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

L.  I understand that failure to maintain the required certifications, and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a de facto determination that all entries to which this certification applies are within the scope of the antidumping duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China.  I understand that such finding will result in:

i)  suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

ii)  the requirement that the importer post applicable antidumping duty cash deposits (as appropriate) equal to the rates determined by Commerce; and

iii)  the importer no longer being allowed to participate in the certification process.

M.  I understand that agents of the importer, such as brokers, are not permitted to make this certification.

N.  This certification was completed by the time of filing the entry summary or within 45 days of 04/11/2023.

O.  I am aware that U.S. law (including, but not limited to, 18 U.S.C. section 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

Signature

{NAME OF COMPANY OFFICIAL}

{TITLE OF COMPANY OFFICIAL}

{DATE}


10b. EXPORTER CERTIFICATION

I hereby certify that:

A.  My name is {COMPANY OFFICIAL'S NAME} and I am an official of Asia Wheel Co., Ltd.;

B.  I have direct personal knowledge of the facts regarding the production and exportation of the certain steel wheels 12 to 16.5 inches in diameter identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own books and records.

C.  The certain steel wheels 12 to 16.5 inches in diameter covered by this certification were produced in and exported from Thailand by Asia Wheel Co., Ltd. and are trailer wheels manufactured using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country.

D.  This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}. (repeat this block as many times as necessary):

    Asia Wheel's Invoice # to U.S. Customer:
    Asia Wheel's Invoice to U.S. Customer Line item #:

E.  The certain steel wheels 12 to 16.5 inches in diameter covered by this certification were shipped to {NAME OF U.S. PARTY TO WHOM MERCHANDISE WAS SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

F.  I understand that Asia Wheel Co., Ltd. is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill certificates, production records, invoices, etc.) for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.

G.  I understand that Asia Wheel Co., Ltd. must provide a copy of this Exporter Certification to the U.S. importer by the date of shipment.

H. I understand that Asia Wheel Co., Ltd. is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with this certification, and any supporting documents, upon request of either agency;

I. I understand that the claims made herein, and the substantiating documentation are subject to verification by CBP and/or Commerce.

J. I understand that failure to maintain the required certification and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a de facto determination that all sales to which this certification applies are within the scope of the antidumping duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China. I understand that such finding will result in:

i) suspension of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met; and

ii) the requirement that the importer post applicable antidumping duty cash deposits (as appropriate) equal to the rates as determined by Commerce; and

iii) Asia Wheels Co., Ltd. no longer being allowed to participate in this certification process.

K. This certification was completed at or prior to the date of shipment or within 45 days of 04/11/2023.

L. I am aware that U.S. law (including, but not limited to, 18 U.S.C. section 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

Signature

{NAME OF ASIA WHEEL CO., LTD. COMPANY OFFICIAL+

{TITLE OF COMPANY OFFICIAL}

{DATE}

11. If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce at (202) 482-0984. CBP ports should submit their inquiries through authorized CBP channels only. (This message was generated by OIII:BCQ.)

12. There are no restrictions on the release of this information.

62

Alexander Amdur

63

Appx080

Re: Countervailing duty scope determination on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China (C-570-091/C-549-091).

Notice of the lifting of suspension occurred on the message date of these instructions. See paragraph 5 below.

1. Commerce received a scope ruling request from Asia Wheel Co., Ltd. Commerce issued a final scope determination on 04/11/2023, that Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand, are not within the scope of the countervailing duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China (C-570-091).

2. Commerce determined that Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand are outside the scope of the order based on the plain language of the scope because the Chinese steel plate components are neither finished or unfinished rims, discs, or steel wheels. Therefore, Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand are not within the scope of the countervailing duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China.

3. For all entries of Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand not within scope that remain unliquidated on or after 02/25/2019 (the first date of suspension of liquidation in this proceeding), CBP shall terminate suspension and liquidate entries of product not within scope which were entered, or withdrawn from warehouse, for consumption.

4. Refund any cash deposits relating to the Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand described above.

5. These instructions constitute notice of the lifting of suspension of liquidation of entries of Asia Wheel Co., Ltd.'s trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country, which Asia Wheel Co., Ltd. exports from Thailand entered, or withdrawn from warehouse, for consumption on or after 02/25/2019.

6. The assessment of countervailing duties by CBP on shipments or entries of this merchandise is subject to the provisions of section 778 of the Tariff Act of 1930, as amended. Section 778 requires that CBP pay interest on overpayments or assess interest on underpayments of the required amounts deposited as estimated countervailing duties. The interest provisions are not applicable to cash posted as estimated countervailing duties before the date of publication of the countervailing duty order. Interest shall be calculated from the date payment of estimated countervailing duties is required through the date of liquidation.  The rate at which such interest is payable is the rate in effect under section 6621 of the Internal Revenue Code of 1954 for such period.

7. Unless instructed otherwise, for all other shipments of certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China not covered by paragraph 2 above, you shall continue to collect cash deposits of estimated countervailing duties for the merchandise at the current rates.

8. This instruction to liquidate entries covered by this message does not limit CBP's independent authority, including its authority to suspend, continue to suspend, or extend liquidation of entries addressed by this message. Accordingly, CBP should examine all entries for which this message directs liquidation to determine whether any such entries are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's independent authority (e.g., Enforce and Protect Act under section 517 of the Tariff Act of 1930, as amended). If entries of subject merchandise covered by this message are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's own authority, CBP port officials should follow CBP's internal procedures with respect to continuing any suspension, the lifting of suspension, and/or continuing any extension of liquidation for such entries.

9. Certifications

If an importer imports Asia Wheel Co., Ltd.'s trailer wheels from Thailand and claims that the trailer wheels were completed using the production method described in paragraph 1, the importer and exporter (Asia Wheel Co., Ltd.) are required to meet the certification and documentation requirements described below in order for no suspension of liquidation and no cash deposit to be required for such entries.

9a. Certification Requirements for Importers and Exporters

9a. (i) For entries of Asia Wheel Co., Ltd.'s trailer wheels from Thailand entered, or withdrawn from warehouse, for consumption on or after 03/22/2021 (the date of initiation of this scope inquiry) for which the importer claims that Asia Wheel Co., Ltd's trailer wheels were completed in Thailand using the production method described in paragraph 1 above, the importer and exporter are required to meet the certification and documentation requirements detailed in the certification below in order for no suspension of liquidation and no cash deposit to be required for such entries.

65

9a.(ii) The exporter is further required to provide the importer a copy of the exporter certification, and the importer is required to maintain a copy of the exporter certification.

9a.(iii)  The importer and exporter are required to maintain sufficient documentation supporting the importer and  exporter certifications (e.g., production records, invoices, etc.).  The importer and exporter are required to maintain the certification and supporting documentation for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in United States courts regarding such entries.

9a.(iv) Although the importer will not be required to submit the certification or supporting documentation to CBP as part of the entry process, the importer and the exporter will be required to present the certification and supporting documentation to Commerce and/or CBP, as applicable, upon request by the respective agency.

9a.(v) Agents of the importer, such as brokers, are not permitted to make this certification. Where the importer uses a broker to facilitate the entry process, it should obtain the entry number and date of entry from the broker.

9a.(vi) The claims made in the importer and exporter certifications and any supporting documentation are subject to verification by Commerce and/or CBP.

9b. Certification Timing Requirements

9b. (i) For entries of Asia Wheel Co., Ltd.'s trailer wheels from Thailand shipped and/or entered, or withdrawn from warehouse, for consumption during the period 03/22/2021 through 04/10/2023, for which certifications are required, importers and exporters each have the option to complete: (a) a blanket certification covering multiple entries, (b) individual certifications for each entry, or (c) a combination thereof.  Importer and Exporter certifications for these entries should be completed, signed, and dated no later than 05/26/2023 (within 45 days of signature of the final scope ruling).

Accordingly, the relevant bullet in the certification should be edited to reflect that the certification was completed within this time frame.  For example, the bullet in the importer certification that reads: "This certification was completed at or prior to the time of entry," could be edited as follows: "The shipments/products referenced herein entered before 04/11/2023. This certification was completed on mm/dd/yyyy, within 45 days of the issuance of the final scope ruling."

Similarly, the bullet in the exporter certification that reads "This certification was completed at or prior to the time of shipment," could be edited as follows: "The shipments/products referenced herein shipped before 04/11/2023.  This certification was completed on mm/dd/yyyy, within 45 days of the issuance of the final scope ruling."

Additionally, the exporter must provide the importer a copy of the exporter certification within 45 days of the final determination issuance.

