## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

ASIA WHEEL CO., LTD, TRAILSTAR LLC, LIONSHEAD SPECIALTY TIRE &
WHEEL, LLC, DEXTER DISTRIBUTION GROUP LLC,
FKA TEXTRAIL, INC.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

DEXTAR WHEEL DIVISION OF AMERICANA DEVELOPMENT, INC.,

Defendant-Appellee.

———————————

On Appeal from the United States Court of Court of International Trade in
Consolidated Case No. 1:23-Cv-00096, Judge Gary S. Katzmann

———————————

## RESPONSE BRIEF FOR DEFENDANT-APPELLEE UNITED STATES

———————————

*Of Counsel:*

RUSLAN KLAFEHN
*Attorney Office of the Chief Counsel*
*For Trade Enforcement & Compliance*
*U.S. Department of Commerce*
*14-01 Constitution Avenue, NW*

BRETT A. SHUMATE
*Assistant Attorney General*

PATRICA M. McCARTHY
*Director*

TARA K. HOGAN
ISABELLE AUBRUN
*Attorneys, Commercial Litigation Branch*
*Civil Division, U.S. Department of Justice*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 616-0465*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF JURISDICTION ...................................................................... 1

STATEMENT OF THE ISSUE .............................................................................. 1

STATEMENT OF THE CASE ............................................................................... 2

I.    Background for Determining the Scope of an Antidumping or
      Countervailing Duty Order ........................................................................... 2

      A. Scope Determinations in Antidumping and Countervailing Duty
         Investigations ........................................................................................... 2

      B. Scope Rulings ........................................................................................... 3

II.   Factual Background ......................................................................................... 6

      A.    Commerce Issues Orders Covering Certain Trailer Wheels 12 to
            16.5 Inches from China ...................................................................... 6

            i.     Commerce Initiates the AD and CVD Investigations ................... 6

            ii.    The Resulting AD and CVD Orders ............................................ 9

      B.    Commerce Issues a Scope Determination Finding Asia Wheel's 12
            to 16.5 Inch Trailer Wheels Within the Scope of the Orders ................. 10

            i.     CBP Issues a Covered Merchandise Referral To Commerce
                   Following An Allegation that Asia Wheel is Evading the
                   Orders ..................................................................................... 10

            ii.    Asia Wheel's Scope Request ........................................................ 12

            iii.   Commerce's Scope Ruling on Asia Wheel's Trailer Wheels ........ 12

III.  The Court of International Trade Sustains Commerce's Scope Ruling ............. 15

SUMMARY OF ARGUMENT .............................................................................. 19

ARGUMENT ........................................................................................................ 21

I.      Standard of Review ................................................................................. 21

II.     Commerce's Scope Determination is Lawful and Supported by
        Substantial Evidence ............................................................................. 22

        A.      Commerce Reasonably Determined that the Plain Language of
                the Orders Did Not Unambiguously Exclude Asia Wheel's
                Wheels ........................................................................................ 23

        B.      Commerce Reasonably Concluded that its Final Scope Memo—a
                (k)(1) Source—Did Not Unambiguously Exclude Asia Wheel's
                Merchandise ............................................................................... 25

III.    Commerce Provided Lawful Notice that Wheels Produced in a Third
        Country from Mixed-Origin Components Could be Subject Merchandise ...... 32

        CONCLUSION ........................................................................................... 40

# TABLE OF AUTHORITIES

<u>CASES</u>

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015) ...................................................................... 21

*Allegheny Ludlum Corp. v. United States*,
  287 F.3d 1365 (Fed. Cir. 2002) ........................................................................ 2

*Arcelormittal Stainless Belgium N.V. v. United States*,
  694 F.3d 82 (Fed. Cir. 2012) ............................................................................. 5

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ...................................................................... 22

*Bell Supply Co. v. United States*,
  83 F. Supp. 3d 1311 (2015) ............................................................................ 17

*Bell Supply Co. v. United States*,
  83 F. Supp. 3d 1311 (Fed. Cir. 2019) ............................................................ 36

*Bell Supply Co., LLC v. United States*,
  888 F.3d 1222 (Fed. Cir. 2018) .................................................................... 3, 4

*Canadian Solar Inc. v. United States*,
  918 F.3d 909 (Fed. Cir. 2019) ........................................................................ 37

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ........................................................................................ 21

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ........................................................................................ 21

*Duferco Steel, Inc. v. United States*,
  296 F.3d 1087 (Fed. Cir. 2002) ...................................................................... 23

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
  745 F.3d 1194 (Fed. Cir. 2014) ........................................................................ 2

*INA Walzlager Schaeffler KG v. United States,*
    108 F.3d 301 (Fed. Cir. 1997) ...................................................................... 6

*McIntosh v. DOD,*
    53 F.4th 630 (Fed. Cir. 2022) ...................................................................... 18

*Mid Continent Nail Corp. v. United States,*
    725 F.3d 1295 (Fed. Cir. 2013) .................................................................. 36

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) .................................................................. 21

*Nippon Steel v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) .................................................................. 21

*Reuter v. DOC,*
    63 F.4th 1357 (Fed. Cir. 2023) ................................................................... 18

*Sharp v. United States,*
    580 F.3d 1234 (Fed. Cir. 2009) .................................................................. 25

*SMA Surfaces, Inc. v. United States,*
    617 F. Supp. 3d 1263 (Ct. Int'l Trade 2023) ............................................. 25

*SmithKline Beecham Corp. v. Apotex Corp.,*
    439 F.3d 1312 (Fed. Cir. 2006) .................................................................. 18

*Sunpreme Inc. v. United States,*
    892 F.3d 1186 (Fed. Cir. 2018) .................................................................... 3

*Sunpreme Inc. v. United States,*
    946 F.3d 1300 (Fed. Cir. 2020) .................................................................. 35

*Tai-Ao Aluminum Co. v. United States,*
    983 F.3d 487 (Fed. Cir. 2020) ............................................................ passim

*Tak Fat Trading Co. v. United States,*
    396 F.3d 1378 (Fed. Cir. 2005) ............................................................ 4, 5, 6

*Trans Tex Tire, LLC v. United States,*
    519 F.Supp.3d 1275 (Ct. Int'l Trade 2021) ............................................... 19

*Union Steel v. United States,*
  713 F.3d 1101 (Fed. Cir. 2013) ...................................................... 21

<u>STATUTES</u>

19 U.S.C. § 1504(a) ...................................................................... 11

19 U.S.C. § 1517 ..................................................................... 10, 35

19 U.S.C. § 1517(b)(1) ................................................................ 34

19 U.S.C. § 1517(e) ............................................................ 2, 15, 35

19 U.S.C. § 1517(e)(1) ................................................................ 36

19 U.S.C. § 1517(e)(1)-(3) ...................................................... 11, 34

19 U.S.C. § 1517(e)(2) ................................................................ 35

19 U.S.C. § 1677(25) ................................................................... 4

19 U.S.C. §§ 1673 ....................................................................... 2

19 U.S.C. §§ 1673d(a) ................................................................. 4

28 U.S.C. § 1581(c) ..................................................................... 1

28 U.S.C. §§1295(a) ................................................................... 1

<u>REGULATIONS</u>

19 C.F.R. §351.226(k)(1) ....................................................... 23, 25

19 C.F.R. § 351.202(b)(5) ............................................................. 3

19 C.F.R. § 351.225 ..................................................................... 5

19 C.F.R. § 351.225(3) ............................................................... 33

19 C.F.R. § 351.225(a) ........................................................... 4, 36

19 C.F.R. § 351.225(d) ........................................................................ 5, 6

19 C.F.R. § 351.225(e) ....................................................................... 5, 12

19 C.F.R. § 351.225(k) .......................................................................... 23

19 C.F.R. § 351.225(k)(1) ....................................................................... 5

19 C.F.R. § 351.225(k)(2) ....................................................................... 6

19 C.F.R. § 351.225(l)(3) ....................................................................... 15

19 CFR § 165.15 ................................................................................... 33

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, counsel for defendant-appellee, the United States, states that she is unaware of any other appeal in or from this action that previously was before this Court of any other appellate court under the same or similar title. Counsel for respondent-appellee further states that she believes the following two cases may directly affect or be affected by this Court's decision in this appeal: *Asia Wheel Co., Ltd. v. United States*, Fed. Cir. Case No. 25-1694 (companion case), and *Dexter Distribution Group LLC fka TexTrail, Inc. v. United States*, Court of International Trade Consolidated Case No. 24-00019 (stayed pending the outcome of this appeal).

## INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 28(b), defendant-appellee, the United States, respectfully submits this brief in response to the brief filed by consolidated plaintiffs-appellants, Asia Wheel. This Court should affirm the Court of International Trade's (CIT or trial court) decision upholding the United States Department of Commerce's scope ruling finding Asia Wheel's steel wheels are covered by the scope of the antidumping and countervailing duty orders on certain 12 to 16.5 inch steel wheels from China.

## STATEMENT OF JURISDICTION

The Court of International Trade possessed jurisdiction pursuant to 28 U.S.C. § 1581(c). The CIT entered final judgment on February 21, 2025, and plaintiffs-appellants Asia Wheel, Trailstar LLC, Lionshead Specialty Tire and Wheel, LLC, and Dexter Distribution Group LLC, fka TexTrail Inc. (Asia Wheel) filed their notice of appeal on April 21, 2025. Therefore, this appeal is timely, as it was filed within 60 days of the CIT's final judgment. *See* 28 U.S.C. §§1295(a); 2107(b).

## STATEMENT OF THE ISSUE

The issues in this case are:

1. Whether the Department of Commerce's determination that Asia Wheel's trailer wheels processed in Thailand with mixed-origin parts are subject to the orders covering 12 to 16.5 inch wheels from China is supported by substantial evidence and in accordance with law.

2. Whether Commerce's decision to impose duties on entries of Asia Wheel's

covered merchandise whose liquidation had already been suspended by

Customs and Border Protection (CBP) pursuant to CBP's authority under

Enforce and Protect Act (EAPA), 19 U.S.C. § 1517(e), was supported by

substantial evidence and accordance with law.

## STATEMENT OF THE CASE

I.  **Background for Determining the Scope of an Antidumping or Countervailing Duty Order**

A. **Scope Determinations in Antidumping and Countervailing Duty Investigations**

At a high level, the Tariff Act of 1930, as amended, "permits Commerce to

impose two types of duties on imports that injure domestic industries." *Guangdong*

*Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1196 (Fed. Cir.

2014).  Under the Tariff Act, "American industries may petition for relief from

imports that are sold in the United States at less than fair value {*i.e.*, are dumped} . . .

or which benefit from subsidies provided by foreign governments," by filing an

antidumping and/or countervailing duty petition before Commerce and the U.S.

International Trade Commission (ITC).  *Allegheny Ludlum Corp. v. United States*, 287

F.3d 1365, 1368 (Fed. Cir. 2002).  This process requires that Commerce determine if

imports are being dumped or subsidized, 19 U.S.C. §§ 1673, 1671(a)(1), and that the

ITC determine whether any domestic industry is being injured by that conduct.

*Id.* §§ 1673d(b)(1), 1671d(b)(1).  To make such a determination, Commerce

undertakes an investigation of the alleged conduct. *See e.g. Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 125 (Fed. Cir. 2018). If both Commerce and the ITC's determinations are affirmative, Commerce will publish an antidumping (AD) or countervailing duty (CVD) order. *Id.* §§ 1673e(a). 1671e(a).

Because Commerce is "charged with writing antidumping and countervailing duty orders that 'include{} a description of the subject merchandise, in such detail as the administering authority deems necessary,'" Commerce first requires that a petition for an AD/CVD investigation include a detailed description of the subject merchandise defining the requested scope of the investigation. *Sunpreme Inc. v. United States*, 892 F.3d 1186, 1188 (Fed. Cir. 2018); 19 C.F.R. § 351.202(b)(5). However, in recognition that the petitioner's description of the merchandise risks being over-inclusive through broad language or use of numerous classification subheadings, Commerce invites interested parties to raise their concerns regarding product coverage in case briefing. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,323 (Dep't of Commerce May 19, 1997). Commerce addresses interested party scope comments in preliminary and final scope memorandums, which are typically issued concurrently with preliminary and final determinations.

## B. Scope Rulings

After the issuance of an order, "questions may arise about the scope of {an} order." *Bell Supply Co.*, 888 F.3d at 1225. Commerce is often called upon to determine whether a certain product is included within the scope of an antidumping

or countervailing duty order because it necessarily writes scope language in general terms. *See* 19 C.F.R. § 351.225(a). Commerce's determinations concerning a particular product are made in accordance with its regulations.

Thus, Commerce's regulations permit interested parties to request a scope ruling to clarify whether their specific product falls under a given order.[1] 19 C.F.R. § 351.225(a); *see e.g.*, *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005); *see also Bell Supply Co.*, 888 F.3d at 1225.Relevant to this appeal, Commerce amended its scope regulations effective in November 2021. *See Regulations to Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300 (Dep't of Commerce Sept. 20, 2021) ("Amendments to § 351.225 . . . apply to scope inquiries for which a scope ruling application is filed . . . on or after November 4, 2021."). Because Asia Wheel filed its scope request in November 2020, the earlier version of Commerce's scope regulations governed Asia Wheel's request for a scope

---

[1] By statute, Commerce makes a determination on whether *subject merchandise* is being dumped/subsidized and may only impose duties on subject merchandise. 19 U.S.C. §§ 1673d(a), 1673e(a). The statute defines "subject merchandise" as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, {or} an order." 19 U.S.C. § 1677(25). Descriptions of subject merchandise, however, must be written in general terms. 19 C.F.R. § 351.225(a). Commerce must therefore determine which products are subject merchandise in the first place in order to be able to administer its AD/CVD orders.

ruling and serves as a basis for the Government's analysis throughout this brief.[2] *See* Appx19, n4; *see also* Appx16, n1.

Pursuant to 19 C.F.R. § 351.225(d), Commerce may make a scope ruling based on the information in the scope request and the sources set forth in 19 C.F.R. § 351.225(k)(1). If Commerce cannot reach a decision based on the scope ruling request and (k)(1) sources, Commerce initiates a formal scope inquiry. 19 C.F.R. § 351.225(e).

In considering whether a product is within the scope of the order, Commerce first considers the language of the order itself. *Arcelormittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012). Commerce may decide that the language of the order unambiguously applies to the product at issue. If it does, that ends the scope inquiry. If Commerce concludes that the language of the order does not unambiguously include or exclude the merchandise, Commerce considers the descriptions of the merchandise contained in the (k)(1) sources. *Tak Fat Trading*, 396 F.3d at 1382-83. The (k)(1) sources are the descriptions of the product contained in

---

[2] Of note to this appeal, the 2021 amendments to 19 C.F.R. § 351.225 added a new § 351.225(j), which codified Commerce's use of the substantial transformation test in scope proceedings to determine an imported product's country of origin. While, the 2021 amendments do not apply to Asia Wheel's scope inquiry, Commerce had used the substantial transformation test prior to the 2021 amendments to determine country of origin. Therefore, Commerce reasonably applied the substantial transformation test in the contested scope ruling, and no party challenges Commerce's use of the substantial transformation test in this instance.

the petition, Commerce's AD/CVD investigation resulting in the order, Commerce's

earlier determinations (including prior scope determinations) and the ITC reports. If

Commerce determines that the (k)(1) sources conclusively answer whether the inquiry

merchandise is within or excluded from the AD/CVD order, Commerce will issue a

final scope ruling. 19 C.F.R. § 351.225(d); *see also Tak Fat Trading*, 396 F.3d at 1382.