66

9b. (ii) For entries of Asia Wheel Co., Ltd.'s trailer wheels from Thailand shipped and/or entered, or withdrawn from warehouse, for consumption on or after 04/11/2023, for which certifications are required:

-- the importer certification must be completed, signed, and dated by the time of filing of the entry summary for the relevant importation; and

-- the exporter certification must be completed, signed, dated and provided to the importer by the time of shipment.

Note: For merchandise shipped within 30 days of 04/11/2023, the certification requirements should be met as soon as practicable, but no later than 45 days after 04/11/2023.

9b. (iii) For unliquidated entries (and entries for which liquidation has not become final) of Asia Wheel Co., Ltd.'s trailer wheels from Thailand for which the importer and/or exporter is unable to meet the certification requirements, which entered as non-AD/CVD type entries (*e.g.*, type 01), and that were entered, or withdrawn from warehouse, for consumption on or after 03/22/2021, for which certifications are required, importers should file a Post Summary Correction with U.S. Customs and Border Protection (CBP) in accordance with CBP's regulations, regarding conversion of such entries to AD/CVD type (i.e., types 03, 06, 34 and 38) entries and report those AD/CVD type entries using the third country case number C-549-091. Similarly, the importer should pay cash deposits on those entries consistent with the regulations governing post summary corrections that require payment of additional duties.

10. Certifications

10a. IMPORTER CERTIFICATION

I hereby certify that:

A. My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADRESS OF IMPORTING COMPANY}.

B. I have direct personal knowledge of the facts regarding the importation into the Customs territory of the United States of the certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. that entered under entry summary number(s), identified below, and which are covered by this certification. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter's identity and location.

C. If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. covered by this certification were imported by {IMPORTING COMPANY} on behalf of {U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER};

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

D. The certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. covered by this certification were shipped to {NAME OF PARTY TO WHOM MERCHANDISE WAS FIRST SHIPPED IN THE UNITED STATES}, located at {ADDRESS OF SHIPMENT}.

E. I have personal knowledge of the facts regarding the production of the certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. identified below. "Personal knowledge" includes facts obtained from another party, (e.g., correspondence received by the importer (or exporter) from the producer regarding the production method and source of the inputs of the imported products).

F. The certain steel wheels 12 to 16.5 inches in diameter produced in and exported from Thailand by Asia Wheel Co., Ltd. covered by this certification are trailer wheels manufactured in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country.

G. This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Entry Summary Line Item #:
Asia Wheel's Invoice #:
Asia Wheel's Invoice Line Item #:

H. I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill certificates, production records, invoices, etc.) until the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.

68

I.  I understand that {IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of (1) the date that is five years after the latest entry date of the entries covered by the certification or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries;

J.  I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon request of either agency;

K. I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

L. I understand that failure to maintain the required certifications, and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a de facto determination that all entries to which this certification applies are within the scope of the countervailing duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China.  I understand that such finding will result in:

   i)  suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

   ii)  the requirement that the importer post applicable countervailing duty and countervailing duty cash deposits (as appropriate) equal to the rates determined by Commerce; and

   iii)  the importer no longer being allowed to participate in the certification process.

M.  I understand that agents of the importer, such as brokers, are not permitted to make this certification.

N.  This certification was completed by the time of filing the entry summary or within 45 days of 04/11/2023.

O.  I am aware that U.S. law (including, but not limited to, 18 U.S.C. section 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

Signature

{NAME OF COMPANY OFFICIAL}

69

Appx086

{TITLE OF COMPANY OFFICIAL}

{DATE}


10b. EXPORTER CERTIFICATION

I hereby certify that:

A,  My name is {COMPANY OFFICIAL'S NAME} and I am an official of Asia Wheel Co., Ltd.;


B.  I have direct personal knowledge of the facts regarding the production and exportation of the certain steel wheels 12 to 16.5 inches in diameter identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own books and records.


C.  The certain steel wheels 12 to 16.5 inches in diameter covered by this certification were produced in and exported from Thailand by Asia Wheel Co., Ltd. and are trailer wheels manufactured using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country.


D.  This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}. (repeat this block as many times as necessary):

    Asia Wheel's Invoice # to U.S. Customer:
    Asia Wheel's Invoice to U.S. Customer Line item #:


E.  The certain steel wheels 12 to 16.5 inches in diameter covered by this certification were shipped to {NAME OF U.S. PARTY TO WHOM MERCHANDISE WAS SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.


F.  I understand that Asia Wheel Co., Ltd. is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, mill certificates, production records, invoices, etc.) for the later of (1) a period of five years from the date of entry or (2) a period of three years after the conclusion of any litigation in the United States courts regarding such entries.


G.  I understand that Asia Wheel Co., Ltd. must provide a copy of this Exporter Certification to the U.S. importer by the date of shipment.


H. I understand that Asia Wheel Co., Ltd. is required to provide the U.S. importer with a copy of this certification and is required to provide  U.S. Customs and Border Protection (CBP) and/or

the U.S. Department of Commerce (Commerce) with this certification, and any supporting documents, upon request of either agency;

I.  I understand that the claims made herein, and the substantiating documentation are subject to verification by CBP and/or Commerce.

J.  I understand that failure to maintain the required certification and/or failure to substantiate the claims made herein, and/or failure to allow CBP and/or Commerce to verify the claims made herein, may result in a de facto determination that all sales to which this certification applies are within the scope of the countervailing duty order on certain steel wheels 12 to 16.5 inches in diameter from the People's Republic of China.  I understand that such finding will result in:

> i)  suspension of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met; and

> ii) the requirement that the importer post applicable countervailing duty cash deposits (as appropriate) equal to the rates as determined by Commerce; and

> iii) Asia Wheels Co., Ltd. no longer being allowed to participate in this certification process.

K. This certification was completed at or prior to the date of shipment or within 45 days of 04/11/2023.

L.  I am aware that U.S. law (including, but not limited to, 18 U.S.C. section 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. government.

Signature

{NAME OF ASIA WHEEL CO., LTD. COMPANY OFFICIAL+

{TITLE OF COMPANY OFFICIAL}

{DATE}

11. If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce at (202) 482-0984. CBP ports should submit their inquiries through authorized CBP channels only.  (This message was generated by OIII:BCQ.)

12. There are no restrictions on the release of this information.

Alexander Amdur

71

72

19 U.S.C. § 1671e

Subsec. (c)(5). Pub. L. 103–465, §264(b)(2), added par. (5).

1988—Subsec. (b)(4)(A). Pub. L. 100–418, §1324(a)(3), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: ''If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include findings as to whether—

''(i) there is material injury which will be difficult to repair, and

''(ii) the material injury was by reason of such massive imports of the subsidized merchandise over a relatively short period.''

Subsec. (e). Pub. L. 100–418, §1333(a), added subsec. (e).

1984—Subsec. (a)(1). Pub. L. 98–573, §606, inserted provision that when an investigation under this part is initiated simultaneously with an investigation under part II of this subtitle, which involves imports of the same class or kind of merchandise from the same or other countries, the administering authority, if requested by the petitioner, shall extend the date of the final determination under this paragraph to the date of the final determination of the administering authority in such investigation initiated under part II of this subtitle.

Subsec. (a)(2). Pub. L. 98–573, §605(a)(1), inserted provision after subpar. (B) that such findings may be affirmative even though the preliminary determination under section 1671b(e)(1) of this title was negative.

Subsec. (b)(1). Pub. L. 98–573, §602(a)(2), inserted '', or sales (or the likelihood of sales for importation,'' in provision after subpar. (B).

Subsec. (c)(3)(A). Pub. L. 98–573, §605(a)(3), inserted reference to par. (4).

Subsec. (c)(4). Pub. L. 98–573, §605(a)(2), added par. (4).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by section 1333(a) of Pub. L. 100–418 effective Aug. 23, 1988, and amendment by section 1324(a)(3) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, see section 1337(a), (c) of Pub. L. 100–418, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 602(a)(2) of Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, and amendment by sections 605(a) and 606 of Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a), (b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

## § 1671e. Assessment of duty

### (a) Publication of countervailing duty order

Within 7 days after being notified by the Commission of an affirmative determination under section 1671d(b) of this title, the administering authority shall publish a countervailing duty order which—

(1) directs customs officers to assess a countervailing duty equal to the amount of the net countervailable subsidy determined or estimated to exist, within 6 months after the date

on which the administering authority receives satisfactory information upon which the assessment may be based, but in no event later than 12 months after the end of the annual accounting period of the manufacturer or exporter within which the merchandise is entered, or withdrawn from warehouse, for consumption,

(2) includes a description of the subject merchandise, in such detail as the administering authority deems necessary, and

(3) requires the deposit of estimated countervailing duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

### (b) Imposition of duties

#### (1) General rule

If the Commission, in its final determination under section 1671d(b) of this title, finds material injury or threat of material injury which, but for the suspension of liquidation under section 1671b(d)(2) of this title, would have led to a finding of material injury, then entries of the merchandise subject to the countervailing duty order, the liquidation of which has been suspended under section 1671b(d)(2) of this title, shall be subject to the imposition of countervailing duties under section 1671(a) of this title.