Only when the (k)(1) sources do not decisively answer this question will Commerce

next consider the five sources of information outlined in (k)(2): (1) the physical

characteristics of the product, (2) the expectations of the ultimate purchasers; (3) the

ultimate use of the product; (4) the channels of trade in which the product is sold; and

(5) the manner in which the product is advertised and displayed. 19 C.F.R. §

351.225(k)(2). Importantly, throughout, "Commerce has 'broad authority to interpret

its own antidumping duty orders.'" *Tak Fat Trading*, 396 F.3d at 1382 (quoting *INA*

*Walzlager Schaeffler KG v. United States*, 108 F.3d 301, 307 (Fed. Cir. 1997)).

## II.   Factual Background

### A. Commerce Issues Orders Covering Certain Trailer Wheels 12 to 16.5 Inches from China

#### i.     Commerce Initiates the AD and CVD Investigations

In 2018, following the filing of petitions by Dexstar Wheel Division of

Americana Development, Inc. (Dexstar), Commerce initiated the AD and CVD

investigations of certain steel wheels 12 to 16.5 inches in diameter from the People's

Republic of China. *Certain Steel Wheels 12 to 16.5 Inches in Diameter From the People's*

*Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 83 Fed. Reg. 45,095 (Dep't of Commerce Sept. 5, 2018); *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 83 Fed. Reg. 45,100 (Dep't of Commerce, Sept. 5, 2018).

Prior to Commerce issuing its preliminary determination and preliminary scope memoranda, Dexstar, concerned about potential circumvention, requested that Commerce clarify the scope of the investigations by explaining what country of origin criteria Commerce would apply when covered merchandise underwent further processing in a third country. Appx134. To that end, Dexstar proposed amending the investigations' scope language to makes clear that rims, discs, and wheels that had been further processed in another country remained covered by the order so long as that further processing would not otherwise remove it from the orders' coverage had it been performed in China. *Id.* Commerce agreed and changed the scope of the investigations to include the following language:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China.

Appx134-35.

The addition of this language, among other things, prompted submissions from interested parties seeking to clarify Commerce's proposed addition concerning third

country processing. Mandatory respondent, Zhejiang Jingu Company Limited, and

U.S. importers, Tredit Tire & Wheel Co., and HiSpec asked that Commerce confirm

that wheels comprised of *either* rims *or* discs from China that are assembled in a third

country, are outside the scope of the orders. Appx121. Put another way,

respondents understood the scope language to cover "third-country processing if

both the 'rims *and* discs' are from China." Appx120-121. But Dexstar disagreed,

explaining in its rebuttal case briefs that its intent in its petition for the investigations

on 12 to 16.5 inch wheels was that a wheel assembled in a third country that included

either a rim *or* disc from China would be covered by the orders, not simply one with a

rim and disc both from China. Appx121.

   In response to these concerns, however, Commerce explained in its final scope

memorandum that it would not change the scope of the investigations. Appx122-124.

Commerce left in place the scope language concerning further processing in a third

country because, it concluded, the current wording "addresses instances in which an

unassembled steel wheel is assembled (and painted or otherwise finished) in a third

country from necessary constituent parts of said wheel: rims and discs, *i.e.*, an

unassembled steel wheel{.}" Appx123. Commerce rejected Dexstar's request to

modify the scope language from "welding and painting of rims *and* discs from China

to form a steel wheel" to "rims *or* discs" from China because, as Commerce explained,

this alteration was "selectively exclusionary and inconsistent with the meaning of the

word 'and'" – language which Dexstar had requested be included in the scope of the investigations to address third country processing in the first place. Appx124.

Importantly, Commerce left itself the option of conducting a substantial transformation analysis in the future to determine if whether a given product is in scope "should a product be completed in a third country from a mix of rim and disc parts from China and third country . . . .". Appx124. In other words, Commerce generally agreed with the respondent/importer's understanding of the scope of the investigations as covering only wheels made with *both* Chinese discs and rims. *Id.* However, Commerce simultaneously deferred the question of wheels produced from mixed-origin discs and rims, determining "that the current scope language is clear that if only if all constituent rim and disc parts to form a steel wheel are from China does the order apply *notwithstanding any analysis of substantial transformation.*" *Id.*

### ii.     The Resulting AD and CVD Orders

Following its investigations, Commerce issued the orders on certain steel wheels from China. *Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 45, 952 (Dep't of Commerce Sept. 3, 2019) (*Orders*). The product subject to these orders are:

> Certain on-the-road steel wheels with a nominal wheel diameter of 12 inches to 16.5 inches within the scope are generally for road and highway trailers and other towable equipment, including, inter alia, utility trailers, cargo trailers, horse trailers, boat trailers, recreational trailers, and towable mobile homes. The standard widths of certain on-the-road steel wheels are 4 inches, 4.5 inches, 5 inches, 5.5 inches, 6 inches, and 6.5 inches, but

all certain on the-road steel wheels, regardless of width, are covered by the scope.

The scope includes rims and discs for certain on-the-road stee wheels, whether imported as an assembly, unassembled, or separately. The scope includes certain on-the-road steel wheels regardless of steel composition, whether cladded or not cladded, whether finished or not finished, and whether coated or uncoated. The scope also includes certain on-the-road steel wheels with discs in either a "hub-piloted" or "stud-piloted" mounting configuration, though the stud-piloted configuration is most common in the size range covered.

The Orders apply to rims, discs, and wheels from China that meet the physical description even if it's exported to a third country for additional processing, so long as the product meets the physical description after third-country processing.

The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China.

*Orders*, 84 Fed. Reg. at 45,954.

## B. Commerce Issues a Scope Determination Finding Asia Wheel's 12 to 16.5 Inch Trailer Wheels Within the Scope of the Orders

### i. CBP Issues a Covered Merchandise Referral To Commerce Following An Allegation that Asia Wheel is Evading the Orders

In March 2020, Dexstar filed an allegation under Enforce and Protect Act (EAPA), 19 U.S.C. § 1517, alleging that U.S. importers were evading the orders by transshipping Chinese-origin steel wheels through Thailand. *See generally* Appx213-221. As an interim measure and based on its "reasonable suspicion" that the "Lionshead, Tex Trail, and Trailstar imported steel trailer wheels into the United

States from Thailand that was, in fact, from China and should have been subject to {the *Orders*}," CBP initiated its interim measures consistent with 19 U.S.C. § 1517(e)(1)-(3). Appx219-220. Specifically, CBP "suspend{ed} the liquidation of each unliquidated entry of such covered merchandise that entered on or after April 9, 2020, the date of the initiation of the investigation." and "extend{ed} the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation on April 9, 2020."[3] Appx220.

In December 2020, unable to determine whether certain steel trailer wheels from China evaded the AD/CVD orders, CBP submitted a "covered merchandise referral" to Commerce. CBP requested "that Commerce issue a determination as to whether certain types of steel trailer wheels produced in Thailand from inputs sourced from China…are subject to the Orders." Appx512. In its Federal Register Notice accepting CBP's referral, Commerce explained that the product subject to the covered merchandise referral was already under consideration in Asia Wheel's scope inquiry and would be addressed as part of that proceeding. Appx511-512.