#### (2) Special rule

If the Commission, in its final determination under section 1671d(b) of this title, finds threat of material injury, other than threat of material injury described in paragraph (1), or material retardation of the establishment of an industry in the United States, then merchandise subject to a countervailing duty order which is entered, or withdrawn from warehouse, for consumption on or after the date of publication of notice of an affirmative determination of the Commission under section 1671d(b) of this title shall be subject to the imposition of countervailing duties under section 1671(a) of this title, and the administering authority shall release any bond or other security, and refund any cash deposit made, to secure the payment of countervailing duties with respect to entries of the merchandise entered, or withdrawn from warehouse, for consumption before that date.

### (c) Special rule for regional industries

#### (1) In general

In an investigation under this part in which the Commission makes a regional industry determination under section 1677(4)(C) of this title, the administering authority shall, to the maximum extent possible, direct that duties be assessed only on the subject merchandise of the specific exporters or producers that exported the subject merchandise for sale in the region concerned during the period of investigation.

#### (2) Exception for new exporters and producers

After publication of the countervailing duty order, if the administering authority finds that a new exporter or producer is exporting the subject merchandise for sale in the region

concerned, the administering authority shall direct that duties be assessed on the subject merchandise of the new exporter or producer consistent with the provisions of section 1675(a)(2)(B) of this title.

(June 17, 1930, ch. 497, title VII, §706, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 160; amended Pub. L. 98–573, title VI, §607, Oct. 30, 1984, 98 Stat. 3029; Pub. L. 99–514, title XVIII, §1886(a)(5), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 103–465, title II, §§218(b)(1), 233(a)(5)(O), 264(c)(9), 265, 270(a)(1)(H), Dec. 8, 1994, 108 Stat. 4855, 4899, 4914, 4917.)

### Editorial Notes

#### Amendments

1994—Subsec. (a)(1). Pub. L. 103–465, §270(a)(1)(H), substituted ''countervailable subsidy'' for ''subsidy''.

Subsec. (a)(2) to (4). Pub. L. 103–465, §§233(a)(5)(O), 265, redesignated par. (3) as (2) and substituted ''subject merchandise'' for ''class or kind of merchandise to which it applies'', redesignated par. (4) as (3), and struck out former par. (2) which read as follows:

''(2) shall presumptively apply to all merchandise of such class or kind exported from the country investigated, except that if—

''(A) the administering authority determines there is a significant differential between companies receiving subsidy benefits, or

''(B) a State-owned enterprise is involved, the order may provide for differing countervailing duties,''.

Subsec. (b)(1). Pub. L. 103–465, §264(c)(9), substituted ''1671b(d)(2)'' for ''1671b(d)(1)'' in two places.

Subsec. (c). Pub. L. 103–465, §218(b)(1), added subsec. (c).

1986—Subsec. (a)(2). Pub. L. 99–514 realigned the margins in provisions following subpar. (B), which realignment had been editorially supplied, thereby requiring no change in text.

1984—Subsec. (a)(2) to (4). Pub. L. 98–573 added par. (2) and redesignated pars. (2) and (3) as (3) and (4), respectively.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

#### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

#### Plan Amendments Not Required Until January 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1671f. Treatment of difference between deposit of estimated countervailing duty and final assessed duty under countervailing duty order

### (a) Deposit of estimated countervailing duty under section 1671b(d)(1)(B) of this title

If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated countervailing duty under section 1671b(d)(1)(B) of this title is different from the amount of the countervailing duty determined under a countervailing duty order issued under section 1671e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1671d(b) of this title is published shall be—

(1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or

(2) refunded or released, to the extent that the cash deposit, bond, or other security is higher than the duty under the order.

### (b) Deposit of estimated countervailing duty under section 1671e(a)(3) of this title

If the amount of an estimated countervailing duty deposited under section 1671e(a)(3) of this title is different from the amount of the countervailing duty determined under a countervailing duty order issued under section 1671e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption after notice of the affirmative determination of the Commission under section 1671d(b) of this title is published shall be—

(1) collected, to the extent that the deposit under section 1671e(a)(3) of this title is lower than the duty determined under the order, or

(2) refunded, to the extent that the deposit under section 1671e(a)(3) of this title is higher than the duty determined under the order,

together with interest as provided by section 1677g of this title.

(June 17, 1930, ch. 497, title VII, §707, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 161; amended Pub. L. 103–465, title II, §264(c)(10), Dec. 8, 1994, 108 Stat. 4914.)

### Editorial Notes

#### Amendments

1994—Subsec. (a). Pub. L. 103–465 substituted ''1671b(d)(1)(B)'' for ''1671b(d)(2)'' in heading and text.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

## § 1671g. Effect of derogation of Export-Import Bank financing

Nothing in this subtitle shall be interpreted as superseding the provisions of section 635a–3 of

19 U.S.C. § 1673e

section, it shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law upon which the determination is based, and it shall publish notice of its determination in the Federal Register.

**(e) Correction of ministerial errors**

The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term ''ministerial error'' includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

(June 17, 1930, ch. 497, title VII, §735, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 169; amended Pub. L. 98–573, title VI, §§602(c), 605(b), Oct. 30, 1984, 98 Stat. 3024, 3028; Pub. L. 100–418, title I, §§1324(b)(3), 1333(a), Aug. 23, 1988, 102 Stat. 1201, 1209; Pub. L. 103–465, title II, §§212(b)(2)(B), 213(b), 214(b)(2), 219(b), (c)(6)–(8), 233(a)(5)(V), Dec. 8, 1994, 108 Stat. 4849–4851, 4856, 4857, 4900; Pub. L. 104–295, §20(b)(6), Oct. 11, 1996, 110 Stat. 3527.)

### Editorial Notes

#### AMENDMENTS

1996—Subsec. (a)(3)(A)(i). Pub. L. 104–295 amended Pub. L. 103–465, §214(b)(2)(A)(i). See 1994 Amendment note below.

1994—Subsec. (a)(1). Pub. L. 103–465, §233(a)(5)(V), substituted ''subject merchandise'' for ''merchandise which was the subject of the investigation''.

Subsec. (a)(3)(A)(i). Pub. L. 103–465, §214(b)(2)(A)(i), as amended by Pub. L. 104–295, inserted ''and material injury by reason of dumped imports'' after ''history of dumping'' and substituted ''subject merchandise'' for ''class or kind of merchandise which is the subject of the investigation''.

Subsec. (a)(3)(A)(ii). Pub. L. 103–465, §214(b)(2)(A)(ii), substituted ''subject merchandise at less than its fair value and that there would be material injury by reason of such sales'' for ''merchandise which is the subject of the investigation at less than its fair value''.

Subsec. (a)(3)(B). Pub. L. 103–465, §214(b)(2)(A)(iii), substituted ''subject merchandise'' for ''merchandise which is the subject of the investigation''.

Subsec. (a)(4). Pub. L. 103–465, §213(b), added par. (4).

Subsec. (b)(1). Pub. L. 103–465, §212(b)(2)(B), inserted at end of concluding provisions ''If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated.''

Subsec. (b)(4)(A). Pub. L. 103–465, §214(b)(2)(B), amended subpar. (A) generally, substituting present provisions for provisions requiring, in the case of an affirmative critical circumstances determination, a further finding as to whether retroactive imposition of antidumping duties on the subject merchandise would be necessary to prevent recurrence of material injury caused by massive imports of the merchandise over a relatively short period of time.

Subsec. (c)(1). Pub. L. 103–465, §219(b)(1), struck out ''and'' at end of subpar. (A), added subpar. (B), and redesignated former subpar. (B) as (C) and substituted ''the suspension of liquidation under section 1673b(d)(2) of this title'' for ''under paragraphs (1) and (2) of sec-

tion 1673b(d) of this title the suspension of liquidation and the posting of a cash deposit, bond, or other security''.

Subsec. (c)(2)(A). Pub. L. 103–465, §219(c)(6), substituted ''1673b(d)(2)'' for ''1671b(d)(1)''.

Subsec. (c)(2)(B). Pub. L. 103–465, §219(c)(7), substituted ''1673b(d)(1)(B)'' for ''1673b(d)(2)''.

Subsec. (c)(3)(B). Pub. L. 103–465, §219(c)(8), substituted ''1673b(d)(1)(B)'' for ''1673b(d)(2)''.

Subsec. (c)(5). Pub. L. 103–465, §219(b)(2), added par. (5).