---

[3] Under 19 U.S.C. § 1504(a), an entry of merchandise for consumption not liquidated within {one} year . . . shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by the importer of record." As interim measures under EAPA, CBP may extend that one year period for deemed liquidation of *unliquidated* entries of covered merchandise subject to the EAPA investigation.

### ii. Asia Wheel's Scope Request

Before CBP made its covered merchandise referral to Commerce, in November 2020, Asia Wheel filed a scope ruling application, asking Commerce to determine whether certain types of steel trailer wheels that it manufactures in its facilities in Thailand and exports to the United States are covered by the orders. Appx102. In its request, Asia Wheel identified three separate production methods that were subject to the request, only one of which, Method A, is relevant to this appeal. In Method A, Asia Wheel manufactures trailer wheels using discs from China and rims produced in Thailand from rectangular steel plates from China.[4] Appx162-179. Specifically, the rectangular steel plates are designed, engineered, and cut to appropriate size in China. The rectangular steel plate is then finished through coiling, welding, planing, polishing, and rolling in Thailand. Commerce initiated a scope inquiry pursuant to 19 C.F.R. § 351.225(e). Appx531-532.

### iii. Commerce's Scope Ruling on Asia Wheel's Trailer Wheels

Commerce determined that a plain reading of the scope language reflects that rims, discs, and wheels further processed in a third country are covered by the *scope if*

---

[4] On appeal, Asia Wheel does not challenge Commerce's determinations on its wheels made by Methods B (outside of the scope of the orders) and Method C (within the scope of the orders). *See* Pl. Br. at 14. For this reason, any reference that we make to Asia Wheel's merchandise refers to those produced by Method A, unless otherwise specified.

*the processing would not otherwise exclude these items from the scope had the processing occurred in*

*China.* Appx1908. Specifically, Commerce noted that third country processing

provision stated that:

> The scope includes "rims, discs, and wheels that have been further
> processed in a third country*, including, but not limited* to, the painting of
> wheels from China and the welding and painting of rims and discs from
> China to form a steel wheel, or any other processing that would not
> otherwise remove the merchandise from the scope of the Orders if
> performed in China."

*Id.* (emphasis added). Commerce determined that the phrase "including, but not

limited to" provided a non-exhaustive list of processing activities. Appx32.

Therefore, Commerce concluded that the scope language was ambiguous because it

"does not address what varieties of processing may otherwise exclude a product from

the scope." *Id.*

Commerce then examined the (k)(1) sources, specifically, the final scope

memorandum issued in the investigations. Appx27-32. The final scope

memorandum stated that Commerce would not "foreclose a further analysis of

substantial transformation should a product be completed in a third country from a

mix of rim and disc parts from China and a third country, if an interested party

requests a scope ruling and/or to address a future circumvention concern." Appx124

Thus, Commerce concluded that the (k)(1) sources left open the question of whether

a wheel was in-scope merchandise "where one wheel component was sourced in a

third country." Appx45, Appx27-32,

Because Asia Wheel's scope inquiry concerned certain steel wheels assembled in a third country that contain components manufactured in China (as well as another country), Commerce employed a substantial transformation analysis to determine whether the country of origin for the purposes of the AD/CVD law was China.

Commerce evaluated several factors to conclude that a totality of the circumstances supported a finding that Asia Wheel's finished wheels are not substantially transformed into Thai-origin wheels by their processing in Thailand and remain Chinese-origin wheels—that is, they remain in-scope merchandise. Appx2458-2462. Specifically, Commerce concluded that: (1) the components, individually, are of the same class or kind as Chinese-origin wheels; (2) they maintain their essential characteristics; (3) the processing steps of finishing the components into a finished wheel in Thailand are relatively minor; and (4) Asia Wheel's investment in trailer wheel production in Thailand is not comparable to the investment into Chinese production facilities involved in producing the components even assuming that the value added by Thai production is not insignificant. Appx1915. In other words, much of the work required to make a steel wheel under Production Method A is completed in China with only comparatively minor finishing done in Thailand—something that is reflected in the level of investment Asia Wheel's puts into its Chinese facilities as opposed to Thai facilities.

In its final scope ruling, Commerce continued to find that Asia Wheel's wheels were in scope merchandise and further elaborated on its substantial transformation analysis. Appx32-53.

Having found Asia Wheel's merchandise to be within the scope of the orders, Commerce instructed CBP to continue to suspend liquidation of entries of trailer wheels produced under Production Methods A and C as of the date of the initiation of the scope inquiry (March 22, 2021) consistent with 19 C.F.R. § 351.225(l)(3). Appx57-58. Commerce declined Asia Wheel's request that Commerce direct CBP not to continue suspension of liquidation of earlier entries. Appx41. Commerce explained that CBP suspends liquidation under its own authority pursuant to 19 U.S.C. § 1517(e), and Commerce could not impinge CBP's authority. Appx60 and did not order any retroactive suspension of liquidation, that is, before initiation of the scope inquiry.

## III. The Court of International Trade Sustains Commerce's Scope Ruling

Asia Wheel, TRAILSTAR, Lionshead, and Textrail all appealed Commerce's scope ruling to the Court of International Trade.[5] On February 21, 2025, the trial court affirmed Commerce's final results in full and sustained Commerce's final scope ruling. Appx1-17. Specifically, the trial court made four findings.

---

[5] On August 18, 2023, the trial court consolidated the four cases under case number 23-00096.

First, the trial court held that Commerce's interpretation of the scope of the orders with respect to Asia Wheel's wheels was supported by substantial evidence. Appx6-10. Asia Wheel argued that the fact that the scope language includes wheels that have been further processed in a third country by "welding and painting of rims and discs from China to form a steel wheel" meant that Asia Wheel's wheels, which are only comprised of discs from China, are necessarily excluded from the orders. Appx6. The trial court rejected this selective reading and instead gave meaning to the entirety of the scope language: "'The scope includes rims, discs, and wheel that have been further processed in a third country, *including, but not limited to*, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, *or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China*.'" Appx8 (quoting the orders) (emphasis in original). The trial court explained that "{t}he phrase 'including, but not limited to' indicates that there are methods of third-country processing that will fall within the scope of the Orders, even if not specifically outlined." Appx8.

The trial court rejected Asia Wheel's argument that Commerce altered, during its investigations, the scope of the orders. Appx8-9. The trial court explained that from the outset, Commerce made clear that its investigations left silent what *other* sorts of third country processing besides the two non-exclusive examples articulated in the orders, such as wheels produced from mixed-origin components, would be covered by the orders. Appx9 (quoting Appx124). Therefore, the trial court

16

explained, "Commerce's scope determination that the Orders did not exclude wheels produced from mixed-origin components was consistent with both the plain text of the Orders and with Commerce's statements during the investigations," after which point Commerce was lawfully permitted to undertake a substantial transformation analysis. Appx10.

Second, the trial court concluded that Commerce's determination that the mixed-origin components of Asia Wheel's wheels were not substantially transformed from China- to Thai-origin wheels is supported by substantial evidence and consistent with the five-factor test outlined in *Bell Supply Co. v. United States*, 83 F. Supp. 3d 1311, 1328 (2015)). Appx10-12. Dismissing Asia Wheel's argument that Commerce incorrectly only considered one component of the wheel, rather than the finished, entire wheel, in its analysis, the trial court reasoned that correct question to ask and answer—both of which Commerce did—was "whether *both* wheel components undergo substantial transformation to become a *finished wheel*." Appx11 (emphasis in original). Citing the scope ruling, the trial court explained that "(1) the wheel components *and finished wheel* are of the same class or kind of merchandise included within the scope, (2) both major components continue to function as the only such component after incorporation into *the finished wheel*, and (3) the production in China culminates in a *complete component and an in-process component, functionally creating an already-designed wheel*." Appx12 (emphasis in original); *see also* Appx33-53.