1988—Subsec. (b)(4)(A). Pub. L. 100–418, §1324(b)(3), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: ''If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include a finding as to whether the material injury is by reason of massive imports described in subsection (a)(3) of this section to an extent that, in order to prevent such material injury from recurring, it is necessary to impose the duty imposed by section 1673 of this title retroactively on those imports.''

Subsec. (e). Pub. L. 100–418, §1333(a), added subsec. (e).

1984—Subsec. (a)(3). Pub. L. 98–573, §605(b)(1), inserted provision that such findings may be affirmative even though the preliminary determination under section 1673b(e)(1) of this title was negative.

Subsec. (b)(1). Pub. L. 98–573, §602(c), inserted '', or sales (or the likelihood of sales) for importation,'' in provisions after subpar. (B).

Subsec. (c)(3)(A). Pub. L. 98–573, §605(b)(3), inserted reference to par. (4).

Subsec. (c)(4). Pub. L. 98–573, §605(b)(2), added par. (4).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

#### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by section 1333(a) of Pub. L. 100–418 effective Aug. 23, 1988, and amendment by section 1324(b)(3) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, see section 1337(a), (c) of Pub. L. 100–418, set out as a note under section 1671 of this title.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 602(c) of Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, and amendment by section 605(b) of Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a), (b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

## § 1673e. Assessment of duty

### (a) Publication of antidumping duty order

Within 7 days after being notified by the Commission of an affirmative determination under section 1673d(b) of this title, the administering authority shall publish an antidumping duty order which—

(1) directs customs officers to assess an antidumping duty equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export

price) of the merchandise, within 6 months after the date on which the administering authority receives satisfactory information upon which the assessment may be based, but in no event later than—

(A) 12 months after the end of the annual accounting period of the manufacturer or exporter within which the merchandise is entered, or withdrawn from warehouse, for consumption, or

(B) in the case of merchandise not sold prior to its importation into the United States, 12 months after the end of the annual accounting period of the manufacturer or exporter within which it is sold in the United States to a person who is not the exporter of that merchandise,

(2) includes a description of the subject merchandise, in such detail as the administering authority deems necessary, and

(3) requires the deposit of estimated antidumping duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

**(b) Imposition of duty**

**(1) General rule**

If the Commission, in its final determination under section 1673d(b) of this title, finds material injury or threat of material injury which, but for the suspension of liquidation under section 1673b(d)(2) of this title would have led to a finding of material injury, then entries of the subject merchandise, the liquidation of which has been suspended under section 1673b(d)(2) of this title, shall be subject to the imposition of antidumping duties under section 1673 of this title.

**(2) Special rule**

If the Commission, in its final determination under section 1673d(b) of this title, finds threat of material injury, other than threat of material injury described in paragraph (1), or material retardation of the establishment of an industry in the United States, then subject merchandise which is entered, or withdrawn from warehouse, for consumption on or after the date of publication of notice of an affirmative determination of the Commission under section 1673d(b) of this title shall be subject to the assessment of antidumping duties under section 1673 of this title, and the administering authority shall release any bond or other security, and refund any cash deposit made, to secure the payment of antidumping duties with respect to entries of the merchandise entered, or withdrawn from warehouse, for consumption before that date.

**(c) Security in lieu of estimated duty pending early determination of duty**

**(1) Conditions for waiver of deposit of estimated duties**

The administering authority may permit, for not more than 90 days after the date of publication of an order under subsection (a), the posting of a bond or other security in lieu of the deposit of estimated antidumping duties required under subsection (a)(3) if—

(A) the investigation has not been designated as extraordinarily complicated by reason of—

(i) the number and complexity of the transactions to be investigated or adjustments to be considered,

(ii) the novelty of the issues presented, or

(iii) the number of firms whose activities must be investigated,

(B) the final determination in the investigation has not been postponed under section 1673d(a)(2)(A) of this title;

(C) on the basis of information presented to the administering authority by any manufacturer, producer, or exporter in such form and within such time as the administering authority may require, the administering authority is satisfied that a determination will be made, within 90 days after the date of publication of an order under subsection (a), of the normal value and the export price (or the constructed export price) for all merchandise of such manufacturer, producer, or exporter described in that order which was entered, or withdrawn from warehouse, for consumption on or after the date of publication of—

(i) an affirmative preliminary determination by the administering authority under section 1673b(b) of this title, or

(ii) if its determination under section 1673b(b) of this title was negative, an affirmative final determination by the administering authority under section 1673d(a) of this title,

and before the date of publication of the affirmative final determination by the Commission under section 1673d(b) of this title;

(D) the party described in subparagraph (C) provides credible evidence that the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise is significantly less than the amount of such excess specified in the antidumping duty order published under subsection (a); and

(E) the data concerning the normal value and the export price (or the constructed export price) apply to sales in the usual commercial quantities and in the ordinary course of trade and the number of such sales are sufficient to form an adequate basis for comparison.

**(2) Notice; hearing**

If the administering authority permits the posting of a bond or other security in lieu of the deposit of estimated antidumping duties under paragraph (1), it shall—

(A) publish notice of its action in the Federal Register, and

(B) upon the request of any interested party, hold a hearing in accordance with section 1677c of this title before determining the normal value and the export price (or the constructed export price) of the merchandise.

**(3) Determinations to be basis of antidumping duty**

The administering authority shall publish notice in the Federal Register of the results of

its determination of normal value and export price (or the constructed export price), and that determination shall be the basis for the assessment of antidumping duties on entries of merchandise to which the notice under this subsection applies and also shall be the basis for the deposit of estimated antidumping duties on future entries of merchandise of manufacturers, producers, or exporters described in paragraph (1) to which the order issued under subsection (a) applies.

### (4) Provision of business proprietary information; written comments

Before determining whether to permit the posting of bond or other security under paragraph (1) in lieu of the deposit of estimated antidumping duties, the administering authority shall—

(A) make all business proprietary information supplied to the administering authority under paragraph (1) available under a protective order in accordance with section 1677f(c) of this title to all interested parties described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title, and

(B) afford all interested parties an opportunity to file written comments on whether the posting of bond or other security under paragraph (1) in lieu of the deposit of estimated antidumping duties should be permitted.

### (d) Special rule for regional industries

#### (1) In general

In an investigation in which the Commission makes a regional industry determination under section 1677(4)(C) of this title, the administering authority shall, to the maximum extent possible, direct that duties be assessed only on the subject merchandise of the specific exporters or producers that exported the subject merchandise for sale in the region concerned during the period of investigation.

#### (2) Exception for new exporters and producers

After publication of the antidumping duty order, if the administering authority finds that a new exporter or producer is exporting the subject merchandise for sale in the region concerned, the administering authority shall direct that duties be assessed on the subject merchandise of the new exporter or producer consistent with the provisions of section 1675(a)(2)(B) of this title.

(June 17, 1930, ch. 497, title VII, §736, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 172; amended Pub. L. 99–514, title XVIII, §1886(a)(7), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §1325, Aug. 23, 1988, 102 Stat. 1201; Pub. L. 103–465, title II, §§218(b)(2), 219(c)(9), 233(a)(1)(C), (2)(A)(iii), (5)(W)–(Y), Dec. 8, 1994, 108 Stat. 4855, 4857, 4898, 4900.)

#### Editorial Notes

##### Amendments

1994—Subsec. (a)(1). Pub. L. 103–465, §233(a)(1)(C), (2)(A)(iii), substituted "normal value" for "foreign market value" and "export price (or the constructed export price)" for "United States price".

Subsec. (a)(2). Pub. L. 103–465, §233(a)(5)(W), substituted "subject merchandise" for "class or kind of merchandise to which it applies".

Subsec. (b)(1). Pub. L. 103–465, §§219(c)(9), 233(a)(5)(X), substituted "1673b(d)(2)" for "1673b(d)(1)" in two places and "subject merchandise" for "merchandise subject to the antidumping duty order".

Subsec. (b)(2). Pub. L. 103–465, §233(a)(5)(Y), substituted "subject merchandise" for "merchandise subject to an antidumping duty order".

Subsec. (c). Pub. L. 103–465, §233(a)(1)(C), (2)(A)(iii), substituted "normal value" for "foreign market value" and "export price (or the constructed export price)" for "United States price" in pars. (1)(C) to (E), (2)(B), and (3).

Subsec. (d). Pub. L. 103–465, §218(b)(2), added subsec. (d).

1988—Subsec. (c)(1). Pub. L. 100–418, §1325(a), amended par. (1) generally, designating existing provisions as cl. (C) and adding cls. (A), (B), (D), and (E).

Subsec. (c)(4). Pub. L. 100–418, §1325(b), added par. (4).

1986—Subsec. (c)(1). Pub. L. 99–514 inserted ", and was sold to any person that is not related to such manufacturer, producer, or exporter," before "on or after the date".