Third, the trial court sustained Commerce's decision to impose AD/CVD duties on the value of the entire wheel, based on its substantial transformation analysis, rather than just the wheel component that was exported from China. Appx12. The trial court explained that Commerce's substantial transformation analysis reasonably concluded that rims and discs under Method A were Chinese-origin, and that the finishing process in Thailand did not substantially transform the finished wheel into Thai-origin wheels. Appx12-13. Commerce's substantial transformation analysis, the trial court explained, correctly determined the country of origin of the "resulting merchandise," not its constituent parts. The court found that Asia Wheel does not provide "any legal support for a different method of duty assessment that would first exclude specific components before determining what duties to assess." Appx13.[6]

Fourth and finally, the trial court held that, by the express language of the orders themselves, Commerce provided adequate notice to Asia Wheel that "trailer wheels produced in third countries from mixed origin components" may be included within the scope of the orders. Appx13-14. Commerce, the trial court noted, covered

---

[6] On appeal, plaintiffs-appellants do not reiterate this argument or otherwise challenge Commerce's reasonable decision to consider the entire wheel in its substantial transformation analysis, rather than simply a single part. Therefore, any challenge to this determination that Asia Wheel might raise in its reply is waived. *See e.g.*, *Reuter v. DOC*, 63 F.4th 1357, n4 (Fed. Cir. 2023); *McIntosh v. DOD*, 53 F.4th 630, 642 (Fed. Cir. 2022); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

its bases by noting in the investigations that it "'does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Appx14 (quoting Appx124). And, the trial court rejected Asia Wheel's reliance on two decisions which, the court explained, contemplated entirely different scenarios than the ones in which Asia Wheel found itself. Appx15 (distinguishing Asia Wheel from the importers in *Tai-Ao Aluminum Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2020) and *Trans Tex Tire, LLC v. United States*, 519 F.Supp.3d 1275 (Ct. Int'l Trade 2021)). The Court entered judgment in favor of the United States.

## SUMMARY OF ARGUMENT

Commerce reasonably concluded that Method A wheels—wheels manufactured in a third country with a mix of components from China and another country—are covered by the orders. The trial court affirmed Commerce's Final Scope ruling in full and this Court should as well.

On appeal, Asia Wheel limits its challenge to the trial court's decision to two arguments: (1) Asia Wheel argues that Commerce's Final Scope Ruling improperly mischaracterizes or misunderstands Commerce's statements in the investigation concerning mixed-origin component wheels, and (2) Asia Wheel argues that Commerce did not provide Asia Wheel with adequate notice that its mixed-origin wheels could be subject to the orders prior to the date of initiation of the scope and therefore, Commerce may only impose duties starting with the date of Commerce's

initiation of the scope inquiry rather than continuing CBP's prior suspension of entries as part of its EAPA investigation.

As the trial court explained in detail, neither argument is supported by the record or this Court's precedent. Commerce reasonably determined that the language of the orders was ambiguous as to Asia Wheel's mixed-origin wheels, and it reasonably determined that Asia Wheel's mixed-origin wheels were not unambiguously excluded. The conclusion of Commerce's resultant substantial transformation analysis, which Asia Wheel does not challenge on appeal – was a finding that Asia Wheel's merchandise was covered by the orders. Commerce acted in accordance with law when it directed CBP to continue to suspend liquidation of those entries that had been subject to the covered merchandise referral prior to the initiation of the scope inquiry. Asia Wheel's arguments that it did not receive adequate notice that its merchandise might be subject to the orders finds no support in the record.

Asia Wheel's arguments on appeal do not undermine Commerce's reasoned and well-supported interpretation of the orders covering certain steel wheels 12 to 16.5 inch wheels and ultimately, do nothing to yield a different conclusion than that of the trial court: Commerce's Final Scope Ruling should be affirmed.

## ARGUMENT

### I.    Standard of Review

When reviewing the trial court's judgment, this Court "reappl{ies} the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citation omitted.). This Court will uphold Commerce's determination unless that determination is unsupported by substantial record evidence or otherwise unlawful. *See Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Importantly, this Court has declared that it "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (cleaned up).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). A party disputing Commerce's determination as unsupported by substantial evidence thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain Commerce's determination if it is reasonable and

supported by the record as a whole, even if some evidence detracts from it. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.     Commerce's Scope Determination is Lawful and Supported by Substantial Evidence

Commerce reasonably concluded that Asia Wheel's wheels—"trailer wheels manufactured using discs from China and rims produced in Thailand from rectangular steel plates from China or a third country"—are subject to the Orders covering certain steel wheels from China. *See generally* Appx18-82; Appx25; Appx107-108. It did so by determining first that the order was ambiguous as to whether it covered wheels processed in a third country from a mix of one wheel component from China and one component originating from a third country. Commerce then conducted a substantial transformation analysis, concluding that the processing of Asia Wheel's wheels in Thailand did not transform them into Thai-origin (rather than Chinese-origin). Appx31-53; Appx1908-1916. The trial court agreed, holding that Commerce's determination that Asia Wheel's wheels were in-scope merchandise was supported by substantial evidence and in accordance with law. Appx1-17.

On appeal, Asia Wheel only challenges a small sliver of the trial court's findings. Asia Wheel does not challenge the trial court's sustaining of Commerce's determination that the orders were ambiguous with respect to Asia Wheel's wheels, nor does it challenge Commerce's substantial transformation analysis. Instead, the entire dispute flows from Asia Wheel's disagreement with Commerce's consideration

22

of the (k)(1) sources, specifically Commerce's final scope memorandum that it issued during the AD/CVD investigations. *See generally* Applnt. Br. at 22-35; Appx22 ("Commerce's scope determination in the original investigations—consideration of which is required under 19 C.F.R. §351.226(k)(1) – demonstrates that…").

The gravamen of Asia Wheel's argument is that during its AD and CVD investigations, Commerce in fact conceded that wheels completed in a third country from mixed-origin (China and another country) rims and discs are in fact outside the scope of the orders. *See* Applnt. Br. at 21-35. And as a result, Asia Wheel concludes, there was no need for Commerce to undertake a substantial transformation analysis of Asia Wheel's wheels because Commerce had already confirmed that only "wheels made in third countries with rims *or* discs from China (but not both) are outside the scope." See, e.g., Applnt. Br. at 25. Not so. As we demonstrate below, Asia Wheel's arguments were correctly debunked as unsupported by the record by the trial court. This Court should do the same.

### A. Commerce Reasonably Determined that the Plain Language of the Orders Did Not Unambiguously Exclude Asia Wheel's Wheels

Consistent with the law and its own regulations, Commerce first determined that the plain language of the orders did not unambiguously exclude "finished wheels processed in a third country from a mix of one wheel component sourced from China and one component originating from a third country." Appx31; *see also* 1907-1909; *see* 19 C.F.R. § 351.225(k); *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1087

(Fed. Cir. 2002) ("Scope orders may be interpreted as including merchandise only if they contain language that specifically includes merchandise or may be reasonably interpreted to exclude it.").

The excerpt from the orders that addresses third party processing reads as follows:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China.

*Orders*, 84 Fed. Reg. at 45,954.