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

##### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, see section 1337(b) of Pub. L. 100–418, set out as a note under section 1671 of this title.

##### Plan Amendments Not Required Until January 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1673f. Treatment of difference between deposit of estimated antidumping duty and final assessed duty under antidumping duty order

### (a) Deposit of estimated antidumping duty under section 1673b(d)(1)(B) of this title

If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated antidumping duty under section 1673b(d)(1)(B) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under section 1673e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1673d(b) of this title is published shall be—

(1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or

19 C.F.R. § 351.225
(2021)

error (*see* paragraph (f) of this section), the correction of which, either singly or in combination with other errors:

(1) Would result in a change of at least five absolute percentage points in, but not less than 25 percent of, the weighted-average dumping margin or the countervailable subsidy rate (whichever is applicable) calculated in the original (erroneous) preliminary determination; or

(2) Would result in a difference between a weighted-average dumping margin or countervailable subsidy rate (whichever is applicable) of zero (or *de minimis*) and a weighted-average dumping margin or countervailable subsidy rate of greater than *de minimis*, or vice versa.

### § 351.225  Scope rulings.

(a) *Introduction.* Issues arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation. Such issues can arise because the descriptions of subject merchandise contained in the Department's determinations must be written in general terms. At other times, a domestic interested party may allege that changes to an imported product or the place where the imported product is assembled constitutes circumvention under section 781 of the Act. When such issues arise, the Department issues ''scope rulings'' that clarify the scope of an order or suspended investigation with respect to particular products. This section contains rules regarding scope rulings, requests for scope rulings, procedures for scope inquiries, and standards used in determining whether a product is within the scope of an order or suspended investigation.

(b) *Self-initiation.* If the Secretary determines from available information that an inquiry is warranted to determine whether a product is included within the scope of an antidumping or countervailing duty order or a suspended investigation, the Secretary will initiate an inquiry, and will notify all parties on the Department's scope service list of its initiation of a scope inquiry.

(c) *By application—*(1) *Contents and service of application.* Any interested party may apply for a ruling as to whether a particular product is within the scope of an order or a suspended investigation. The application must be served upon all parties on the scope service list described in paragraph (n) of this section, and must contain the following, to the extent reasonably available to the interested party:

(i) A detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number;

(ii) A statement of the interested party's position as to whether the product is within the scope of an order or a suspended investigation, including:

(A) A summary of the reasons for this conclusion,

(B) Citations to any applicable statutory authority, and

(C) Any factual information supporting this position, including excerpts from portions of the Secretary's or the Commission's investigation, and relevant prior scope rulings.

(2) *Deadline for action on application.* Within 45 days of the date of receipt of an application for a scope ruling, the Secretary will issue a final ruling under paragraph (d) of this section or will initiate a scope inquiry under paragraph (e) of this section.

(d) *Ruling based upon the application.* If the Secretary can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, whether a product is included within the scope of an order or a suspended investigation, the Secretary will issue a final ruling as to whether the product is included within the order or suspended investigation. The Secretary will notify all persons on the Department's scope service list (*see* paragraph (n) of this section) of the final ruling.

(e) *Ruling where further inquiry is warranted.* If the Secretary finds that the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1)

of this section, the Secretary will notify by mail all parties on the Department's scope service list of the initiation of a scope inquiry.

(f) *Notice and procedure.* (1) Notice of the initiation of a scope inquiry issued under paragraph (b) or (e) of this section will include:

(i) A description of the product that is the subject of the scope inquiry; and

(ii) An explanation of the reasons for the Secretary's decision to initiate a scope inquiry;

(iii) A schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.

(2) The Secretary may issue questionnaires and verify submissions received, where appropriate.

(3) Whenever the Secretary finds that a scope inquiry presents an issue of significant difficulty, the Secretary will issue a preliminary scope ruling, based upon the available information at the time, as to whether there is a reasonable basis to believe or suspect that the product subject to a scope inquiry is included within the order or suspended investigation. The Secretary will notify all parties on the Department's scope service list (see paragraph (n) of this section) of the preliminary scope ruling, and will invite comment. Unless otherwise specified, interested parties will have within twenty days from the date of receipt of the notification in which to submit comments, and ten days thereafter in which to submit rebuttal comments.

(4) The Secretary will issue a final ruling as to whether the product which is the subject of the scope inquiry is included within the order or suspended investigation, including an explanation of the factual and legal conclusions on which the final ruling is based. The Secretary will notify all parties on the Department's scope service list (see paragraph (n) of this section) of the final scope ruling.

(5) The Secretary will issue a final ruling under paragraph (k) of this section (other scope rulings) normally within 120 days of the initiation of the inquiry under this section. The Sec-

retary will issue a final ruling under paragraph (g), (h), (i), or (j) of this section (circumvention rulings under section 781 of the Act) normally within 300 days from the date of the initiation of the scope inquiry.

(6) When an administrative review under § 351.213, a new shipper review under § 351.214, or an expedited antidumping review under § 351.215 is in progress at the time the Secretary provides notice of the initiation of a scope inquiry (*see* paragraph (e)(1) of this section), the Secretary may conduct the scope inquiry in conjunction with that review.

(7)(i) The Secretary will notify the Commission in writing of the proposed inclusion of products in an order prior to issuing a final ruling under paragraph (f)(4) of this section based on a determination under:

(A) Section 781(a) of the Act with respect to merchandise completed or assembled in the United States (other than minor completion or assembly);

(B) Section 781(b) of the Act with respect to merchandise completed or assembled in other foreign countries; or

(C) Section 781(d) of the Act with respect to later-developed products which incorporate a significant technological advance or significant alteration of an earlier product.

(ii) If the Secretary notifies the Commission under paragraph (f)(7)(i) of this section, upon the written request of the Commission, the Secretary will consult with the Commission regarding the proposed inclusion, and any such consultation will be completed within 15 days after the date of such request. If, after consultation, the Commission believes that a significant injury issue is presented by the proposed inclusion of a product within an order, the Commission may provide written advice to the Secretary as to whether the inclusion would be inconsistent with the affirmative injury determination of the Commission on which the order is based.

(g) *Products completed or assembled in the United States.* Under section 781(a) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order imported parts or components referred to in section 781(a)(1)(B) of the Act that are

235

used in the completion or assembly of the merchandise in the United States at any time such order is in effect. In making this determination, the Secretary will not consider any single factor of section 781(a)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(a)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(a)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(h) *Products completed or assembled in other foreign countries.* Under section 781(b) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order, at any time such order is in effect, imported merchandise completed or assembled in a foreign country other than the country to which the order applies. In making this determination, the Secretary will not consider any single factor of section 781(b)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(b)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(i) *Minor alterations of merchandise.* Under section 781(c) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order articles altered in form or appearance in minor respects.

(j) *Later-developed merchandise.* In determining whether later-developed merchandise is within the scope of an antidumping or countervailing duty order, the Secretary will apply section 781(d) of the Act.

(k) *Other scope determinations.* With respect to those scope determinations that are not covered under paragraphs (g) through (j) of this section, in considering whether a particular product is included within the scope of an order or a suspended investigation, the Sec-retary will take into account the following:

(1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

(2) When the above criteria are not dispositive, the Secretary will further consider:

(i) The physical characteristics of the product;

(ii) The expectations of the ultimate purchasers;

(iii) The ultimate use of the product;

(iv) The channels of trade in which the product is sold; and

(v) The manner in which the product is advertised and displayed.

(l) *Suspension of liquidation.* (1) When the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

(2) If the Secretary issues a preliminary scope ruling under paragraph (f)(3) of this section to the effect that the product in question is included within the scope of the order, any suspension of liquidation described in paragraph (l)(1) of this section will continue. If liquidation has not been suspended, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary issues a preliminary scope ruling to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the product ended, and will instruct the Customs Service to refund any cash deposits or release any bonds relating to that product.

(3) If the Secretary issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect

that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section will continue. Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.

(4) If, within 90 days of the initiation of a review of an order or a suspended investigation under this subpart, the Secretary issues a final ruling that a product is included within the scope of the order or suspended investigation that is the subject of the review, the Secretary, where practicable, will include sales of that product for purposes of the review and will seek information regarding such sales. If the Secretary issues a final ruling after 90 days of the initiation of the review, the Secretary may consider sales of the product for purposes of the review on the basis of non-adverse facts available. However, notwithstanding the pendency of a scope inquiry, if the Secretary considers it appropriate, the Secretary may request information concerning the product that is the subject of the scope inquiry for purposes of a review under this subpart.

(m) *Orders covering identical products.* Except for a scope inquiry and a scope ruling that involves section 781(a) or section 781(b) of the Act (assembly of parts or components in the United States or in a third country), if more than one order or suspended investigation cover the same subject merchandise, and if the Secretary considers it appropriate, the Secretary may conduct a single inquiry and issue a single scope ruling that applies to all such orders or suspended investigations.