As Commerce explained and the trial court affirmed, "{w}hile this scope language does not specifically include wheels produced from mixed-origin components, it can be reasonably interpreted to include any wheels produced from mixed-origin components that still qualify as 'steel wheels…from China,' and whose processing 'would not otherwise remove the merchandise from the scope of the investigations if performed in {China}'" Appx8. That is, Commerce identified two non-exclusive examples of third-country processing that would *not* remove certain steel wheels from the scope of the orders but left open the possibility that other forms of third-country processing could keep the wheels in scope by prefacing those

examples with the phrase "including, but not limited to."[7]  Appx1908; Appx32.  As

written, Commerce's determination that the language of the orders leaves open other

forms of third country processing beyond those two examples is supported by

substantial evidence.  Asia Wheel, for its part, does not seriously challenge the trial

court's conclusion on this point.

### B. Commerce Reasonably Concluded that its Final Scope Memo—a (k)(1) Source—Did Not Unambiguously Exclude Asia Wheel's Merchandise

Instead, Asia Wheel focuses almost entirely on Commerce's interpretation of

the scope language under the (k)(1) sources, specifically Commerce's investigation that

resulted in the AD/CVD orders. *See generally* Applnt. Br. at 22-35; Appx22

("Commerce's scope determination in the original investigations—consideration of

which is required under 19 C.F.R. §351.226(k)(1) – demonstrates that…").  Asia

Wheel argues that, in its Final Scope Memorandum, Commerce determined that

wheels completed in a third country from a mix of rims and discs from China and a

---

[7] As the trial court explained, an interpretation of the language "the welding and painting of *rims and discs from China* to form a steel wheel" as excluding wheels produced from mixed-origin components would render meaningless the phrase "including but not limited to."  Appx8 (citing *SMA Surfaces, Inc. v. United States*, 617 F. Supp. 3d 1263, 1275 (Ct. Int'l Trade 2023).  Treating (1) "the painting of wheels from China" and (2) "the welding and painting of rims and discs from China" as the only two possible forms of third country processing that would nevertheless leave a product within scope would entirely erase the purpose of the phrase "including but not limited to."  *C.f.*, *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (rejecting interpretation of statutory language that "would violate the canon that {this Court} must 'give effect, if possible, to every clause and word of a statute' and should avoid rendering any of the statutory text meaningless or as mere surplusage.")

third country are out-of-scope merchandise. *See* Applnt. Br. at 21-35. Asia Wheel

argues that Commerce's final scope ruling improperly recharacterized its scope

analysis from the investigations. *See* Applnt. Br. at 25-30. Asia Wheel makes two

main arguments: (1) that Commerce's Final Scope Memorandum that resulted from

its AD and CVD investigation requires that both the rims and discs must come from

China to be covered by the orders, Applnt. Br. at 22-25, and (2) that the final scope

ruling impermissibly recharacterized Commerce's Final Scope Memorandum. Applnt.

Br. at 25-29. Both arguments are meritless. In fact, it is Asia Wheel that seeks to

rewrite history.

Throughout the investigations, both Dexstar and respondents (importers)

suggested revisions and clarifications to the proposed scope language defining the

subject merchandise. Appx120-124; Appx134-137. Early on, in response to

Dexstar's concern that importers would use third-country processing to circumvent

the orders, Commerce revised the scope language to include "rims and discs from

China that have been further processed in a third country into finished steel wheels."

Appx134-135. Commerce made this decision, it explained in its Final Scope

Memorandum, because it understood Dexstar "to be requesting that rims and discs

from China that have been further processed in a third country into finished steel

wheels be included within the scope." Appx137.

After Commerce proposed this addition to the scope language, however,

Dexstar sought further clarification in the order "that either a rim *or* a disc from China

would be covered by these investigations, not only a rim and a disc together."
Appx123 (emphasis added). Commerce declined to add such language, explaining
that this interpretation was inconsistent with Dextar's initial request: "the
assembly…of steel wheels in a third country from all constituent parts produced in
China." Appx124. Therefore, Commerce explained, it would not substitute the word
"or" for "and" in the phrase "rims and discs from China" because doing so would
expand this example of third country processing beyond its original intent. Appx124.
So, Commerce declined to modify this example of third country processing to
expressly include wheels manufactured in a third country from a mix of rims and discs
from China and some third country.

Asia Wheel exaggerates the meaning of Commerce's response to Dexstar's
request to modify the scope language. *See* Applnt. Br. at 23-24. By Asia Wheel's
telling, when Commerce wrote that "the existing language sufficiently conveys the
concept that third-country processing of a steel wheel must be of rims and discs
produced in China," Commerce conveyed that some other, unspecified combination
of rims and discs processed in a third country would necessarily be outside the scope.
Applnt. Br. at 24; *see also* Appx8 ("A nonexclusive example of third-country
processing that would certainly not remove wheels from the scope still leaves open
what other types of third country processing would similarly not remove the
merchandise from the scope of the investigation.") As Commerce explained in its
Final Scope Memorandum and as the trial court agreed, Commerce's statements

27

addressed scope language referring to "rims and discs from China." Appx123-124; Appx8-9. Commerce did not, during the investigations, articulate how it would later, based on a substantial transformation analysis, determine whether other merchandise was outside the scope of the orders. It plainly left that determination for a future, merchandise-specific inquiry. Appx124.

Asia Wheel attempts to minimize this fact, Applnt. Br. at 24-25. But Commerce made clear in the Final Scope Memorandum that notwithstanding the two examples of third country processing that it *did* identify, it did "not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country, if an interested party requests a scope ruling and/or to address a future circumvention concern." Appx124.[8]

Asia Wheel demurs on this point, arguing that Commerce was clear that statement "that the current scope language is clear that *only if* all constituent rim and disc parts to form a steel wheel *are from China* does the order apply notwithstanding

---

[8] Asia Wheel's own recitation of the factual background demonstrates as much. *See* Applnt. Br. at 23. Asia Wheel notes that "{t}wo other imports, Trans Texas and HiSpec . . . asked Commerce to confirm in the final determination . . . that wheels comprised of *rims and discs* from China that are assembled in a third country with *rims or discs* from third countries are **not** within scope." *Id.* As Asia Wheel correctly points out, Commerce declined "to amend the scope language further." *Id.* This Court should conclude, as did the trial court, that Commerce left open whether "wheels comprised of *rims and discs* from China that are assembled in a third country with *rims or discs* from third countries" are in-scope merchandise. *Id.*

any analysis of substantial transformation." [9]   Applnt. Br. at 25 (quoting the Final

Scope Ruling) (emphasis in original).  This statement, however, only pertains to

wheels made with Chinese discs and rims, and not to mixed-origin components as the

trial court held and as demonstrated by Commerce's other statements.  Appx8.  It

does not matter, as Asia Wheel shrugs off, that "Commerce *always* has the authority to

conduct a scope ruling and perform a substantial transformation analysis to address a

particular fact pattern."  Applnt. Br. at 24 (emphasis in original).  What matters is that

in *this* investigation, Commerce did not specifically address wheels that, like those of

Asia Wheel, that were processed in a third country and made of mixed origin

components.  Because it did not, Commerce conducted a substantial transformation

analysis of Asia Wheel's wheels under the residuary prong of the order: "or any other

processing that would not otherwise remove the merchandise from the scope of the

Orders if performed in China."  Appx6-8; Appx135.  As the trial court correctly

explained, this amounted to a reasoned decision from Commerce "that during the

original investigation it would not address the inclusion of wheels produced from

mixed-origin components."  Appx9.  "Commerce's intent to defer the question of

---

[9] Commerce's statement of its inherent authority, however, is important to demonstrate that ambiguity.  As the trial court held, "Commerce's intent {was} to defer the question of wheels produced from mixed-origin components for later, case-by-case basis."  Appx9.  The notion that Commerce considers Chinese-origin rims and discs assembled in a third country to be in-scope is not mutually exclusive to Commerce's intention to consider mixed-origin wheels at a later time, on a case-by-case basis.  In fact, it has no bearing on Asia Wheel's at all.

wheels produced from mixed-origin components for later, {on} a case-by-case analysis" was clear. Appx9. And that is precisely what Commerce then did.