(n) *Service of applications; scope service list.* The requirements of § 351.303(f) apply to this section, except that an application for a scope ruling must be served on all persons on the Department's scope service list. For purposes of this section, the "scope service list" will include all persons that have participated in any segment of the proceeding. If an application for a scope ruling in one proceeding results in a single inquiry that will apply to another proceeding (*see* paragraph (m) of this section), the Secretary will notify persons on the scope service list of the other proceeding of the application for a scope ruling.

(o) *Publication of list of scope rulings.* On a quarterly basis, the Secretary will publish in the FEDERAL REGISTER a list of scope rulings issued within the last three months. This list will include the case name, reference number, and a brief description of the ruling.

## Subpart C—Information and Argument

### § 351.301 Time limits for submission of factual information.

(a) *Introduction.* The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets forth the time limits for submitting such factual information, including information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, allegations concerning market viability, allegations of sales at prices below the cost of production, countervailable subsidy allegations, and upstream subsidy allegations. Section 351.302 sets forth the procedures for requesting an extension of such time limits. Section 351.303 contains the procedural rules regarding filing, format, translation, service, and certification of documents.

(b) *Time limits in general.* Except as provided in paragraphs (c) and (d) of this section and § 351.302, a submission of factual information is due no later than:

(1) For a final determination in a countervailing duty investigation or an antidumping investigation, seven days

19 U.S.C. § 1517

section 171 of Title 28, Judiciary and Judicial Procedure.

EFFECTIVE DATE OF 1980 AMENDMENTS

Pub. L. 96–542, § 3, Dec. 17, 1980, 94 Stat. 3210, provided that: "The amendments made by this Act [amending this section and provisions set out as a note under section 251 of Title 28, Judiciary and Judicial Procedure] shall be effective as of November 1, 1980."

Amendment by Pub. L. 96–417 effective Nov. 1, 1980, and applicable with respect to civil actions pending on or commenced on or after such date, see section 701(a) of Pub. L. 96–417, set out as a note under section 251 of title 28.

EFFECTIVE DATE; TRANSITIONAL RULES

Pub. L. 96–39, title X, § 1002, July 26, 1979, 93 Stat. 306, provided that:

"(a) EFFECTIVE DATE.—The amendments made by this title [enacting this section and amending sections 1514, 1515, and 1516 of this title and sections 1541, 1582, 2632, 2633, and 2637 of Title 28, Judiciary and Judicial Procedure] shall take effect on that date (hereinafter in this section referred to as the 'effective date') on which title VII of the Tariff Act of 1930 [subtitle IV of this chapter] (as added by title I of this Act) takes effect [Jan. 1, 1980]; and section 515(a) of such Act of 1930 [section 1515(a) of this title] (as amended by section 1001(b)(2)) shall apply with respect to any denial, in whole or in part, of a protest filed under section 514 of such Act of 1930 [section 1514 of this title] on or after the effective date.

"(b) TRANSITIONAL RULES.—

"(1) CERTAIN PROTESTS, PETITIONS, ACTIONS, ETC.— The amendments made by this title [enacting this section and amending sections 1514, 1515, and 1516 of this title and sections 1541, 1582, 2632, 2633, and 2637 of Title 28, Judiciary and Judicial Procedure] shall not apply with respect to—

"(A) any protest, petition, or notice of desire to contest filed before the effective date [Jan. 1, 1980] under section 514, 516(a), or 516(d), respectively, of the Tariff Act of 1930 [section 1514, 1516(a), or 1516(d) of this title];

"(B) any civil action commenced before the effective date [Jan. 1, 1980] under section 2632 of title 28 of the United States Code; or

"(C) any civil action commenced after the effective date [Jan. 1, 1980] under such section 2632 if the protest, petition, or notice of desire to contest (under section 514, 516(a), or 516(d), respectively, of the Tariff Act of 1930) on which such action is based was filed before such effective date.

"(2) LAW TO BE APPLIED FOR PURPOSES OF SUCH ACTIONS.—Notwithstanding the repeal of the Antidumping Act, 1921 [sections 160 to 171 of this title], by section 106(a) of this Act, and the amendment of section 303 of the Tariff Act of 1930 [section 1303 of this title] by section 103 of this Act, the law in effect on the date of any finding or determination contested in a civil action described in subparagraph (A), (B), or (C) of paragraph (1) shall be applied for purposes of that action.

"(3) CERTAIN COUNTERVAILING AND ANTIDUMPING DUTY ASSESSMENTS.—The amendments made by this title [enacting this section and amending sections 1514, 1515, and 1516 of this title and sections 1541, 1582, 2632, 2633, and 2637 of Title 28, Judiciary and Judicial Procedure] shall apply with respect to the review of the assessment of, or failure to assess, any countervailing duty or antidumping duty on entries subject to a countervailing duty order or antidumping finding if the assessment is made after the effective date. If no assessment of such duty had been made before the effective date that could serve the party seeking review as the basis of a review of the underlying determination, made by the Secretary of the Treasury or the International Trade Commission before the effective date, on which such order, finding, or lack thereof is based, then the underlying determination shall be subject to review in accordance with the law in effect on the day before the effective date.

"(4) CERTAIN COUNTERVAILING AND ANTIDUMPING DUTY DETERMINATIONS.—With respect to any preliminary determination or final determination of the Secretary of the Treasury under section 303 of the Tariff Act of 1930 [section 1303 of this title] or the Antidumping Act, 1921 [sections 160 to 171 of this title], which is treated under section 102 of this Act [set out as a note under section 1671 of this title] as if made under section 703(b), 705(a), 733(b), or 735(a) of the Tariff Act of 1930 [section 1671b(b), 1671d(a), 1673b(b), or 1673d(a) of this title] (as added by title I of this Act) such determinations shall be subject to judicial review in the same manner and to the same extent as if made on the day before the effective date."

TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6. For establishment of U.S. Customs and Border Protection in the Department of Homeland Security, treated as if included in Pub. L. 107–296 as of Nov. 25, 2002, see section 211 of Title 6, as amended generally by Pub. L. 114–125, and section 802(b) of Pub. L. 114–125, set out as a note under section 211 of Title 6.

EFFECT OF TERMINATION OF USMCA COUNTRY STATUS

For provisions relating to effect of termination of USMCA country status on sections 401 to 432 of Pub. L. 116–113, see section 4601 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL
JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

Executive Documents

ACCEPTANCE BY PRESIDENT OF PANEL AND COMMITTEE DECISIONS

For acceptance by President of decisions of binational panels and extraordinary challenge committees in event that subsec. (b)(7)(B) of this section takes effect, see section 2 of Ex. Ord. No. 12889, Dec. 27, 1993, 58 F.R. 69681, set out as a note under former section 3311 of this title.

For provision that in the event that subsec. (g)(7)(B) of this section takes effect, the President accepts, as a whole, all decisions of binational panels and extraordinary challenge committees, see section 3 of Ex. Ord. No. 12662, Dec. 31, 1988, 54 F.R. 785, set out as a note under section 2112 of this title.

## § 1517. Procedures for investigating claims of evasion of antidumping and countervailing duty orders

### (a) Definitions

In this section:

### (1) Administering authority

The term "administering authority" has the meaning given that term in section 1677(1) of this title.

## (2) Commissioner

The term "Commissioner" means the Commissioner of U.S. Customs and Border Protection.

## (3) Covered merchandise

The term "covered merchandise" means merchandise that is subject to—

(A) an antidumping duty order issued under section 1673e of this title; or

(B) a countervailing duty order issued under section 1671e of this title.

## (4) Enter; entry

The terms "enter" and "entry" refer to the entry, or withdrawal from warehouse for consumption, of merchandise into the customs territory of the United States.

## (5) Evasion

### (A) In general

Except as provided in subparagraph (B), the term "evasion" refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

### (B) Exception for clerical error

#### (i) In general

Except as provided in clause (ii), the term "evasion" does not include entering covered merchandise into the customs territory of the United States by means of—

(I) a document or electronically transmitted data or information, written or oral statement, or act that is false as a result of a clerical error; or

(II) an omission that results from a clerical error.

#### (ii) Patterns of negligent conduct

If the Commissioner determines that a person has entered covered merchandise into the customs territory of the United States by means of a clerical error referred to in subclause (I) or (II) of clause (i) and that the clerical error is part of a pattern of negligent conduct on the part of that person, the Commissioner may determine, notwithstanding clause (i), that the person has entered such covered merchandise into the customs territory of the United States through evasion.