Additionally, Commerce's scope ruling is consistent with its description of subject merchandise in the Final Scope Memorandum. In the Final Scope Memorandum, Commerce explained that it "{did} not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Asia Wheel attempts to dismiss this clear and unequivocal statement, claiming that

> "whatever Commerce meant by 'a mix of rim and disc parts from China and a third country,' it did not mean that wheels made in third countries from rims or discs from China (but not both) could potentially be covered by the scope, because Commerce expressly addressed this scenario during the investigations."

> Applnt. Br. at 29.

As the trial court explained, however, Asia Wheel's interpretation would render the scope meaningless because it reads out "or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China." In other words, Asia Wheel asserts that it was unreasonable for Commerce to interpret its reference in the investigations to a "mix of rim and disc parts from China" to refer to the very mix of rims and discs being discussed in the paragraph in which the sentence appears. This interpretation fails.

Accordingly, Commerce reasonably determined that (k)(1) sources, *i.e.* Commerce's statements in the investigations, did not unambiguously exclude Method A wheels from the orders.

And in any event, on appeal, Asia Wheel does not challenge the substance of Commerce's substantial transformation analysis. As the trial court correctly held, Commerce's substantial transformation analysis and its resulting conclusion that Asia Wheel's wheels remain of Chinese-origin despite their mixed origin components and third country processing is supported by substantial evidence. *See* Appx1012-. The trial court concluded that Commerce made use of the correct, five-factor test in its assessment of the origin of Asia Wheel's Method A wheels. Appx10-11. The trial court explained, "Commerce reasonably found that because the Chinese manufacturing of Method A wheels results in one finished component and one in-process components…the processing in China 'functionally results in an already designed wheel.'" Appx12 (quoting Commerce's Final Scope Ruling). Because Commerce's substantial transformation analysis was both (1) warranted and (2) correctly considered the factors to conclude that Asia Wheel's wheels remained of Chinese origin despite their Thai-processing, this Court should affirm Commerce's Final Scope Ruling.

**III.** **Commerce Provided Lawful Notice that Wheels Produced in a Third Country from Mixed-Origin Components Could be Subject Merchandise**

Next, Asia Wheel argues that even if this Court were to affirm Commerce's scope ruling, it should nevertheless limit which of Asia Wheel's entries are subject to duties because, Asia Wheel argues, it did not receive adequate notice that its mixed-origin wheels could be subject to the orders until Commerce formally initiated its scope inquiry on March 22, 2021. Applnt. Br. at 35-50. Therefore, Asia Wheel argues, Commerce did not have the authority to impose duties on any entries entered *prior* to that initiation date. *Id.* The trial court correctly rejected this argument, and this Court should affirm this aspect of the judgment.

First, Asia Wheel claims that Commerce's statement in its Final Scope Memorandum that it would not "foreclose future analysis of substantial transformation . . . was nothing more than the 'intent to consider' found insufficient {as fair notice} in *Tai-Ao*". Applnt. Br. at 39-44 (citing *Tai-Ao Aluminum Co.*, 983 F.3dat 495). Second, Asia Wheel argues that Commerce unlawfully continued CBP's suspension of liquidation when, Asia Wheel argues, CBP issued a covered merchandise referral because it could not determine if the wheels were covered by the AD/CVD orders. Applnt. Br. at 45-50. Asia Wheel's arguments are unconvincing.

As an initial matter, Commerce's continuance of CBP's prior suspension of liquidation is consistent with its regulations, irrespective of "CBP's admission that it could not determine whether the wheels were within the scope of the AD/CVD

Orders." Applnt. Br. at 45. When Commerce has initiated a formal scope inquiry and some subset of entries for the product in question "is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or final scope ruling, at the cash deposit rate that would apply if the product were rules to be included within the scope of the order." 19 C.F.R. § 351/225(l)(1). Once Commerce issues a final scope ruling "to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) …will continue." 19 C.F.R. § 351.225(3).

That is exactly what happened here. CBP began suspending liquidation of Asia Wheel's entries on April 9, 2020, throughout the pendency of the EAPA investigation. Appx219-220. CBP did so once it developed, as part of its EAPA investigation, a "reasonable suspicion" that "Lionshead, Tex Trail, and Trailstar imported steel trailer wheels into the United States from Thailand that was, in fact, from China and should have been subject to {the Orders}." *Id.*[10] In responding to CBP's covered merchandise referral, Commerce explained that it had already initiated a formal scope inquiry to determine if Method A wheels were within scope. Thus, it would be inconsistent with its own regulations for Commerce "to instruct CBP to

---

[10] While CBP acknowledged receipt of Dexstar's allegation on March 19, 2020, 19 CFR § 165.15 permits CBP fifteen business days (*i.e.* excluding weekends and holidays) to decide whether to initiate an investigation. Thus, CBP initiated its EAPA investigation on April 9, 2020, or 15 business days after it acknowledged receipt of Dexstar's EAPA allegation.

terminate its prior (and retroactive) suspension of liquidation," notwithstanding the fact that CBP is a separate government agency and implemented interim measures under a different statutory authority. Applnt. Br. at 45. Moreover, Asia Wheel's position ignores that CBP is a separate government agency and implemented interim measures under a different statutory authority. Suspension of liquidation of certain entries had already occurred as a result of CBP's actions pursuant to its EAPA investigation. Specifically, in April 2020, CBP began to suspend those entries from under 19 U.S.C. §1517(e)(1)-(3) once it developed, as part of its EAPA investigation into the same, a "reasonable suspicion" that "Lionshead, Tex Trail, and Trailstar imported steel trailer wheels into the United States from Thailand that was, in fact, from China and should have been subject to {the *Orders*}." Appx219-220. CBP initiated its interim measures consistent with 19 U.S.C. §1517(e)(1)-(3).

Asia Wheel's arguments to the contrary are flawed in several ways. First, Asia Wheel presents an overly narrow definition of covered merchandise. Asia Wheel would have CBP conclusively determine that the merchandise described in EAPA allegations are subject to an AD/CVD order before imposing duties starting at the date of the initiation of the scope inquiry. Applnt. Br. 45-47. The EAPA statutory scheme, however, is not so strict. 19 U.S.C. § 1517(b)(1) allows for initiation of an investigation where an allegation or referral "reasonably suggests that covered merchandise has been entered into the . . . United States." The statute requires only that the information provided in the allegation reasonably suggests that the products

within the allegation *are* covered by an AD/CVD order. Indeed, that is central to the purpose of EAPA: to determine whether products imported as not subject to an AD/CVD order are actually products subject to an AD/CVD order. *See generally* 19 U.S.C. § 1517. It would also frustrate EAPA's purpose if entries of merchandise could continue to liquidate despite a pending investigation as to whether it is subject to an AD/CVD order and thus should be liquidated with assessment of AD/CVD duties. *See* 19 U.S.C. § 1517(e)(2).