#### (iii) Electronic repetition of errors

For purposes of clause (ii), the mere nonintentional repetition by an electronic system of an initial clerical error does not constitute a pattern of negligent conduct.

#### (iv) Rule of construction

A determination by the Commissioner that a person has entered covered merchandise into the customs territory of the United States by means of a clerical error referred to in subclause (I) or (II) of clause (i) rather than through evasion shall not be construed to excuse that person from the payment of any duties applicable to the merchandise.

## (6) Interested party

### (A) In general

The term "interested party" means—

(i) a foreign manufacturer, producer, or exporter, or the United States importer, of covered merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise;

(ii) a manufacturer, producer, or wholesaler in the United States of a domestic like product;

(iii) a certified union or recognized union or group of workers that is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product;

(iv) a trade or business association a majority of the members of which manufacture, produce, or wholesale a domestic like product in the United States;

(v) an association a majority of the members of which is composed of interested parties described in clause (ii), (iii), or (iv) with respect to a domestic like product; and

(vi) if the covered merchandise is a processed agricultural product, as defined in section 1677(4)(E), a coalition or trade association that is representative of either—

(I) processors;

(II) processors and producers; or

(III) processors and growers.

### (B) Domestic like product

For purposes of subparagraph (A), the term "domestic like product" means a product that is like, or in the absence of like, most similar in characteristics and uses with, covered merchandise.

## (b) Investigations

### (1) In general

Not later than 15 business days after receiving an allegation described in paragraph (2) or a referral described in paragraph (3), the Commissioner shall initiate an investigation if the Commissioner determines that the information provided in the allegation or the referral, as the case may be, reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion.

### (2) Allegation described

An allegation described in this paragraph is an allegation that a person has entered covered merchandise into the customs territory of the United States through evasion that is—

(A) filed with the Commissioner by an interested party; and

(B) accompanied by information reasonably available to the party that filed the allegation.

### (3) Referral described

A referral described in this paragraph is information submitted to the Commissioner by

any other Federal agency, including the Department of Commerce or the United States International Trade Commission, that reasonably suggests that a person has entered covered merchandise into the customs territory of the United States through evasion.

**(4) Consideration by administering authority**

**(A) In general**

If the Commissioner receives an allegation under paragraph (2) and is unable to determine whether the merchandise at issue is covered merchandise, the Commissioner shall—

(i) refer the matter to the administering authority to determine whether the merchandise is covered merchandise pursuant to the authority of the administering authority under subtitle IV; and

(ii) notify the party that filed the allegation, and any other interested party participating in the investigation, of the referral.

**(B) Determination; transmission to Commissioner**

After receiving a referral under subparagraph (A)(i) with respect to merchandise, the administering authority shall determine whether the merchandise is covered merchandise and promptly transmit that determination to the Commissioner.

**(C) Stay of deadlines**

The period required for any referral and determination under this paragraph shall not be counted in calculating any deadline under this section.

**(D) Rule of construction**

Nothing in this paragraph shall be construed to affect the authority of an interested party to commence an action in the United States Court of International Trade under section 1516a(a)(2) of this title with respect to a determination of the administering authority under this paragraph.

**(5) Consolidation of allegations and referrals**

**(A) In general**

The Commissioner may consolidate multiple allegations described in paragraph (2) and referrals described in paragraph (3) into a single investigation if the Commissioner determines it is appropriate to do so.

**(B) Effect on timing requirements**

If the Commissioner consolidates multiple allegations or referrals into a single investigation under subparagraph (A), the date on which the Commissioner receives the first such allegation or referral shall be used for purposes of the requirement under paragraph (1) with respect to the timing of the initiation of the investigation.

**(6) Information-sharing to protect health and safety**

If, during the course of conducting an investigation under paragraph (1) with respect to covered merchandise, the Commissioner has reason to suspect that such covered merchandise may pose a health or safety risk to consumers, the Commissioner shall provide, as appropriate, information to the appropriate Federal agencies for purposes of mitigating the risk.

**(7) Technical assistance and advice**

**(A) In general**

Upon request, the Commissioner shall provide technical assistance and advice to eligible small businesses to enable such businesses to prepare and submit allegations described in paragraph (2), except that the Commissioner may deny technical assistance if the Commissioner concludes that the allegation, if submitted, would not lead to the initiation of an investigation under this subsection or any other action to address the allegation.

**(B) Eligible small business defined**

**(i) In general**

In this paragraph, the term ''eligible small business'' means any business concern that the Commissioner determines, due to its small size, has neither adequate internal resources nor the financial ability to obtain qualified outside assistance in preparing and filing allegations described in paragraph (2).

**(ii) Non-reviewability**

The determination of the Commissioner regarding whether a business concern is an eligible small business for purposes of this paragraph is not reviewable by any other agency or by any court.

**(c) Determinations**

**(1) Determination of evasion**

**(A) In general**

Except as provided in subparagraph (B), not later than 300 calendar days after the date on which the Commissioner initiates an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion.

**(B) Additional time**

The Commissioner may extend the time to make a determination under subparagraph (A) by not more than 60 calendar days if the Commissioner determines that—

(i) the investigation is extraordinarily complicated because of—

(I) the number and complexity of the transactions to be investigated;

(II) the novelty of the issues presented; or

(III) the number of entities to be investigated; and

(ii) additional time is necessary to make the determination under subparagraph (A).

**(2) Authority to collect and verify additional information**

In making a determination under paragraph (1) with respect to covered merchandise, the

Commissioner may collect such additional information as is necessary to make the determination through such methods as the Commissioner considers appropriate, including by—

    (A) issuing a questionnaire with respect to such covered merchandise to—

      (i) an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise;

      (ii) a person alleged to have entered such covered merchandise into the customs territory of the United States through evasion;

      (iii) a person that is a foreign producer or exporter of such covered merchandise; or

      (iv) the government of a country from which such covered merchandise was exported; and

    (B) conducting verifications, including on-site verifications, of any relevant information.

**(3) Adverse inference**

**(A) In general**

If the Commissioner finds that a party or person described in clause (i), (ii), or (iii) of paragraph (2)(A) has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner may, in making a determination under paragraph (1), use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.

**(B) Application**

An inference described in subparagraph (A) may be used under that subparagraph with respect to a person described in clause (ii) or (iii) of paragraph (2)(A) without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by the Commissioner, such as import or export documentation.

**(C) Adverse inference described**

An adverse inference used under subparagraph (A) may include reliance on information derived from—

    (i) the allegation of evasion of the trade remedy laws, if any, submitted to U.S. Customs and Border Protection;

    (ii) a determination by the Commissioner in another investigation, proceeding, or other action regarding evasion of the unfair trade laws; or

    (iii) any other available information.

**(4) Notification**

Not later than 5 business days after making a determination under paragraph (1) with respect to covered merchandise, the Commissioner—

    (A) shall provide to each interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise a notification of the determination and may, in addition, include an explanation of the basis for the determination; and

    (B) may provide to importers, in such manner as the Commissioner determines appropriate, information discovered in the investigation that the Commissioner determines will help educate importers with respect to importing merchandise into the customs territory of the United States in accordance with all applicable laws and regulations.

**(d) Effect of determinations**

**(1) In general**

If the Commissioner makes a determination under subsection (c) that covered merchandise was entered into the customs territory of the United States through evasion, the Commissioner shall—

    (A)(i) suspend the liquidation of unliquidated entries of such covered merchandise that are subject to the determination and that enter on or after the date of the initiation of the investigation under subsection (b) with respect to such covered merchandise and on or before the date of the determination; or

    (ii) if the Commissioner has already suspended the liquidation of such entries pursuant to subsection (e)(1), continue to suspend the liquidation of such entries;

    (B) pursuant to the Commissioner's authority under section 1504(b) of this title—

      (i) extend the period for liquidating unliquidated entries of such covered merchandise that are subject to the determination and that entered before the date of the initiation of the investigation; or

      (ii) if the Commissioner has already extended the period for liquidating such entries pursuant to subsection (e)(1), continue to extend the period for liquidating such entries;

    (C) notify the administering authority of the determination and request that the administering authority—

      (i) identify the applicable antidumping or countervailing duty assessment rates for entries described in subparagraphs (A) and (B); or

      (ii) if no such assessment rate for such an entry is available at the time, identify the applicable cash deposit rate to be applied to the entry, with the applicable antidumping or countervailing duty assessment rate to be provided as soon as that rate becomes available;

    (D) require the posting of cash deposits and assess duties on entries described in subparagraphs (A) and (B) in accordance with the instructions received from the administering authority under paragraph (2); and

    (E) take such additional enforcement measures as the Commissioner determines appropriate, such as—

(i) initiating proceedings under section 1592 or 1595a of this title;

(ii) implementing, in consultation with the relevant Federal agencies, rule sets or modifications to rule sets for identifying, particularly through the Automated Targeting System and the Automated Commercial Environment authorized under section 58c(f)(4) of this title, importers, other parties, and merchandise that may be associated with evasion;

(iii) requiring, with respect to merchandise for which the importer has repeatedly provided incomplete or erroneous entry summary information in connection with determinations of evasion, the importer to deposit estimated duties at the time of entry; and

(iv) referring the record in whole or in part to U.S. Immigration and Customs Enforcement for civil or criminal investigation.