Additionally, Asia Wheel's reliance on *Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) is misplaced. Relying on a single a sentence that it, in its opinion, Asia Wheel argues means that CBP may only suspend liquidation when it has concluded that a product falls within ambiguous scope language and, because CBP had referred the matter to Commerce, CBP had not made the requisite finding determination. Applnt. Br. at 45-46, 49 (citing *Sunpreme Inc.*, 946 F.3d at 1321). But unlike in that case, where CBP exercised its inherent authority to collect duties, 946 F.3d at 1320-21, as concerns Asia Wheel here, CBP suspended liquidation during its *own* EAPA proceeding because it had found a "reasonable suspicion" of evasion. 19 U.S.C. § 1517(e). Therefore, Asia Wheel is incorrect that in an EAPA proceeding, CBP need not affirmatively find that a product is within the scope of an order. *See* Applnt. Br. at 48-50. All CBP needs is a "reasonable suspicion" of evasion, 19 U.S.C. § 1517(e), before it shall "suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the {EAPA}

investigation." 19 U.S.C. § 1517(e)(1).  Because that is what CBP had here, Asia Wheel

has no basis to collaterally attack CBP's suspension of liquidation.  And in any event,

this is an appeal of Commerce's Final Scope Ruling—*not* a challenge to CBP's EAPA

investigation.

As Asia Wheel reiterates and the trial court agrees, however, that Commerce

discharges its duty under the scope regulations only if it has provided the importer

with fair notice that its product can be subject to AD/CVD duties.  *See* Applnt. Br/.

at 36-37; Appx13.  That is, Commerce may only impose such a duty "to merchandise

that {AD/CVD Orders} may be reasonably interpreted to include;" only then has

Commerce given "adequate notice of what conduct is regulated by the order."  *Mid*

*Continent Nail Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) (internal

quotation omitted); *see* Applnt. Br. at 36-37.

But adequate notice is *not* the same as giving an importer certainty that a

product will be subject to duties.  *Id.* at 1301-1302; Appx14.  Precisely because

Commerce is required to describe merchandise subject to its orders using "general

terms, 19 C.F.R. §351.225(a), "issues arise regarding whether a product falls within the

scope of an {AD or CVD order}."  *Bell Supply Co.*, 393 F.Supp.3d 1229, 1236-37 (Fed.

Cir. 2019).

This reality was central to the trial court's analysis of this question.  In its

opinion, the trial court correctly explained that "{t}he existence of some ambiguity in

scope language does not mean that notice {is} inadequate as to products requiring

substantial transformation to determine country of origin, as it is impractical to require Commerce to anticipate every type of third-country processing." Appx14 (discussing *Canadian Solar Inc. v. United States*, 918 F.3d 909, 921-22 (Fed. Cir. 2019)). During the investigation, Commerce expressly articulated its intention to later evaluate whether wheels that did not fit the two, non-exclusive examples of third-country processing outlined in the order might nevertheless be covered by the order. Appx14; *see also* Appx124. The scope language explicitly covers "rims, discs, and wheels that have been further processed in a third country." Beyond the two examples of further processing listed, this part of the order included "any other processing that would not otherwise remove the merchandise from the scope of the orders if performed in {China}." Appx14.

Asia Wheel argues that this language alone was insufficient to provide notice that its third-country processed wheels from mixed-origin components would be subject to the order, relying on the same theory underpinning its argument challenging the Final Scope Ruling. *See* Applnt. Br. at 35-50. And, according to Asia Wheel, Commerce's statements in the investigation's Final Scope Memorandum likewise did not adequately signal that its merchandise might be subject to the orders. *Id.* By Asia Wheel's telling, Commerce's statements in the investigation concerning the types of third country-processed wheels in fact "convey{ed} that wheels produced in a third country from rims or discs from China (but not both) are outside the scope." Applnt.

37

Br. at 40. This illogic, the same that Asia Wheel uses to support its challenge to the scope ruling itself, is contrary to Commerce's reasoned analysis.

In response to questions (and as we explained above) about whether the scope included third country processed wheels made from rims and discs (but not both) from China, Commerce explained that it generally agreed that the third country processing example listed in the order applied if "all constituent rim and disc parts to form a steel wheel are from China." Appx124. However, plainly Commerce left open the option for a future evaluation of wheels such as Asia Wheel's, writing that it did "not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rims and disc parts from China and third country." Appx124. This confirmation, the trial court correctly explained, was precisely the sort of notice that Commerce was required to provide an importer: enough to permit a "reasonable importer {to} interpret Commerce's original scope language to include the wheels at issue and where Commerce provided additional commentary noting that substantial transformation analysis would be used on a case-by-case basis." Appx15.

Asia Wheel is correct in its recitation of the general principles of notice articulated in *Tai-Ao Aluminum Co. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020), but overstates *Tai-Ao*'s holding by asserting that Commerce's statement of intent to investigate something in the future, if prompted, is never adequate notice. Applnt. Br. at 30-31, 37. In *Tai-Ao*, this Court held that certain importers did not receive

adequate notice that their merchandise might be subject to an anti-circumvention

inquiry on the date of initiation because Commerce's initiation of that inquiry was

with respect to specific producers, and not on country-wide basis. *Tai-Ao*, 983 F.3d at

495-96. The trial court distinguished *Tai-Ao*, where "Commerce expanded the scope

of its inquiry" from "the present case, where a reasonable importer could interpret

Commerce's original scope language to include the wheels at issue where Commerce

provided additional commentary noting that substantial transformation analysis would

be used on a case-by-case basis." Appx15. here Commerce provided notice to parties

that their merchandise may be covered pursuant to the original investigation. *Id.* The

trial court correctly confirmed that in the present case, Commerce's statements did

not contradict statements made by Commerce earlier, as had been in the case in *Tai-

Ao*, but simply clarified of the original scope and was consistent with earlier

statements in the investigation. *Id.* Asia Wheel's reliance on *Tai-Ao* is ultimately

misplaced. Applnt. Br. at 30-35.

Although Asia Wheel discusses Commerce's authority under EAPA, it does not

appear to seriously dispute that *had* Asia Wheel been provided with adequate notice,

Commerce would have been permitted to direct CBP to continue to suspend pre-

initiation but post-EAPA referral entries. The only challenge Asia Wheel actually has

is to Commerce's decision is that Asia Wheel's wheels were subject to the orders. *See

e.g.*, Applnt. Br. at 47. Asia Wheel writes that "the CIT has recognized that

Commerce's determination of the scope overrides a contrary scope position taken by

CBP. *Id.* (quoting from *Aspects Furniture Int'l Inc. v. United States*, 607 F. Supp. 3d 1256, 1267-1268 Ct. In'l Trade 2022) in support of this proposition). But regardless of the holding of this non-binding trial court opinion, it has no relevance because Commerce *did* find Asia Wheel's wheels to be in-scope merchandise. Therefore, this scope determination does not "override{} a contrary scope position taken by CBP." *C.f.*, Applnt. Br. at 47. The only reason Asia Wheel claims Commerce should not have continued CBP's suspension of liquidation is because Asia Wheel believes its wheels were not in scope; we have demonstrated that position is not borne out by the record.

Because Commerce explained all this and relied on these principles in its Final Scope Ruling to show that it provided adequate notice to Asia Wheel, this Court should affirm Commerce's determination to instruct CBP to continue suspension of pre-initiation entries. Appx57-61.

## CONCLUSION

For these reasons, the judgment of the Court of International Trade should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
    *Assistant Attorney General*

PATRICIA M. McCARTHY
    *Director*

*Of Counsel:*

RUSLAN KLAFEHN
    *Attorney Office of the Chief Counsel*
    *For Trade Enforcement & Compliance*
    *U.S. Department of Commerce*
    *14-01 Constitution Avenue, NW*

TARA K HOGAN
    *Assistant Director*

/s/ Isabelle Aubrun
ISABELLE AUBRUN
    *Trial Attorney/Senior Trial Counsel*
    *Commercial Litigation Branch*
    *Civil Division*
    *U.S. Department of Justice*
    *P.O. Box 480, Ben Franklin Station*
    *Washington, DC 20044*
    *(202) 616-0465*
    *Isabelle.aubrun2@usdoj.gov*

December 15, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,005 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Isabelle Aubrun*
Isabelle Aubrun