**(2) Cooperation of administering authority**

**(A) In general**

Upon receiving a notification from the Commissioner under paragraph (1)(C), the administering authority shall promptly provide to the Commissioner the applicable cash deposit rates and antidumping or countervailing duty assessment rates and any necessary liquidation instructions.

**(B) Special rule for cases in which the producer or exporter is unknown**

If the Commissioner and the administering authority are unable to determine the producer or exporter of the merchandise with respect to which a notification is made under paragraph (1)(C), the administering authority shall identify, as the applicable cash deposit rate or antidumping or countervailing duty assessment rate, the cash deposit or duty (as the case may be) in the highest amount applicable to any producer or exporter, including the "all-others" rate of the merchandise subject to an antidumping order or countervailing duty order under section 1673e of this title or 1671e of this title, respectively, or a finding issued under the Antidumping Act, 1921, or any administrative review conducted under section 1675 of this title.

**(e) Interim measures**

Not later than 90 calendar days after initiating an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall decide based on the investigation if there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion and, if the Commissioner decides there is such a reasonable suspicion, the Commissioner shall—

(1) suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the investigation;

(2) pursuant to the Commissioner's authority under section 1504(b) of this title, extend the period for liquidating each unliquidated entry of such covered merchandise that en-

tered before the date of the initiation of the investigation; and

(3) pursuant to the Commissioner's authority under section 1623 of this title, take such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise.

**(f) Administrative review**

**(1) In general**

Not later than 30 business days after the Commissioner makes a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may file an appeal with the Commissioner for de novo review of the determination.

**(2) Timeline for review**

Not later than 60 business days after an appeal of a determination is filed under paragraph (1), the Commissioner shall complete the review of the determination.

**(g) Judicial review**

**(1) In general**

Not later than 30 business days after the Commissioner completes a review under subsection (f) of a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may seek judicial review of the determination under subsection (c) and the review under subsection (f) in the United States Court of International Trade to determine whether the determination and review is conducted in accordance with subsections (c) and (f).

**(2) Standard of review**

In determining whether a determination under subsection (c) or review under subsection (f) is conducted in accordance with those subsections, the United States Court of International Trade shall examine—

(A) whether the Commissioner fully complied with all procedures under subsections (c) and (f); and

(B) whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**(3) Rule of construction**

Nothing in this subsection shall affect the availability of judicial review to an interested party under any other provision of law.

**(h) Rule of construction with respect to other civil and criminal proceedings and investigations**

No determination under subsection (c), review under subsection (f), or action taken by the Commissioner pursuant to this section shall preclude any individual or entity from proceeding, or otherwise affect or limit the authority of any individual or entity to proceed, with any civil, criminal, or administrative investigation or proceeding pursuant to any other provision of Federal or State law, including sections 1592 of this title and 1595a of this title.

(June 17, 1930, ch. 497, title IV, § 517, as added Pub. L. 114–125, title IV, § 421(a), Feb. 24, 2016, 130 Stat. 161.)

### Editorial Notes

#### References in Text

The Antidumping Act, 1921, referred to in subsec. (d)(2)(B), is act May 27, 1921, ch. 14, title II, 42 Stat. 11, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, § 106(a), July 26, 1979, 93 Stat. 193.

#### Prior Provisions

A prior section 1517, act June 17, 1930, ch. 497, title IV, § 517, 46 Stat. 737, related to frivolous protest or appeal, prior to repeal by act June 25, 1948, ch. 646, § 39, 62 Stat. 992, eff. Sept. 1, 1948. See section 2641 of Title 28, Judiciary and Judicial Procedure.

### Statutory Notes and Related Subsidiaries

#### Effective Date

Pub. L. 114–125, title IV, § 421(c), Feb. 24, 2016, 130 Stat. 168, provided that: ''The amendments made by this section [enacting this section and amending section 1581 of Title 28, Judiciary and Judicial Procedure] shall take effect on the date that is 180 days after the date of the enactment of this Act [Feb. 24, 2016].''

#### Regulations

Pub. L. 114–125, title IV, § 421(d), Feb. 24, 2016, 130 Stat. 169, provided that: ''Not later than the date that is 180 days after the date of the enactment of this Act [Feb. 24, 2016], the Secretary [of the Treasury] shall prescribe such regulations as may be necessary to implement the amendments made by this section [enacting this section and amending section 1581 of Title 28, Judiciary and Judicial Procedure].''

### §§ 1518, 1519. Repealed. June 25, 1948, ch. 646, § 39, 62 Stat. 992, eff. Sept. 1, 1948

Section 1518, acts June 10, 1890, ch. 407, § 12, 26 Stat. 136; May 27, 1908, ch. 205, § 3, 35 Stat. 406; Aug. 5, 1909, ch. 6, § 28, 36 Stat. 98; May 28, 1926, ch. 411, § 1, 44 Stat. 669; June 17, 1930, ch. 497, title IV, § 518, 46 Stat. 737, related to the judges of the United States Customs Court: their appointment, salary, retirement, vacancies, and powers; the control of the fiscal affairs and of the clerical force of the court; and the division of the court. See sections 251 to 254, 456, 1581, 2071, 2639, and 2640 of Title 28, Judiciary and Judicial Procedure. Last sentence of section, relating to the transfer of unexpended appropriations for salaries to be available for expenditures for the same purposes, was omitted as executed.

Section 1519, act June 17, 1930, ch. 497, title IV, § 519, 46 Stat. 739, related to publication of Customs Court's decisions. See section 255 of Title 28, Judiciary and Judicial Procedure.

### § 1520. Refunds and errors

**(a) Cases in which refunds authorized**

The Secretary of the Treasury is authorized to refund duties or other receipts in the following cases:

(1) *Excess deposits.*—Whenever it is ascertained on liquidation or reliquidation of an entry or reconciliation that more money has been deposited or paid as duties than was required by law to be so deposited or paid.

(2) *Fees, charges, and exactions.*—Whenever it is determined in the manner required by law that any fees, charges, or exactions, other than duties and taxes, have been erroneously or excessively collected.

(3) *Fines, penalties, and forfeitures.*—Whenever money has been deposited in the Treasury on account of a fine, penalty, or forfeiture which did not accrue, or which is finally determined to have accrued in an amount less than that so deposited, or which is mitigated to an amount less than that so deposited or is remitted.

(4) *Prior to liquidation.*—Prior to the liquidation of an entry or reconciliation, whenever an importer of record declares or it is ascertained that excess duties, fees, charges, or exactions have been deposited or paid.

**(b) Authorization of appropriations**

The necessary moneys to make such refunds are authorized to be appropriated annually from the general fund of the Treasury.

**(c) Repealed. Pub. L. 108–429, title II, § 2105, Dec. 3, 2004, 118 Stat. 2598**

**(d) Goods qualifying under free trade agreement rules of origin**

Notwithstanding the fact that a valid protest was not filed, the Customs Service may, in accordance with regulations prescribed by the Secretary, reliquidate an entry to refund any excess duties (including any merchandise processing fees) paid on a good qualifying under the rules of origin set out in section 202 of the United States-Chile Free Trade Agreement Implementation Act, section 4033 of this title, section 202 of the United States-Oman Free Trade Agreement Implementation Act, section 203 of the United States-Peru Trade Promotion Agreement Implementation Act, section 202 of the United States-Korea Free Trade Agreement Implementation Act, section 203 of the United States-Colombia Trade Promotion Agreement Implementation Act, or section 203 of the United States-Panama Trade Promotion Agreement Implementation Act, or section 4531 of this title, for which no claim for preferential tariff treatment was made at the time of importation if the importer, within 1 year after the date of importation, files, in accordance with those regulations, a claim that includes—

(1) a written declaration that the good qualified under the applicable rules at the time of importation;

(2) copies of all applicable certificates or certifications of origin; and

(3) such other documentation and information relating to the importation of the goods as the Customs Service may require.

(June 17, 1930, ch. 497, title IV, § 520, 46 Stat. 739; June 26, 1934, ch. 756, § 2, 48 Stat. 1225; June 25,

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court Nos. 2025-1689, 2025-1690, 2025-1692, 2025-1693

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 11,260 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: June 23, 2025

Signature: _____/s/ Jay C. Campbell___

Name: _____Jay C. Campbell___